```
 1                    UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF PENNSYLVANIA
 2                        JOHNSTOWN DIVISION

 3

        UNITED STATES OF AMERICA,
 4
                    Plaintiff,          Case No:  14-mj-00040
 5
                vs.                     Johnstown, Pennsylvania
 6                                      SEPTEMBER 29, 2014

 7      JOSEPH D. MAURIZIO, JR.,

 8                    Defendant.
        _____
 9

10              TRANSCRIPT OF DETENTION PROCEEDINGS
                    BEFORE KEITH A. PESTO
11                 DISTRICT MAGISTRATE JUDGE

12
                    A-P-P-E-A-R-A-N-C-E-S
13
        FOR THE GOVERNMENT:  Stephanie L. Haines, AUSA
14                           United States Attorney's Office
                             Penn Traffic Building, Ste. 200
15                           319 Washington Street
                             Johnstown, PA  15901
16
        FOR THE DEFENDANT:   Steven P. Passarello, Esq.
17                           Passarello & Sisto
                             616 Hileman Street
18                           Altoona, PA 16601

19      COURT REPORTER:      Kimberly K. Spangler, RPR
                             United States District Court
20                           Penn Traffic Building, Ste. 204
                             319 Washington Street
21                           Johnstown, PA  15901
                             (814) 536-9999
22

23          Proceedings recorded by mechanical stenography,
        transcript produced with computer.
24

25
```

I N D E X

September 29, 2014


Defendant's
Witness:                 Direct       Cross      Redirect

VINCENT E. VENA            36           39

JOHANNA VENA               40           42

ANGELA L. MAURIZIO         43



Certificate of reporter   64

* * *

```
 1                    P R O C E E D I N G S

 2       (The proceedings convened on September 29, 2014,

 3     commencing at 10:07 a.m.)

 4              MR. PASSARELLO:  Your Honor, may we approach,

 5     briefly?

 6              THE COURT:  Do you want this on the record or

 7     off?

 8              MS. HAINES:  On.

 9              (Discussion held at sidebar.)

10              MR. PASSARELLO:  I have Father Thomas Hopko with

11     me.  He is the canon lawyer through the diocese for

12     Father Maurizio.  I would ask that he be allowed to sit

13     at the table with me --

14              THE COURT:  That's fine.  He's co-counsel as far

15     as that's concerned.  Yeah.

16              Apparently, because of the identity of the

17     parties the courtroom is packed, and there was a request

18     from the CSOs that they use the jury box to put

19     spectators in, and I said no to that because the bar is

20     the bar.

21              If he's an admitted attorney he's on this side of

22     the bar.

23              MR. PASSARELLO:  Well, he's a lawyer --

24              THE COURT:  If he's a canon lawyer -- you would

25     bring your paralegal, you would bring your secretary,
```

4

```
 1        they're a part of your defense team, that's fine.

 2              MR. PASSARELLO:  Thank you.

 3              MS. HAINES:  I am not opposed -- I know usually

 4        they have the row right behind me closed because of

 5        previous incidents.  If they want to put, just for ease

 6        of people standing, if they want to put the media back

 7        there I don't care.  If you authorize that.  If the

 8        marshals are okay with that, I don't care if they open

 9        that first row right behind me for media.

10              THE COURT:  Oh.  You mean the separate chairs on

11        this side of the bar?

12              MS. HAINES:  No, no, no.  Behind the bar.  The

13        first row behind the prosecution is usually roped off --

14              THE COURT:  Oh.  Well, I'm not going to interfere

15        with the marshals.  It's their call, whatever they want

16        to do is fine.

17              MS. PRICE:  They just asked me what you want to

18        do, that's why --

19              THE COURT:  I don't anticipate any disruption, so

20        if they want to use those for seats that's fine.

21              Anything else?

22              MR. PASSARELLO:  No, Your Honor.

23              MS. HAINES:  In talking with Mr. Passarello, the

24        intent is for the government to proceed by proffer as we

25        have in the past.
```

```
1              THE COURT:  Okay.  I'll ask that on the record.

2              MS. HAINES:  Okay.

3              MR. PASSARELLO:  Thank you, Your Honor.

4              (The following proceedings were held in open

5      court:)

6              THE COURT:  Let's go on the record.  It's shortly

7      after 10 o'clock on Monday, September 29th, 2014.  We're

8      in Courtroom A for a detention hearing in the United

9      States v. Joseph D. Maurizio, Jr.  My number 14-40-mj.

10     The government is present represented by Attorney

11     Haines, and the defendant is present represented by

12     Attorney Passarello.

13             There was a little bit of discussion before we

14     went on the record about seating.  This is probably the

15     most crowded courtroom I've had in 20 years.  Folks, we

16     do this every week.  The lurid nature of the publicity

17     involved has packed the courtroom, but this is an

18     ordinary proceeding we do all the time.  The courtroom

19     is always open; you're welcome to come any time.  But

20     because of the nature of the proceeding it's attracted a

21     little more than the usual attention.  That does not

22     mean that I do not expect decorum to be maintained.

23             With that said, back to the government.  Now,

24     normally in a detention hearing the government either

25     proceeds by proffer from the pretrial services report or
```

1    presents evidence.  Which do you please to do today?

2         MS. HAINES:  We intend to proceed by proffer,

3    Your Honor.

4         THE COURT:  Very well.

5         Do you have any witnesses, Attorney Passarello?

6         MR. PASSARELLO:  I do, Your Honor.

7         THE COURT:  Okay.  Do you want to hold them in

8    reserve until you've heard what the government has to

9    say, or do you want them sworn now?

10        MR. PASSARELLO:  I apologize, Your Honor.  I

11   would hold them in reserve until I hear the proffer.

12        THE COURT:  All right.  Go ahead.  All right,

13   government.

14        MS. HAINES:  Well, Your Honor, we are proceeding

15   in this case under a presumption of detention case based

16   upon the first charge in the complaint, which is the 18

17   United States Code, Section 2423(c) offense.  And being

18   that it's a presumption case, we are invoking that

19   presumption, which pushes the burden to the defense to

20   establish terms and conditions or reasons why or how

21   they can rebut that presumption.  That is how the

22   government intends to proceed.

23        THE COURT:  All right.  So you have nothing

24   beyond the original complaint and the pretrial services

25   report which gives the defendant's history, ties to the

1    community, and other personal circumstances.

2         MS. HAINES:  Your Honor, I do have an additional

3    proffer.  I wasn't sure if you want me to make my

4    proffer right now --

5         THE COURT:  Yeah.  Go ahead.

6         MS. HAINES:  Sure.

7         Your Honor, the United States concurs

8    wholeheartedly with the pretrial services report which

9    does recommend detention of Father Maurizio in this

10   case.  They base their detention finding on both a risk

11   of flight as well as a danger to the community, and the

12   government concurs and wholly supports those findings.

13        We would bring to the Court's attention, in

14   addition to the fact that it is, like I stated, a

15   presumption of detention case, the following for you to

16   consider:  We'll do the risk of flight first.  We

17   believe that Father Maurizio is a risk of flight.  As

18   the pretrial services report pretty well those Father

19   Maurizio has engaged in extensive travel outside of the

20   confines of the United States.  Just looking in his last

21   year of travel, he has been in and out of the States I

22   believe seven or eight times to third-world or Central

23   American countries.

24        With that being said, obviously he has

25   established contacts in those locations.  We are not

8

1    sure of all of those contacts or his loyalty or their

2    loyalty to him outside of the confines of the United

3    States.  We believe, though, those circumstances

4    definitely pose a risk of flight.

5          We also look at the fact that while we have

6    secured.

7          His passport, I have talked with our Homeland

8    Security agents, and while they have asked to be

9    basically informed of any attempt by Father Maurizio to

10   obtain another passport, they have also talked with me

11   about the fact that reality is if someone does try to

12   attempt to get another passport, sometimes the reality

13   of it is they get that passport and are either out of

14   the country through Canada and elsewhere before the

15   agents even get that information.  With that being said,

16   we believe that's yet another factor of a risk of

17   flight.

18         We also, through our investigation, are aware of

19   or have heard about large sums of money in the past that

20   the defendant has had in his possession.  We are still

21   tracking those allegations and those circumstances down.

22   But yet that's another concern of ours, that these sums

23   of money we've heard about we're not sure where they

24   came from, who they came from, where they may be or if

25   they currently exist in those amounts, which we believe

9

1    is yet another concern of him leaving.

2         The crux and the main points that we'd like to

3    make, though, for why the defendant should remain

4    detained go to the danger to the community, Your Honor.

