1

```
 1                  UNITED STATES DISTRICT COURT
                  WESTERN DISTRICT OF PENNSYLVANIA
 2                       JOHNSTOWN DIVISION

 3

    UNITED STATES OF AMERICA,
 4
                  Plaintiff,          Case No:  14-cr-23
 5
           vs.                        Johnstown, Pennsylvania
 6                                    November 6, 2014

 7    JOSEPH D. MAURIZIO, JR.,

 8              Defendant.
    _____
 9

10        TRANSCRIPT OF DETENTION/EVIDENTIARY HEARING
                  BEFORE KEITH A. PESTO
11             DISTRICT MAGISTRATE JUDGE

12
                  A-P-P-E-A-R-A-N-C-E-S
13

14    FOR THE GOVERNMENT:  Stephanie L. Haines, AUSA
                          United States Attorney's Office
15                        Penn Traffic Building, Ste. 200
                          319 Washington Street
16                        Johnstown, PA  15901

17    FOR THE DEFENDANT:   Steven P. Passarello, Esq.
                          Passarello & Sisto
18                        616 Hileman Street
                          Altoona, PA 16601
19
      COURT REPORTER:      Kimberly K. Spangler, RPR
20                        United States District Court
                          Penn Traffic Building, Ste. 204
21                        319 Washington Street
                          Johnstown, PA  15901
22                        (814) 536-9999

23

24

25
```

```
1                          I N D E X

2                      November 6, 2014

3

4       Defendant's

5       Witnesses:              Direct      Cross     Redirect

6       THOMAS R. SEITZ           14          16

7

8       RICHARD WILLIAM STERN     20          21

9

10      Government's

11      Witnesses:              Direct      Cross     Redirect

12      DAVID COLEMAN             25          28         33

13      KEVIN PETRULAK            33          53        55/58

14

15      CERTIFICATE OF REPORTER                          43

16                           *  *  *

17                      E X H I B I T S

18

19      Government's

20      Exhibits:                        Marked    Admitted

21      Exhibit 1                                      50

22      Exhibit 2                                      50

23      Exhibit 3                                      50

24                           *  *  *

25
```

1          P R O C E E D I N G S

2     (The proceedings convened on November 6, 2014, at 10:23

3     a.m.)

4          THE COURT:  All right.  We're here.  It's 10:30

5     on Thursday, November 6th, 2014, in Courtroom A for what

6     I hope is the last portion of the detention hearing in

7     the United States vs. Maurizio, Criminal Number 14-23.

8          The defendant's present with counsel, Attorney

9     Passarello and Attorney Kiss.  And the government is

10    present represented by Attorney Haines.

11         Just to recount in one place the procedural

12    history:  The complaint was submitted to me back in

13    September on the 25th, and I issued an arrest warrant

14    based on that.

15         At the initial appearance the government moved

16    for three days under the Bail Reform Act to prepare its

17    case for detention.

18         The detention hearing was actually held on --

19    let's see -- at the arraignment on the 14th of October,

20    at which time -- I'm sorry.  The original detention

21    hearing was held on the 29th of September.  After that

22    the government submitted the case to the grand jury and

23    an indictment was returned.

24         At the arraignment I followed up on remarks I had

25    made at the detention hearing, saying that there was no

4

1    issue of risk to the community at that point, but that I

2    had detained the defendant based on what I saw as a risk

3    of flight due to some unclear information about

4    financial assets, and asked counsel to confer, and for

5    the defendant to provide the government with information

6    concerning financial resources.  The government was then

7    to have ten days to vet that information and then get

8    back to me.

9         I followed up on that with a telephone call that

10   was held on the 27th of October, at which time it turned

11   out that there was a disagreement as to the import of

12   certain information that had been exchanged between

13   counsel.  And the government also advised that it might

14   have some additional evidence that it wanted to present

15   on danger to the community.

16        This hearing was then set for October 30th.  That

17   was subsequently rescheduled at the request of counsel

18   for today.  So here we are.

19        I am expecting that the government is to present

20   evidence that it said it would present at the telephone

21   conference of an IRS agent.  I believe there was also

22   something additional regarding danger to the community

23   that the government wished to present that was maybe by

24   proffer, maybe by testimony.

25        And as far as the defendant is concerned, the

```
1    defendant has proffered at the telephone conference an
2    explanation of two matters that the government had a
3    question about; one being an account that the defendant
4    contends is disclosed in the letter of October 16th, and
5    the other matter being a financial asset that is maybe a
6    trust fund in the hands of the Independent Catholic
7    Foundation or the Independent Foundation -- I'm not sure
8    what the name of the entity is.
9         MR. PASSARELLO:  It's an endowment account.
10        THE COURT:  It's an endowment account, all right.
11        So if you have evidence or if you have a live
12   witness for that or if you want to proceed by proffer,
13   however you prefer to proceed.  All right.  So let's go
14   first.  The defendant, because the detention at this
15   point is based on risk of flight, and I was unclear
16   about all the information.  Why don't you tell me about
17   the two items that the government questioned you about
18   at the time of the telephone conference.
19        MR. PASSARELLO:  Yes, Your Honor.  The first the
20   United States questioned was what was an Eaton Vance
21   account.  I provided that Eaton Vance account.  It was
22   in a packet with the Stifel Nicolaus documents that I
23   handed to the government in the conference room back
24   after the last hearing.  It is an account -- if I may,
25   Judge -- I think it contains $30,000, but I have the
```

1    account numbers, et cetera, for that account.

2         The second one, which I think is the one they

3    were more focused on was what I understand to be the

4    endowment accounts -- or the endowment account.  It's my

5    understanding -- and I have a live witness here, Dick

6    Stern, to testify to that.  But those are accounts that

7    my client does not have access to, but the explanation

8    of those accounts is as follows:  There were three what

9    are known as burses, three accounts that were part of

10   the Altoona Diocese, Johnstown Diocese accounts.  They

11   were Father Ignatius Peals account, Father Ignatius

12   Watts account, and I believe a DIDO fund, which was to

13   be used for church emergencies, et cetera.

14        Those accounts, by directive of the bishop, were

15   drained.  And those accounts were closed and placed into

16   three new foundations with the Catholic Foundation.

17        THE COURT:  Three new accounts with the Catholic

18   Foundation.

19        MR. PASSARELLO:  Catholic Foundation.

20        Those monies were disbursed into those accounts

21   and I believe -- and I don't know if that's the accounts

22   that they're talking about -- but that's the only

23   accounts I could find with the Catholic Foundation after

24   she -- after Stephanie Haines -- U.S. Attorney Haines

25   referenced those in a phone conversation.

1          We talked with Dick Stern.  Dick Stern is here to

2     testify, if necessary, that that was the history of

3     those accounts.  That Father Joe has no independent

4     access to those accounts.  And, in fact, he indicated to

5     me today that the only way he could get money off those

6     is to get interest only.  So if that's the account that

7     they're talking about, that's my explanation for that

8     account.

9          THE COURT:  All right.  So he's not the legal

10     owner.  Is he the beneficiary of those funds?

11          MR. PASSARELLO:  No, he is not.

12          THE COURT:  Okay.  So why are they even listed as

13     connected to him?

14          MR. PASSARELLO:  Because they referenced them,

15     and I had to answer them.

16          THE COURT:  Okay.

17          MR. PASSARELLO:  You know, if that's the accounts

18     that they're talking about.  Now, I think Attorney

19     Haines indicated something about Independent Catholic

20     Charities.  I could find nothing on Independent Catholic

21     Charities.  What we did find was the foundations to the

22     Independent Catholic Foundation.  So that would be my

23     explanation for that.  If there's a different account,

24     I'm sure Dick Stern would testify to those.  But because

25     they raised it I felt I had to explain.

8

1           THE COURT:  All right.  Does the government have

2    any information that there's any other account than the

3    ones referred to by Attorney Passarello?

4           MS. HAINES:  Yes, Your Honor.  In fact, we're

5    aware of the accounts he's talking about.  What I

6    referenced before and was speaking about in the

7    endowment accounts are separate and distinct from that.

8    We have paperwork; I have the agent; I have a letter

9    that's specifically addressed to Father Maurizio dealing

10   with two separate endowment accounts.  One is a

11   reference under HIM, this Humanitarian Interfaith

12   Ministries endowment account, which the present market

13   value at the end of last year was $462,428.52.

14          THE COURT:  All right.  Back up.  What was the

15   first number, two or four?

16          MS. HAINES:  It's 462 thousand --

17          THE COURT:  Okay.  All right.  Let me interrupt

18   you there, because that's the account I recall being the

19   controversy when we had our telephone conference, and

20   the amount was, at that time I thought it was $200,000.

21         MR. PASSARELLO:  That's what was stated.

22         MS. HAINES:  And the actual account that has the

23   market value as of December 31st of 2013 is $462,428.52.

24   It is the endowment account I said during the conference

25   call that was in the name or related to the HIM

1    Ministries, which Father Maurizio is involved with and

2    is the sole proprietor of HIM --

3            THE COURT:  All right.

4            MS. HAINES:  -- so that's what we are talking

5    about.  That's what the witness is here to testify

6    about.  And in addition to correspondence specific to

7    that that were sent to the defendant as to whether or

8    not he was interested in any type of disbursements out

9    of this large amount --

10           THE COURT:  All right.

11           MS. HAINES:  -- which was of concern to us

12   because we hadn't heard about it, we had to find it on

13   our own, and we still continue to, obviously, have to be

14   finding them on our own because they are not sure or

15   aware of it.

16           THE COURT:  All right.  Anything on what Attorney

17   Passarello said that you're not already aware of or that

18   you contest?

19           MS. HAINES:  About the --

20           THE COURT:  The Independent --

21           MS. HAINES:  -- Eaton Vance account?

22           THE COURT:  Yeah.  Or the Independent Catholic

23   Foundation account.

24           MS. HAINES:  Your Honor, we would ask -- our

25   understanding the Eaton Vance account wasn't $30,000 so

```
1    we're interested --

2         THE COURT:  I remember the amount, again when we

3    discussed on the telephone, the amount was about

4    $100,000.

5         MS. HAINES:  Correct.

6         THE COURT:  So either there's been a disbursement

7    for that account or we're talking about two different

8    accounts.

9         MS. HAINES:  Correct.

10        THE COURT:  Now, I understand that there's

11   disbursements for counsel fees and so on which may or

12   may not.  But, Attorney Passarello, is it 30 or is it

13   100?

14        MR. PASSARELLO:  Judge, I apologize.  I believe

15   it -- let me see if I can get that account, what I have

16   of record.  Again, I apologize.

17        No, Judge, I apologize.  It was the exact figure

18   I told you at the hearing, which was 106 -- I'm sorry,

19   127,824.33.

20        THE COURT:  All right.  Does that jibe with your

21   figures, speaking in this case --

22        MR. PASSARELLO:  And that would have been the --

23        THE COURT:  Hang on a second.  Speaking -- my

24   last comment was directed to the government, and they're

25   conferring.
```

1        Now you had a clarification, Attorney Passarello?

2        MR. PASSARELLO:  I apologize, Judge.  That was

3   from the document that I spoke to you about on the

4   phone, and the document that was given to them in the

5   conference room.

6        THE COURT:  Okay.  Turning to Attorney Haines,

7   does that jibe with the figures that you have?