5         When you look at the allegations themselves that

6    are contained within the criminal complaint there are

7    the two charges:  Basically, the sex tourism charge,

8    which the presumption kicks in on, which involves

9    allegations that Father Maurizio engaged with Honduran

10   minor males on multiple occasions while he was visiting

11   and supposedly on mission-related work.

12        As the criminal complaint shows, the Homeland

13   Security agents actually were in Honduras, boots on the

14   ground, talking to some of these victims.  They are

15   still in pursuit of finding other victims.  Because, of

16   course, as they talk to some they are given more

17   information about others that exist out there.

18        As the Court is aware, Honduras is a very poor

19   country.  The living conditions of these victims are

20   horrific.  These agents are finding them and talking

21   with them.  The ones we've talked to so far -- it's

22   outlined in the complaint -- they have come forward

23   after we have found them.  Have looked for and found

24   them.  It's not like they're knocking down the

25   government's door in some alleged conspiracy against

1      Father Maurizio.  The agents have found them and talked

2      to these victims.  They have explained in detail what

3      Father Maurizio did to them, and they're outlined in the

4      complaint.

5           They talk about how he would pay in candy to have

6      sexual acts performed in front of him, by him, and for

7      him.  They talk about how he took pictures of these

8      children while they were naked.  It talks about how he

9      took pictures of them while they were showering, and he

10     propositioned them with money for additional pictures,

11     for their silence.

12          The victims talk about how they were asked by

13     Father Maurizio -- and these were minor boys -- that

14     they were asked by him to masturbate themselves while he

15     watched.  They talked about how they were photographed

16     by the defendant while they were masturbating at his

17     direction.  They told us about how he talked to one

18     child and asked the child how much he would charge for

19     the child to masturbate in front of him.  When the child

20     refused to do that, the child victim tells us that the

21     father paid him for his silence, about what he had just

22     done and what he had just asked for.

23          We also have a victim who talks about how the

24     father placed his hand on his genitals.  We also have a

25     -- the boy who talks about after the minor boy's penis

1   was touched by the father, how the father immediately

2   gave him money for that act.  And we also have, most

3   horrifically, a victim who talks about how in the chapel

4   the father performed oral sex on a 14-year-old boy.

5         All this during a time he was in Honduras on a

6   mission to basically help children, he used and abused

7   them.

8         That is just a small summary of the evidence that

9   goes on the sex tourism, which is the rebuttal for the

10   presumption.

11         We also then have the second count in the

12   indictment which deals with the possession of child

13   pornography.  And that is as a result of about, about

14   almost two and a half weeks ago on September 12th

15   Homeland Security officers and agents executed search

16   warrants at the home farm of the defendant, as well as

17   the rectory at the parish where the father performed

18   services.

19         As a result of our obtaining literally thousands

20   of pieces of evidence, we have yet to scratch the

21   surface but we have already uncovered images of child

22   pornography.

23         And I want to point out for purposes of just

24   where the investigation still has yet to go, because

25   it's a fluid and ongoing investigation.  Obviously,

1    we're at the complaint stage, but this is rapidly

2    evolving into many other areas and many other possible

3    charges.  Speaking just to the images that are charged

4    in the complaint for the possession of child

5    pornography, they are graphic images of a prepubescent

6    minor, who it appears he has been posed, fully naked,

7    genitalia exposed, up on the side of a filthy bed with a

8    leg, it appears to be posed in such a way to highlight

9    the lascivious exhibition of his genitalia.

10         The investigation has shown that this child had

11   polio, which leads us to believe he had to be posed in

12   that manner, that he possibly wasn't capable of doing it

13   on his own.  As the investigation develops what we

14   believe, and what we intend to continue to pursue, is

15   that Father Maurizio took those pictures.

16         As the Court is aware, production or manufacture

17   of child pornography is a mandatory minimum of 15 years

18   on every single picture that was taken.

19         In addition to those pictures of the child that

20   were seized and in our possession that deals with

21   Count 2, the charges in the complaint, we also have

22   various other pictures of what we are terming "child

23   erotica."  I can't give you a number, but there are

24   several series of pictures where there are fully naked

25   children, either one in particular the same child, seven

1    or eight pictures of this fully naked toddler from all

2    various directions that the camera took pictures of him.

3    We have other pictures of children frolicking in water

4    completely naked.  The interesting thing --

5            THE COURT:  Hang on a second.  Let me stop you

6    there, because my parents would be in jail under that,

7    because everybody's got pictures of kids in kiddie

8    pools.

9            Now stop -- let's go back, though, to the child

10   with polio who's posed.  I want to hear about that.

11   Tell me what you've got in the way of evidence that

12   shows that this is related to the sex tourism case.  Is

13   this child that's posed a person that would have been

14   associated with the humanitarian mission that the

15   defendant is associated with?

16           MS. HAINES:  This child where he is located,

17   where he lives, he lives at the bottom of the hill.  He

18   lives with his mother at the bottom of the hill, where

19   if you go up the hill is where the missionary HIM and

20   Father Maurizio would go.  So he is right down the hill.

21   And he had contact with this child and the mother during

22   his trips to Honduras.

23           THE COURT:  Okay.  So you're inferring that this

24   is a manufactured picture, not just a -- because, you

25   know, once again, we do this every week.  If this were a

1    person who's just downloading stuff off the internet you

2    probably wouldn't even be moving for detention.

3         MS. HAINES:  Well, Your Honor, correct.  What the

4    importance of this is is the investigation to date has

5    been able to identify who the child is, the location

6    that the picture was taken -- which, like I said, is

7    right down the hill from the Honduran nonprofit where

8    the defendant was, and has been able to identify through

9    contact back and forth between Honduran authorities who

10   this child is and where he lives, and the picture was

11   taken at a time when Father Maurizio was in Honduras.

12        THE COURT:  All right.  That clarifies things.

13        The images, though, that you're referring to, is

14   it what you set forth in Paragraph 16 of the complaint?

15        MS. HAINES:  Before I answer let me make sure I

16   look at Paragraph 16.

17        THE COURT:  You're giving me more detail about

18   the same incident that you mentioned in Paragraph 16 of

19   the complaint.

20        MS. HAINES:  Yes, Your Honor.

21        THE COURT:  Okay.

22        MS. HAINES:  Yes, Your Honor, and --

23        THE COURT:  So to follow up though, that was

24   2009.

25        MS. HAINES:  Correct.

```
 1          THE COURT:  And those allegations, according to

 2     your allegations to me, were in the hands of the FBI and

 3     -- the complaints were made in 2009, so this complaint

 4     has been out there since 2009.

 5          MS. HAINES:  The complaint dealing with

 6     allegations of Father Maurizio touching and

 7     inappropriate sexual contact with children, yes, dates

 8     back to 2009.

 9          THE COURT:  So this is something new.

10          MS. HAINES:  The pictures we are talking about

11     are pictures we saw for the first time when seized back

12     on September 12th -- just two, two and a half weeks

13     ago -- when we seized his computer and we took hard

14     drives and a camera and over 280 CDs.  These were things

15     that the child pornography charge that is in the

16     complaint, Count Number 2, that is derived from evidence

17     we seized on September 12th, just two weeks ago.

18          THE COURT:  Right.

19          MS. HAINES:  The pictures on the computer.  The

20     other pictures I'm talking about too, you said, "oh,

21     your parents could be in trouble for that" --

22          THE COURT:  Actually, what I'm actually quoting

23     is Kelly Preston from the movie *Sky High* where she --

24     it's the kid's first day of high school, and how can you

25     embarrass a kid more than talk about them frolicking in
```

1    the kiddie pool, so.

2         MS. HAINES:  But --

3         THE COURT:  In any case, back to this.  We're

4    talking about a 2009 image, correct?

5         MS. HAINES:  Right.  Through our investigation,

6    the reason we're able to pretty much pinpoint when this

7    picture was taken, this child is now deceased.  And we

8    were able to find out when he died and date back and

9    work back to -- and looking at him as well you can tell

10   an age on him.

11        THE COURT:  All right.  But my charge, as you

12   know, is not guilt or innocence.  My charge is danger to

13   the community.  So do you have anything more recent than

14   2009?

15        MS. HAINES:  Yes.  Yes.  And, Your Honor, I'm

16   getting there.  And the reason I laid the foundation,

17   since this is a complaint detention hearing you are

18   allowed -- because it hasn't gone in front of the grand

19   jury yet you are allowed to hear, as the grand jury

20   would, the facts and circumstances underlying this when

21   you're determining detention.

22        THE COURT:  Right.

23        MS. HAINES:  So I think it's important for you to

24   take what happened in 2009, as I bring you forward, as

25   you consider detention on a complaint rather than

1   an affidavit.

2          THE COURT:  Right.

3          MS. HAINES:  Excuse me, rather than an

4   indictment.