8        MS. HAINES:  What we understood is there was a

9   disbursement out of the Eaton Vance account of

10   127,000-odd dollars that was going to pay attorney fees.

11        THE COURT:  That was discussed way back on

12   October 14th.  That was prior to.  This is something

13   separate.  Do you have any information that that

14   $100,000 isn't what Attorney Passarello claims it to be?

15        MS. HAINES:  Well, we don't understand exactly

16   what he's saying is left in that account.  Is it 30,000

17   or 106,000?

18        THE COURT:  I think what he's saying is he

19   misspoke earlier when he said 30.  It really should be

20   100.

21        Is that what you're saying?

22        MR. PASSARELLO:  That is, Your Honor.

23        THE COURT:  All right.  Okay.  So he --

24        MR. PASSARELLO:  I'm going by the document that I

25   have, which is dated 9/26/2014.

1              THE COURT:  Okay.

2              MS. HAINES:  Our understanding, Your Honor, is

3    the 127,000 that was taken out plus for attorneys fees

4    emptied the account.  But then there was 103,000 or so,

5    104,000 left over that was in a John Hancock Venture

6    Annuity that was the remainder of that.

7              MR. PASSARELLO:  And that is correct also, Judge.

8    The John Hancock Annuity is also part of that document

9    that was provided, and I believe is also in the letter

10   that we sent to the United States --

11             THE COURT:  Right.

12             MR. PASSARELLO:  -- that was from that paragraph.

13             THE COURT:  Yeah.  That's Paragraph 3 on the

14   second page of the letter of October 16th, so that's

15   already been out there for almost a month now.

16             Is there anything -- all right.  I think I

17   understand what's going on with the $100,000 account.

18   The more important thing is you have what you thought

19   was 200 -- now $400,000 -- in this HIM Ministries.

20             All right.  Tell me, Attorney Passarello, before

21   they put a witness on the stand about this.  Are you

22   aware of that, and does your client have any control or

23   legal interest, any access to that fund?

24             MR. PASSARELLO:  Judge, the only named accounts I

25   was aware of is what I put in the letter.  But I do have

1        a member of Wesell and Company here that can testify as

2        to that HIM account --

3                THE COURT:  All right.  Let's hear --

4                MR. PASSARELLO:  -- and also Dick Stern, that --

5                THE COURT:  All right.

6                MR. PASSARELLO:  -- can testify as well.

7                THE COURT:  All right.  Let me hear where that

8        account is, because if this defendant has access or

9        control of that account, that's a significant matter.

10       So let's actually have --

11               MR. PASSARELLO:  It is a significant matter --

12               THE COURT:  All right.  So then I want to have --

13               (Request by the court reporter to speak one at a

14       time.)

15               THE COURT:  Okay.  Sorry.  The boss.  Okay.

16       Folks, the hierarchy in the courtroom is basically boss,

17       employee, everybody else.

18               All right.  So let's have the witness from Wesell

19       and Company get on the record what this HIM account is.

20               MR. PASSARELLO:  From Weimer -- Wesell.  I

21       apologize.

22               (The witness was placed under oath by Courtroom

23       Deputy Price.)

24               THOMAS R. SEITZ, DEFENDANT'S WITNESS, SWORN

25               THE COURT:  All right.  Before we get started,

1    one of the facts of advancing age is you tend to meet

2    more and more people.  Mr. Seitz, we've never met

3    before.  You look like a Seitz.  Are you related to

4    Paul?

5            THE WITNESS:  I am.

6            THE COURT:  How are you related to Paul?

7            THE WITNESS:  Brother.

8            THE COURT:  Geesh.  All right.  My assistant's --

9    I coach soccer at Forest Hills High School.  My

10   assistant coach is Paul Seitz.  So although I've never

11   met you, and it doesn't constitute any conflict, I am

12   familiar with the Seitz family.  All right.  Go ahead.

13           MR. PASSARELLO:  Thank you.

14                      DIRECT EXAMINATION

15   BY MR. PASSARELLO:

16   Q.  Mr. Seitz, would you state your full name and spell

17   it for the record.

18   A.  Thomas R. Seitz.  S-E-I-T-Z.

19   Q.  And where are you employed?

20   A.  Wessel and Company.

21   Q.  And where is that located?

22   A.  215 Main Street.

23   Q.  And are you a CPA?

24   A.  Yes.

25   Q.  Let's cut to the chase.  Do you know Father Joseph

1    Maurizio?

2    A.   Yes.

3    Q.   Does your company handle a number of accounts for

4    him?

5    A.   We handle the Humanitarian Interfaith Ministries.

6    Q.   You heard the United States attorney reference an

7    HIM Ministries endowment account with approximately

8    $400,000 in it?

9    A.   Yes.

10   Q.   Are you familiar with that account?

11   A.   Yes.

12   Q.   Would you explain to the Court what that account is

13   and what access, if any, that Father Joe has to that

14   account.

15   A.   It is an account that's handled by Independent

16   Catholic Foundation, the Diocese of Altoona/Johnstown.

17   So they have full control over that account, how they

18   invest the monies.  Humanitarian Interfaith Ministries

19   has access to income and accumulation of income.

20       The latest statement that I've seen -- and this is

21   from Bill Hilldyke, the executive director -- there was

22   about $23,500.  And this was as of 12/31/2012.

23

24   Q.   Okay.  And this account, is it -- are you saying

25   Father Joe does not have direct access to that account?

1    Like can he go to you and get a check out of that

2    account?

3    A.  He cannot.

4    Q.  Is he able to withdraw funds on his own from that

5    account?

6    A.  He would have to go through the Independent Catholic

7    Foundation.

8    Q.  Okay.  So you can't release money to Father Joe

9    directly from that account?

10   A.  Correct.

11   Q.  Okay.  And just so we're clear, are we talking about

12   the same account that United States Attorney Haines is

13   talking about?

14   A.  Yes.

15   Q.  And who is the owner of that account again?

16   A.  It's Independent Catholic Foundation.

17        MR. PASSARELLO:  All right.  I don't have

18   anything further from this witness.

19        THE COURT:  Cross examine.

20        MS. HAINES:  Yes, Your Honor.

21                    CROSS-EXAMINATION

22   BY MS. HAINES:

23   Q.  Mr. Seitz, are you aware that Father Maurizio was

24   sent the letters and given the updates as to how much

25   money is accessible in those accounts?

1    A.   Yes.

2    Q.   And would you agree with me the endowment account

3    that we're talking about is in excess of 462,000 as of

4    December 31st of 2013?

5    A.   Yes.

6    Q.   Are you aware of the fact that also when Father

7    Maurizio is sent the update that he is provided the

8    semiannual update regarding the endowment of interest to

9    you, that he is also provided with a distribution

10   application that can be filled out for the distribution

11   of specific available funds?

12   A.   Yes.

13   Q.   And you are aware of the fact that HIM Ministries is

14   actually Joseph Maurizio, correct?

15   A.   Yes.

16        MS. HAINES:  I have no further questions.

17        THE COURT:  All right.  Thanks.  You may step

18   down unless -- is there any redirect?

19        MR. PASSARELLO:  No.

20        THE COURT:  Okay.  All right.  You may step down.

21   Thank you.

22        THE WITNESS:  Thank you.

23        THE COURT:  That takes care of that.  Anything

24   else as far as the accounts themselves?

25        MS. HAINES:  Your Honor, actually, my agent also

1     just referenced to me and pointed out to me that there

2     is another Topshop Memorial Endowment Fund that is

3     directed by letter to Father Maurizio regarding an

4     endowment that is of interest to him that as of

5     December 31st of 2012 has $102,030.94 in it as well that

6     we --

7              THE COURT:  When you say "of interest to him"

8     what do you mean?

9              MS. HAINES:  The letter says, "Dear Father

10    Maurizio, we are pleased to provide this annual update

11    regarding the endowments of interest to you.  Please see

12    below for updated values" and --

13             THE COURT:  All right.

14             MS. HAINES:  -- there's --

15             THE COURT:  Are you saying that he has legal or

16    beneficial interests in these accounts?  Because, you

17    know, we could go through every bank account in Western

18    Pennsylvania.

19             MS. HAINES:  Well, Your Honor, if I recall, the

20    direction from the beginning of this was to disclose any

21    possible assets --

22             THE COURT:  Right.

23             MS. HAINES:  -- that may be in the hands of or in

24    the name of the defendant.  My agents have undertaken an

25    extensive research of thousands of records.  They are

1    relating to me, as I am relating to you, additional

2    possible assets that are coming up during their

3    investigation with a lot of money that is pointing back

4    to the defendant.

5           THE COURT:  Right.

6           MS. HAINES:  So I bring that up because that is

7    another one we found that we have not heard about

8    before, and it is directed to Father Maurizio via

9    letter.

10          THE COURT:  Okay.  But there's nothing

11   underhanded about not saying something if they don't

12   have any idea that it could possibly be considered an

13   interest of his.

14          So, Attorney Passarello, are you aware of --

15   what's the name of this account?

16          MR. PASSARELLO:  It's Topshop.

17          MS. HAINES:  Topshop Memorial Endowment Fund.

18          THE COURT:  All right.  What is that, if you know

19   anything about it?

20          MR. PASSARELLO:  I have Dick Stern here that can

21   testify --

22          THE COURT:  All right.  Let's get Mr. Stern on

23   the line.

24          MR. PASSARELLO:  Mr. Stern.

25          (The witness was placed under oath by Courtroom

1    Deputy Price.)

2          RICHARD WILLIAM STERN, DEFENDANT'S WITNESS, SWORN

3                    DIRECT EXAMINATION

4    BY MR. PASSARELLO:

5    Q.  Mr. Stern, would you spell your full name for the

6    record, please.

7          THE COURT:  He already did that.  We have that.

8          MR. PASSARELLO:  I'm sorry.

9    Q.  Let's cut to the chase.  Are you familiar with

10   what's known as Topshop Foundation and HIM Foundation

11   through Independent Foundation of Catholic Charities?

12   A.  I am familiar that they exist.  I do not receive the

13   reports of those.

14   Q.  Okay.  Are you familiar with who owns the accounts?

15   A.  Yes.

16   Q.  Who owns them?

17   A.  Humanitarian Interfaith Ministries.

18   Q.  Okay.  Are they assets of Father Joe?

19   A.  No.  I would say they're assets of Humanitarian

20   Interfaith Ministries.

21   Q.  Do you know anything about how those accounts work?

22   A.  They are accounts with the Independent Catholic

23   Foundation.  They are endowment accounts.  They work as

24   Mr. Seitz described.  I have not seen the endowment

25   agreements for those, but every endowment agreement that

1    I know of for the Catholic Foundation allows only access

2    to accumulated interest.

3    Q.  Okay.  And Mr. Seitz testified as to the HIM

4    Foundation -- I'm assuming I can call him back for

5    Topshop.  Father Joe can't cut a check to himself on

6    these accounts?

7    A.   No.  He would have to go through the Independent

8    Catholic Foundation, as Mr. Seitz described.

9    Q.  Okay.  And this asset -- just so we're clear,

10   they're not in his name and he can't draw on them unless

11   he goes through a process?