5          THE COURT:  Right.

6          MS. HAINES:  So we've got all that going on in

7   2009.

8          THE COURT:  Right.

9          MS. HAINES:  Bringing things more forward, like I

10   said, we executed a search warrant on September 12th.

11   We find the images of child pornography.  We also, like

12   I said, we've just scratched the surface in looking at

13   everything so far that we have seized.  But just to give

14   you a flavor of the more recent stuff we found on either

15   a laptop and/or a loose hard drive that came out of the

16   office rectory more relevant to today and detention, on

17   Father Maurizio's, one of his media items that we seized

18   we have him accessing websites, I believe in July.  We

19   have him accessing websites such as www:justusboys.com.

20          Now, when we did a quick preview of that website

21   it appears, when you open the website, to be various

22   videos and/or pictures and images of adult homosexual

23   acts.  On the left-hand side there are different

24   categories on justusboys.com.  One of them is younger.

25   We went to that.  We have not done a complete preview of

1    all that, but it caught our attention.  We also have him

2    -- there's an article that was downloaded on his

3    computer called -- it referred to Costa Rica sex

4    tourism.  We know he travels back and forth to Costa

5    Rica.  That concerned us.

6          We also had on his computer which was downloaded

7    a 16-year-old Mr. Philippine swimsuit pageant long

8    video.  That while the 16 year olds from what we saw

9    were clothed, they were scantily clothed in very small

10   bathing suits, and it seemed to focus in or be very --

11   emphasizing the areas of this Mr. Philippines 16 year

12   old video.

13         Also very compelling, as the Court may be aware,

14   as a result of obtaining the complaint and the arrest

15   warrant last week, there was information put out to the

16   public regarding, you know, any tips or further

17   information, which is standard in these types of cases

18   because it is an ongoing investigation.  And without

19   putting any great detail out, we have received tips of

20   potential local victims at the hands of Father Maurizio.

21   Those things are being tracked down immediately by law

22   enforcement.

23         But I think it's important for this Court to

24   understand when we're talking about danger to the

25   community, we do have people coming forward naming

1    specific names of minor boys in this district that may

2    be victims.  We have yet to even interview them because

3    of how quickly this is all happening.

4          Releasing Father Maurizio out into the public

5    when we are still getting our hands around these

6    possible victims and bringing them in and talking with

7    them would be a complete -- a possibility of

8    obstruction, but it would be very detrimental.

9          THE COURT:  Okay.  But you're piling supposition

10   on supposition.  We have an accusation that we haven't

11   even investigated yet, and if you let him out he's going

12   to go interfere with an investigation of something we

13   haven't even investigated yet.

14         MS. HAINES:  But there's a presumption of

15   detention, Your Honor, and I'm telling you what's out

16   there --

17         THE COURT:  Yeah.  But I'm not required to just

18   say, you know, the government wants it, I've got to give

19   it to them.  I mean, there --

20         MS. HAINES:  No, but --

21         THE COURT:  There has to be some evidence.  What

22   you've got is an accusation.

23         MS. HAINES:  What we have is an accusation,

24   correct, Your Honor, that came in from --

25         THE COURT:  You have an accusation that you

1    haven't checked out yet.

2         MS. HAINES:  We have not, Your Honor.  They are

3    being interviewed.  The accusation just came in this

4    weekend.

5         THE COURT:  Okay.

6         MS. HAINES:  It's from a credible source in our

7    investigation, because we know the person who gave us

8    the information and they identified the potential

9    victims.  So that is going forward as of today.

10        THE COURT:  Is there a date on the alleged

11   occurrence?

12        MS. HAINES:  If I could ask the --

13        THE COURT:  Sure.

14        MS. HAINES:  -- agents?

15        (An off-the-record discussion was held.)

16        MS. HAINES:  The agents informed me that there

17   was no specific date given, but that it's recent

18   behavior by the children that caused the concern, and

19   that these are minor boys that have had a lot of access

20   to the father, both supervised and unsupervised.  And

21   that while there's not a date given, these are

22   definitely minors and this has occurred recently.

23        THE COURT:  Okay.  So it would be fair to say

24   after this story broke some parent said to their kid,

25   did anything like this ever happen to you, and he said,

```
 1    well, yeah, mom, as a matter of fact.  And that's how it

 2    all started; is that what you're putting out there?

 3         MS. HAINES:  I don't believe that's the exact

 4    scenario.  As the tip came in, it is a relative of the

 5    children that is responding and relaying, I think you

 6    want to interview those of us that are around the

 7    children as well as these children, because this is what

 8    we have witnessed by these children who have been around

 9    him on quite a frequent basis.

10         THE COURT:  And that behavior is taking place

11    within the last year?

12         (An off-the-record discussion was held.)

13         MS. HAINES:  What the agent tells me is these

14    children that have been possibly alleged as victims, we

15    have seen extensive photography by the father of these

16    children on his cell phone within the last year.

17         THE COURT:  Okay.  All right.  That at least

18    gives me some date.  Can you give me a rough age for

19    these kids?

20         MS. HAINES:  Seven and five.

21         THE COURT:  Okay.  Thanks.  I know I'm

22    interrupting the flow of your presentation --

23         MS. HAINES:  That's okay.

24         THE COURT:  -- so if you want to take your notes

25    and get back on track go ahead.
```

 1          MS. HAINES:  I'm sort of in the part where we're

 2     trying to educate the Court just on some of the recent

 3     events that have happened, as this obviously has just

 4     evolved.  We've got the stuff in the past.  You see from

 5     the pretrial services report he has had various recent

 6     travels.

 7          I can say another thing that's quite recent that

 8     we have in our possession is the father on July 30th of

 9     2014, and August 1st of '14, we seized during a border

10     search his cell phone when he was coming back into the

11     country from when he was visiting Costa Rica and

12     Nicaragua on one of his mission trips.  And during a

13     border search we were able to seize his cell phone.  And

14     during that border search what the investigators used

15     was a Google application that does translation between

16     two parties that are having a conversation in different

17     languages.

18          As a result of the seizure of his phone there at

19     the end of July, beginning of August, we seized and used

20     the Google app to translate a conversation that went on

21     between Father Maurizio and what we believe to be one,

22     if not two -- because there's two different boys' names

23     that are said during the conversation -- that are

24     minors.  And just sort of as an idea of some of this

25     conversation that was translated and that HSI agents

1    have, there is questioning going back and forth from the

2    father to these minor boy or boys about, Do you have a

3    girlfriend, Do you have sex with your girlfriend.  He

4    also asks if the minor boy would like to come to the

5    United States with him.  He also asks if the minor child

6    is going to miss him, and hopefully he'll see him again

7    when he comes back in March of 2015.  And says

8    basically, Are you going to miss me, I won't be back

9    until March of 2015 because I have -- and he lists all

10   the other countries that he intends to go and visit

11   prior to him returning to this country.

12            So the concern, of course, was the conversation

13   between the father and the minor child.  Once again

14   taking it into -- not segregating one little piece of

15   evidence but taking it into the totality of what we

16   have, you know, that translation between a minor child

17   and the defendant, with finding child pornography on his

18   rectory computer, along with other victims potentially

19   coming forward with things we still have to look at, and

20   still having to look at thousands and thousands of

21   pieces of images yet to date with the presumption, the

22   risk of flight we've already articulated and what we

23   believe is a true danger to the community with his

24   release, we are asking that he be detained.

25            THE COURT:  Okay.  How do you know that the --

1       this is a text exchange?  This is an exchange by text

2       that you seized from the cell phone?

3               (An off-the-record discussion was held.)

4               MS. HAINES:  The agent --

5               THE COURT:  Okay.  All right.  Overhearing

6       what -- you had a conversation with the agent.  This is

7       an oral conversation?

8               MS. HAINES:  Or texting into the phone.  She's

9       not sure if it's orally being said into the phone and

10      then being translated by the app, or being texted into

11      the phone and then being translated by the app.

12              THE COURT:  Okay.  Well, I was wondering how you

13      can determine that -- it's unusual for a person to text

14      or to say, Hello, John, age 14.  You usually say, Hello,

15      John or text, Hello, John.

16              How do you know the person's a minor?

17              MS. HAINES:  Because there's two different names

18      that are specifically mentioned in the text.  And the

19      discussion revolved around that the boy is currently 16

20      years old, and that when he comes back -- when Maurizio

21      comes back in March of 2015 the child may be 18 by then.