12   A.   Right.  His only association would be with

13   Independent Catholic Foundation.

14          MR. PASSARELLO:  I don't have anything further.

15          THE COURT:  Cross examine.

16                      CROSS-EXAMINATION

17   BY MS. HAINES:

18   Q.  You would agree with me, sir, that HIM is Father

19   Maurizio, correct?  The HIM --

20   A.   He controls --

21   Q.   -- Foundation?

22   A.   He controls HIM, yes.

23          MS. HAINES:  Thank you, Your Honor.  That's all.

24          THE COURT:  All right.  I didn't get clear where

25   you are employed, what's your official role?

1          THE WITNESS:  I'm retired.  I am the -- from

2     35 years with the Somerset Trust Company.  I am the

3     finance chairman for Our Lady Queen of Angels parish.

4          THE COURT:  I see.  Okay.

5          THE WITNESS:  That's how I get asked all the

6     questions about the finances.

7          THE COURT:  And so an endowment fund in the

8     amount of $100,000 spins off maybe $4,000 a year in

9     interest, if you invest it prudently and not invading

10    the principal?

11         THE WITNESS:  It varies quite a bit and --

12         THE COURT:  Depends on how the market goes.

13         THE WITNESS:  Yes.

14         THE COURT:  All right.  So what's available to be

15    distributed by the Independent Catholic Foundation is

16    the increase in value, or what you refer to as accrued

17    interest?

18         THE WITNESS:  That's correct.

19         THE COURT:  And that distribution is done by

20    application to the Independent Catholic Foundation in

21    accordance with what, the written instrument creating

22    the endowment?

23         THE WITNESS:  That's correct.

24         THE COURT:  All right.

25         THE WITNESS:  If you think of the endowment

1    agreement as a trust agreement that's -- being in

2    banking that's the way I think of it.

3         THE COURT:  So it's not a checking account that

4    any person can go and withdraw from.  It's a source of

5    funds that a person applies for if, for instance, you

6    needed reimbursement for an expense that was covered by

7    the terms of the trust agreement?

8         THE WITNESS:  That is correct.

9         THE COURT:  All right.  And the trust is

10   controlled by the Independent Catholic Foundation?

11        THE WITNESS:  That is correct.

12        THE COURT:  And the trustees of that foundation

13   are?

14        THE WITNESS:  There is a board of trustees.

15        THE COURT:  There is a board of trustees.  Any of

16   them linked to Queen of Angels, Father Maurizio, or you?

17        THE WITNESS:  I do not know exactly all of them.

18   I do not believe so.  I mean, I might know someone from

19   the business world, but not -- not directly.

20        THE COURT:  Father Maurizio doesn't have

21   appointment or removal power of the board of trustees?

22        THE WITNESS:  Absolutely not.

23        THE COURT:  Okay.  All right.  That's what I'm

24   concerned with.

25        All right.  In light of my questions, do either

1    of counsel have anything further?

2           MR. PASSARELLO:  No, Your Honor.

3           MS. HAINES:  No, Your Honor.

4           THE COURT:  All right.  You may step down.

5           THE WITNESS:  Thank you.

6           THE COURT:  All right.  You wanted to present

7    your IRS agent.  I think we've pretty much beaten to

8    death the HIM Ministries, at least from the

9    defendant's point of view.  But you had some information

10   that you wanted to put on the record as well.

11          MS. HAINES:  We actually have two witnesses, yes,

12   Your Honor, today.

13          THE COURT:  All right.  Okay.  Well, let's hear

14   what you referred to as the IRS agent first, and then

15   you've got -- who's the other one?

16          MS. HAINES:  Well, I prefer to put my other agent

17   on first.

18          THE COURT:  Who's the other one?

19          MS. HAINES:  The other agent is from Homeland

20   Security.  Special Agent David Coleman.  He has

21   actually --

22          THE COURT:  Is this in reference to the

23   photograph?

24          MS. HAINES:  All this is in reference to

25   something that has just occurred that we were briefed on

1      this morning.

2              THE COURT:  Oh, this morning.  Okay.  Well,

3      that's news to me.  Go ahead.  Let's put him on first.

4              (The witness was placed under oath by Courtroom

5      Deputy Price.)

6              DAVID COLEMAN, GOVERNMENT'S WITNESS, SWORN

7                        DIRECT EXAMINATION

8      BY MS. HAINES:

9      Q.   Please state your name for the record.

10     A.   My name is David Coleman.  I'm a special agent with

11     Homeland Security Investigations, posted duty

12     Pittsburgh, Pennsylvania.

13     Q.   How long have you been so employed with HSI?

14     A.   Since June 2009.

15     Q.   And prior to being employed with HIS by whom were

16     you employed?

17     A.   I was employed by Customs and Border Protection.

18     Q.   And for what period of time?

19     A.   From November 2007 until June 2009.

20     Q.   And prior to your employment in 2007 how were you

21     employed?

22     A.   I was a crime scene technician with the Waterbury

23     Police Department in Waterbury, Connecticut.

24     Q.   Specific to your current employment with HSI, what

25     are your duties and responsibilities as a special agent?

1    A.   Yes.   I investigate the customs and immigrations

2    laws of the United States and violations thereof.

3    Q.   And have you become part of the investigative team

4    on Defendant Maurizio?

5    A.   Yes, I have.

6    Q.   And what has your role been as part of this

7    investigative team?

8    A.   I've participated with interviews and going through

9    financial documents.

10   Q.   And are you aware of the fact that there are certain

11   members of the investigative team that as of Monday were

12   in country conducting further interviews, based on

13   previous evidence we have received?

14   A.   Yes, I am.

15   Q.   And as a result of the current investigation in

16   country, were we back-briefed last night -- and more

17   specifically you this morning -- as to the current

18   status of witness and potential victim identification?

19   A.   Yes, I was.   Based upon prior witness interviews, an

20   additional victim in this case was identified and he was

21   interviewed.

22   Q.   And was the team able to locate and find the

23   additional victim that had been referenced by multiple

24   previous witnesses, as part of a previous investigation

25   in country?

1    A.  Yes.  Yes, he was.

2    Q.  And was that interview conducted in country

3    yesterday?

4    A.  Yes.

5    Q.  And could you tell the Court the result of what that

6    interview with this victim relayed.

7    A.  Yes.  This victim stated that he was abused by

8    Joseph Maurizio starting at approximately the age of 12

9    or 13.  The abuse started with over-the-pants fondling

10   of the genitals, progressed to under-the-pants fondling

11   of the genitals, and anal sex performed by the victim on

12   Joseph Maurizio.

13   Q.  And did we seek out this victim as a result of prior

14   witnesses who say they observed this activity being

15   perpetrated by the defendant against this victim?

16   A.  Yes.

17   Q.  And as a result of that did we have to actually

18   locate and find this victim on our own?

19   A.  Yes.  This victim traveled quite a distance in order

20   for the agents in country to interview.

21   Q.  And during the interview when the victim relayed

22   what had happened to him, did he also identify by

23   picture exactly who had perpetrated these sexual crimes

24   on him?

25   A.  Yes.  He identified Joseph Maurizio.

1    Q.   In talking with the team that's currently on the

2    ground, are they continuing to identify and attempting

3    to locate additional victims that have been identified

4    to them through witnesses?

5    A.   They are also trying to identify witnesses and

6    additional victims.

7    Q.   And are they aware of or have they heard the names

8    and identities of additional potential victims that they

9    are currently trying to find right now?

10   A.   Yes, I believe so.

11   Q.   As a result of the information that was obtained

12   from the agents who just arrived in country this week,

13   and as a result of the interview that was conducted

14   yesterday, do you understand what the intention is, both

15   with the United States and with the Honduran authorities

16   relative to this new information?

17   A.   Yes.  The Honduran authorities will lodge additional

18   charges, and I believe this indictment will be

19   superceded.

20           MS. HAINES:  No further questions.

21           THE COURT:  Cross examine.

22                       CROSS-EXAMINATION

23   BY MR. PASSARELLO:

24   Q.   This interview occurred where, what country?

25           MS. HAINES:  Your Honor, may we approach briefly

1    on that question?

2          THE COURT:  Do you want this on the record or

3    off?

4          MS. HAINES:  On the record.

5          THE COURT:  Okay.

6          MS. HAINES:  Sidebar, please.

7          THE COURT:  Okay.  Over here.

8          (The following proceedings were held at sidebar:)

9          MS. HAINES:  The question that's been asked by

10   defense counsel as to exactly what country this has

11   occurred in, the United States is cautious about

12   releasing that as a result of we have a team in country.

13   It is a very volatile country.  It is a very violent

14   location they're located in.

15         My understanding is that this is a very big

16   contentious issue, not only here but also in the country

17   where our team is currently located.  I specifically

18   talked with them about the danger or violence they are

19   currently experiencing, just because of where they're

20   located.  They're safe.  My concern is identifying it in

21   open court where an ongoing investigation is located at

22   this point.

23         THE COURT:  Well, you just on the record in open

24   court in front of everybody else accused this guy of --

25         MS. HAINES:  I didn't accuse him, Your Honor.

1     There was evidence that was submitted --

2            THE COURT:  Right.  You're accusing him of

3     perpetrating crimes, and your agent said we're going to

4     supercede the indictment.  And now you don't even want

5     cross-examination as to where these accusations took

6     place?

7            MS. HAINES:  I'm just asking for a ruling, Your

8     Honor.  That's it.  If you tell us we have to say it,

9     we'll say it --

10           THE COURT:  Yeah.

11           MS. HAINES:  -- I just need to protect the

12    agents --

13           THE COURT:  I'm overruling --

14           MS. HAINES:  -- in that respect, but I understand

15    and --

16           THE COURT:  Yes.

17           MS. HAINES:  That's fine.

18           (The following proceedings were held in open

19    court:)

20           THE COURT:  The objection is overruled.

21    BY MR. PASSARELLO:

22    Q.  Do you remember the question?

23    A.  I do.

24    Q.  Okay.  And what country?

25    A.  Honduras.

1    Q.   And this allegation made by this individual, what

2    time frame are we talking about that these occurred --

3    or this incident occurred?

4    A.   This would be starting approximately 2005 or 2006,

5    if I recall the dates correctly.

6    Q.   And in the initial -- are you familiar with the

7    initial complaint that the United States filed in this

8    case?

9    A.   Not verbatim, no.

10   Q.   Okay.  Are you aware in that initial complaint

11   they'd referenced potentially four victims?

12   A.   I was not aware of that.

13   Q.   Are you aware that the indictment in this case

14   indicted on only one victim?

15   A.   Yes, I am aware of that.

16   Q.   One of the allegations made in the original

17   complaint that was filed that was not indicted on was

18   substantially similar to what you testified to.  Is that

19   the same child, do you know -- if you know?

20   A.   I do not know.

21   Q.   Okay.  And as you sit here today, can you testify

22   before this Court that charges actually have been filed

23   in Honduras on this child?

24   A.   The second minor or the first one?

25   Q.   The one you're talking about.

1    A.   Not -- not to my knowledge.

2    Q.   As you sit here in court today, can you testify

3    before this Court that charges have been filed by the

4    United States on this child that you're talking about

5    against Father Joe?

6    A.   No.

7         MR. PASSARELLO:  I have nothing further from this

8    witness.

9         THE COURT:  Any redirect?

10        MS. HAINES:  No, Your Honor.

11        THE COURT:  Sir, hang on a second.

12        THE WITNESS:  Yes, sir.

13        THE COURT:  The original complaint presented to

14   me referred to John Doe One, John Doe Two, and John Doe

15   Three.  To the best of -- do you know whether this

16   person identified is either John Doe One, John Doe Two,

17   or John Doe Three?