22      And I apologize, I should have said that --

23              THE COURT:  No, no.  That's okay.

24              MS. HAINES:  That's the translation.

25              THE COURT:  And then one thing that I'm just kind

```
1      of curious about:  If I'm traveling internationally the

2      government can seize my cell phone?

3              MS. HAINES:  Border detention.  Border, yes, when

4      you come back --

5              THE COURT:  Without any --

6              MS. HAINES:  It's called a border search.

7              THE COURT:  Oh, so they just do that routinely on

8      the basis of a profile or --

9              MS. HAINES:  It can be a random border search.

10     It can be sort of your number's up and your stuff gets

11     searched, or there can be some type of reasonable

12     suspicion that may lay reason why those bags are looked

13     at for a border search.

14              But the analysis on the personal cell phone of

15     the defendant was done, pursuant to a border search when

16     he came back into the country, and I believe the port

17     was Miami -- it was Atlanta.  When he came back into the

18     country through Atlanta a border search was conducted at

19     that point by HSI agents.

20              THE COURT:  Okay.  All right.  I'm not

21     quarrelling with the Fourth Amendment law.  I just find

22     it ironic that on the one hand, back when you were

23     talking about risk of flight you said, We can't be sure

24     that he's not going to get a passport and fly away

25     without us knowing about it.  And on the other hand you
```

```
 1    just kind of routinely seize people's cell phones when
 2    they come into the country from a trip to Paris or
 3    whatever.
 4              MS. HAINES:  Well, that's predicated on them
 5    coming back though.  In that situation, coming back into
 6    Atlanta they got it.  We're talking about someone is
 7    able to secure a passport after we've seized it, I doubt
 8    they'd be coming back to us.  That's our fear, the
 9    defendant, that if he finds another way to obtain
10    another passport or make contacts in another country or
11    obtain money, that we wouldn't have that luxury of
12    coming back.
13              THE COURT:  Oh, I understand.  I understand what
14    you're afraid of.  I think -- I just think it's ironic
15    about why you say you fear that.  All right.  Okay.  I
16    think I understand the government's case.
17              MS. HAINES:  Thank you, Your Honor.
18              THE COURT:  Thanks.
19              Attorney Passarello.
20              MR. PASSARELLO:  Morning, Your Honor.
21              THE COURT:  Good morning.
22              MR. PASSARELLO:  Your Honor, I think what's
23    important to start with is what is before this Court
24    today based upon the law in question.  Obviously, there
25    is a presumption.  However, the Court's focus is
```

```
 1      twofold:  One, is the defendant a flight risk.  And the
 2      Commonwealth -- the United States -- must prove that by
 3      a preponderance.  Sorry for that slip.
 4              THE COURT:  It's okay.  I know you practice law
 5      in Blair County where Pennsylvania is the Commonwealth,
 6      and here in federal court the prosecutor is the
 7      government.
 8              MR. PASSARELLO:  Yes.
 9              And the second, Judge, is that the defendant
10      presents a danger to the community, and that's by clear
11      and convincing evidence.
12              Let's just talk about the first one first.  Look,
13      I believe that if they've seized his passport, they've
14      taken his passport.  And if the Court puts a condition
15      that he has to be on home detention, the fear of flight
16      is minimal here.  It amazes me that the United States
17      can come in here and say, Well, even though we got this
18      flagged and we believe that he does all this kind of
19      stuff to these children in all these different
20      countries, somehow some way he may still be able to get
21      a passport and may still be able to get through customs
22      and may still be able to get to a different country.
23              It amazes me that they say that, especially if
24      they're going to flag him.  I don't think there's any
25      risk of flight here at all.
```

```
 1              THE COURT:  Well, just to stop you there.  Under

 2     the statute I'm operating under, in any case that

 3     involves these allegations, any release shall contain at

 4     a minimum a condition of electronic monitoring, plus

 5     restrictions on personal associations, places of abode,

 6     travel, reporting on a regular basis, and curfew.

 7              MR. PASSARELLO:  Absolutely.

 8              THE COURT:  But at the very least, if he gets out

 9     he gets out with an ankle bracelet and under home

10     confinement so --

11              MR. PASSARELLO:  Correct.

12              THE COURT:  -- that's what you're saying.

13              MR. PASSARELLO:  That is exactly what I'm saying,

14     Judge.  And they've taken his passport.  I don't see how

15     he can even get out of the country.  The second, Judge,

16     is --

17              THE COURT:  Well, actually, we had a case about a

18     year ago I think a person who had been released, and the

19     week before he was scheduled to enter his plea he just

20     got on a plane and went to Australia or someplace.  We

21     don't have an extradition treaty, and it was kind of an

22     "egg on our face" situation, so it does happen.

23              MR. PASSARELLO:  Okay.  In this case, Your Honor,

24     I believe, based upon the taking of the passport, the

25     conditions that would be placed on this defendant, I
```

1      don't think the Commonwealth meets that burden that he

2      poses a flight risk.

3            The second, obviously, is the defendant presents

4      a danger to the community.  And I understand, Judge,

5      there's a presumption.  It is a rebuttable presumption,

6      and it is not a burden of proof on me, it's been

7      characterized as a burden of production.

8            If the Court takes a look at what the

9      Commonwealth has presented, what they have presented is,

10     We believe we may be able to show this; we believe that

11     there may be other victims that are coming out; we

12     believe we -- none of those have been charged.

13           What we're charged with here is, according to the

14     affidavit, one picture of an individual boy back in 2009

15     who now they inform me has been deceased.  And if the

16     Court -- I believe under the statute one picture

17     actually is an affirmative defense for the --

18           THE COURT:  Actually, Paragraph 16 says images,

19     plural.  But Attorney Haines was just referring to one

20     particular picture.  So they say they have images,

21     quote.

22           MR. PASSARELLO:  They say they have images, and

23     she characterized them as child erotica not child

24     pornography.  The only image that has been told before

25     this Court of child pornography that they allege is the

1    image of this one boy.  And I believe it's only one

2    image, although she may have said two.  I apologize,

3    two.  But under the statute I still think that may be an

4    affirmative defense.  I think it's three or less.

5         Secondly, Your Honor, if Father Maurizio's

6    released on home detention there is -- I don't believe

7    he poses a danger to the community.  I have a bunch of

8    witnesses here, including family members as well as

9    parishioners, that will tell you wonderful things about

10   Father Maurizio, and I'm sure maybe the Court doesn't

11   want to hear them.

12        But if the Court takes a look at the

13   pre-detention investigation you'll see a number of

14   things.  One is ties to the community --

15        THE COURT:  He's living on the property that he

16   was born on that belonged to his parents, right?

17        MR. PASSARELLO:  He has lived pretty much here

18   all of his life.  He's been a priest for approximately

19   27 years.  He's done missionary work, and wonderful

20   missionary work.  They portray him as a monster.  I

21   portray him as a wonderful -- he does wonderful

22   missionary work for 17 years, has helped a ton of

23   underprivileged individuals.

24        Judge, he has, obviously, no prior criminal

25   record, has never been a flight risk before.  And I will

1    inform the Court of this:  These allegations reared

2    their heads back in 2009.  We hired a defense team down

3    in Honduras to investigate those allegations.  They went

4    no where.  They were with the FBI until Laurel

5    Highlands, and no charges have been filed.  These in

6    essence, to me, are a regurgitation of those charges.

7         And I don't know the boys they've interviewed

8    because they only list them as John Doe One, John Doe

9    Two, and John Doe Three.  However, we have interviewed

10   boys from the Honduras, and I have declarations from

11   those boys that will inform you that Father Joe did

12   nothing of the kind, and that they were offered money,

13   toys, and candy in order to say things about Father Joe

14   that they deemed to be untrue.  That's the climate that

15   we are in in this case.

16        Now, the danger to the community, look, as soon

17   as you put this out in the newspaper or the tip line

18   people are going to -- I mean, people are going to say,

19   Jimmy was abused, Johnny was abused.  There has never

20   been any indication until these charges were filed of

21   any child that was in the parish of Father Maurizio, was

22   an alter boy for Father Maurizio, or any type of

23   relation to Father Maurizio had ever made an allegation

24   against him at all in the United States.  None.  None at

25   all.

1          He has strong family support.  He has strong

2     community ties.  He has no prior record.  He has done --

3     he served in the military.  He served in the United

4     States Navy, was honorably discharged.

5          I believe, Your Honor, that you have to look at

6     what's before you today.  Not supposition, not

7     speculation, not any of that, in order to make your

8     determination.

9          Now, look, if they come up with more stuff down

10    the road there's always the opportunity to come back.

11    But for purposes of today, even though the presumption

12    exists, I believe we've rebutted it with the evidence in

13    the presentence and my argument here today.

14          And I would also like to present at least some

15    witnesses who have done missionary work with Father Joe,

16    that have had their children around Father Joe that will

17    tell this Court there is no concern and there's never

18    been any.

19          THE COURT:  Sure.  If you have witnesses I'll

20    hear them.