18        THE WITNESS:  I do not, Your Honor.

19        THE COURT:  You have no idea who John Doe One,

20   John Doe Two, and John Doe Three are?

21        THE WITNESS:  No, I do not.

22        THE COURT:  All right.  The events that you're

23   referring to took place allegedly when this individual

24   was 12 or so.

25        THE WITNESS:  Starting approximately --

1          THE COURT:  And that was 2005, so that individual

2     is now 21, 22 years old?

3          THE WITNESS:  To the best of my knowledge, yes.

4          THE COURT:  All right.  Just wanted to make sure

5     my math is correct.

6          In light of my comments, do either counsel have

7     anything else?

8          MS. HAINES:  Just one question, Your Honor.

9                    REDIRECT EXAMINATION

10    BY MS. HAINES:

11    Q.  You are not aware of exactly what's contained in the

12    complaint, correct, Special Agent Coleman, because you

13    were not the affiant on that complaint?

14    A.  That is correct.  I do not.

15         MR. PASSARELLO:  Nothing for me.

16         THE COURT:  All right.  And then your other

17    witness.

18         MS. HAINES:  I would call Special Agent Kevin

19    Petrulak.

20         (The witness was placed under oath by Courtroom

21    Deputy Price.)

22         KEVIN PETRULAK, GOVERNMENT'S WITNESS, SWORN

23                     DIRECT EXAMINATION

24    BY MS. HAINES:

25    Q.  Special Agent Petrulak, by whom are you employed?

1      A.   I'm employed by the Criminal Investigation Division

2      of the Internal Revenue Service.

3      Q.   How long have you been so employed?

4      A.   Since January of 2002.

5      Q.   And where is your current duty station located?

6      A.   Pittsburgh, Pennsylvania.

7      Q.   As a special agent with the Criminal Investigation

8      Division of the IRS what are some of your duties and

9      responsibilities?

10     A.   We conduct any sort of investigations that would

11     have some sort of financial nexus, which obviously would

12     include violations of Title 26, the tax code, such as

13     tax evasion.  But it also includes money laundering and

14     the structuring of money which could -- the number of

15     related crimes that is connected to those charges or

16     those type of investigations vary greatly.

17          I personally have already been involved in narcotics

18     investigations, investigations related to immigration

19     and customs violations, investigations into food stamp

20     fraud.  I could go on and on.  Investment fraud

21     investigations, in addition to the numerous tax

22     investigations that I've conducted.

23     Q.   And you said you've been with the IRS Criminal

24     Investigation Division for approximately 13 years?

25     A.   That's correct.

1   Q.   Is it fair to say that as a special agent you try to

2   follow the money or you try to find out where the

3   money's coming from?

4   A.   Yeah.   That's very true.   But in addition to that

5   I'm more -- personally, I like to liken it to I take

6   large volumes of information, document information, and

7   I dwindle it down into summaries that can be easily

8   understood to either prove or disprove allegations

9   against individuals.

10       I've also -- I've organized thousands of pages of

11   airline records, telephone, toll records, various other

12   travel records.   In addition to the financial records

13   that I analyze, I'm able to take that information, mass

14   volumes of information, and put it into a condensed form

15   that's easily understood and will either disprove or

16   prove allegations against somebody.

17   Q.   And how did you become involved with the case

18   against Defendant Maurizio?

19   A.   A group supervisor from HSI approached me about

20   assisting them with the investigation after they learned

21   that Mr. Maurizio had a large amount of personal

22   savings.   And this didn't come to light until charges

23   were brought forth in relation to the exploitation

24   charges.   So they asked me to come onboard to assist

25   Agent Coleman, because time is of the essence and they

1    needed more manpower on figuring out exactly where this

2    money came from, if possible, and so on and so forth.

3    Q.  And what did you do then when you became part of the

4    team in reference to this "where did the money come

5    from"?

6    A.  Agent Coleman had already subpoenaed some financial

7    institutions for accounts that he had already

8    identified, so I began looking at those records and

9    analyzing those records.

10   Q.  And did you also, as part of your investigation,

11   expand the type of records and the number of records

12   from financial institutions that you wanted to look at?

13   A.  Yes.  Typically, I'll do a cursory look at the

14   records that I have available, and I'll look through to

15   see if there's any transactions between other financial

16   institutions.  And then if we don't have those records

17   already, then I'll ask you to send a subpoena out for

18   those records as well.

19   Q.  And in doing this were you able to discover numerous

20   personal accounts in the name of Defendant Maurizio, as

21   well as several what I would call joint accounts where

22   Defendant Maurizio's name and someone else's might have

23   been on it?

24   A.  Yes.  I found numerous personal bank accounts.

25   There was two checking accounts in addition to the

1   multiple investment accounts.  The joint accounts would

2   have been mostly related to the HIM Ministry.  However,

3   there were also ministry accounts related to Our Lady

4   Queen of Angels church and the various other church

5   accounts that he also had access to, some of which he

6   had sole access to.

7   Q.  Could you summarize for the Court, specific to his

8   personal accounts that he had sole or has sole access

9   to, exactly what your analysis and findings revealed in

10  a general sense.

11  A.  In a general sense there wasn't a large amount of

12  money in the checking accounts.  Off the top of my head,

13  I believe the one account has approximately $10,000 in

14  it.  The other one much less than that.  The one

15  checking account was -- most of the balance was

16  withdrawn in September of 2014, so the balance in there

17  was minimal.  However, his investment accounts were

18  significant.  In all, his investment accounts total over

19  $1 million in assets.

20  Q.  You also referenced that there were some accounts

21  that he either held jointly with the church or even some

22  church accounts he held on his own.

23      Is that correct?

24  A.  That's correct.

25  Q.  What did your analysis of these show you?

1    A.   The HIM Ministries accounts have an approximate

2    balance I believe of $88,000 in them currently.  Those

3    are joint accounts.  Mr. Stern, I believe, is the only

4    other signature on the account.  But they're dual

5    signature accounts.  So in addition to Mr. Maurizio,

6    Mr. Stern also has to endorse those checks to withdraw

7    that money.

8        Mr. Maurizio also had access to a couple of church

9    ministry accounts; one being Matthew 25 Ministry, the

10    other one being Central City Youth Ministry.  But also

11    additional signatures were needed on those accounts.

12    But I believe those two ministries were also helping the

13    fund, the HIM Ministries as well, so they were certainly

14    linked together in some fashion.

15        And off the top of my head, I know the one, Our Lady

16    Queen of Angels account that Mr. Maurizio has -- and I

17    believe he still has; I'm not sure if it's been resolved

18    yet -- sole access to would be the Mass Stipend account,

19    which I can't recall exactly how much is in it off the

20    top of my head, but there was significant money in that

21    account too.

22    Q.  As a result of collecting the, you said about

23    $1 million or so of reports from his personal bank

24    accounts, as well as all the joint accounts with the

25    church or with HIM, did you then start trying to

1    condense or analyze and come to some resolution about

2    the movement of money or where money was coming from and

3    going to?

4            MR. PASSARELLO:  Judge, I'm going to object at

5    this point.  We made a request from the United States

6    that if they intended on calling this individual as an

7    expert witness and providing expert opinion above and

8    beyond what a lay witness would know in regard to these

9    accounts, that we would request a report and then the

10   opportunity to respond.

11           The United States sent me a letter and indicated

12   that they were solely calling this individual as a fact

13   witness, which he has testified to facts up and until

14   this point.  But I think at this point they're asking

15   him to come to an ultimate conclusion that's simply in

16   the realm of an expert opinion.

17           THE COURT:  I have a clarification question

18   before I go further.  Is there anything, Agent, that

19   you've testified to that is not already listed in the

20   letter that was sent by Attorney Passarello to Attorney

21   Haines on October 16th?  Because what you've been

22   referring to looks like it tracks information already

23   disclosed.

24           THE WITNESS:  Sure.  To this point, no, I haven't

25   --

```
 1            THE COURT:  So there's not --

 2            THE WITNESS:  -- additional, but I do have

 3      additional information yet to testify about.

 4            THE COURT:  All right.  Why don't we get the

 5      factual testimony on the record, and then you're going

 6      to ask him for an expert opinion --

 7            MS. HAINES:  No, Your Honor, I'm not.

 8            THE COURT:  Oh, you're not?  Okay.

 9            MS. HAINES:  I'm not asking for an expert

10      opinion.  I'm asking him to detail what he did, how he

11      did what he did, and what the numbers showed as a result

12      of what he did.

13            THE COURT:  All right.  Well, then I take it as

14      the question that you were objecting to is withdrawn,

15      and she's going to rephrase it.  Let's go ahead.

16      BY MS. HAINES:

17      Q.  Could you explain to the Court exactly how you

18      undertook to evaluate the information relative to the

19      financial situation of the defendant.

20      A.  Sure.  After my cursory review of the records to see

21      if I could identify any additional places that we needed

22      to send subpoenas out to --

23            THE COURT:  I'm sorry.  I just -- any additional

24      places that what?

25            THE WITNESS:  After my cursory review initially
```

1    when I looked through the documents to see if I can

2    identify any other financial institutions that we could

3    send subpoenas to --

4              THE COURT:  Oh, send subpoenas.

5              THE WITNESS:  -- and get those records in, then I

6    began taking those records and inputting them into an

7    Excel spreadsheet.

8              And then once -- and the three accounts that I've

9    analyzed so far for the records that we've received are

10   the Somerset Trust personal account, the 1st Summit

11   personal checking account, and the Stifel Nicolaus

12   account, investment account.

13             And so I put the debit and credit items into a

14   spreadsheet, which is approximately 2,000 lines long.

15   And then after I have a master spreadsheet, then I'm

16   able to sort the debits from the credits and I'm able to

17   sort by payee and payor and find out exactly where the

18   money into those accounts came from and where it went.

19   BY MS. HAINES:

20   Q.  Okay.  And when you said you did that for the

21   credits and the debits, did you then condense a huge

22   spreadsheet into smaller spreadsheets relative to

23   credits and debits?

24   A.  I did.  I created from the master spreadsheet, I

25   took and I made one spreadsheet with all the credits and

1    then another spreadsheet with all the debits.  And then

2    I looked in those spreadsheets for items that would be

3    of interest for this hearing in particular, and I made

4    smaller more condensed spreadsheets just highlighting

5    those particular items that we wanted to talk about

6    today.

7              MS. HAINES:  May I approach, Your Honor?

8              THE COURT:  Sure.

9    Q.  I'm showing you what's been marked as Government

10   Exhibit Number 1.  Do you recognize that?

11   A.  I do.

12   Q.  Would you tell the Court what that is.

13   A.  This is a summary of the credits from the three

14   personal accounts that I've analyzed, and this is

15   actually -- it's seven pages.  This is not all of the

16   deposits into these accounts.  These are the items that

17   I deemed to be of interest to our investigation of

18   Mr. Maurizio.

19   Q.  And could you explain to the Court the significance

20   of what you were seeing as you were putting everything

21   into this spreadsheet and what you were looking at.

22   A.  Sure.  I'll just start on page 1.  I'm not aware of

23   any cash source that Mr. Maurizio has, so any cash

24   deposits, which you can see on the top of the page

25   totaling $9,195 would be of interest to us because,

1    again, we're not aware of any source of cash that he

2    has.