21          We say presumption and rebut.  But two things:

22    You can't beat something with nothing.  You actually

23    have to propose a release plan.  What's the proposed

24    release plan?

25          MR. PASSARELLO:  My proposed release plan, Your

1    Honor, is that he be released, that he obviously remain

2    on all the conditions of home detention, that he have an

3    ankle bracelet, that he have a curfew, that he not be

4    allowed around children -- not because we're admitting

5    any of these allegations, basically for his own

6    protection -- that he report subject to any random

7    checks.  All that.  Anything that the Court wants to put

8    on him that the Court would assure -- and I think that

9    does assure that there's no danger to this community.

10        I think the people that sit here speak volumes

11   for what type of person Father Maurizio is.  The type of

12   person that Attorney Haines presented to this Court is

13   not the Father Maurizio I've known for five years.  And

14   I'm sure it's not the Father Maurizio these people have

15   known all of their lives.  And I think there's a

16   balancing act.

17        And I believe, number one, I don't think they've

18   proven flight risk.  I think it's pretty simple to get

19   rid of that risk of flight.

20        Secondly, I think with strict conditions on his

21   release; bracelet, home detention, random checks,

22   reporting every day if the Court wants him to report,

23   and not being around children, not even having

24   computers, cell phones, or any type of media, if the

25   Court wants to put that in.  Obviously, I think he

```
 1        should be allowed to watch TV.  But besides that, we
 2        would agree to that.
 3             I just, based upon my history with this case and
 4        based upon the credibility of this foreign country, and
 5        the hostility and the upheaval in that country, I
 6        fundamentally believe that to detain this individual
 7        based upon what's presented before this Court today is
 8        not in accord with the Act and it's wrong.
 9             And I would just ask the Court to release Father
10        Maurizio with the conditions that we have requested or
11        asked for, or whatever any other conditions the Court
12        wants to put on.  And I would ask at least to call a few
13        witnesses on his behalf if the Court would allow me to.
14             THE COURT:  Sure.  Sure, go ahead.  Why don't you
15        have all of the proposed witnesses stand and be sworn
16        together, and that way we can cut down on the use of
17        time.
18             MR. PASSARELLO:  If we could have stand -- and,
19        Judge, although I'm not going to call all these, but
20        just in case.
21             THE COURT:  Okay.
22             MR. PASSARELLO:  Christine Shaulis, Joshua
23        Shaulis, Robert Choby, RoseMarie DiLoreto, Charles
24        DiLoreto, Cynthia Howard, Angie Maurizio, Dr. Vince and
25        Joey Vena, Michael Knapp, and Dick Stern.
```

```
 1              (Prospective witnesses were placed under oath by
 2     Courtroom Deputy Price.)
 3              THE COURT:  Go ahead and call your first witness.
 4              MR. PASSARELLO:  Initially we'd call Dr. Vince
 5     Vena.
 6              THE COURT:  Now, before counsel even goes on the
 7     record, you have a daughter named Aubrey?
 8              THE WITNESS:  I do.
 9              THE COURT:  Classmate of my son's.  It's a small
10     world.
11              THE WITNESS:  It is.
12              THE COURT:  And both of our children attended
13     Bishop McCort together.  So we already have -- I have
14     never -- I didn't know your name.  And then Sunday at
15     church I find out that you were once stationed at my
16     parish.
17              So it's inevitable that there's going to be
18     some -- you know, I've known you probably for 25 years.
19              MR. PASSARELLO:  Yes, you have, Your Honor.
20              THE COURT:  I've worked with Attorney Haines for,
21     I don't know, however long it's been, and so.
22              MR. PASSARELLO:  Every time I see you now you
23     tell me how much older I'm getting.
24              THE COURT:  Yeah, yeah, and vice versa.  So
25     anyhow, I've had people on my -- anyway.  Okay, and the
```

1    court reporter, it's the doctor who operated on her leg,

2    so it's a small world.

3              MS. PRICE:  Sir, would you state your full name,

4    please.

5              THE WITNESS:  Yes.  Vincent E. Vena, V-E-N-A.

6              Your Honor, thank you for allowing me to speak

7    today.

8              MR. PASSARELLO:  Well, hold on.  I've got to ask

9    you some questions.

10             THE COURT:  Go ahead.

11                          DIRECT EXAMINATION

12   BY MR. PASSARELLO:

13   Q.  Dr. Vena, let me ask you, How do you know Father Joe

14   Maurizio?

15   A.  I've known Father Joe for 17 years.

16   Q.  And in what capacity do you know him?

17   A.  My initial exposure to him was as a hospital

18   chaplain at Conemaugh when I was a young physician

19   there.  We have since had many interactions.  He was at

20   one point associated with St. Stephens Parish where I

21   was a parishioner.  We have had the opportunity early in

22   his mission work to help try to organize a medical team

23   for Honduras.  We've been very supportive of his mission

24   work in the Honduras.

25             I have since had the opportunity to directly

1    attend -- be with him on mission work in Costa Rica,

2    with my family and my boys and my daughter.

3    Q.  In any of your associations, especially on your

4    mission trips with Father Joe, have you seen him do

5    anything inappropriate, such as the allegations here

6    today?

7    A.  Absolutely not.  I think you have a small army of

8    people here that will testify to the character of Father

9    Joe as an individual who is absolutely committed to

10   helping some of the most desperate people in the world.

11   And I've had the opportunity to witness that firsthand.

12       Many of these kids, most in this room couldn't

13   appreciate what they're going through.  They have no

14   families, they have no support system.  Many of the

15   communities they're in treat them as they're rats.

16   Father Joe is driven to help them and, you know, his

17   many trips are involved in that.

18       I have had the opportunity -- my wife, Joey is here

19   today with me.  She has attended early in the mission

20   work in the Honduras directly with him there working,

21   had the opportunity to assist not only at the orphanage

22   but in the prison system.

23       I recently -- last year, maybe two years ago, I

24   can't recall -- was with him for a two-week trip to

25   Costa Rica where we did mission work and actually spent

1    time, leisurely time, vacation, if you will, with Father

2    Joe, which is unusual for him.

3         And I will tell you, to see how these children

4    respect is what I would describe it as, you know,

5    because no one else is supporting them, I will tell you,

6    in many cases.

7         So to answer your question, no.  I have never

8    witnessed, with my own family or with any other

9    interaction around these children, any behavior that was

10   unbecoming of someone who is otherwise just priestly,

11   faithful, and committed to helping.

12        And I will tell you, my training allows me to see

13   concerning behavior.  I'm trained to look for it, if you

14   will.  You know, the grooming, the other activities that

15   would take place in a predatory nature.  None of that.

16   Q.   Do you have children?

17   A.   I do.

18   Q.   How old?

19   A.   I have three children.  They're all teenagers now.

20   Q.   Girls, boys?

21   A.   I have an older girl, she's 18.  And then I have two

22   boys who are now 16 and 13.

23   Q.   Would you have any concerns leaving those children

24   with Father Maurizio?

25   A.   No.  And I have.  You know, it's -- none at all.

1          MR. PASSARELLO:  Thank you.

2          THE COURT:  The government gets to cross examine

3     you.

4                         CROSS-EXAMINATION

5     BY MS. HAINES:

6     Q.  Sir, I believe you said that you accompanied Father

7     Maurizio to a recent mission trip in Costa Rica.

8     A.  Yes, ma'am.

9     Q.  Were you present then when there was a transmission

10    from Father Maurizio to the 16 year old where he asked

11    if the boy was asking -- or do you want me to come and

12    spend the night with you?  Were you present when that

13    transmission from the father went to the 16-year-old

14    boy?

15    A.  No.

16    Q.  Would you agree with me, too, that someone who would

17    be engaging in inappropriate and criminal sexual

18    behavior with children would not do it right out in

19    front of you or your wife?  You would agree with me,

20    would you not?

21    A.  I would agree.

22          MS. HAINES:  Okay.  No further questions.

23          THE COURT:  Anything else?

24          MR. PASSARELLO:  No, Your Honor.

25          THE COURT:  All right.  Thank you, Doctor, you

1    may step down.

2          MR. PASSARELLO:  Your Honor, I would call Joey

3    Vena.

4          MS. PRICE:  Would you state your full name,

5    please.

6          THE WITNESS:  Yes.  I'm Dr. Johanna Vena.

7                    DIRECT EXAMINATION

8    BY MR. PASSARELLO:

9    Q.   And, Dr. Vena, are you familiar with Father Joseph

10   Maurizio?

11   A.   Yes, I am.

12   Q.   And how are you familiar with him?

13   A.   I have known Father Maurizio for over 15 years, as

14   he was a priest at our parish, as a personal friend, and

15   from doing mission work in Central America with him.