3         Below the cash deposits you see all the deposits

4    from Central City Youth Ministries into his personal

5    accounts.  And if you read the column "memo," that would

6    be what would be written in the memo line of these

7    checks.  And you can see that it appears that he's being

8    reimbursed for various items that he appeared to have

9    initially incurred the expense on, and now he's being

10   refunded for those initial expenditures.

11        Those are of interest to us because once we look at

12   the debits from the account, I don't see any ATM

13   withdrawals coming out of the account to pay for such

14   reimbursements.  I don't see any reimbursements that

15   would align with these reimbursement checks.

16        So below Central City Youth Ministries you see

17   checks from the HIM Ministries.  And if you read what

18   was in the memo lines of a lot of those checks it's

19   for -- mostly it's for reimbursement of mission expenses

20   for the mission trips taken by Mr. Maurizio.  And a lot

21   of times he actually references that he fronted cash up

22   front for these expenditures, and now he's being

23   reimbursed for them.

24        For example, if you look at check number 135, which

25   would be the second check listed under the HIM

1    Ministries account it says "to cover cash loan from

2    Father Joe to cover checks."

3        On page 2 -- and I kind of have these couple items

4    highlighted -- it says on item number 204 for $3,000 it

5    says "cash paid in Nicaragua for orchard by Karen

6    Keasley."  Below that, check number 205 it says "cash

7    paid in Nicaragua for Christmas gifts 2008" for an

8    additional thousand dollars.

9        So that sparked my interest because, again, like the

10   cash deposits, like the other reimbursements that I've

11   seen so far, I don't see him withdrawing money out of

12   these accounts to come up with cash to pay for these,

13   what appears to be some sort of cash that he's spending

14   and now being reimbursed for.

15       Below that would be -- and below that would be

16   checks that were written to Mr. Maurizio that were

17   deposited into the account.  A lot of those checks are

18   just simply transfers between his accounts.  That's

19   important to me because, typically, if I want to

20   withdraw money from my bank account in the form of cash

21   I'll either write a check to cash or write a check to

22   myself or write a check to the bank, and then go to a

23   teller or go to the bank and cash the check.  And so I

24   listed those items just to show that that's not what was

25   happening here with these reimbursement checks.

1    Below the checks to him there's a lot of checks to

2  Our Lady Queen of Angels --

3        THE COURT:  All right.  I can read the document.

4  I'm going to interpose this just on grounds of

5  cumulativeness and waste of time.  I mean, we have six

6  years of line by line "$34 reimbursement for Christmas

7  party."  I'm not going to be here until the end of time

8  listening to that, so I'm going to sua sponte ask for a

9  conclusion.  Where are we going?

10  Q.  Agent, would you please tell the bottom line of what

11  you saw when you looked at the debits, the credits, and

12  the credit card activity of Defendant Maurizio and what

13  raised a huge red flag during your analysis?

14        THE COURT:  Well --

15        MS. HAINES:  You asked for a conclusion, I'm

16  asking him --

17        THE COURT:  No, no, no.  I just -- you know,

18  you're dangling objection bait.  When you say "raise a

19  huge red flag" he's going to object that it's

20  argumentative, I'm going to sustain it, so let's just

21  ask the question.

22  Q.  Give us the bottom line, please, Agent.

23        THE COURT:  Thank you.

24  A.  The bottom line is I see checks going into his

25  personal accounts for tens of thousands of dollars of

1    reimbursement which appear to me to be cash expenditures

2    up front that he was now being reimbursed for, and I do

3    not see him withdrawing cash or paying for these

4    expenditures that he's being reimbursed for otherwise.

5    Q.  So is it fair to say your conclusion is there an

6    unknown source of cash, when he fronts all this cash

7    where you have no idea where it's coming from?

8    A.  He has --

9         MR. PASSARELLO:  Judge, I have to object to that

10   question.

11        THE COURT:  And the basis for your objection is?

12        MR. PASSARELLO:  Judge, it is calling for an

13   expert legal conclusion, an expert conclusion based upon

14   this report.  He asked for an expert report -- they're

15   asking him to say there's an illegal source of funds

16   here.

17        MS. HAINES:  Your Honor, with all due respect, he

18   is not saying -- he is saying from what he saw there is

19   an unknown source of cash --

20        THE COURT:  Okay.

21        MS. HAINES:  -- he analyzed.  He said what he

22   condensed down, and when you asked me to ask him a

23   conclusion from --

24        THE COURT:  Well, I --

25        MS. HAINES:  -- evidence he's looked at that is

```
1    not an expert opinion.  He's a case agent from the IRS

2    that is testifying to his analysis.

3         THE COURT:  Well, it is an opinion.  But if the

4    only objection is that they didn't tell you what they

5    were going to say in advance, you know, they don't have

6    to provide everything.  And even if you ask for it, they

7    don't have to provide it.

8         I'm interested to hear -- look, let me -- you

9    guys already know this, but there are extra people in

10   the courtroom and this is directed to them.  My issue

11   here is the Bail Reform Act.  My issue here is risk of

12   flight, and to some extent your attempt to reopen on

13   dangerousness to the community.

14        Risk of flight has nothing to do with guilt or

15   innocence of the ultimate charges.  If the government

16   has brought him onboard in September to, hey, we've got

17   all this guy's financial records, let's see if we can

18   build a tax prosecution.  You know, that's a whole other

19   kettle of fish.

20        But I want to know -- you're asking him is there

21   a -- you're asking for the conclusion that there is an

22   unknown source of cash to this defendant.  All right.

23   Now, that as far as it goes is not objectionable, but it

24   is almost worthless to me.  So let's narrow it down to

25   when was this cash available.  Because I've got, you
```

1    know, 2008.  So you raided this guy's house, I issued

2    the search warrant.  You raided this guy's church.  Did

3    you find huge stacks of cash?  Did you find checkbooks

4    written in code?  Did you find anything that would be

5    relevant to risk of flight?

6            You know, you go out and you can comb through all

7    this and charge him with money laundering or whatever

8    you want to do.  But what I want to know is is there

9    anything today that says that the information that's

10   been disclosed so far does not allay or does raise a red

11   flag as to a question of whether he's going to flee and

12   has the ability to do so?

13           MS. HAINES:  Yes, Your Honor.  I can ask him that

14   question.

15   Q.  Agent, did you review bank financial records up

16   until I believe the close of the statements on the 30th

17   of September of this year, 2014?

18   A.  I did.

19   Q.  And did your analysis on the credits, debits, and

20   activities continue up until the end of September's

21   statements of 2014?

22   A.  Yeah.  That's correct.

23   Q.  And did the behavior on the accounts that you

24   started to testify to that concerns you about an unknown

25   source of cash continue up until the 2014 statements you

1    were looking at?

2    A.   They did.  In fact, the day of the search warrant he

3    went to the bank and withdrew over $9,700, almost

4    emptying his personal checking account.  And I'm still

5    not aware of where that money is.

6    Q.   Did you also do further analysis of the records as

7    to the debits and the credit card history of the

8    defendant?

9    A.   I did.  In part of the analysis of the money coming

10   in, largely reimbursements, checks were coming in.  So I

11   wanted to confirm that he wasn't, you know, paying for

12   these monies through the bank accounts or credit cards

13   somehow, and then now being reimbursed for them.  And

14   that's how I concluded that there's some unknown source

15   of funds that he's using to pay for these expenses up

16   front and then being reimbursed for them.

17   Q.   I'm going to show you what's been marked as

18   Government Exhibits 2 and 3.  Can you identify what

19   Government Exhibits 2 and 3 are?

20   A.   Yes.  Government Exhibit 2 is a summary of the

21   debits or withdrawals from his personal accounts that I

22   deemed to be significant.

23        Government Exhibit Number 3 is a summary of the

24   transactions that occurred in regards to his Somerset

25   Trust credit card.

1    Q.   And all three exhibits, 1, 2, and 3, you actually

2    authored those, correct?

3    A.   I am.

4         MS. HAINES:   I would move to admit all three at

5    this time, pending any further question.

6         THE COURT:   Any objection?

7         MR. PASSARELLO:   No objection.

8         THE COURT:   Okay.  Admitted.

9    BY MR. HAINES:

10   Q.   Right to the present time, you already testified

11   about the fact that the day that the search warrant was

12   executed that you see a withdrawal of over $9,700 that

13   came out of an account that is unaccounted for, correct?

14   A.   Correct.

15   Q.   What are some of the other recent activities that

16   you have seen that brought you to say that there's an

17   unknown source of cash?

18   A.   In addition to the reimbursements that we've already

19   discussed, there's also several wires conducted in cash

20   that Mr. Maurizio sent to a priest in Honduras totaling

21   $10,100.

22   Q.   And what was the most recent amount of that cash

23   sent?

24   A.   That was sent in May of 2013.

25   Q.   And for this total of $10,000 of cash that went via

1    Western Union to a priest in Honduras, did you undertake

2    to look if the cash that was used up front by the

3    defendant was taken out of a personal account or put on

4    his credit card?

5    A.   I did.  The only transaction that I found that could

6    have possibly been used to fund some of the monies that

7    went to Honduras via Western Union would have been a

8    $2,000 check.  It's on page 2 of Government Exhibit 2

9    from 1st Summit Bank.  It's under the checks listed

10   under the name Joseph Maurizio.  And you can see in the

11   memo line that it says "Honduras for Western Union

12   transfer."  However, that date is 2011.  That coincides

13   with one of the transfers for $5,000, but I couldn't

14   find any information relative to the additional $3,000

15   plus fees that were sent that day, nor did I find any

16   information at all to suggest that the over $5,000 that

17   was sent to Honduras via Western Union in 2013 came out

18   of any of his accounts.

19   Q.   And also specific to his reimbursement requests,

20   let's say, from the most recent trips he took out of the

21   country, what did your analysis show again?

22   A.   Again, my analysis showed that he was seeking

23   reimbursement for expenditures that he had in country.

24   In addition to the bank and other financial institution

25   records that I reviewed, I also got statements off of

1    Mr. Stern, who also signs the HIM Ministry checks in

2    regard to those reimbursement checks.  Also received

3    documents in regards to those reimbursement checks from

4    both Wessel and Company and Mr. Stern.  And those

5    documents where Mr. Maurizio is seeking reimbursement

6    for mission trips shows receipt after receipt after

7    receipt of him using cash to buy things while he's on

8    mission trips, and then seeking reimbursement for them.

9    Q.   Do you find any source of that cash in his accounts

10   or in his credit card activity?

11   A.   I did not.

12   Q.   Did you specifically ask Mr. Stern whether he knew

13   where this unexplained source of cash was coming from

14   for the defendant?

15   A.   I did.

16   Q.   And what was his answer?

17   A.   He said that he had never thought of it before, but

18   that is a good question because, typically, most of the

19   receipts, other than the airline fares and the rental

20   car charges, were always in the form of cash payment.

21   Q.   So Mr. Stern had no idea where this other cash was

22   coming from?