16   Q.   Now, that was your husband that testified

17   previously?

18   A.   Correct.

19   Q.   He indicated you had done -- you were actually in

20   Honduras with Father Joe?

21   A.   That's correct.

22   Q.   And have you ever seen Father Joe act in any

23   inappropriate way with minor children, as alleged by the

24   United States?

25   A.   I have seen Father Joe interact with many children

1   on many occasions, and never was there any concern of

2   any inappropriate behavior.  He treats every child, as

3   well as every adult, on these mission trips with the

4   utmost respect.  And I've seen nothing but respect

5   returned to Father Joe in appreciation from the

6   children, the orphans, and the people who are working in

7   the missions.

8   Q.   These children in the Honduras, how are they treated

9   down there?

10  A.   Well, in the missions they're treated very well.

11  But these are children that come off the streets and, as

12  my husband said, there's no, no safety net for these

13  children.  And the government, before the orphanages

14  were opened, would shoot these children who were

15  homeless and causing problems on the street.  They were

16  very desperate.

17      Father Joe gave them a place of safety.  He gets

18  them healthy, he educates them, he gives them a future.

19  And Father Joe I know would never do anything to hurt

20  these children.  He's committed his entire life to

21  helping these children who otherwise likely would never

22  survive and certainly have no future.

23  Q.   You have children, obviously?

24  A.   Three.

25  Q.   Would you have any concerns leaving them with Father

1    Joe?

2    A.  I have left Father -- our children have interacted

3    with Father Joe on numerous occasions.  I've never had

4    any concerns.  One of my children is here to show the

5    support and how strongly we feel that Father Joe would

6    never do anything to hurt our children or any others.

7    Q.  Have your children ever complained he's done

8    anything inappropriate?

9    A.  Never.

10        MR. PASSARELLO:  I have nothing further.

11        THE COURT:  Okay.  The government gets to cross

12    examine you.

13                  CROSS-EXAMINATION

14    BY MS. HAINES:

15    Q.  Ma'am, you would agree with me you haven't been on

16    every single mission trip with Father Maurizio, have

17    you?

18    A.  I have not.

19    Q.  And would you also agree with me that there have

20    been times on some of the trips where he was accompanied

21    by people that Father Joe would go down either before

22    the rest of the group would arrive or stay a little

23    longer?  Is that correct?

24    A.  I would not be aware of that.

25    Q.  So it didn't happen on your trips, but it may have

1    happened on other trips?

2    A.   I would not know.

3    Q.   And would you agree with me, as I asked your

4    husband, that someone who would be engaging in the type

5    of conduct that has been alleged today probably wouldn't

6    do that out in front of you or your husband.  Correct?

7    A.   I agree.

8         MS. HAINES:  Thank you.

9         MR. PASSARELLO:  I have nothing further.

10        THE COURT:  Dr. Vena, just one question:  The

11   time frame of the trips that you made with the

12   defendant, when was that?

13        THE WITNESS:  The Honduras trip was in the early

14   2000s, and the Costa Rica trip was two years ago.

15        THE COURT:  Thank you.

16        MR. PASSARELLO:  Judge, I would call Angie

17   Maurizio.

18        MS. PRICE:  Would you state your full name,

19   please.

20        THE WITNESS:  Angela L. Maurizio.

21                     DIRECT EXAMINATION

22   BY MR. PASSARELLO:

23   Q.   Ms. Maurizio, real briefly, where do you reside?

24   A.   809 Sugar Maple Drive, Windber.  My brother's farm.

25   Q.   So you live with him?

1    A.   In the last two weeks, yes.  I've been there for a

2    year.

3    Q.   If he is released would that be where he would be

4    residing?

5    A.   Yes.

6    Q.   And you would be living with him there as well?

7    A.   Yes.

8    Q.   And if there were conditions placed upon him by this

9    Court would you help to assure that they're followed?

10   A.   Yes.

11        MR. PASSARELLO:  Thank you.  I have nothing

12   further from this witness, Your Honor.

13        THE COURT:  Cross examine.

14        MS. HAINES:  No questions, Your Honor.

15        THE COURT:  The government has no questions.

16   Thank you.

17        MR. PASSARELLO:  Judge, most of the other

18   witnesses would testify substantially similar to the two

19   doctors, and so based upon our presentation today, I

20   would ask that the Court consider release for Father

21   Maurizio.

22        THE COURT:  All right.

23        MS. HAINES:  Your Honor, I neglected to put one

24   factor forth when we were going back and forth.  The

25   United States has further information just for the Court

 1    to consider.  The agents were able -- and they actually

 2    have a copy of it -- the Honduran authorities have

 3    signed off on an arrest warrant for Father Maurizio.

 4    And I guess, as I understand it, the steps they take in

 5    Honduras to secure his arrest is they sign the arrest

 6    warrant, which has been signed, and then they turn it

 7    over to INTERPOL as well as the Honduran police.

 8         So we're in that intermediate step where they've

 9    let us know that they've got it signed.  They just need

10    to turn it over to INTERPOL, which will then cause a red

11    notice to go out, which would require him to go into

12    custody as a result of an INTERPOL arrest warrant

13    through Honduras.

14         THE COURT:  The United States is party to an

15    extradition treaty with the Honduras?

16         MS. HAINES:  I believe we are.  I've talked with

17    the CEOS, the Center for Exploited Children out of

18    Washington, D.C.  The way she explained it to me it's a

19    very old treaty, but what would happen is if an arrest

20    warrant was issued through INTERPOL on the father, which

21    it appears they are taking those steps, that Father

22    Maurizio would be taken into custody in this country and

23    have to fight extradition back to Honduras while he

24    remained in custody here so --

25         THE COURT:  Right.

1          MS. HAINES:  -- that's my understanding.

2          THE COURT:  Yeah.  I presume we just don't whisk

3     people away.

4          MS. HAINES:  No.  As Washington, D.C., alerted

5     us, that once that arrest warrant that has been signed

6     gets into Interpol's hands and the red notice is out, he

7     will be taken into custody but will have to be in

8     custody to fight it.

9          But for whatever that's worth, that has not

10    happened yet.  Of course, we stand on the fact that we

11    in the Western District of Pennsylvania have laid

12    sufficient grounds that have not been rebutted for risk

13    and danger --

14         THE COURT:  When you say "that has not happened,"

15    what is the "that"?

16         MS. HAINES:  We have a copy of the signed arrest

17    warrant.

18         THE COURT:  They just haven't entered it into

19    the system.

20         MS. HAINES:  They have not entered it or turned

21    it over to INTERPOL yet, which we believe may -- it

22    could happen today or any day.  They've just alerted us

23    that they've had it signed.

24         THE COURT:  All right.  So we could have spared

25    the lurid details that the news media's in the back

1   busily taking down if you'd just told me that release or

2   detention is a moot point.

3         MS. HAINES:  It's not a moot point though, Your

4   Honor, that's the thing.  It's not a moot point because

5   until the Honduran authorities turn it over to INTERPOL

6   it's just a piece of paper they have signed.  They

7   simply let us know, here's a picture of it --

8         THE COURT:  All right.

9         MS. HAINES:  -- if you guys proceed with your --

10        THE COURT:  I understand.

11        MS. HAINES:  -- case.

12        THE COURT:  Yeah.  I understand that.  All right.

13        MR. PASSARELLO:  Your Honor, I apologize.  But it

14  definitely is not a moot point.  It's my understanding

15  that back in 2009 a substantially similar document was

16  signed and nothing went -- happened with that in

17  Honduras.  Our legal team in Honduras is investigating

18  this document that they are referencing that, in fact,

19  we have known about.  I believe it allegedly was signed

20  approximately one month ago.  I don't believe it's a

21  moot point because of what happened five years ago.  The

22  same thing could happen substantially again.  And if

23  you're going to detain him based on the fact that we

24  have mere speculation that they could be filing this

25  with INTERPOL and they take him into custody, I don't

1    think that's appropriate.

2         THE COURT:  Right.  On the other hand, my charge

3    is to make sure that he is available for hearing in this

4    case.

5         MR. PASSARELLO:  Correct.

6         THE COURT:  And if he is whisked away to have to

7    fight extradition on a charge from Honduras, that's just

8    as much of a problem from my point of view, under my

9    duty under the statute, as if he fled to, you know,

10   outer Mongolia.  So the status of the charges in the

11   Honduras are significant.

12        All right.  Now, there are two competing points

13   of view here:  We have some charges from 2009 which you

14   say are trumped up by hostile Honduran authorities, that

15   are completely at odds with everything else that the

16   defendant has done over the last 15 years.

17        The government's position is that we have some

18   horrific circumstances, which for some reason the ball

19   was dropped in 2009, but now are coming to light.