23   A.   He did not.

24        MS. HAINES:  No further questions.

25        THE COURT:  Cross examine.

```
 1              MR. PASSARELLO:  Sure.

 2                    CROSS-EXAMINATION

 3   BY MR. PASSARELLO:

 4   Q.   These Western Union wire transfers, did you get the

 5   receipts from Wesell for those?

 6   A.   I believe -- I haven't had an opportunity to look at

 7   every Wesell record, but I believe they sent information

 8   at least relative to one of those transactions.

 9   Q.   But do you know where that $10,000 went?

10   A.   Yes.  It went to a priest in Honduras.

11   Q.   Do you know what it went for?

12   A.   Exactly what it went for, no, I do not.

13   Q.   If I told you that that money went to --

14              MS. HAINES:  Objection, Your Honor.

15              MR. PASSARELLO:  -- children on the street --

16              THE COURT:  Let's hear the question.

17   Q.   If I told you that that money was cash transfers

18   from Western Union went to Father Satrino San Pedro for

19   Bishop Encilian Sanchez to feed kids -- starving kids on

20   the street, would you have any documentation or

21   paperwork to contradict that?

22              THE WITNESS:  I --

23              THE COURT:  No, hold on, there's an objection.

24              Is there any objection?

25              MS. HAINES:  No there's not, Your Honor.
```

1        THE COURT:  Okay.  All right.  You may answer.

2        THE WITNESS:  I do not.

3   BY MR. PASSARELLO:

4   Q.   And if Wesell has the receipts and documentation for

5   that, you would be able to get that?

6   A.   If they have it would I be able to get it, yes.

7   Q.   Okay.  And I think you testified that these

8   spreadsheets are from three accounts, Somerset, 1st

9   Summit, and Stifle Nicolaus?

10  A.   Correct.

11  Q.   And those are accounts that have already been

12  provided in the letter that we provided to Attorney

13  Haines?

14  A.   Correct.

15  Q.   And am I wrong that if the Court freezes those

16  accounts that Father Joe would not have access to those

17  accounts?

18  A.   Yes.  He wouldn't have access to those accounts if

19  they were frozen.

20  Q.   And so I'm clear, have you filed charges against

21  Father Joe for any IRS problems?

22  A.   No.  I just became involved in this investigation

23  three weeks ago.

24  Q.   Okay.

25        MR. PASSARELLO:  I don't have anything further

1    from this witness.

2          MS. HAINES:  I have one question, Your Honor.

3                    REDIRECT EXAMINATION

4    BY MS. HAINES:

5    Q.  Special Agent, are you able or are you aware of

6    anybody who is able to freeze unknown sources of cash?

7    A.  No.

8          THE COURT:  I was going to say, I'd love to hear

9    the answer to that because I'd love to know how you do

10   that.

11         All right.  I do have a couple questions.  How

12   many, let's say, middle-level professionals, attorneys,

13   CPAs, doctors, have you audited in the course of your

14   career with the IRS?

15         THE WITNESS:  I've never audited anybody.  That's

16   what a revenue agent does.  I'm a special agent.  I just

17   purely conduct criminal investigations --

18         THE COURT:  How many --

19         THE WITNESS:  In fact, on a tax case I typically

20   have a revenue agent assigned to my case to assist me

21   with technical issues.

22         THE COURT:  How many of these spreadsheets have

23   you run on a doctor, a lawyer, an accountant who makes,

24   let's say, between about 50- and $150,000 a year?

25         THE WITNESS:  In 13 years I've done -- I don't

1    know how many spreadsheets I've done like this.

2              THE COURT:  One, ten, a hundred?

3              THE WITNESS:  A hundred probably.

4              THE COURT:  A hundred, okay.  All right.

5              In how many of those cases are you able to

6    determine to the last dollar, hundred dollar, thousand

7    dollar, ten thousand dollar ballpark where that person's

8    money is spent?

9              THE WITNESS:  Well, usually what goes through the

10   accounts I can determine it exactly.  But if it's spent

11   at Home Depot, I don't know exactly what it was spent

12   for.  But I can always determine where it went,

13   typically.  The only time that I can't determine where

14   money went is if the bank is unable to provide me with

15   records, which sometimes happens.  Or sometimes we don't

16   request all of the records.  Like, for example, we may

17   only request credits and debits over $250 on a case,

18   just because of the cost of getting all those small

19   checks.  Other than that happening though, I usually can

20   figure out exactly where the money came from and went

21   to.

22             THE COURT:  Okay.  So I'm a doctor.  Let's say

23   I'm a doctor and I treat, let's say, people who are

24   illegal immigrants who are working at local restaurants.

25   All right.  And they pay me 20, $30 in cash for health

1    needs.  And over the course of the last six years I've

2    treated maybe 100 illegal aliens.  And I use that money,

3    I go to the Sheetz and buy gas, I go to Jo-Ann Fabrics

4    and buy yarn, whatever.

5         Is that going to generate a record like this?

6         THE WITNESS:  If you spend -- if you have cash

7    and you just go spend it at Sheetz or a restaurant, no,

8    I wouldn't know about that because it's only --

9         THE COURT:  Well, let's say I get a $50 co-pay

10   from somebody in cash, and then I put it into my bank

11   account, and then I take money out of my bank account to

12   pay my gas bill or my water bill.

13        Is that going to generate a sheet like this?

14        THE WITNESS:  Sure.  Yeah.  You would see -- you

15   would see, if you just took $50 and deposited it you

16   would see it would say cash, and it would say $50 in the

17   transaction amount line.

18        THE COURT:  All right.  Okay.  That's kind of

19   what I'm --

20        THE WITNESS:  Yeah.

21        THE COURT:  -- in my own way and fashion trying

22   to figure out what these spreadsheets might mean,

23   putting it into terms of people whose financial pictures

24   would be similar to the defendant's.

25        THE WITNESS:  Okay.

```
 1              THE COURT:  In light of my questions, do either
 2     of counsel have anything?
 3              MS. HAINES:  I do.
 4                      REDIRECT EXAMINATION
 5     BY MS. HAINES:
 6     Q.   The Judge posed a question of middle income or
 7     doctors or lawyers who would be making I believe he said
 8     between 150 and --
 9              THE COURT:  I said between 50 and 150.
10     Q.   Do you know the amount of income that Defendant
11     Maurizio was making?
12     A.   I don't know exactly.  From my understanding from
13     speaking with Mr. Stern, it's in the $20,000 range.
14              MR. PASSARELLO:  Object to that; it's hearsay.
15              THE COURT:  Well, that's overruled.  But I recall
16     from the pretrial services report there was something
17     about $25,000 a year.
18              Is that your recollection, Counsel?
19              THE WITNESS:  That's --
20              THE COURT:  Your recollection, Agent, Counsel --
21     I'm sure I could dig it out of the report.
22              MR. PASSARELLO:  That's correct.
23              THE COURT:  All right.  The pretrial services
24     report said the defendant was previously employed by the
25     United States Navy, and he became a priest in his 40s.
```

```
1    So he had at least a career before that, so I have no
2    idea where -- and he inherited, I presume, the farm that
3    he's living on from his parents because he's living on
4    the farm that his parents owned, from the pretrial
5    services report.  So there's all kinds of stuff out
6    there.
7           What I'm concerned about is what's loose that
8    could fund flight.  Anything relevant to that.
9           MS. HAINES:  You've heard the agent testify --
10          THE COURT:  No, no, no.  I mean do you have any
11   questions in redirect relative to that?
12          MS. HAINES:  No.
13          THE COURT:  Okay.  All right.  And anything from
14   you?
15          MR. PASSARELLO:  No, Your Honor.
16          THE COURT:  All right.
17          THE WITNESS:  Thank you, Your Honor.
18          THE COURT:  All right.  Anything else?
19          MR. PASSARELLO:  Nothing from the defense, Your
20   Honor.
21          MS. HAINES:  Nothing from the United States, Your
22   Honor.
23          THE COURT:  All right.  Do either of you wish to
24   make any argument?
25          MS. HAINES:  Briefly, Your Honor.
```

1          THE COURT:  Sure.

2          MS. HAINES:  Obviously, as we've talked about in

3     the preceding hearings, this is a presumption of

4     detention case.  You've heard our previous evidence on

5     danger.  You've also heard, as our team is now in

6     country again following up on previous information we

7     obtained, we have found another victim who has detailed

8     for us, which we believe further fortifies danger, but

9     it also fortifies our risk of flight argument in that

10    now, as we've had testimony, that there are potentially

11    additional charges that can be coming against the

12    defendant which may elevate his need or desire to try to

13    flee, recognizing that the United States may be bringing

14    additional charges as well as Honduras.

15          More importantly on the risk of flight issue,

16    when we're talking about the financial aspects -- which

17    has been sort of the purpose that we've been going back

18    and forth over -- what we presented to you is in

19    relation to going back to the very first hearing the

20    concern that the Court had was when you look at the

21    pretrial services report, the finances that were

22    disclosed by Father Maurizio versus where he says, "In

23    addition to the above-listed assets, he's advised that

24    he has investments from which he receives monthly

25    income."

1          What you have heard, Your Honor, during this

2     hearing, as well as previous, is that what he listed for

3     us would lead one to believe that he had a personal

4     checking account of about $2,000.  Then he went right to

5     his mission checking account, with two signatures

6     required, of $88,000.  Then he lists some vehicles, an

7     ATV, land, and a residence.

8          What you've heard and have been able to see is

9     the voluminous amounts of personal accounts, as well as

10    other accounts his name was on.  And, clearly, the

11    defendant recognizes the significance of his name along

12    with someone else's on an account because he

13    acknowledges one of them in the mission checking

14    account.

15         He failed to disclose well over a million

16    dollars, as the agent has testified to, in personal

17    accounts.  You also have heard about how the agent's

18    analysis talks about everything he did:  I looked at the

19    money coming in, I looked at the money going out, I

20    looked at his credit card activity, I also looked at

21    these reimbursements that he continually was asking for

22    that were necessitated by the fact that the defendant at

23    the outset was paying cash.  And as the agent told us,

24    he was trying to find where is this cash.  And it wasn't

25    on one occasion or two occasions, but as the agents

62

1    start trying to show you, dating the whole way back from

2    2008.  And then as we talked about in the more present,

3    right up until the day of the search warrant we have

4    activity of unknown sources of cash being asked to be

5    reimbursed to the defendant with no known location of

6    where that cash came from initially.

7         We also have him, as the agent testified, on the

8    day of the search warrant withdrawing about $9700 worth

9    of cash from one of his accounts.  We don't know where

10   that money is either.

11        I think the bottom line is, Your Honor, you

12   wanted to -- you talked to us and wanted us to answer

13   the question:  Risk of flight and what do we know about

14   his financials.

15        Well, when you start from what the defendant told

16   us, it has grown exponentially, which is the position of

17   the United States.  Clearly you don't forget about all

18   that when you're talking either he forgot about it or he

19   didn't want us to know about it.

20        You also heard about we were supposed to be

21   provided with any potential assets that may be out there

22   in the defendant's name.  Yes, we have the list that

23   came via letter from the defense counsel.  But you also

24   heard about the endowment accounts.  Now, it sounds like

25   the access may be limited, but you heard how the letters

1     are sent directly to the defendant, that he's told about

2     "here's your semiannual update on endowments of interest

3     to you," and attached to them are disbursement forms

4     listing specific amounts of money that could possibly be

5     accessed.  We never heard about those before.  They are

6     possible.

7          Now, in the grand scheme as we've developed and

8     looked into it, we had to find them, we had to digest

9     them, we had to look for them and find out what they

10    were.  They weren't disclosed to us.  They weren't told

11    definitely by the defendant from the beginning.