20        What's interesting to me is that in 2014, this

21   summer, we have a border search, perfectly legal under

22   the Fourth Amendment, seizing the cell phone.  And then

23   we have an execution of a search warrant which comes up

24   with at least an image, maybe images, of child

25   pornography.

1          And I completely don't regard the possibility

2     that there might be thousands of other images on these

3     multiple things that were seized, because if it isn't

4     here in court it's not evidence.  And so the possibility

5     of something is it's a possibility, but it's not

6     evidence.

7          But let me ask this, Attorney Passarello:  You

8     got a guy who knows, who believes, who's had attorneys

9     defending himself since 2009 against these charges.  And

10    yet on his computer, which is seized in September of

11    2014, we have an image which, subject to defenses, is

12    illegal child pornography.

13          Since it would be crazy for me to possess

14    something like that if I knew there were false

15    accusations out there, what possible reason would there

16    be for him to possess something like that?  And this is

17    -- I'm thinking out loud for both of counsels' benefit.

18          What you're describing is Jekyll and Hyde.

19    Father Jekyll and Mr. Hyde.  You've got wonderful

20    things, you've got terrible things.  You've got one

21    person though.  I can't let Dr. Jekyll go free and

22    detain Mr. Hyde.  So, you know, do we -- don't you see

23    that there's some evidence here?  I mean, a 69-year-old

24    man who's got photographs of minor boys naked sounds

25    more of a compulsive thing to me than anything else.

1    And if we have somebody who's under some kind of

2    compulsion, don't we have a danger to the community?

3         MR. PASSARELLO:  Your Honor, if I may?

4         THE COURT:  Yeah.  Sure.

5         MR. PASSARELLO:  First of all, I don't believe we

6    have someone who's under the compulsion --

7         THE COURT:  Well --

8         MR. PASSARELLO:  If you listen to the United

9    States' presentation the image -- of course, I have yet

10   to see it -- the image was found on a rectory computer,

11   and that they indicated here that they intended or will

12   attempt to try to show that Father Joe actually took

13   that picture.  They haven't any proof of that.  There's

14   no proof that Father Joe even knew it was on that

15   computer.

16        THE COURT:  But there I can follow a chain of

17   inferences that if the person is at a mission where he

18   was -- unless there's some evidence that there's

19   somebody else at the rectory who would have had the same

20   access and the same -- yeah.  I think that chain is

21   satisfactory.

22        MR. PASSARELLO:  Or even a time and date when

23   that was taken.

24        THE COURT:  Oh, sure.  When we're talking proof

25   beyond a reasonable doubt this isn't even -- this

1   doesn't even step up to the plate.

2        MR. PASSARELLO:  But I think if we're talking

3   compulsion, Your Honor, you'd have way more than just

4   one image on the computer -- I'm sorry, two, they've

5   alleged two.  It's absolutely an affirmative defense to

6   the statute in the first place.

7        THE COURT:  Yeah --

8        MR. PASSARELLO:  I agree.  Listen, I agree.  If

9   somebody -- if we knew these allegations were 2009,

10  maybe you'd think that if there were any images on the

11  computer somebody would try to wipe them clean.  I just

12  don't see the compulsive behavior that this Court is

13  seeing based upon those images.

14       What I see, I see a lot of speculation here.  I

15  see a lot of guess.  I see a lot of -- you say we have a

16  Jekyll and Hyde, okay --

17       THE COURT:  I say that's a possibility.

18       MR. PASSARELLO:  I believe the individual that

19  has been portrayed by us and our witnesses are based

20  upon fact and testimony that we've presented to this

21  Court.

22       The other individual that the Court sees is based

23  upon a proffer on speculation.  And the bottom line to

24  me, Judge, is Father Joe, as I've known him, is a good

25  man.  He has done wonderful work, and I don't think

1    there's any debate about that.

2            I think that the charges that we've addressed in

3    2009 and the charges that we intended to address here,

4    you have to say where the source is coming from.  And I

5    just think that the precautions and the statute that the

6    Court has to look at and the factors, we can obviously

7    get rid of flight risk, and I think we can protect the

8    community, whatever concerns the Court has or the United

9    States has, by putting those specific and strict

10   conditions on his release.

11           THE COURT:  Okay.

12           MR. PASSARELLO:  And we let INTERPOL do what

13   Interpol's going to do if they, in deed, are going to do

14   anything.  The Court's absolutely right, the FBI had

15   this back five years ago.  And you characterized it as

16   dropping the ball; I characterize it as there was

17   nothing there.

18           THE COURT:  No.  I said that's the supposition

19   here that they're advancing, yeah.

20           MR. PASSARELLO:  I would ask that the Court

21   consider release.

22           THE COURT:  All right.  Why speculate when we can

23   actually have evidence?

24           Attorney Haines, how long does it take the

25   government to do a forensic analysis of the devices

```
1    seized?

2          MS. HAINES:  I was there on -- last week I was in

3    their office.  They were working around the clock.  They

4    have gone through, like I said, there are thousands and

5    thousands of images.  There were four computers -- five

6    computers.  There was one camera that had approximately

7    18,000 photos on.  They are flagging photos that raise

8    the eyebrow.

9          And just to give you an example of how it's

10   going, I asked them to estimate to get through all of

11   everything you have -- they know everything they have --

12   how long.  They said, If we worked around the clock from

13   the day I was there, they said we'd need three more

14   weeks.  But they showed me what they were already

15   flagging.

16         Obviously, just for the record and for clarity,

17   there are -- the child pornography images, there are

18   two.  Of the one that is clear-cut, not a question in

19   the agents' minds, I've seen them as well -- it's

20   clear-cut child pornography.  It's of the same child but

21   two pictures; one from a distance and one right up on

22   the child.

23         THE COURT:  Right.

24         MS. HAINES:  They are also flagging any and all

25   pictures that appear to have children who are naked.
```

54

1    There are a few pictures they have flagged from his

2    recent trip to Costa Rica -- excuse me, the Dominican

3    they have flagged where he takes a picture of the whole

4    child.  And then he takes a picture just of the waist

5    down.  And they have flagged those pictures as well,

6    where there's a sequence of pictures.  So that's the

7    process they're going through.

8            Then you add in the Google app translation that

9    we've talked about --

10           THE COURT:  Right.  Okay.  I don't need to rehash

11   the evidence.  What I'm asking is when do you think you

12   might have something that's new?  Because going to the

13   website in July is, you know, first of all, that's not

14   illegal at all.  And the, you know, somebody having

15   18,000 photographs, if they are a camera -- you know,

16   I'm not a camera guy, but there are people who take

17   thousands and thousands and thousands of pictures.

18           So the other thing -- as you and I and Attorney

19   Passarello and pretty much everybody, Agent Bossart over

20   here and Marshal Frank as well, know that somebody who

21   is into child pornography they're just leaking out at

22   the seams.  There's tons of it, there's not just one or

23   two images.

24           So how long before you think you -- you say three

25   weeks.

1          MS. HAINES:  Well, like I said, they said three.

2     But there are images that we are calling right now child

3     erotica, but when they are analyzed and looked at by the

4     experts who make those decisions, there are definitely

5     sequences of pictures that they've set aside that are

6     quite suspicious that may or could be argued to be child

7     pornography because the way they're taken.

8          We've just pointed out the two that are

9     clear-cut.  But there's groups of other pictures that we

10    have flagged and looked at that we could make argument

11    for as potential child pornography because of the way

12    they're taken, the way the focus --

13         THE COURT:  All right.  "Could make an argument

14    of potential child pornography."  Make an argument that

15    you've got child pornography.

16         MS. HAINES:  We did.  We charged him because of

17    the two pictures we have of the child that's posed with

18    lascivious exhibition of his genitalia.  We have charged

19    him with that in the complaint.

20         THE COURT:  Right.

21         MS. HAINES:  Obviously, that we did immediately

22    when we found them.  We obviously have 30 days to

23    indict.  As we continue our investigation --

24         THE COURT:  Right.  Right.  Oh, yeah.  Yeah.  I

25    signed the arrest warrant based on -- yes.  I know you

```
1    got probable cause to arrest.  Yes.  Yes.

2         But I'm talking about what do we have here that

3    meets the statutory standards of danger to the

4    community?

5         MS. HAINES:  Your Honor, we went through that.

6    First of all, there's a presumption of detention.  We

7    have his behavior back in 2009.  That's why it was

8    important that we went through the facts.  We have the

9    recent findings.  We also have a YouTube video that

10   was -- for what it's worth -- that they found and

11   tagged.  So looking at his YouTube videos, they are

12   looking --

13        THE COURT:  All right.  All right.

14        MS. HAINES:  One of them --

15        THE COURT:  The YouTube video, tell me about the

16   YouTube video.

17        MS. HAINES:  There's a YouTube video that

18   immediately caught the agents' eyes.  It's a YouTube

19   video entitled, "little white boy gets raped by black

20   man."  Now, I mean, that obviously raises an eye.  You

21   open the video of -- obviously by what it's called it's

22   very concerning.  You open the video.  It's of a white

23   young male -- from what you can see of the screen shot,

24   it appears to be an adult white male that's literally

25   being beat up and raped by a black male.
```

1        THE COURT:  So it's --

2        MS. HAINES:  Now, those things they are just

3   going through.  All these things are being, you know --

4        THE COURT:  All right.  It's lurid, but it's not

5   child pornography is what you're saying.