12         So when you look at presumption of detention, the

13    unknown, clear unknown sources of cash that continued

14    for years right up to the present, looking even at the

15    date of the search warrant the withdrawal of almost

16    $10,000 that is unaccounted for right now, coupled with

17    the previous information and evidence we've given you on

18    danger, as well as what you've just heard today, we ask

19    that the defendant be detained.

20         MR. PASSARELLO:  May it please the Court,

21    Attorney Haines.  Your Honor, first I'm going to address

22    just briefly the danger to the community issue.  I

23    believe that there's been nothing presented that should

24    change this Court's mind on its original ruling.  If the

25    Court recalls correctly, the original complaint had at

1    least three alleged victims.  The grand jury, for

2    whatever reason, indicted only on one.  Father Maurizio

3    was aware at the original time that there were at least

4    potentially three victims in the criminal complaint.

5         We were aware of these allegations made back five

6    years ago.  Father Maurizio never fled anywhere and he's

7    not -- he would never -- he's not a flight risk.  But

8    we'll get into that.  But what I'm saying to you, Judge,

9    is he was aware of those.  I don't think danger to the

10   community has changed.  You heard the testimony before

11   regarding that, so I believe that position the Court had

12   originally should remain.

13        Secondly, serious flight risk.  Under the law the

14   threat of flight must be serious.  And, in fact, there's

15   a case that indicates that when the defendant's assets

16   have been frozen it eliminates serious flight risk.  I

17   would indicate to the Court the following: We, to the

18   best of our ability, provided every single account that

19   we could provide to the United States.  We don't have

20   the resources that they have.  We don't have 10,000

21   agents located in Pittsburgh, Harrisburg, Honduras, and

22   everything else to find them.  We've provided everything

23   we could do.  We've also provided to the Court live

24   testimony regarding those accounts and what access he

25   has to them.

1           The endowment account that they're talking about,

2    Judge, he doesn't own it, he doesn't have access to it,

3    and we already heard testimony on it.

4           Our plan before this Court, I believe we have

5    provided to this Court the least restrictive means to

6    assure his appearance absent detention.  You have to

7    make a finding there's no other reasonable means absent

8    detention to assure his appearance.

9           We have provided the plan, and the plan is as

10   follows:  Number one, we put his house up as collateral.

11   We have the appraisal, we have all the documents for the

12   farm.

13          Number two, every single account -- now I believe

14   we have them all -- that you think he has access to or

15   can have access to, we have agreed to freeze.  Can't

16   touch.

17          We also have agreed to whatever in-home detention

18   conditions this Court wants to put on Father Maurizio so

19   that he can at least remain free until disposition of

20   his case.

21          All of this other stuff that they have done for

22   the last two hearings about well, there's going to be

23   this filing and this filing and this victim and that

24   victim and the IRS is coming.  It sounded like fury and

25   signifies absolutely nothing.  And the reason why is we

1    are here to focus on the indictment that is before this

2    Court today; one count of the sexual tourism charge and

3    one count of the possession of child pornography charge.

4    And that's it.  And that's what we are here for today.

5         I do not believe he is a serious flight risk, and

6    the Court has to make a determination it's serious.  I

7    believe we have provided a plan that would assure his

8    appearance absent continued incarceration in this case,

9    which is what is our burden of production to do.  And I

10   don't believe that the Commonwealth has met their burden

11   by a preponderance that he is a serious flight risk.

12        THE COURT:  You did it again; it's the federal

13   government, not the Commonwealth.

14        MR. PASSARELLO:  I'm sorry.

15        THE COURT:  It's okay.

16        MR. PASSARELLO:  I apologize, Your Honor.

17        THE COURT:  That's all right.

18        MR. PASSARELLO:  The United States.

19        THE COURT:  Anything else from the government in

20   rebuttal?

21        MS. HAINES:  No, Your Honor.

22        THE COURT:  All right.  Well, let me talk about

23   the risk, or the dangerousness to the community.  I have

24   heard in the initial complaint brought to me several

25   allegations of what's been referred to as sex tourism,

1    that being sexual conduct with a minor that took place

2    in another country.  When it was presented to the grand

3    jury, apparently, it reduced down to one.

4         At the initial detention hearing there was a

5    statement about a local charge that was maybe in the

6    offing, and that's not happened.  There's been no

7    evidence as to that.  And if there's no evidence as to

8    that, there's no evidence to that.

9         Today what I've heard is that someone unknown has

10   come forward in Honduras to testify to an event that

11   took place about ten years ago.

12        Now, Attorney Haines, I know you've coached a

13   basketball team, I've coached a soccer team.  If that

14   soccer team were in Honduras and ten years after the

15   fact somebody said, I was molested by my coach, you

16   know, I'm allowed to take the strength of the case into

17   account when I discuss -- when I make a ruling on

18   dangerousness to the community.

19        And an accusation -- I didn't find dangerousness

20   to the community based on the accusations that were

21   presented to me previous.  This latest accusation, even

22   though it may be late-breaking information to you,

23   involves an accusation of conduct that took place years

24   and years ago, and it does not present any additional

25   evidence of dangerousness to the community.

1          As far as risk of flight goes, I detained him

2     because the defendant had declined -- and you were

3     reading from the pretrial services report, Attorney

4     Haines, that he had declined to provide information.

5     Well, subsequent to that counsel provides information.

6     I've heard about that.  It appears that the amounts that

7     were disclosed have all been checked out.  Now, I didn't

8     hear about this $9,700 until today, and I still don't

9     know where that went.

10          But the claim that this HIM Ministries account

11     was a source of funds that would potentially allow the

12     defendant to flee I think has been thoroughly explored

13     and thoroughly proven not to be the case.

14          So what you have, even though we're talking about

15     large amounts of money, is you're talking about large

16     amounts of money that are either investment income which

17     spins off income for what I hope are charitable purposes

18     but, in any case, are not either legally or beneficially

19     assets of the defendant.  His personal wealth has been

20     explored, and that is as counsel for the defendant has

21     said, that is freeze-able.

22          All right.  But here's something that hasn't come

23     up today and has troubled me somewhat:  At our telephone

24     conference there was a discussion that there was going

25     to be additional evidence as to dangerousness to the

1    community in the form of either testimony or a proffer

2    that the alleged pornographic picture, the child

3    pornography that was charged in the indictment, was, in

4    fact, manufactured by the defendant.  And that would

5    make him susceptible to a 15-year mandatory minimum.

6    Notwithstanding that the defendant is 69, and whether

7    it's a 15-year minimum or 15-year maximum, you're still

8    talking about the rest of his natural life.  But I

9    didn't hear anything about this alleged manufacturing.

10          Furthermore, what I haven't heard is something

11   that's unique in my experience with cases of this type.

12   You've charged the defendant with child pornography.  I

13   signed the search warrant.  You seized his computers,

14   you seized his flash drives, you seized his cell phone,

15   you seized everything.

16          And you said at the initial proceeding that you

17   had 18,000 images that you were going through and were

18   cataloging them and so on.  And if you had found child

19   pornography, if you had found evidence that there was

20   something on there that was, I'm sure -- well, I'm not

21   sure -- I would presume, based on my experience with the

22   government in every other case, I would have heard about

23   it because it's evidence that is relevant to both

24   dangerousness to the community and risk of flight.

25          So what I have is an image of a young boy who has

1    polio, who has since died, who is alleged to have been

2    posed in a sexually provocative way.  That is a

3    conclusion.  I've not seen the photograph.  When I

4    asked, you know, well, the government declined to

5    produce it on the grounds that -- and you cited your

6    legal basis for doing so, and that's fine.

7         But usually if you have a child pornographer

8    you've got a compulsive.  You've got thousands of

9    images, you got people that can't be parted from it.

10   When we release people who are charged with child

11   pornography, one of the conditions that pretrial

12   services routinely -- they have four menu items that

13   they routinely offer as conditions on computer

14   monitoring, because usually the defendant is connected

15   to the internet.  And as pretrial services officers have

16   told me, if they're compulsive they can't stay away, we

17   nab them.

18        Attorney Passarello is proffering basically a

19   home detention confinement.  At the previous hearing he

20   said take away his computer, take away his access to the

21   internet, doesn't matter to us, no big deal.  That's

22   very unusual.  In fact, I can't recall another case

23   involving child pornography that presents both of those

24   circumstances.  One image, and a defendant who says,

25   hey, disconnect me, fine, no problem.  So dangerousness

```
1    to the community and risk of flight are obviously,

2    intertwined.

3          What cannot be overlooked in this case is that

4    defendant is a Catholic priest.  I know that is so

5    because after the first hearing, when the courtroom was

6    a little more crowded than this, a person professing to

7    be a member of the press sent a nasty-gram to my chief

8    judge complaining that he wasn't allowed to sit in the

9    jury box and had to stand through the hearing.

10         Well, you know, this side of the bar is where the

11   business of the Court gets done.  I don't ask Mr. Ray

12   back there to go walk around the print floor of the

13   Altoona Mirror -- and it wasn't you, Phil.  I say

14   because I know you.  And this is where it goes.  But

15   what was curious about the journalist's letter, email,

16   was, And there's a substantial first amendment interest

17   in the press being able to ferret out the misdeeds of

18   Catholic priests.  Wow.

19         And the local paper, they ran a completely

20   unrelated story concerning the settlement of alleged

21   abuse cases by a Franciscan monk over at Bishop McCourt

22   High School next to a story about this case as if, well,

23   you know, they're all Catholics, there's some -- the

24   government's not involved with that.

25         But what you have when you have a member of the
```

1    clergy is you have -- people put money in the collection

2    plate.  They don't use credit cards.  You have, in many

3    cases, people will come up and give a minister cash.  It

4    lends itself to abuse.  The IRS -- you know, some of the

5    investigations that Congress has attempted with some of

6    these mega-church donors, you know, where is this money

7    coming from, where is it going.

8         I don't care about the sloppy recordkeeping.  I

9    don't care if Father Maurizio is stealing from the

10   collection plate.  That's not what's here.  What's at

11   issue when it comes to risk of flight is does this

12   individual have a source of income that I don't know

13   about that could possibly fund his flight.  And the

14   answer to that is no.

15        Now, if you come up with evidence that there is,

16   or he's got cash tucked away in the mattress that

17   despite your search of his house you didn't find, I

18   didn't hear it today.

19        If I am to believe that despite the disclosure

20   made today and in the letter of October 16th, and the

21   testimony here today, that there is a risk of flight

22   because potentially out there there is a source of

23   income or a source of funds that could fund a flight,

24   well then no one in America could ever possibly be

25   released prior to trial ever again because everybody's

1   in that situation.  We have, in this Court and every

2   other court that I'm familiar with, released on pretrial

3   conditions people who sell drugs.  The very nature of

4   their business is a cash business, every dollar of which

5   is illicit.

6            Now, I don't know whether counsel for the

7   defendant's claim that the money that was wired to

8   Honduras in 2008 really went to feed street children or

9   not.  But I do know that every dollar that a drug dealer

10  gets for selling cocaine is an illegal dollar, and it's

11  not going for feeding hungry kids in Honduras either.

12  And yet, we let those people out on pretrial release

13  routinely without opposition from the government.