6        MS. HAINES:  We don't believe it is, no.

7   However, you can't just look at that in and of itself

8   and say, okay, that YouTube video.  In the big, grand

9   totality of the circumstances we've got images of child

10  pornography.  We've got a Google app where he's asking a

11  16-year-old child if he'll spend the night with him.

12  Like I said, we have potential victims coming forward as

13  a result of this hitting the media saying we believe

14  there are victims here locally.  You have the probation

15  office who's done an investigation.  They are

16  recommending detention for him as well based on flight

17  and danger.

18        THE COURT:  All right.  Anything else?

19        MS. HAINES:  No, Your Honor.

20        MR. PASSARELLO:  No, Your Honor.

21        THE COURT:  All right.  Something that nobody has

22  talked about that arises in the pretrial services report

23  is that despite the forfeiture of the passport the

24  defendant has substantial financial resources, including

25  some things that the defendant has declined to produce

1      or to make any comment on or to give any additional

2      details.

3           Where I have somebody who is an international

4      traveler and is able to move in interstate commerce

5      even, and I don't know what kind of resources he has at

6      his disposal, that's a huge red flag for me.

7           So I am going to detain him for two reasons:  One

8      is, I am not satisfied that the risk of flight -- I am

9      not concerned about danger to the community.  And,

10     frankly, the case against the defendant is a lot weaker

11     where the government hasn't even asked for detention.

12     We have what may be an avalanche of child porn on seized

13     equipment.  But right now we have a bunch of lurid

14     accusations.  We have one image that would qualify as

15     child pornography, subject to any affirmative defenses.

16          On the other hand, the fact that I don't -- I am

17     not charged with determining guilt or innocence.  I am

18     charged with making sure that there's no danger to the

19     community and that the defendant actually be available

20     for trial.

21          It does concern me that Honduras happens to be

22     heating up.  Whether that's politically motivated I have

23     no idea.  Whether that's based on a fresh look at the

24     evidence I have no idea.  I do know that if that goes

25     through I lose jurisdiction over the defendant, and

1    that's a problem for me.  More problematic from my point

2    of view is that without understanding of what resources

3    are available to the defendant should he choose to flee,

4    I am unable to really make an accurate judgment as to

5    what is the risk of flight.  And this is a presumption

6    case, so where I have a doubt or a lack of knowledge, my

7    default position is to detain, and that's what I have to

8    do.

9            MR. PASSARELLO:  I can provide information on his

10   investments.

11           THE COURT:  Well, that's what I'm coming to.

12           What I want from this, I want the government to

13   give me, as soon as possible, what they've got that

14   justifies their claim that this guy has child

15   pornography.  Because right now we don't have evidence.

16   If they rebut the risk of flight issue, I don't think

17   you've got danger to the community.  You have a

18   statutory presumption, which is rebutted by the proposed

19   terms of release which would include, Attorney

20   Passarello, encumbrance on any assets.

21           If this guy has a farm that can be turned into

22   cash I want a property bond.  I know I'm going to hear

23   about it from the clerk's office because property bonds

24   are a pain in the rear to do.  But I want any

25   possibility that this individual has resources that

1    would make him a risk of flight, I want that cancelled

2    out.  So I would need full disclosure from you about

3    financial resources and encumbrances on them.

4            From the government's point of view, if you're

5    seriously maintaining that this guy is such a danger to

6    the community that there are no conditions that could

7    assure the safety of the public, notwithstanding the

8    fact that these allegations have been out there for five

9    years, because those allegations from John Does 1, 2,

10   and 3 that you're relying on, not the child pornography

11   that's more recent -- if you're telling me he's a danger

12   to the community I want to see some proof, some

13   evidence, that there is something on his computer that

14   indicates what I've termed as a compulsion.

15           MS. HAINES:  Your Honor, are you asking that you

16   would like the agents to bring into your private office,

17   obviously, and click through everything they've tagged

18   to show you, including the images of the --

19           THE COURT:  No.  I'm not going to do their job

20   for them.  Once they've sorted through tell them to

21   bring me what they think -- I've done that before in

22   camera --

23           MS. HAINES:  We can bring you right now all that

24   we have already, just scratching the surface.  We'll

25   provide all of it to you in your office if you want

1    tomorrow.  We'll click through them all and show them to

2    you what we've already flagged.

3            THE COURT:  Okay.  Well, let's not spend my day

4    looking at 18,000 images.  Pick out --

5            MS. HAINES:  Oh, no, just the ones that are

6    relevant --

7            THE COURT:  Yeah.  Give me your ten worst case

8    scenarios and I'll look at them.  If you've got them now

9    we can step out into the hall and we'll look at them

10   now.

11           MS. HAINES:  They're back in, HSI Pittsburgh has

12   them in their forensic lab.

13           THE COURT:  Can they --

14           MS. HAINES:  We can't transmit them.

15           THE COURT:  No, obviously, you do not want to

16   transmit child pornography over --

17           MS. HAINES:  No.  They would have to be

18   downloaded onto a disc and then hand carried to your

19   office, which I can absolutely have the agents do and we

20   can provide that to you and sit there and look at them.

21           THE COURT:  Let's do that.  Now, in the meantime,

22   for reasons that I've already stated, on the risk of

23   flight ground only I'm going to order detention.

24           MR. PASSARELLO:  Your Honor, if I may.  Would you

25   like me to direct the investment information directly to

1    your chambers?

2          THE COURT:  Yes.  Yeah, if you want to -- if you

3    can get that to me within the same time frame as the

4    government is getting their evidence to me that would be

5    appreciated.

6          MR. PASSARELLO:  I will try to get that to you

7    either today or first thing tomorrow.  With the

8    understanding, Your Honor, that obviously, the retaining

9    of investigators and the defense team in Honduras costs

10   money.

11         THE COURT:  Is an encumbrance itself, yes.

12         MR. PASSARELLO:  We would need -- can't deny him

13   the right to counsel or the right to present a defense,

14   so we just would ask the Court to take that into

15   consideration.

16         THE COURT:  Right.  Well, you know, one of the

17   things that certainly should be apparent to everybody is

18   that we have minor children of desperate economic

19   circumstances, probably not literate in English, in

20   Honduras, some of whom are deceased.  Charges which --

21   not those charges, but other charges, which would put

22   this defendant in jail for the rest of his natural life.

23   This is going to be a long, drawn-out process.  Pretrial

24   proceedings alone, given the requirement of translation,

25   investigation, confrontation, are going to be

1    protracted.

2         I am very aware -- you know, I am very aware --

3    probably less so than the prosecutor and the agents of

4    HSI, because you guys have to deal with it on a much

5    more frequent basis than I -- I'm very aware of the

6    nature of the charges and the importance of the charges.

7         But at the same time, the practical reality of

8    the government's request for detention on the basis of

9    the claim that there are no conditions that can assure

10   the safety of the public, would result in the

11   incarceration of somebody for a period of years as we

12   run up to the trial process on, at this point, nothing

13   more than what are accusations.  So I hope everybody is

14   quite aware of what's at stake here beyond just the dry

15   words of the statute.

16        The defendant stands committed.

17        We are in recess.

18        (Proceedings concluded at 11:24 a.m.)

19                              * * *

20

21

22

23

24

25

1                    CERTIFICATE OF OFFICIAL REPORTER

2

3          I, Kimberly K. Spangler, Federal Official Court

4     Reporter, in and for the United States District Court

5     for the Western District of Pennsylvania, do hereby

6     certify that pursuant to Section 753, Title 28, United

7     States Code, that the foregoing is a true and correct

8     transcript of the stenographically reported proceedings

9     held in the above-entitled matter, and that the

10    transcript page format is in conformance with the

11    regulations of the Judicial Conference of the United

12    States.

13

14                        Dated this ____ day of _____ 2014

15

16          _____
                    KIMBERLY K. SPANGLER, RPR
17          FEDERAL OFFICIAL COURT REPORTER

18

19

20

21

22

23

24

25