14           The possibility that there is a source of funds

15  out there that exists no matter what the charges are,

16  any time, any place, to say that that's a risk of flight

17  would be to say there is no such thing as pretrial

18  release.

19           Furthermore, there are Third Circuit cases, which

20  have been cited to me repeatedly over the years, that

21  say a financial crime in itself is not a risk to the

22  community.

23           If, in fact, you're morphing this into a money

24  laundering charge or you're trying to also build a tax

25  case out of this, okay.  But that doesn't add anything

```
 1    to the limited inquiry that I have.  I am not here for

 2    guilt.  I am not here for innocence.  I found probable

 3    cause as to the underlying charge, but I cannot find

 4    that there is a risk of flight that cannot be allayed by

 5    satisfactory conditions.

 6          And let me talk about an equitable matter at that

 7    point.  This case is going to be a nightmare for Judge

 8    Gibson.  It's going to be a nightmare for the

 9    government.  It's going to be a nightmare for the

10    defense.  We're talking about allegations that took

11    place ten years ago, so far, in Honduras.  We're talking

12    about in some cases witnesses who have died or you've

13    had to scour countries to find, presumably Spanish

14    speaking.  There are interpretation problems.  There are

15    motivation problems.  There is the fact that the FBI had

16    this case in 2009 and did not go forward with it.  Which

17    means, for practical purposes, that there is Brady

18    material that is just all over.

19          The pretrial proceedings in this case are going

20    to take years.  I expect at least one trip to the

21    circuit on interlocutory appeal.  And I see that the

22    first salvo has already been fired in the defendant's

23    motion to sever the charges.  That's going to require a

24    briefing.  And then, undoubtedly, there's going to be

25    more pretrial motions.
```

1          Pretrial detention should not be pretrial

2    punishment.  That is, that is not the case that the Bail

3    Reform Act says you can use that.  You cannot use

4    pretrial detention to leverage a case against the

5    defendant.  The government has cited in writing its

6    claim that, well, the fact that Honduras has filed an

7    arrest warrant makes the question of release moot

8    because he's going to be extradited.

9          That's not what the extradition statute says.

10   It's not even the Department of Justice's call.  That's

11   the Department of State's call.  And that assumes that

12   there's an extradition request.

13         Now I accept, because it's been presented to me,

14   that there was an arrest warrant issued in August of

15   this year.  But if there's an extradition request that's

16   a whole separate ballpark.  And as I've already

17   mentioned when I spoke with counsel before, that's a

18   very unfavorable set of precedents as far as the

19   defendant is concerned.  That does result in virtually

20   automatic detention.  But we're not there yet, and the

21   possibility of extradition is not something that I can

22   factor in and say, well, it's not going to do any harm

23   because he's probably going to be put in jail anyway.

24   That's just not permissible for me; it's not permissible

25   for anybody.

1         All right.  I find that the risk of flight can be

2    satisfactorily countered by home detention.  No visitors

3    who are minors.  Not even the condition that we

4    routinely put into place that say minors can be there

5    only when supervised by an adult who has knowledge of

6    the charges.  None of that.  No conditions at all.  Just

7    no minors.  No visitors not pre-approved by pretrial

8    services.  Your sister lives there, apparently --

9         MR. PASSARELLO:  She does.

10        THE COURT:  Is she a co-owner of the property?

11        MR. PASSARELLO:  No, she's not.  But she resides

12   there.

13        THE COURT:  She resides there.  All right.  Well,

14   I'm not going to kick her out of her residence.  But she

15   doesn't get visitors unless they're pre-approved by

16   pretrial services.  No minors, period.  So if there's a

17   Christmas thing with kids, it's not going to take place

18   there, and you're not going to go to it.

19        No internet at all.  If there is a landline at

20   the house -- and I'm going to require electronic

21   monitoring.  He cuts the monitor, he goes off the

22   property, you know, he goes to jail and he stays there

23   until the end of pretrial proceedings some years down

24   the road.

25        So if, in fact, there is a brick of $20 bills

1    sitting in a safe house someplace in Windber that could

2    potentially fund a flight, the best he's got is the

3    couple minutes head start that he would have, because

4    pretrial services would immediately know that he's left

5    his property.

6          If you have a smart phone, if you have anything

7    else that is internet capable, you're going to turn that

8    over too.  You're allowed what I had in the 1960s;

9    you're allowed a landline that doesn't have a picture or

10   anything else.

11         Television, yes.  Not a television that you can

12   hook up to a Game Boy or an Xbox 360 and game over the

13   wire with other people, because I know those things can

14   be used as internet communication devices.

15         All the assets referred to in October 16th's

16   letter and anything that belongs to or the defendant has

17   access to he's to be off of.  My understanding is that

18   -- well, obviously, you're not acting as a pastor or a

19   priest at your former parish because you've been in

20   jail.  But any parish accounts you're off of those.  No

21   signature authorities, nothing.  I mean no access to

22   that at all.

23         I'm trying to think of how you pay the gas bills

24   at your residence.  I think the defendant's sister is

25   going to have to pay the bills.

1          MR. PASSARELLO:  Yes, Judge.

2          THE COURT:  Attorney Passarello, I'm probably

3     going to require an accounting from you periodically as

4     to just how much cash the sister is using to pay the

5     bills, just to make sure there's not an accumulation of

6     cash that could potentially fund a flight.

7          MR. PASSARELLO:  Understood.

8          THE COURT:  If there is any, not signature

9     authority, any beneficial authority, any informational

10    authority about any of the accounts for HIM, the HIM

11    accounts, Humanitarian Interfaith Ministries accounts or

12    the -- what was it, the stop --

13         MR. PASSARELLO:  Topshop.

14         THE COURT:  Topshop or Matthew 25 or anything

15    else under whatever name, he is to come off of those.  I

16    think the Ecclesiastical phrase is syndic, S-Y-N-D-I-C.

17    Back in the tutoring when the clerics were forbidden to

18    hold things, they had to find a layperson who would hold

19    it for them.  You're going to have to find a syndic.

20    Either there's a successor plan or those things are just

21    going to have to go into cessation until this thing is

22    over, because if he had control over them he can't have

23    any access to them.

24         MR. PASSARELLO:  I understand.

25         THE COURT:  All right.  Access to him, travel by

1    him, resources to him, computers.  That's all the

2    conditions I think I've ever imposed in 20 years of

3    being here.  I don't think I've overlooked anything, but

4    after we close the record if somebody says, oh, yeah,

5    what about the so and so -- fortunately, the election's

6    over so you don't even get to leave to go vote, unless

7    you're doing it by absentee ballot by mail.

8           You're allowed to leave the property for medical

9    care.  You have to clear that in advance if you're not

10   being taken to the hospital in an ambulance which,

11   again, pretrial services would have that because you'd

12   be leaving the premises.  If you're going to visit a

13   doctor as a matter of routine medical care, that's to be

14   provided in advance and cleared by pretrial services.

15          That covers every condition I have ever imposed

16   on any defendant in any case whatsoever in this court.

17   I will ask that the court reporter transcribe that.  I

18   will put it in a written order.  But the transcribed

19   copy of what I have just gone through will be appended

20   to my order, just so that there is no ambiguity as to

21   what I've ordered.

22          Now, sir, let me speak to you directly.  In

23   previous cases I have released people on pretrial

24   conditions.  If you violate any of those conditions you

25   don't get a second chance.  Somebody went off the porch

1    and went down to the corner bar and bought a sixpack,

2    and they spent the rest of the pretrial period in jail.

3    Any of the conditions violated will result in a

4    revocation of my release order.  There is no second

5    chance, because this has already been a more protracted

6    proceeding than any other I've been involved in, and I

7    do not intend to hold any more evidentiary hearings in

8    this.

9            Either of counsel is free to appeal my order to

10   Judge Gibson, but I'll have the paperwork out to counsel

11   today.

12           MS. HAINES:  And, Your Honor, we ask that you

13   hold your release order in abeyance as we appeal to

14   Judge Gibson.  Also on the grounds, not only that we

15   respectfully disagree with your decision on both risk of

16   flight and danger, but also on the fact that as of today

17   it is our understanding that some of those accounts, the

18   names have not been fully removed as of yet, and/or that

19   the potential power of attorney that's in place is his

20   niece.

21           So the United States would oppose his release,

22   one, because we're appealing and we ask you to hold in

23   abeyance and, two, because not everything has been put

24   in place, even to effectuate what you are saying should

25   be done to assure that he doesn't have access to money

```
1    to flee.

2           THE COURT:  Oh, in case it wasn't clear, he's got

3    to do all that before he's released, just like you have

4    to post a bond and so on before you're released.  So

5    that's not an issue.

6           As to the other, yeah, you routinely -- when you

7    appeal to Judge Gibson it supercedes my order pending

8    his review.

9           MS. HAINES:  Thank you, Your Honor.

10          THE COURT:  So I will put that in place

11   procedurally then, since the government has indicated

12   that they're going to appeal to Judge Gibson.

13          Attorney Passarello, whether you want to have

14   your ducks in a row or whether you want to litigate the

15   matter in front of Judge Gibson, that's up to you.  My

16   conditions of release have been set forth, and if you go

17   ahead and remove the defendant from all those accounts

18   that I've referred to, it may do you no good, depending

19   on what Judge Gibson does, but if Judge Gibson agrees

20   with my order then that would result in the conditions

21   that I've imposed on him already being satisfied, and

22   that would not be a further impediment to actual

23   release.

24          MR. PASSARELLO:  Yes, Your Honor.  And I would

25   just indicate that we're in the process of revoking the
```

1   power of attorney, and also we have removed him from

2   some accounts he has signed.  And the other accounts

3   that are in his name only I believe you have frozen, so

4   that will take care of that.

5          THE COURT:  Well, yeah.  I'm ordering you to come

6   up with a person to whom legal control over those

7   accounts can be assigned pending disposition of this

8   case.

9          MR. PASSARELLO:  Yes, I understand.

10         THE COURT:  All right.  With that understanding

11   and with the government's appeal, sir, you're going to

12   be returned to custody pending Judge Gibson's decision

13   on whether to adopt or to reject my position in this

14   matter.  As I've already said, a transcript of this

15   matter will be made, and that should be provided to

16   Judge Gibson as well.

17          In the meantime, please remember the advice I

18   gave you at the initial appearance.  The only person in

19   the world that you can speak to without fear of hearing

20   it from the witness stand is your attorney.  I would

21   advise you to talk to your attorney first.  If you take

22   my advice, you'll talk to your attorney only.  I've

23   never seen anybody benefit from violating rule

24   number one, which is talk to your attorney first.

25          All right.  We're in recess.

1          (Proceedings concluded at 12:14 p.m.)

2                          *  *  *

3              CERTIFICATE OF OFFICIAL REPORTER

4

5          I, Kimberly K. Spangler, Federal Official Court

6     Reporter, in and for the United States District Court

7     for the Western District of Pennsylvania, do hereby

8     certify that pursuant to Section 753, Title 28, United

9     States Code, that the foregoing is a true and correct

10    transcript of the stenographically reported proceedings

11    held in the above-entitled matter, and that the

12    transcript page format is in conformance with the

13    regulations of the Judicial Conference of the United

14    States.

15

16                    Dated this ____ day of _____ 2014

17

18           _____
             KIMBERLY K. SPANGLER, RPR
19           FEDERAL OFFICIAL COURT REPORTER

20

21

22

23

24

25