```
 1                  UNITED STATES DISTRICT COURT
              WESTERN DISTRICT OF PENNSYLVANIA
 2                      JOHNSTOWN DIVISION


 3

      UNITED STATES OF AMERICA,
 4
                  Plaintiff,          Case No:  14-cr-23
 5
           v.                         Johnstown, Pennsylvania
 6                                    November 14, 2014

 7      JOSEPH D. MAURIZIO, JR.,

 8              Defendant.
      _____
 9

10        TRANSCRIPT OF DE NOVO HEARING PROCEEDINGS
              BEFORE THE HONORABLE KIM R. GIBSON
11                UNITED STATES DISTRICT JUDGE

12
                    A-P-P-E-A-R-A-N-C-E-S
13

14   FOR THE GOVERNMENT:   Stephanie L. Haines, AUSA
                           United States Attorney's Office
15                         Penn Traffic Building, Ste. 200
                           319 Washington Street
16                         Johnstown, PA  15901

17   FOR THE DEFENDANT:    Steven P. Passarello, Esq.
                           Passarello & Sisto
18                         616 Hileman Street
                           Altoona, PA  16601
19
     COURT REPORTER:       Kimberly K. Spangler, RPR
20                         United States District Court
                           Penn Traffic Building, Ste. 204
21                         319 Washington Street
                           Johnstown, PA  15901
22                         (814) 536-9999

23

24

25
```

```
 1                         I N D E X

 2                    November 14, 2014

 3

 4   Government
     Witnesses:       Direct     Cross     Redirect     Recross

 5   JASON ADAMS         4         19         24           26

 6   KEVIN PETRULAK     28         46         50           52

 7

 8   Defense
     Witnesses:       Direct     Cross     Redirect

 9   VINCENT VENA       54         56

10   JOHANNA VENA       58         63

11   ROSEMARY DiLORETO 64

12   CHRISTINE SHAULIS 66         69

13   SHAWN LEWIS        70         72

14   THOMAS WEIMER      73

15   THOMAS R. SEITZ    75

16   RICHARD W. STERN   77

17   Certificate of reporter                            94

18

19                          *  *  *

20

21                      E X H I B I T S

22   Government
     Exhibits:                        Marked    Admitted

23   Exhibit 1                                    43
     Exhibit 2                                    43
24   Exhibit 3                                    43

25
```

```
1                    P R O C E E D I N G S

2       (The proceedings convened on November 14, 2014,

3    commencing at 9:00 a.m.)

4              THE COURT:  This is the time and place set for

5    detention hearing in the case of United States v. Joseph

6    D. Maurizio, 14 Criminal 40.  14 Criminal 23.  The 40

7    was the magistrate judge number; we now have a criminal

8    number assigned to it.

9              Counsel, if you would both enter your appearance

10   please, and tell me who you represent.

11             MS. HAINES:  Good morning, Your Honor.  Stephanie

12   Haines for the United States.

13             MR. PASSARELLO:  Good morning, Your Honor.

14   Steven Passarello for the defendant, Joseph Maurizio.

15             THE COURT:  Well, good morning to you and to the

16   defendant and to the others present today.

17             The purpose of today's proceeding is to decide

18   the issue of detention in this case.  I realize there

19   have been prior proceedings in front of the magistrate

20   judge; however, there was a request for a de novo

21   hearing, and I granted that request.

22             Are the parties ready to proceed in this matter?

23             MS. HAINES:  The United States is ready, Your

24   Honor.

25             MR. PASSARELLO:  The defense is ready, Your
```

1    Honor.

2              THE COURT:  Attorney Haines, on behalf of the

3    United States if you would proceed.

4              MS. HAINES:  The United States calls Special

5    Agent Jason Adams.

6              JASON ADAMS, GOVERNMENT'S WITNESS, SWORN

7                        DIRECT EXAMINATION

8    BY MS. HAINES:

9    Q.   Would you please state your name for the record.

10   A.   Jason Adams.

11   Q.   And by whom are you employed?

12   A.   Homeland Security Investigations.

13   Q.   And are you a special agent with them?

14   A.   Yes.

15   Q.   And how long have you been so employed?

16   A.   Since July of 2009.

17   Q.   Prior to your employment with Homeland Security by

18   whom were you employed?

19   A.   I worked in the private sector in the defense

20   contract industry, human resources, risk management, and

21   private security.

22   Q.   With your current position at Homeland Security

23   where are you stationed?

24   A.   The HSI office in Pittsburgh, Pennsylvania.

25   Q.   And could you please tell the Court a little bit

1    about your duties and responsibilities.

2    A.   I work in the child exploitation group, investigate

3    crimes involving child exploitation.

4    Q.   Have you become involved, as a member of the

5    investigative team, on the case of United States v.

6    Joseph Maurizio?

7    A.   Yes.

8    Q.   Could you please tell the Court how you became

9    involved with this case.

10   A.   Due to the complexity of the case, I was asked to

11   assist the case agent with this investigation.

12   Q.   And who is the lead case agent?

13   A.   Special Agent Molly Rock.

14   Q.   And are there a number of individuals as part of

15   your team?

16   A.   Yes.

17   Q.   Could you please describe at the outset when and how

18   you and your agency became involved.

19   A.   In approximately February of 2014 the HSI office in

20   Pittsburgh received information that there were reports

21   of sexual abuse committed by Joseph Maurizio against

22   former male residents of ProNino Honduras in El Progreso

23   Honduras.

24   Q.   And did you undertake an investigation as to what

25   ProNino was in Honduras?

1    A.   Yes.

2    Q.   And what did you come to learn about that location

3    and the children that resided there?

4    A.   They're an orphanage that takes in homeless

5    children, needy children, hungry children in the

6    El Progreso area.  They have multiple locations where

7    the children can stay and they can get food, clothes,

8    shelter.

9    Q.   And what did your investigation reveal as to

10   Defendant Maurizio's contact with that location?

11   A.   Our investigation revealed that he had started there

12   in the early 2000s, approximately, and he had been

13   involved with funding and traveling to ProNino Honduras

14   and developing the orphanages, building buildings, and

15   assisting them with developing the orphanages in

16   general.

17   Q.   When your agency became aware of these allegations

18   in February of this year, did you also learn that

19   another federal agency had been involved in this case?

20   A.   Yes.

21   Q.   Could you tell the Court what information you had

22   relative to that.

23   A.   We received information that the FBI had received a

24   report in approximately 2009 of these allegations.

25   Q.   Did your agency then coordinate with the FBI on

1    this?

2    A.   Yes, we did, fully.   We requested and received full

3    reports from the FBI regarding their investigation.

4    Q.   And what did you come to learn about the progress or

5    ability of the FBI to proceed on this case?

6    A.   We were informed that while their investigation was

7    still open that they had referred the investigation --

8    requested the assistance, rather, of their legat office

9    in a neighboring country -- they didn't have a presence

10   in Honduras -- and that legat office wasn't able to get

11   into Honduras to locate victims, conduct interviews, and

12   further their investigation.

13   Q.   So it wasn't that the FBI dropped this case, did

14   they?

15   A.   No.

16   Q.   As a result of your coordination with the FBI, did

17   you also undertake looking into the travel habits of

18   Defendant Maurizio?

19   A.   Yes.

20   Q.   And what did your investigation reveal?

21   A.   That he extensively traveled to South American

22   countries, specifically Honduras, multiple times,

23   coinciding with trips that witnesses described to us,

24   and that he also traveled to the Dominican Republic,

25   Costa Rica, Haiti, Nicaragua.

1    Q.   And this travel by Maurizio to Central American

2    countries continued until when?

3    A.   Our records show that he traveled to Honduras up

4    until the allegations in 2009, and then he stopped

5    traveling to Honduras for approximately a year and a

6    half.  Our records show that he didn't travel for that

7    period of time.  And then when he began to travel again

8    he didn't travel back to Honduras.

9    Q.   Did he travel during the calendar year 2014 out of

10   the country?

11   A.   Yes, he did.

12   Q.   And were there multiple trips out of the country in

13   this calendar year?

14   A.   There were.  He traveled to Costa Rica and Haiti.

15   Q.   Now, you testified that the FBI was unable to get

16   into Honduras.  Was your agency able to go down to

17   Honduras after you received the allegations of abuse?

18   A.   Yes, it was.  Our office there is well equipped to

19   handle investigations like this.  We have an HSI -- we

20   have a special agent that's assigned to the HSI legat

21   office, and we have a vetted unit which is made up of

22   Honduran national police officers, which is

23   approximately 20 in number.  So they were better

24   equipped to locate witnesses and further the

25   investigation for HSI.

1    Q.   To date, how many times has the investigative HSI

2    team with the attaché unit there been in Honduras for

3    interviews?

4    A.   Twice.

5    Q.   Let's talk about your first trip to Honduras, when

6    would that have occurred?

7    A.   In late July, early August of 2014.

8    Q.   And what was accomplished, in a general sense,

9    during that trip to Honduras?

10   A.   As a result, we were able to locate two witnesses

11   who provided information relevant to the sexual abuse

12   claims against Joseph Maurizio, and we were able to

13   interview one victim who disclosed sexual abuse by

14   Joseph Maurizio.  This victim was a minor when the

15   sexual abuse was committed.

16   Q.   Did this minor come screaming forward to us telling

17   us everything?

18   A.   No.  These witnesses, as well as the victim, had to

19   be located.  They did not approach us and request to be

20   interviewed whatsoever.  Our vetted unit in Honduras had

21   to go and locate these individuals with the assistance

22   of ProNino Honduras.

23   Q.   As a result of being identified with a victim minor

24   during your first trip to Honduras, what was the result

25   of that?  What action did we take here in the United

1    States?

2    A.   There was a -- Joseph Maurizio was charged with one

3    count, based on the sexual abuse allegation.

4    Q.   Now, you also said that you made two trips to

5    Honduras.  When was your second trip to Honduras?

6    A.   Just recently, the 1st of November 2014.

7    Q.   And when did the team return back from Honduras?

8    A.   We just returned a few days ago.

9    Q.   As a result -- why did you go back a second time to

10   Honduras?

11   A.   We went back because on the first trip the witnesses

12   provided additional people that we should speak to that

13   possibly were abused as well and might be able to

14   provide information.  Those individuals weren't located

15   on the first trip, so that's why we went back on the

16   second trip, because those individuals were potentially

17   located.

18   Q.   And were additional victims located during the trip

19   that you just returned from this week?

20   A.   Yes.

21   Q.   How many additional victims do we have?

22   A.   Two.

23   Q.   And were they both minors?

24   A.   Yes.

25   Q.   And in a general sense, what did Victim Number 2 and

1    Minor Victim Number 3 state?

2    A.   They disclosed sexual abuse by Joseph Maurizio while

3    they were minors and living at ProNino Honduras.

4    Q.   While you were in Honduras were the Honduran

5    authorities also involved in your investigation?

6    A.   Yes.

7    Q.   Let's talk about your first trip and Minor Victim

8    Number 1, who is in our Count 1 of our indictment.  What

9    is your understanding of what the Honduran authorities

10   have done in reference to Victim Number 1?

11   A.   They have issued an arrest warrant based on that,

12   the information obtained from that victim, and that

13   arrest warrant is currently still active.

14   Q.   As a result of the investigation that was just

15   concluded a few days ago, what are the Honduran

16   authorities intending to do with Minor Victim Number 2

17   and Minor Victim Number 3?

18   A.   They informed us that they were going to file

19   additional charges based on the information obtained

20   from those victims as well.

21   Q.   And what is your understanding of what we here in

22   the United States plan to do?

23   A.   File additional charges as well for those two new

24   victims.

25   Q.   As part of your investigation as a Homeland Security

1    agent, were you able to take part in or aware of either

2    border searches or inbound inspections that occurred

3    within the last calendar year when Defendant Maurizio

4    returned from his out-of-country trips?

5    A.   Yes.

6    Q.   How many of these inbound inspections were conducted

7    by Homeland Security?

8    A.   There were two.

9    Q.   Could you just sort of tell me when and from what

10   country was the inbound inspection for.

11   A.   In March there was an inbound inspection that was

12   conducted.  And then in late July, early August there

13   was a -- actually, it was August rather -- there was an

14   inspection done as well, and items were searched as part

15   of a border search process.

16   Q.   Could you please explain to the Court exactly what

17   -- and let's talk specifically about the most recent

18   inbound inspection border search that was conducted in

19   late July, early August as the defendant was arriving

20   back from Costa Rica.  Tell us exactly what that

21   incorporates.

22   A.   The devices that were with Mr. Maurizio at the time

23   that he was entering the country were seized and

24   searched.  A camera was searched, the memory card of

25   that camera was searched and photographs were located on

1    that camera that were of interest to us.  Two in

2    particular which we would deem, I guess it would be

3    called child erotica.  It appeared to be a 10- to

4    12-year-old boy.  There were two pictures of him sitting

5    on a beach.  One was an overall picture of his whole

6    body, he was clothed.  And then the other picture was

7    zoomed in with his groin area featured in the center of

8    the photograph still clothed on the second photo.  And

9    then the other photo that we -- or the photo that we

10   found was approximately a 15-, 16-year-old boy.  Another

11   photo of his groin area, the groin area featured

12   prominently in the center of the picture.

13   Q.  And these were pictures that were discovered during

14   the inbound search of the defendant's personal items,

15   correct?

16   A.  Yes.

17   Q.  Was a cell phone also seized from the defendant as a

18   result of the inbound inspection that just occurred a

19   few months ago?

20   A.  Yes.

21   Q.  Was there anything relevant on the defendant's cell

22   phone that your agency found?

23   A.  There was a Google translation app history that was

24   located, and in that translation history there were

25   translations that were done on the phone that indicated

1      Joseph Maurizio was having a conversation with a minor

2      male in an inappropriate way, of a sexual nature.

3      Q.   And how did we know that it was with an underage

4      boy?

5      A.   There were references in the translations to the

6      individual being under the age of 18, and approximately

7      15 to 16 years of age.

8      Q.   And you said there was inappropriate dialogue

9      between the defendant on his cell phone and this minor

10     child.  And why was that dialogue of interest?

11     A.   There were references to questions asking if the

12     individual was having sex with his girlfriend and if the

13     individual wanted Mr. Maurizio to spend the night.

14     Q.   Was another investigative step that was taken was

15     the obtaining of search warrants for relevant property

16     specific to the defendant?

17     A.   Yes.

18     Q.   And how many search warrants were obtained?

19     A.   Two search warrants for the farm location in Windber

20     and the rectory in Central City.

21     Q.   And when were these search warrants executed?

22     A.   August of -- I believe it was August or September of

23     2014.

24     Q.   So within the last few months?

25     A.   Within the last few months, yes.

1    Q.   And were teams dispersed to both the rectory and the

2    farm, pursuant to these search warrants?

3    A.   Yes.

4    Q.   And what was seized during this execution?

5    A.   Several miscellaneous documents, groups of

6    miscellaneous documents, CDs, DVDs, videotapes,

7    computers, cell phones.

8    Q.   Let's talk about the pictures.  Were there thousands

9    of pictures seized?

10   A.   There were, yes.

11   Q.   And were or have they been previewed?

12   A.   Yes.

13   Q.   Were there specific pictures found that resulted in

14   Count 2 of our federal indictment for possession of

15   child pornography?

16   A.   Yes.

17   Q.   And where were those pictures located?

18   A.   They were located on one of the computers that was

19   seized from the rectory.

20   Q.   Were there also additional pictures that were

21   flagged by your agency of relevance to this case?

22   A.   Yes.

23   Q.   So in addition to the two images he's charged with

24   child pornography, could you tell the Court the

25   additional images that are currently flagged for further

1    investigation.

2    A.   We term those images child erotica.  They were

3    images, appeared to be taken in Honduras of nude minors.

4    One of the groupings of photographs was of children

5    playing in a mud hole, appear to be swimming in a mud

6    hole.  And it was a makeshift swimming hole, and they

7    were nude, and there didn't appear to be any attempt to

8    not photograph the children nude.  The nudity of the

9    children was predominant in the photographs.  And the

10   last photograph in the series was of the children

11   standing in front of the camera as well.

12   Q.   And they were naked?

13   A.   They were holding their hands over their groin area

14   in the very last photo.

15   Q.   But they had no clothing on, correct?

16   A.   Yes, that's true.

17   Q.   Were there other sequences of pictures that

18   predominantly focused on naked toddlers?

19   A.   Yes.  There was another grouping of photographs that

20   appeared to be taken on the side of the road, and there

21   was various photographs of a nude toddler wearing a hat,

22   and then there was a photograph of Joseph Maurizio

23   holding one of the naked toddlers.

24   Q.   In addition to previewing the pictures, did your

25   agency also undertake looking at recent downloads that

1   had occurred on the defendant's computer that was

2   seized?

3   A.   Yes.   There was a recent web history that was

4   reviewed.

5   Q.   And the recent web history would indicate what?

6   A.   Websites that were visited.   In particular of

7   interest to us there was a website called "just us boys"

8   that was visited.   The specific web page was, appeared

9   to be a forum where a person posted a conversation about

10   a gay relationship they were having with another male.

11   Further review of that website revealed there was a

12   section of that website titled "younger."

13   Q.   And was this "just us boys" website accessed

14   multiple times on the computer of the defendant?

15   A.   Yes.

16   Q.   Was there also a review of any recent articles that

17   had been downloaded on the defendant's computer?

18   A.   There were.   In particular, an article regarding sex

19   tourism in Costa Rica.

20   Q.   And would that article have been downloaded just

21   prior to the defendant's trip to Costa Rica?

22   A.   It appeared it had been downloaded and reviewed

23   prior to the trip.

24   Q.   Were there any other videos that were downloaded

25   that were of interest that were recent downloads?

1   A.   There were two YouTube videos that were present in

2   the web history.  One was of a -- appeared to be a

3   beauty pageant involving young males in the Philippines

4   approximately 15 to 16 years of age.  The video was

5   still posted at YouTube when we viewed it, and the video

6   predominantly shows younger males under the age of 18 in

7   a fashion show wearing a Speedo-type outfit.  The camera

8   focuses in on their groin area several times.

9        And the other video that was of interest to us was

10  entitled to the effect of "black man rapes a white boy."

11  However, when we reviewed that video it appeared to be

12  of two adult males in a prison cell fight.

13  Q.   But the search terms that would have been used to

14  access or find that video would have involved "black

15  male raping white boy"?

16  A.   Yes, that's reasonable to determine.

17  Q.   And these were all recent downloads that were on the

18  defendant's computer at the time you seized them in

19  September, correct?

20  A.   Yes.

21  Q.   As a result of the investigation and the subsequent

22  charges, did your agency sponsor a tip line?

23  A.   Yes.  We requested tips to be called in.

24  Q.   And were there any relevant tips that you have

25  followed up on from that tip line?

1    A.   Yes.  We received a tip that there were possibly two

2    young relatives of Joseph Maurizio possibly been abused.

3    Q.   Did we come to find out what the age of these boys

4    were?

5    A.   One was I believe under the age of ten years of age.

6    Q.   And did we follow up with this tip to try to

7    determine whether or not these young children had been

8    abused?

9    A.   We did.  We approached the parent and requested to

10   forensically interview the children by a forensic

11   interview specialist, and that request was denied.

12            MS. HAINES:  No further questions.

13            THE COURT:  Counsel, cross examine.

14            MR. PASSARELLO:  Thank you, Your Honor.

15            THE COURT:  Can you use the podium.

16            MR. PASSARELLO:  Oh, yes.  I'm sorry.

17                      CROSS-EXAMINATION

18   BY MR. PASSARELLO:

19   Q.   Agent, before I forget this question, the United

20   States Attorney Haines asked you about the YouTube

21   video, the "black man rapes white boy."  And she

22   indicated that in order to get that you have to use the

23   search term "black man rapes white boy," correct?

24   A.   That's a reasonable assumption to make, because you

25   would have to type that title similar to that name of

1      that video in order for it to come up in your search

2      results.

3      Q.   Do you know what the search was?

4      A.   No.

5      Q.   No.

6           And are you familiar with the original criminal

7      complaint that was filed in this case?

8      A.   Yes, I am.

9      Q.   And in that criminal complaint isn't it true that

10     there were actually John Doe 1, John Doe 2, John Doe 3,

11     which are three alleged victims?

12     A.   Yes.

13     Q.   Okay.  And are those other two victims referenced in

14     that complaint the two that you're talking about that

15     you went back for in November?

16     A.   No.

17     Q.   Okay.  And, as I understand it, even though there

18     were three alleged victims in the original complaint,

19     the grand jury indicted only on one; is that correct?

20     A.   Yes.

21     Q.   And it's my understanding that these two additional

22     victims that you have allegedly found in the Honduras,

23     the intention, as you believe it to be, is that Honduras

24     is going to charge.  But have they charged yet?

25     A.   No.

1    Q.   And the intention is that the United States is going

2    to charge, but have they charged yet?

3    A.   No.

4    Q.   On the original charge in Honduras, has Honduras

5    initiated extradition proceedings against my client?

6    A.   Not to my knowledge.

7    Q.   United States Attorney Haines asked you about the

8    devices that were searched and seized on recent trips

9    from Father Maurizio.

10    Is it my understanding that after your review of

11    that the only charges based upon that search to date are

12    the two pictures that you referenced?

13    A.   Yes, that's my understanding.

14    Q.   And is it my understanding that according to the

15    United States Attorney at prior hearings, there's

16    approximately 18,000 pictures that you have reviewed?

17    A.   Yes, that's correct.

18    Q.   And out of 18,000 it's my understanding that only

19    two are the basis for the child possession, child

20    pornography charge, correct?

21    A.   Yes.

22    Q.   Okay.  The other stuff talked about the beauty

23    pageants, the picture of Father Maurizio holding a

24    toddler who's naked.  There are no charges based on

25    those, correct?

1    A.   Correct.

2    Q.   You went to Honduras twice you said?

3    A.   Yes.

4    Q.   Did you visit the orphanage?

5    A.   Yes.

6    Q.   Would it be fair to say that -- well, let me ask you

7    this:  Did you observe any of the poor children there

8    that actually were naked?

9    A.   No.

10   Q.   No.

11        Did you observe the abject poverty in that area?

12   A.   Yes.

13   Q.   And you indicated on your first trip to Honduras

14   that you didn't go out seeking this victim that you

15   interviewed, correct?

16   A.   I'm sorry --

17   Q.   Let me rephrase, I misspoke.

18        You indicated that the victim did not come running

19   to you.

20   A.   Yes.  Correct.

21   Q.   Who pointed you in the direction of that victim?

22   A.   We received reports from ProNino Honduras.

23   Q.   And as I understand this matter, five years ago --

24   the allegations that are based against Father Maurizio,

25   at least at this point, were from a trip in 2009,

1    correct?  His trip to Honduras in 2009.

2    A.   The most recent trip we took was based on

3    information that was provided on our, just our most

4    recent trip in July, beginning of August.  That trip was

5    based on information from 2009.

6    Q.   And that's the basis of the charges that are

7    presently before this Court?

8    A.   Yes.

9    Q.   Okay.  And five years ago I think you indicated that

10   the FBI was investigating these allegations, correct?

11   A.   Yes.

12   Q.   And the FBI filed no charges against Mr. Maurizio,

13   correct?

14   A.   That's correct.

15   Q.   And, as I understand it, it's your testimony that

16   the FBI couldn't get into Honduras?

17   A.   That's my understanding.

18   Q.   Okay.  And is it your testimony that the FBI did not

19   have witness statements in their files regarding alleged

20   sexual activity?

21   A.   I have not personally reviewed the FBI files so I'm

22   not aware if they have witness statements in their file.

23   Q.   Are you aware that they were provided with witness

24   statements from individuals from ProNino USA?

25   A.   I'm not aware of that, no.

1    Q.   The Google translation testimony that you testified

2    to, are charges filed on that case?

3    A.   No.

4         MR. PASSARELLO:   I don't have anything further,

5    Your Honor.

6         THE COURT:   Thank you.

7         Attorney Haines.

8         MS. HAINES:   Nothing further, Your Honor.

9         THE COURT:   Attorney Haines, with regard to the

10   alleged Victims 2 and 3, can you develop a little bit

11   more for the Court the time frame when these alleged

12   offenses occurred.

13        MS. HAINES:   Yes, Your Honor.

14                    REDIRECT EXAMINATION

15   BY MS. HAINES:

16   Q.   Special Agent Adams, specific to let's talk first

17   about Minor Victim Number 2.   Were you present when

18   Minor Victim Number 2 was located and interviewed?

19   A.   Yes.

20   Q.   And what is your understanding of the time frame by

21   which Victim Number 2 was subjected to sexual

22   inappropriate actions by the defendant?

23   A.   He was approximately 15, 16 years of age.   Of

24   course, this victim didn't keep track of -- make note of

25   when he was actually abused by Joseph Maurizio, but he

1    indicated to us he was a minor, he was approximately

2    around that age.

3    Q.   And did he identify for us that he was located as an

4    orphan or basically a ward of ProNino when this

5    occurred?

6    A.   Yes.  Yes, he was a resident of ProNino.

7    Q.   And did he detail not only his age but exactly what

8    was done to him by the defendant?

9    A.   Yes.

10   Q.   And was the information he provided consistent with

11   other information from witnesses that we had already

12   received?

13   A.   Yes.

14   Q.   Let's talk about Minor Victim Number 3.  Were you

15   present in Honduras when this victim was located and

16   interviewed?

17   A.   Yes.

18   Q.   And did he provide to us a time frame or his age at

19   the time he was subjected to the actions of the

20   defendant?

21   A.   His statement to us was that the abuse started

22   approximately 12 or 13 years of age, and he was at

23   ProNino Honduras as a resident there when it began, and

24   it occurred over the course of a number of years until

25   it stopped in approximately 2009.

1   Q.  And did he also detail for us during that time frame

2   specific instances of abuse that he was subjected to at

3   the hands of the defendant?

4   A.  Yes.

5   Q.  And did the information he provided to us during

6   this interview, was it also consistent with information

7   we had received from others?

8   A.  Yes, it was.

9          MS. HAINES:  Anything further, Your Honor?

10          THE COURT:  No, that's fine.

11          Attorney Passarello, do you have some follow-up

12   questions?

13          MR. PASSARELLO:  Just briefly, Your Honor.

14                    RECROSS-EXAMINATION

15   BY MR. PASSARELLO:

16   Q.  Agent, Victim Number 2 said the abuse was when he

17   was 15 or 16.  What year was he 15 or 16?

18   A.  He's approximately 19 years of age now, so this

19   would have been 2008 -- approximately 2008, 2009.

20   Again, he was very unclear about when this happened.  He

21   could not remember specific dates, specific years.

22   Q.  Okay.  But he did provide to you his age at the

23   time?

24   A.  Approximate, yes.

25   Q.  Okay.  So you're saying 2008, 2009 potentially?

```
1    A.  Yes, that's correct.

2    Q.  Okay.  And the other individual was 12 or 13 at the

3    time?

4    A.  Yes.

5    Q.  And what year was he 12 or 13?

6    A.  He's 21 now, so approximately seven, eight years ago

7    when this happened.

8    Q.  Okay.  And, again, just so I'm clear, I'm assuming

9    Victim 2 -- I shouldn't assume.

10        So I'm clear, Victim 2 and 3, were they -- were you

11   pointed in their direction by ProNino Honduras?

12   A.  We were provided their names by ProNino Honduras and

13   also by other witnesses.

14   Q.  Okay.  Who runs ProNino Honduras now?

15   A.  There is a board that's in charge of ProNino

16   Honduras made up of multiple individuals involved in the

17   local community, people that fund it.

18            MR. PASSARELLO:  Thank you.  Nothing further.

19            THE COURT:  Anything further?

20            MS. HAINES:  No, Your Honor.

21            THE COURT:  Thank you.  You can step down.

22            Call your next witness, Attorney Haines.

23            MS. HAINES:  Thank you.  The United States calls

24   Special Agent Kevin Petrulak.

25            KEVIN PETRULAK, GOVERNMENT'S WITNESS, SWORN.
```

```
 1                       DIRECT EXAMINATION

 2       BY MS. HAINES:

 3       Q.   Please state your name for the record.

 4       A.   Kevin Petrulak.  My last name is spelled

 5       P-E-T-R-U-L-A-K.

 6       Q.   By whom are you employed?

 7       A.   The criminal investigation division of the Internal

 8       Revenue Service.

 9       Q.   How long have you been so employed?

10       A.   Since January of 2002.

11       Q.   And where is your current duty station?

12       A.   Pittsburgh.

13       Q.   Can you please tell the Court what are your duties

14       and responsibilities in your capacity as a special agent

15       with criminal investigations for IRS.

16       A.   I conduct criminal investigations that relate to any

17       federal crime that has a financial nexus.  The main

18       focus of my agency would be to conduct tax fraud

19       investigations, money laundering investigations, and the

20       structuring of money.  But that would constitute a

21       variety of other crimes, because a lot of federal crimes

22       are -- involving use of money or are conducted for

23       money.

24       Q.   And can you tell the Court how you became involved

25       in this investigation.
```

1    A.   Sure.   In the past I've been involved a lot with

2    immigration and custom investigations, and I sit at

3    their office a couple days a week as an unofficial

4    liaison between the agencies so I can assist them with

5    any financial nexus that they have with their

6    investigation.

7         And they approached me approximately a month ago

8    with information about Mr. Maurizio, that he had a

9    significant amount of retirement savings, an unusual

10   amount, approaching a million dollars.   And they asked

11   me to assist them with trying to figure out how he was

12   able to accumulate such a retirement.

13   Q.   Okay.   And as a result of having that conversation

14   and coming on board, what did you start to undertake to

15   do?

16   A.   HSI had already subpoenaed some financial records,

17   so I started by reviewing the records that they had

18   already received from those subpoenas.

19   Q.   And in the records that you were reviewing, did you

20   start to understand personal banking accounts in

21   Defendant Maurizio's name alone, as well as accounts

22   that Mr. Maurizio, as well as others, had signature

23   authority on?

24   A.   Yes.

25   Q.   And in summary fashion, could you please tell the

1      Court -- let's first talk about personal accounts that

2      were solely or are solely accessible by the defendant.

3      A.   He currently has two checking accounts, one at 1st

4      Summit Bank, one at Somerset Trust.   He has a retirement

5      account that has check-writing privileges on it, so it

6      works sort of like a checking account as well with

7      Stifel Nicolaus.

8      Q.   And the accounts that you're talking about that he

9      has personal signature authority and sole signature

10     authority on, what is an amount?

11     A.   Counting -- he also has investment accounts with

12     insurance companies that have a cash value.   Counting --

13     and another investment that he has, he doesn't really

14     have check-writing privileges on, but counting those

15     accounts his net worth was over a million dollars.

16     Q.   And was there one Stifel Nicolaus account in

17     particular that had over $800,000 for his personal -- or

18     at his personal disposal?

19     A.   Yes.   That's correct.

20     Q.   As a result of seeing, as I believe you said, an

21     unusual amount of wealth -- well, let me ask you this:

22     Why do you say it's unusual for Mr. Maurizio to have

23     wealth in excess of a million dollars?

24     A.   As a priest I was told I guess he reported to the

25     Courts that he makes somewhere around $25,000 a year,

1   and he's been a priest for approximately 25 years.  So

2   I'm not aware of any other source of income that he has

3   other than his livelihood as a priest.  So for somebody

4   to have that amount of income, it's unusual for them to

5   even -- even staying at the rectory and stuff I think

6   it's unusual to be able to save that amount of money.

7   Q.  So as a result of this unusual finding what did you

8   start to do?

9   A.  When I first get financial records I usually -- I'll

10  do a cursory look through the records to see if I can

11  identify other financial accounts that have not yet been

12  subpoenaed, so if it takes a while I get information

13  back from financial institutions.  So that's the first

14  thing I did here.  I did a cursory review of the records

15  to see if I could identify additional sources of

16  information, which I did.  I advised you that we needed

17  some more subpoenas to go out for those institutions,

18  which we got out.

19      And then after that I began to put the financial

20  records into spreadsheets line by line.  I believe the

21  spreadsheets for the three checking-writing accounts

22  that Mr. Maurizio has personally are around 2000 lines

23  long.

24      But once I have that inputted, then I'm able to sort

25  it by date or by payee, payor, by debits and credits,

1    and I'm able to make much more sense of the activity in

2    the accounts that way.

3    Q.  What were you looking for specifically as you were

4    making these spreadsheets?

5    A.  Sources of income, sources of the funds in the

6    account was my main focus initially.

7          MS. HAINES:  May I approach, Your Honor?

8          THE COURT:  Yes.

9    Q.  I'm showing you what's marked as Government

10   Exhibits 1, 2, and 3.  Defense counsel has been

11   previously provided with them, and I am also providing a

12   copy to the Court.

13       Agent, if you could look at those three government

14   exhibits, and let's start with Government Exhibit

15   Number 1, and would you tell me what that is.

16   A.  Sure.  Government Exhibit Number 1 is a snapshot of

17   the credit items that were deposited into the three

18   check-writing accounts held personally by Mr. Maurizio.

19       I say snapshot because it's not all inclusive

20   because what I did, I mentioned previously that the

21   original spreadsheet is 2000 lines long, so there's a

22   lot of transactions.  So once I sorted the debits and

23   credits by payee and payor, I kind of pulled out what I

24   thought would be useful and really taking a look at --

25   at what we wanted to focus on.

1          So there are other items that aren't on this

2     spreadsheet.  I believe the original credit spreadsheet

3     that I have is maybe closer to 20 pages, but this one's

4     only, you can see, seven pages long.  But you can see

5     that it's sorted by payee, so you can see who is

6     providing the source of funds to Mr. Maurizio.  The

7     initial item on there is cash, and you can see that

8     there is a total of $9,195 in cash deposited into those

9     accounts.

10         And just to step back to add a little further

11    explanation of the schedule, if you look over to the far

12    left that's the institution that it came out of, and

13    then his name appears on all the accounts, so it's his

14    name under "account name."  It provides the account

15    number.  The "transaction type" would be credit.

16    "Statement date" would be the statement you can find

17    each transaction on.  "Transaction date" would be the

18    date that it cleared the bank.  "Item date" would be

19    like if there's a check written, the date on that item

20    in particular.  And on the far right is the amount of

21    the item.  And next to that, the "memo line" would be if

22    there was anything written in the memo line of any check

23    item, that's where that would occur.  And then "analysis

24    notes" would be if there's anything that I want to note

25    for future reference for myself I would put that

1    information there.

2          So, as you can see, the first one, as I mentioned,

3    was the cash deposits.  And below that would be the

4    check items that he deposited from a Central City Youth

5    Ministry account which is an Our Lady Queen of Angels

6    Ministry church account.

7          After that checks deposited from HIM.  That's

8    Mr. Maurizio's charity that he operates to help fund the

9    orphanage and the missionary trips that he goes on.

10   After that would be checks that he wrote to himself.

11   There's often transfers between accounts.  If it is

12   you'll note -- I'll note on the analysis notes which

13   account it came from.

14         After that, the majority of checks after that are

15   all from Our Lady Queen of Angels for various reasons.

16   The memo line usually indicates the purpose of the

17   check.  In fact, that's the remaining of the checks on

18   this spreadsheet.  The deposits on the spreadsheet would

19   be Our Lady Queen of Angels.

20   Q.  Did you start to notice in the memo line of the

21   check "reimbursement for cash" indicators?

22   A.  Yeah.  Well, I don't have any reimbursement for

23   cash, but you see reimbursements for lots of things.  A

24   lot of times it does indicate that he paid cash.  For

25   example, if you look at the second check under

1     Humanitarian Interfaith Ministry, check number 135, you

2     can see in the memo line of the check he writes "to

3     cover cash loan from Father Joe to cover check" in the

4     amount of $4,000.  So that indicates to me that

5     Mr. Maurizio had $4,000 up-front money that he used, and

6     then the charity was refunding that money back to him.

7     If you look on page 2, item number 204,

8     from Humanitarian Interfaith Ministry --

9     Q.  Which is the second one down on page 2 --

10    A.  Which is the second one down on page 2, yes.

11         It says "cash paid in Nicaragua for orchard by Karen

12    Keasley."  It's for $3,000.  So that would indicate to

13    me that he had $3,000 in cash that he used apparently to

14    pay Ms. Keasley, which he was now being reimbursed for.

15         In addition to that you'll see other mission trip

16    expenses being reimbursed.  Typically, it's what all the

17    checks from HIM are for.  He goes on a mission trip, he

18    comes home with receipts, and he gets reimbursement from

19    a charity for these expenses.

20         I spoke with Mr. -- now, the HIM account is a

21    double-signature account.  So Mr. Maurizio can't just

22    withdraw the funds himself.  He needs a second

23    signature.  And that second person on that account right

24    now is Dick Stern.  And I spoke with Mr. Stern about

25    these reimbursement checks, and he explained to me that

1    typically, other than maybe the rental car payments and

2    the airfare, which typically they require a credit card

3    nowadays, most of these reimbursements are receipts that

4    Mr. Maurizio brings back from a trip that indicates that

5    he spent cash for these expenses, and now he's

6    requesting to be reimbursed for them.

7        So I would say the majority, even though a lot of

8    these checks don't indicate that he spent cash, based on

9    my conversation with Mr. Stern and looking at --

10   Mr. Stern actually provided us with some packets that

11   Mr. Maurizio would give to him for these reimbursements

12   that actually had receipts that showed him spending

13   cash.

14       So I would say the majority of these reimbursements

15   from the charity account would have been cash

16   expenditures that he made that he was now being

17   reimbursed for.

18   Q.   So when you see these repetitive requests by the

19   defendant for cash reimbursements, do you next look to

20   see where is this cash coming from that he has in his

21   pocket at the outset?

22   A.   Yes.  The first thing I would do is I would go to

23   Government Exhibit Number 2, because that's the money's

24   coming out of his personal accounts.  Because I would

25   suspect that if somebody has cash and they don't have a

1    cash business or some other cash source -- which I don't

2    know Mr. Maurizio to have -- then they must be

3    withdrawing the money out of their bank account and then

4    obtaining the cash that way.

5        So Government Exhibit Number 2 is the same as

6    Number 1 except for it's the debits, the money coming

7    out.  And, again, I pulled out particular items of

8    interest to us.  And you can see -- and there's a few

9    ways to get cash.  You can write a check to yourself and

10   go to the bank, you can write a check to the bank and go

11   to the bank and ask for cash, you can write a check to

12   cash and go to an ATM.  And usually I would say most

13   people frequently would go to the ATM if they needed

14   cash, or write a check to themselves for cash.

15       But you can see on page 1 the second item down is

16   cash.  And he only has made two items that show to be

17   cash, and one of them actually would just be a check

18   written to cash for $127,000 and some change, and that

19   was conducted by his power of attorney, Christine

20   Shaulis, in order to obtain a cashier's check on his

21   behalf.  So the only real cash transaction that I see is

22   an ATM withdraw dated back in July of 2011 for $99.70.

23       I next would think that he may have written checks

24   to himself which he cashed at the bank, so I go to the

25   second page where I show checks written to Mr. Maurizio.

1    And you can see they only total together $3,478.93, one

2    of which was of note to me because in the memo line the

3    check says "Honduras for Western Union transfer,

4    $2,000," which would cover more than half of that

5    amount.  So that didn't explain how he got the cash to

6    me either.

7        The checks to the banks I looked at.  I didn't

8    really see -- most of the checks to 1st Summit Bank on

9    page 1 would have been for counter checks.  I didn't see

10   that explaining where he got the cash.  The Somerset

11   Trust Company checks that he wrote, most of those were

12   to pay for a Somerset Trust credit card.  So I didn't

13   see him withdrawing these funds from the accounts that

14   he was depositing these reimbursements back into, so I

15   couldn't explain the cash that way.

16       So the only other explanation that I could -- I

17   could come up with is possibly taking cash advances on

18   credit cards.  And although I do not have his ES-2

19   credit card accounts, Chase and the one at Somerset

20   Trust, the Chase account I believe he quit using in

21   2012, and that's when he begins using this Somerset

22   Trust account.  We do not have the records yet from

23   Chase.  We are still attempting to obtain those.  But we

24   do have the records for Somerset Trust Company and the

25   credit card he holds with them, and that would be

1    Government Exhibit Number 3.

2        So if you review Government Exhibit Number 3 you

3    don't see any cash withdrawals from the credit card or

4    cash advances.  And more of note to me is that if you

5    actually go back and compare the -- if you go back to

6    some of the trips that have occurred within this time

7    frame, beginning in August 2012 through September of

8    2014 that this credit covers, I don't really see a lot

9    of expenditures being put on this credit card, other

10   than maybe airfare or rental cars, that would explain

11   him paying for these monies, these reimbursements

12   through credit card transactions.  Like you don't see

13   him using them at restaurants or anywhere else when he's

14   on location on these mission trips.  So the credit card

15   doesn't explain to me how he was able to come up with

16   the source of funds for these reimbursements either.

17       And in addition to the reimbursements for the HIM

18   Ministry, there's also numerous smaller reimbursements

19   more in the hundreds or less dollar range in relation to

20   his work with the church.  And if you read through the

21   memo lines of the transactions, for a lot of the checks

22   from Our Lady Queen of Angels you'll see he's being

23   reimbursed for different things along the way.  And so,

24   obviously, he has some sort of monies, and I don't see

25   these monies coming out of his accounts or on his credit

1    cards either.

2        So in all, it seems to me that he has -- in the past

3    few years he has tens of thousands of reimbursement

4    checks that he had money to front in the first place,

5    and I cannot explain his source of funds after reviewing

6    his personal accounts, other than some source of cash

7    that he has that I'm not aware of.

8    Q.   And you mentioned Mr. Stern.  Did you discuss with

9    Mr. Stern or, frankly, ask Mr. Stern, "Do you know where

10   this unknown source of cash is coming from for the

11   defendant"?

12   A.   I did ask Mr. Stern that, and he responded that he

13   did not and he didn't know Mr. Maurizio to have a source

14   of cash, but that he thought it was a good question.

15   Q.   Let's talk specifically about September 12th of this

16   year, which would be the day the search warrant was

17   executed at the rectory and at the farm.  Correct?

18   A.   I believe so.  I wasn't there.

19   Q.   Was there something of relevance that happened with

20   the defendant and money on the date of September 12th of

21   2014?

22   A.   Yes.  Since I wasn't at the search I confirmed this

23   through my counterparts with HSI that it was the day of

24   the search warrant.  But if you look at Government

25   Exhibit Number 2, and under the 1st Summit Bank items,

1    the item dated 9/12/14, you can see it says in the memo

2    line "bank check."  And my analysis is that he purchased

3    a counter check with his money.  He withdrew $9,759.94,

4    which essentially wiped all the money that he had in

5    this account out at the time.  I'm not really sure where

6    those funds went.  I don't see them being redeposited

7    anywhere, so.

8    Q.   And that would be the seventh line down on page 1 of

9    Government Exhibit Number 2 you're referring to,

10   correct?

11   A.   Correct.

12   Q.   So your analysis, when he wiped out that account on

13   the day of our search warrant, you do not know where

14   that $9,700 of cash is right now?

15   A.   No, I'm not aware.  It seems to me like he -- he

16   could have gotten a cashier's check and -- a cashier's

17   check is always good.  So if you just get a cashier's

18   check for cash you can take it to the bank and get it

19   cashed, I'm sure, just for safekeeping.  But I'm not

20   aware of what happened to that money.

21   Q.   You talked about that you saw in a memo line

22   "Western Union."  Did you undertake to look at any

23   Western Union activity that had occurred in the last few

24   years with the defendant?

25   A.   I did.  And that activity is that he had wired some

1      cash to Honduras, a priest in Honduras, and the memo

2      line of that one check -- the wires total $10,100.  The

3      $100 wire seems to be a test of some sort to make sure

4      it would work.  But the other two wires, one actually

5      being if you look on the second page of Government

6      Exhibit Number 2 and go back to that item that

7      references Honduras under -- it's under Joseph Maurizio.

8      But under the memo line "Honduras for Western Union

9      transfer for $2,000," he actually transferred on

10     December 28th, 2011.  He transferred $5,000, which would

11     lead me to believe that he had $3,000 accessible to him

12     elsewhere that I can't find, in addition to this $2,000

13     that he withdrew from the account to cover that check.

14         The other transaction, I can't find any withdrawals

15     from his account to cover that check.  So I'm assuming

16     he had all $5,000 to fund -- to fund that money.  And

17     off the top of my head, I believe that that transfer

18     occurred in 2013 sometime.

19     Q.  And this is the second $5,000 for cash transfer from

20     the defendant down to a priest that you're talking about

21     that occurred in 2013, which you have no understanding

22     or no known source of that cash.  Correct?

23     A.  That's correct.

24         MS. HAINES:  I would move to admit Government

25     Exhibits 1, 2, and 3, Your Honor.

```
1            MR. PASSARELLO:  No objection.

2            THE COURT:  Government Exhibits 1, 2, and 3 are

3       admitted without objection.

4       BY MS. HAINES:

5       Q.  Agent Petrulak, I believe you testified that you

6       just sort of came on this case about a month ago,

7       correct?

8       A.  Yes.

9       Q.  And is it fair to say that in addition to the

10      spreadsheets, you have undertaken additional

11      investigative steps relative to this case?

12      A.  Sure.  I've conducted numerous interviews with our

13      team.  I'm looking through emails that were obtained the

14      day of the search warrant on Mr. Maurizio's computers,

15      and any other information that we have available.

16      Q.  Let's talk then first about the emails.  So you

17      started to look at emails that were seized from the

18      defendant's computer pursuant to our search warrant,

19      correct?

20      A.  Correct.

21      Q.  Have you looked at all of them yet?

22      A.  No.  There's thousands of them.  And I just actually

23      received those two days ago, I believe, from our

24      computer forensics person who has to digest the

25      information in his computer and basically puts it into a
```

1    format that I can boot up on to my computer and look at.

2    And so he has them all in Adobe format and I'm able to

3    search.

4        So I began searching for various terms like "cash"

5    and things like that to see what emails would come up

6    and that reference the terms I searched for.

7    Q.  And are these emails where you're looking at

8    conversations between the defendant and others?

9    A.  Yes.

10   Q.  And in your preliminary investigation have you found

11   emails relative to cash discussions?

12   A.  Yes.  A lot of which I believe occurred with

13   Mr. Boxler, who is related to the HIM Ministry in the

14   past.  And I remember one in particular where

15   Mr. Maurizio says that he's going to be carrying $3,000

16   in cash to a Mother Theresa in -- I can't remember the

17   country that he was going to at the time, but he was

18   going to be carrying the cash for her.

19       And in addition to that, he emailed Rick Boxler a

20   summary of the expenditures for the HIM Ministry, and on

21   the last page of this summary it states that during this

22   span of time that Mr. Maurizio was making mission trips

23   to Honduras that he personally spent thousands.  It just

24   says "thousands of dollars in cash" during those trips,

25   doesn't give a specific amount though.

1    Q.   And his spending of "thousands of dollars" worth of

2    cash, by his own words, you have no idea where that cash

3    came from either, do you?

4    A.   No, I do not.

5    Q.   Okay.  You also stated that you've been a part of

6    the interview teams that have gone out recently.

7    A.   That's correct.

8    Q.   And is it fair to say yesterday the team was out

9    interviewing potential witnesses that may have relevant

10   information?

11   A.   Yes, we were.

12   Q.   And did you on this occasion have the opportunity to

13   speak with local law enforcement in the Central City

14   area relative to what they knew about Mr. Maurizio?

15   A.   I did.

16   Q.   And what relevant information was obtained by you in

17   talking with local law enforcement?

18   A.   I was told that on three separate occasions people

19   from the local area approached the local police

20   department to report that their child had been solicited

21   sexually by Mr. Maurizio in the past two years, and they

22   wanted the local police department to do something about

23   his activity, but they wanted their names to be left out

24   of their investigation.

25        MS. HAINES:  No further questions.

1          THE COURT:  Counsel.

2          MR. PASSARELLO:  Yes, Your Honor.

3                    CROSS-EXAMINATION

4    BY MR. PASSARELLO:

5    Q.  Agent, let's go from backwards to forwards.  These

6    allegations that local law enforcement talked about, no

7    charges have been filed to the best of your knowledge?

8    A.  To the best of my knowledge, no.

9    Q.  No.

10        And you're saying they were approached a couple

11   years ago?

12   A.  Within the last two years.  He didn't give me any

13   specific date and time.  It didn't all occur at one time

14   I gathered from his conversation that I had.

15   Q.  And in your analysis and report did you include and

16   count the housing allowance that Father Maurizio

17   receives from the Catholic Church?

18   A.  I accounted for anything that was deposited into any

19   of his financial accounts; otherwise, I would not have

20   accounted for it.

21   Q.  Okay.  Did you account for any cash gifts from

22   parishioners that are given to Father Maurizio?

23   A.  If they didn't make it to his bank account, then no.

24   Q.  Okay.  And as I understand your Exhibit 1, if I can

25   read it -- and I just went to the eye doctor so I'm

1    getting older, my eyes aren't so good -- it looks like

2    this -- the first part of it, the first block says

3    "cash, cash, cash, cash, cash."

4    A.  Sure.

5    Q.  And you said $9,195 of cash?

6    A.  That would be the total.  All of those cashes

7    individually are all separate transactions.

8    Q.  Right.  And if I understand that total based on the

9    dates, that would be a total of $9,195 from the year

10   2007 to the year 2014?

11   A.  That's correct.

12   Q.  So I'm no mathematician, I know you are -- that's

13   why I became a lawyer -- but that's maybe $1300 of cash

14   deposits a year?

15   A.  Yeah.  I didn't do the math myself, but it's

16   probably close.

17   Q.  Okay.  All right.  So when you make it sound like

18   it's $9,195, that's over a seven-year period?

19   A.  Sure.

20   Q.  Yeah.  Okay.  And you referenced a $127,000 check or

21   something to that effect?

22   A.  Sure.  On Exhibit Number 2 under "cash" there, the

23   second cash transaction there was a check that was

24   written to cash for $127,030.76 which occurred in

25   October of this year.  That wasn't actually conducted in

1    cash.  As I think I already mentioned, a counter -- a

2    cashier's check was purchased for that money.

3    Q.  Did you follow up on where that money went?

4    A.  I believe it went to you.

5    Q.  Thank you.

6        And the $9,700 that you referenced that Attorney

7    Haines made a big deal about taken out the day of the

8    search warrant and he took -- cleaned out an account of

9    $9,700, did you follow up where that money went?

10   A.  I'm still trying to obtain where that went with the

11   bank.  But no, I haven't received anything.  We're still

12   receiving records by the day, really, from various

13   financial institutions.

14   Q.  Did you bother to ask Sean Lewis, who runs that

15   account?

16   A.  I didn't know -- I wasn't aware that Sean Lewis

17   would know where a cashier's check went.

18   Q.  Okay.  And so I'm clear, obviously -- and I asked

19   you this previously -- if the Court freezes these

20   accounts that Mr. Maurizio has access to, he obviously

21   wouldn't have access to them, correct?

22   A.  To the accounts, that's correct.

23   Q.  That's correct.  Oh, and the Western Union cash

24   stuff that was sent, did you follow up on where that

25   went?

1    A.   I believe I mentioned it went to a priest in

2    Honduras.

3    Q.   For what purpose?

4    A.   I wouldn't know.

5    Q.   Were you informed at the last hearing that it was

6    food vouchers for poor children?

7    A.   That's what you had said.

8    Q.   Did you follow up on that?

9    A.   I believe our team in Honduras was attempting to

10   follow up on it at the time, but I wasn't in Honduras

11   myself so I would have been unable to.

12   Q.   And I think you said that the $3,000 cash email you

13   talked about was to give to Mother Theresa?

14   A.   Sure.  I mean my testimony is that he has a bunch of

15   cash that I can't explain where it came from.  I don't

16   know where it went.

17   Q.   Well, I'm asking you the $3,000 -- I know what your

18   testimony is, sir.  I'm asking the $3,000 that you

19   talked about in this email, I think you said it went to

20   somebody named Mother Theresa, or he's holding it for

21   Mother Theresa.  Right?

22   A.   I believe that's what the email said.

23   Q.   And the cash that you can't account for for seven

24   years totals $9,165?

25   A.   No, that's not true.  That's the cash that went into

1    his bank accounts.  I can't account for all the cash

2    that he was reimbursed for.

3    Q.  And your investigation is still ongoing?

4    A.  That's correct.

5    Q.  And I'm assuming through your investigation you will

6    obviously consider the housing allowance he gets from

7    the Catholic Church, as well as gifts that he gets from

8    his parishioners to determine where that cash came from,

9    correct?

10   A.  I'm not aware that the Catholic Church gives him a

11   cash housing allowance, but if they do I will certainly

12   get to the bottom of it.

13   Q.  And to date, there's no IRS or any kind of money

14   laundering charges or anything like that, is there?

15   A.  There are not.

16        MR. PASSARELLO:  Thank you.

17                    REDIRECT EXAMINATION

18   BY MS. HAINES:

19   Q.  Agent, I believe you attempted to state the focus of

20   your analysis, am I correct, is not on where the cash

21   ultimately went, but how he got that cash to begin with.

22   Correct?

23   A.  Yeah.  I'm trying to determine his source of money,

24   his source of funds that were deposited into

25   his accounts, leading to his vast retirement account,

1       and how he paid for these reimbursements up-front.

2       Because I can't really see the source of funds, and that

3       confuses me.

4       Q.   And the defense counsel talked about this $9,000

5       cash talked about and asked you if that's what's

6       unaccounted for, you said no.  Correct?

7       A.   That's correct.  Yeah.

8       Q.   Could you quantify, are we talking about $100 of

9       unaccounted-for cash over the years, or thousands and

10      thousands of dollars of unaccounted-for cash over the

11      years in the hands of the defendant?

12      A.   Thousands of dollars.  If you just look at the

13      reimbursement checks that he's received from the HIM

14      Ministry, they're thousands of dollars each time.  And

15      in addition to that, although this spreadsheet looks

16      like it encompasses the whole way from 2007 through the

17      present, it doesn't actually, because the Stifel

18      Nicolaus account, the retirement account with the

19      800-some thousand dollars in it, Stifel Nicolaus

20      actually purchased UBS in 2009, late in 2009.

21          So as far as what was deposited into that account

22      prior to around September of 2009, I'm not aware yet,

23      because we still have a subpoena out to UBS because

24      Stifel Nicolaus does not have those deposits.  So there

25      could be additional items not even on this spreadsheet

1    yet.

2    Q.  Defense counsel talked to you about the ability or

3    the possibility of freezing accounts, correct?

4    A.  Correct.

5    Q.  You can't freeze unknown cash, correct?

6    A.  That's correct.

7         MS. HAINES:  No further questions.

8         THE COURT:  Attorney Passarello, additional

9    questions?

10                   RECROSS-EXAMINATION

11   BY MR. PASSARELLO:

12   Q.  I understand you can't freeze unknown cash, Agent,

13   but as I understand your testimony here today, your

14   investigation is not complete.  Correct?

15   A.  Yes.  It's just beginning.

16   Q.  And basically what you can testify to today is you

17   see some cash anomalies here, but you don't have an

18   answer for them?

19   A.  Yes.  I have questions, that's basically what I'm

20   saying.

21   Q.  And it's possible that those questions can be

22   answered that they're legitimate sources of cash?

23   A.  It's possible.

24   Q.  It's possible, right?  Just as it's possible it

25   could be what Ms. Haines says it is, right?

1    A.   Sure.

2    Q.   Absolutely.

3         MR. PASSARELLO:  I have nothing further from this

4    witness.

5         MS. HAINES:  Nothing further, Your Honor.

6         THE COURT:  You can step down, Agent.  Thank you.

7         MS. HAINES:  Your Honor, those are the two

8    witnesses the United States has that go to show our

9    position of both risk of flight and danger to the

10   community which, as the Court is aware, this is a

11   presumption case, which of course we would invoke in

12   addition to the testimony given by our two witnesses

13   and, of course, we would concur with the pretrial

14   services report where they also find the risk of flight

15   and danger to the community in their recommendation to

16   detain.

17        So that is basically the witness and testimony

18   presentation of the United States on our position.

19        THE COURT:  Counsel.

20        MR. PASSARELLO:  Thank you, Your Honor.  We would

21   call Vincent Vena.

22        THE COURT:  Sir, if you would come forward and be

23   sworn.

24        VINCENT VENA, DEFENDANT'S WITNESS, SWORN

25                    DIRECT EXAMINATION

1          THE COURT:  You may proceed, Counsel.

2          MR. PASSARELLO:  Thank you, Your Honor.

3     BY MR. PASSARELLO:

4     Q.   Would you state your full name for the record,

5     please.

6     A.   Vincent E. Vena.  V-E-N-A.

7     Q.   Mr. Vena, where do you currently reside?

8     A.   528 Waterfall Drive, Johnstown, PA.

9     Q.   Where do you work?

10    A.   Western PA Orthopedics and Sports Medicine.

11    Q.   What do you do there?

12    A.   I'm an orthopedic surgeon and specialist in

13    musculoskeletal care.

14    Q.   Are you married?

15    A.   Yes.

16    Q.   Who are you married to?

17    A.   Johanna Vena.

18    Q.   Do you have children?

19    A.   Three.

20    Q.   How old?

21    A.   18, 16, and 13.

22    Q.   I'm sorry, where did you say you resided again?

23    A.   In Johnstown.

24    Q.   Okay.  So would you consider yourself a member of

25    this community?

1    A.   I am, very much so.

2    Q.   Have you taken missionary trips with Father Joe?

3    A.   I have.

4    Q.   I'm sorry.  With the defendant, Father Joe.

5         Approximately how many?

6    A.   We have -- I've been present only on one.

7    Q.   And where was that, to what country?

8    A.   Costa Rica.

9    Q.   On that trip that you particularly went on, did you

10   ever observe Father Joe do anything untoward or

11   inappropriate to minor children?

12   A.   No.

13   Q.   Obviously, you weren't with him 24/7, but the times

14   that you observed him what did you observe?

15   A.   I saw nothing but a caring individual.  That trip

16   was a unique trip.  We had the opportunity to

17   incorporate some vacation time with my family, my

18   children, personal time with us and Father Joe.  We also

19   spent about half of that trip doing mission work.  We

20   spent time in Costa Rica at one of the large orphanages

21   or the churches that's run down there.  So we got to see

22   a little bit of both ends of the spectrum, if you will,

23   in Costa Rica.

24   Q.   And, as you understand it, the purpose of Father

25   Joe's trips to these Central American countries is

1    missionary work.  Correct?

2    A.   Father Joe would be best described as a mission

3    priest, yes.

4    Q.   Have your children been around Father Joe?

5    A.   Absolutely.

6    Q.   Do you have any concerns about him being around your

7    children?

8    A.   None.  I, you know, as a surgeon, involvement with

9    Boy Scouts, I am trained to look for behavior that is

10   unacceptable, grooming and the like.  Nothing like that

11   have I seen with Father Joe.

12   Q.   Even after today, after all you've heard from the

13   United States Attorney's Office, would you have any

14   qualms, any hesitation about letting Father Joe be

15   around your children alone?

16   A.   I have no reservations.  And my children, I'd offer

17   their testimony, if you want.

18   Q.   Would you consider him a danger to the community?

19   A.   No.

20        MR. PASSARELLO:  I have nothing further from this

21   witness.

22                    CROSS-EXAMINATION

23   BY MS. HAINES:

24   Q.   Dr. Vena, I believe you stated that you were on a

25   mission trip with the defendant to Costa Rica, correct?

1    A.   Yes.

2    Q.   Isn't it true you would not have been present when

3    the defendant was talking with a 16-year-old boy on a

4    Google transcript where he asked the boy if he was

5    wanting him to stay overnight.  Correct?

6    A.   That is correct.

7    Q.   Isn't it also correct that the defendant is not --

8    or more likely than not -- not going to solicit a child

9    for sex in your presence.  Correct?

10   A.   I wouldn't think so.

11   Q.   And isn't it also true that the defendant is not

12   going to commit a sex act on a child in your presence.

13   Correct?

14   A.   I would agree.

15        MS. HAINES:  No further questions.

16        MR. PASSARELLO:  Nothing further.

17        THE COURT:  All right, Doctor, you can step down.

18   Thank you.

19        MR. PASSARELLO:  We would call Johanna Vena.

20        THE COURT:  If you would be sworn here, please,

21   Mrs. Vena.

22        JOHANNA VENA, DEFENDANT'S WITNESS, SWORN

23                   DIRECT EXAMINATION

24   BY MR. PASSARELLO:

25   Q.   Morning.

1    A.   Good morning.

2    Q.   Would you state your full name for the record,

3    please.

4    A.   Johanna Vena.

5    Q.   Where do you reside?

6    A.   528 Waterfall Drive in Johnstown.

7    Q.   Would you consider that part of this community?

8    A.   Yes.

9    Q.   Are you married?

10   A.   Yes.

11   Q.   Was your husband just testifying?

12   A.   Yes.

13   Q.   Are you employed?

14   A.   Yes.

15   Q.   What do you do?

16   A.   I'm a veterinarian.

17   Q.   Mrs. Vena, have you been on missionary trips with

18   Father Maurizio?

19   A.   Twice.

20   Q.   To where?

21   A.   The first trip was to Honduras, the second was Costa

22   Rica.

23   Q.   Obviously, you weren't with him 24/7, but did you

24   observe any inappropriate behavior by Father Joe in

25   regards to any of the minor children either in the

1    Honduras or Costa Rica?

2    A.   Never.   And I also, as a volunteer with numerous

3    youth organizations, I'm trained to identify any type of

4    grooming or inappropriate behavior, and I've never seen

5    anything with Father Joe.

6    Q.   Never seen any of that type of behavior?

7    A.   Correct.

8    Q.   On your trip to Honduras, how would you characterize

9    the country itself, the culture?

10   A.   The poverty is shocking.   Some of the things that

11   were -- we saw a lot of very surprising displays of the

12   poverty that the people there experience.   The street

13   children are everywhere, and that's who we're trying to

14   help on our mission trips.

15   Q.   Was it unusual to see children who were naked?

16   A.   Not at all.

17   Q.   Was that prevalent?

18   A.   It was not unusual.   You'll see -- you could tell

19   when kids were homeless, you'll see them on the streets

20   a lot of times where they appear to be homeless.   A lot

21   of times they are clothed either very poorly or

22   occasionally not at all.   And it's also not unusual for

23   the kids to go have a swim in the swimming holes.   And

24   when I was present they wouldn't be naked, but I don't

25   think that it would be frowned upon for them to take a

```
 1      swim without clothes for the children.
 2      Q.  Did you observe that there was some testimony or
 3      evidence presented regarding two pictures that were
 4      found was of a child who had polio.  Did you actually
 5      observe that child?
 6              MS. HAINES:  Objection, Your Honor.  There was no
 7      specifics --
 8              MR. PASSARELLO:  I apologize.
 9              MS. HAINES:  There was no specific testimony
10      during this hearing as to the child, who it was,
11      anything --
12              MR. PASSARELLO:  I apologize.
13              THE COURT:  Do you withdraw the question?
14              MR. PASSARELLO:  I do.
15              THE COURT:  You can rephrase then.
16              MR. PASSARELLO:  Thank you, Judge.
17      BY MR. PASSARELLO:
18      Q.  There was some evidence or testimony presented at
19      this hearing regarding the two pictures that he's --
20      Father Joe's being charged with.  Do you recall that?
21      A.  Yes.
22      Q.  And do you recall the specific child that was
23      referenced?
24              MS. HAINES:  Objection, Your Honor.  Once again,
25      there has been nothing in this hearing that has talked
```

1   about the specific identity of the child and those two

2   images that the defendant is currently charged with.

3         THE COURT:  I will permit the question.  Go

4   ahead.

5   BY MR. PASSARELLO:

6   Q.  Do you know the child that we're talking about?

7   A.  In --

8   Q.  If you know.  If you don't --

9   A.  In previous hearings there was discussion about

10  pictures of a child that I --

11        THE COURT:  Well, if you will stop just one

12  moment.  This is based on personal knowledge, not what

13  was heard at previous hearings.  So as long as you are

14  going to testify to personal knowledge --

15        THE WITNESS:  I am.

16        THE COURT:  -- you can go ahead.

17        THE WITNESS:  Well, I can tell from the

18  description of the pictures I knew exactly the child

19  that was being discussed because there was a child --

20  shall I describe --

21  BY MR. PASSARELLO:

22  Q.  Yes.

23  A.  There was a child that lived at the foot of the hill

24  of the orphanage in Honduras who was crippled, and I

25  personally witnessed him, and we have discussed him,

1   Father Joe and also George that was at the orphanage.

2   Q.   When you observed him personally, what did you

3   observe?

4   A.   He was naked and laying in the middle of the road.

5   Q.   Are you aware that Father Joe or George purchased

6   something for that child?

7   A.   Yes.  George was telling me about how the

8   organization, the orphanage went to great lengths to get

9   a wheelchair for this child, and they got him one.  And

10  his parents didn't bother using it and the child

11  wouldn't use it.  So the child just drug himself around

12  without using the wheelchair that they provided him.

13  Q.   Did you ever see Father Joe ever do anything

14  untoward towards this child?

15  A.   No.

16  Q.   And when you observed the child he was naked in the

17  middle of the street?

18  A.   Yes.

19       MR. PASSARELLO:  I have nothing further from this

20  witness.

21       THE COURT:  Attorney Haines.

22                    CROSS-EXAMINATION

23  BY MS. HAINES:

24  Q.   Doctor, I am correct, am I not, that while you were

25  with the defendant in Costa Rica you were not present or

1    a part of the conversation between the defendant and a

2    16-year-old boy involving the defendant asking whether

3    or not he could spend the night.  Correct?

4    A.  Correct.

5    Q.  And you would agree with me that the defendant would

6    not solicit a sexual act from a child in your presence.

7    Correct?

8    A.  Correct.

9    Q.  You'd also agree with me that the defendant is not

10   going to commit a sexual act on a child in your

11   presence.  Correct?

12   A.  Correct.

13         MS. HAINES:  No further questions.

14         MR. PASSARELLO:  Nothing further, Your Honor.

15         THE COURT:  All right, Dr. Vena, you can step

16   down.

17         THE WITNESS:  Thank you.

18         MR. PASSARELLO:  We would call Rosemary DiLoreto.

19         ROSEMARY DILORETO, DEFENDANT'S WITNESS, SWORN

20                    DIRECT EXAMINATION

21   BY MR. PASSARELLO:

22   Q.  Ms. DiLoreto, hi.  I know you told me you were a

23   little hard of hearing, so I'm going to try to speak as

24   loud as I can.

25       Can you state your name for the record, please.

1    A.   Rosemary DiLoreto.

2    Q.   Can you spell the last name for the court reporter.

3    A.   D-I capital L-O-R-E-T-O.

4    Q.   And, Ms. DiLoreto, are you related to Father

5    Maurizio?

6    A.   I am.

7    Q.   How are you related?

8    A.   I am his sister.

9    Q.   Where do you currently reside?

10   A.   We live at 409 Village Street in Windber.

11   Q.   Has your brother, to the best of your knowledge,

12   does he have any prior criminal convictions?

13   A.   No, not to my knowledge.

14   Q.   Has your brother resided in this community or nearby

15   communities most of or all of his life?

16   A.   Most of his life.

17   Q.   Where does he currently reside, if released?

18   A.   Pardon me?

19   Q.   Where would he live if released?

20   A.   He would live at the farm that my parents left him.

21   Q.   And is that the family farm?

22   A.   It is.

23   Q.   Where is that located?

24   A.   In Paint Township.

25   Q.   And is that in Somerset --

65

```
 1    A.   Somerset County.

 2    Q.   Thank you.

 3         Was your brother in the military?

 4    A.   Yes, he was.

 5    Q.   Did he serve our country in the military?

 6    A.   Yes.  In Vietnam.

 7    Q.   And what branch of the military?

 8    A.   In the Navy.

 9    Q.   Was he honorably discharged?

10    A.   He was.

11         MR. PASSARELLO:  Thank you.  I have nothing

12    further from this witness.

13         MS. HAINES:  If I may have one moment, Your

14    Honor?

15         THE COURT:  Go ahead.

16         MS. HAINES:  No questions, Your Honor.

17         THE COURT:  All right.  Thank you.  You may step

18    down.

19         You can call your next witness, Counsel.

20         MR. PASSARELLO:  Thank you, Your Honor.  Judge, I

21    would -- just so the Court's aware -- I would probably

22    have one more witness on the danger to the community

23    issue, and then I have four short financial witnesses.

24    So it won't take that long, it shouldn't.

25         THE COURT:  All right.  We will keep going for a
```

1    while, and if my court reporter indicates to me she

2    needs a break we will take a break.

3         MR. PASSARELLO:  Thank you, Judge.

4         THE COURT:  She has to take down everything we

5    say, and she's been going now for almost an hour and a

6    half.  We will keep going though, go ahead.

7         MR. PASSARELLO:  Thank you.  We would call

8    Christine Shaulis.

9         THE COURT:  Please come forward to be sworn.

10        CHRISTINE V. SHAULIS, DEFENDANT'S WITNESS, SWORN

11                      DIRECT EXAMINATION

12   BY MR. PASSARELLO:

13   Q.   State your full name for the record, please.

14   A.   Christine V. Shaulis.  S-H-A-U-L-I-S.

15   Q.   Where do you currently reside?

16   A.   2907 Jackson Avenue, Windber.

17   Q.   And are you married?

18   A.   Yes.

19   Q.   To whom?

20   A.   Joshua A. Shaulis.

21   Q.   How many children do you have?

22   A.   Two.

23   Q.   How old?

24   A.   Seven and nine.

25   Q.   And are you related to the defendant, Father Joseph

 1    Maurizio?

 2    A.   Yes.

 3    Q.   How are you related?

 4    A.   He's my uncle and my godfather.

 5    Q.   At this point in time are you the power of attorney

 6    for his financial accounts?

 7    A.   Yes.

 8    Q.   Do you understand that pursuant to our plan

 9    submitted to the Court that that power of attorney would

10    be revoked?

11    A.   Yes.

12    Q.   Are you okay with that?

13    A.   Yes.

14    Q.   All right.   During your -- how long have you known

15    Father Joe?

16    A.   My entire life.

17    Q.   Has he been basically a member of this community for

18    his entire life?

19    A.   Yes.

20    Q.   Have your children been around Father Joe?

21    A.   Absolutely.

22    Q.   Anything that you've observed that you felt was

23    inappropriate?

24    A.   Never.

25    Q.   If you believed in your heart of hearts that

```
 1    something occurred or was inappropriate, would you raise
 2    that with the authorities?
 3    A.   Absolutely, yeah.
 4    Q.   The tip line and the children that the United States
 5    talked about, they're yours, right?
 6    A.   Yes.
 7    Q.   Okay.  And did the government agents come to you and
 8    interview you regarding this?
 9    A.   Yes.
10    Q.   Did you have a conversation with Agent Rock
11    regarding these allegations?
12    A.   Yes.
13    Q.   Could you tell the Court what that conversation
14    entailed.
15    A.   Yes.  She met with some people that were concerned
16    that my children were affected by Father Joe, and I told
17    her that that was absolutely absurd.  My children have
18    never been alone with him.  We're always together as a
19    family.  She wanted to have my children examined, and I
20    said absolutely not, because I would not want to put
21    them through anything like that, especially when they've
22    never been alone with him.  They're little.  They don't
23    need to be, you know, subjected to something like that.
24    And basically I guess that's pretty much what it was.
25    Q.   Is there anything that she talked about regarding
```

69

1    the allegations or who made them?

2    A.   From who they were made from, yes.  She couldn't

3    tell us who it was.

4    Q.   Okay.  But what was the context --

5    A.   The comment was they were "off," meaning strange

6    when she talked to them.

7    Q.   And that was Agent Rock's comment?

8    A.   Yes.  To my husband, and I heard it.

9    Q.   Has there been any other follow up with you on these

10   matters?

11   A.   No.

12          MR. PASSARELLO:  I have nothing further.

13          MS. HAINES:  I just have one question.

14                      CROSS-EXAMINATION

15   BY MS. HAINES:

16   Q.   Ma'am, if I understand your testimony, you are the

17   current power of attorney for the defendant, correct?

18   A.   Correct.

19   Q.   Which means you currently have personal access to

20   over $900,000 of the defendant's money, correct?

21   A.   Correct.

22          MS. HAINES:  No further questions.

23          MR. PASSARELLO:  Thank you.

24          THE COURT:  You can step down.

25          MR. PASSARELLO:  Your Honor, we would call Sean

1       Lewis.

2                   THE COURT:  And how long do you expect this

3       testimony to be?

4                   MR. PASSARELLO:  From my perspective?

5                   THE COURT:  Yes.

6                   MR. PASSARELLO:  Five minutes.

7                   SEAN LEWIS, DEFENDANT'S WITNESS, SWORN

8                             DIRECT EXAMINATION

9       BY MR. PASSARELLO:

10      Q.  Mr. Lewis, would you state and spell your last name

11      for the record, please.

12      A.  Sean B. Lewis.  L-E-W I S.

13      Q.  And, Mr. Lewis, where do you work?

14      A.  1st Summit Bank.

15      Q.  You heard the IRS agent testify as to some of the

16      accounts or the accounts that Mr. Maurizio has at your

17      bank?

18      A.  Yes.

19      Q.  And are you manager of those accounts?

20      A.  I am not manager of those accounts; I am Father

21      Joe's financial advisor.

22      Q.  You're aware of those accounts?

23      A.  Yes.

24      Q.  And are these accounts that he has sole access to?

25      A.  Yes.

1    Q.   At this point is it his power of attorney that has

2    access to them?

3    A.   That is correct.

4    Q.   I'm going to ask you this question:  Obviously, if

5    the Court freezes those accounts and the power of

6    attorney is revoked, are you willing to comply with that

7    Court's order?

8    A.   Yes.

9    Q.   The IRS agent testified as to $9,700 that he doesn't

10   know where it came from -- or he doesn't know where it

11   went.  And have you done research on that and

12   investigated, found out where that money went?

13   A.   Yes.  A check -- I met with Father Joe, and a check

14   was issued payable to 1st Summit Bank from his personal

15   checking account with the bank.  That check in turn,

16   along with a certificate of deposit that was redeemed,

17   was used to purchase a check to you.

18   Q.   My law office?

19   A.   Correct.

20   Q.   Okay.  And if the agent would have called you or

21   interviewed you you would have told him that, correct?

22   A.   Correct.

23        MR. PASSARELLO:  Yeah.  I have nothing further

24   from this witness.

25                     CROSS-EXAMINATION

```
 1    BY MS. HAINES:

 2    Q.   Sir, you said you work for 1st Summit Bank, correct?

 3    A.   Correct.

 4    Q.   So what is your official title at the bank?

 5    A.   I'm vice president with 1st Summit, and I also carry

 6    my investment and insurance credentials.

 7    Q.   And how long have you been in the banking industry?

 8    A.   Thirty years.

 9    Q.   You would agree with me, sir, that you cannot freeze

10    unknown sources of cash, correct?

11    A.   That's correct.

12         MS. HAINES:  No further questions.

13         MR. PASSARELLO:  Nothing further, Judge.

14         THE COURT:  You can step down, sir.

15         MR. PASSARELLO:  Call Tom Weimer.

16         THE COURT:  Please come forward to be sworn, sir.

17         THOMAS WEIMER, DEFENDANT'S WITNESS, SWORN

18                      DIRECT EXAMINATION

19    BY MR. PASSARELLO:

20    Q.   Mr. Weimer, just briefly would you state and spell

21    your last name for the record, please.

22    A.   W-E-I-M-E-R, Weimer.

23    Q.   And your first name is Tom?

24    A.   Thomas.

25    Q.   Where do you work?
```

1    A.   Stifel Nicolaus.

2    Q.   You heard the IRS agent testify -- if you did hear

3    him testify -- about accounts that Father Joseph

4    Maurizio has at Stifel Nicolaus.   Correct?

5    A.   Yes.

6    Q.   Are you the manager of those accounts or are you the

7    financial advisor for Father Joe at Stifel?

8    A.   I'm the financial advisor for Father Joe.

9    Q.   And are these accounts that he has access to

10   himself?

11   A.   Yes.

12   Q.   And/or his power of attorney?

13   A.   That's correct.

14   Q.   Correct.

15        If the Court were to order that these accounts that

16   are in your control at Stifel Nicolaus, the investment

17   accounts, them frozen would you comply with that order?

18   A.   We would.

19   Q.   Obviously, you can't track unknown sources of cash,

20   correct?   You can't freeze those, right?

21   A.   That's right.

22   Q.   But you can freeze the accounts he has assess to,

23   correct?

24   A.   That's correct.

25   Q.   How many accounts are you running for Father Joe at

74

1     this point?

2     A.   Three.

3     Q.   Three.  And is that a portfolio account?

4     A.   There's a personal account where the bulk of the

5     money is; there's a traditional IRA account; and there's

6     a Roth IRA account.

7              MR. PASSARELLO:  Thank you.  I have nothing

8     further from this witness.

9              MS. HAINES:  No questions, Your Honor.

10             THE COURT:  All right, sir, you may step down.

11             MR. PASSARELLO:  Your Honor, I would call Tom

12    Seitz.

13             Your Honor, just for your knowledge, I have only

14    one witness after this one.

15             THE COURT:  All right, sir.  If you would come

16    forward and be sworn.

17             THOMAS R. SEITZ, DEFENDANT'S WITNESS, SWORN

18                       DIRECT EXAMINATION

19    BY MR. PASSARELLO:

20    Q.  Mr. Seitz, would you state and spell your full name

21    for the record, please.

22    A.   It's Thomas R. Seitz.  S-E-I-T-Z.

23    Q.   Where do you work?

24    A.   Wessel and Company.

25    Q.   And what is that?

1    A.   It's an accounting firm.

2    Q.   Do you know Joseph Maurizio?

3    A.   I do.

4    Q.   Do you have some accounts that you're aware of that

5    he or -- he may have access to?

6    A.   Yes, through Humanitarian Interfaith Ministries.

7    Q.   Okay.  Are you also aware of something called Top

8    Shop?

9    A.   Yes.

10   Q.   And is that the only two accounts you're aware of?

11   A.   There's also another endowment fund with the

12   Independent Catholic Foundation.

13   Q.   The endowment funds, which is the Independent

14   Catholic Foundation and Top Shop, does Father Maurizio

15   have sole access to those accounts?

16   A.   No.

17   Q.   He cannot just write a check to himself or get money

18   from you?

19   A.   He cannot.

20   Q.   Does it require a second signature?

21   A.   I believe there is an application process that

22   Humanitarian would have to go through to request

23   accumulation of income funds.

24   Q.   Either way, if the Court would order that these

25   accounts be frozen, would you comply with that order?

1    A.   Yes.  I mean, I have no access --

2    Q.   I mean you can't get money, right?

3    A.   Right.  I can't give him money.

4    Q.   Okay.  But you're just here to testify that those

5    accounts exist?

6    A.   Correct.

7         MR. PASSARELLO:  Thank you.  I have no further

8    questions.

9         MS. HAINES:  No questions, Your Honor.

10        THE COURT:  You can step down, sir.

11        MR. PASSARELLO:  Your Honor, the defense's last

12   witness would be Dick Stern.

13        THE COURT:  Mr. Stern, if you would come forward

14   to be sworn, please.

15        DICK STERN, DEFENDANT'S WITNESS, SWORN

16                    DIRECT EXAMINATION

17   BY MR. PASSARELLO:

18   Q.   Mr. Stern, would you state and spell your full name

19   for the record, please.

20   A.   Richard W. Stern.  S-T-E-R-N.

21   Q.   Where are you employed?

22   A.   I'm retired from 35 years at Somerset Trust Company.

23   Q.   What is it you do now, just enjoy life?

24   A.   I do mostly volunteer work, which takes up more time

25   than working.

1    Q.   We're going to talk to you about accounts that

2    you're aware of that you know about that through the

3    church that Father Joe may or may not have access to,

4    okay.

5        What accounts are you aware of, can you testify to

6    those for the Court?

7    A.   I'm the finance committee chairman for the church,

8    and there are some 15-odd accounts that the church has,

9    plus a credit card, that we have removed Father Joe's

10   authority from all of those accounts.  It now resides

11   with me and the deacon that the diocese appointed to

12   temporarily manage the parish.

13   Q.   And in order to remove Father Joe, Father Joe had to

14   voluntarily sign for the removal, correct?

15   A.   He did.

16   Q.   And did he do so?

17   A.   He did.

18   Q.   You heard the IRS agent testify that he met with

19   you?

20   A.   Yes.

21   Q.   Regarding unknown sources of cash; do you remember

22   that discussion at all?

23   A.   Yes.

24   Q.   Was his testimony consistent with your recollection

25   of the conversation?

1    A.   Yes.

2    Q.   How long have you known Father Joe?

3    A.   Approximately 10 years; the time that he has been at

4    Our Lady Queen of Angels parish.

5    Q.   And do you live in this community?

6    A.   I do.  I live in Indian Lake.

7    Q.   And how long have you lived here?

8    A.   Since 1980.

9    Q.   Have you ever in your time knowing Father Joe seen

10   him do anything untoward or anything like that to any

11   children?

12   A.   Absolutely not.  On the contrary, he was very

13   careful around children in my observation.

14   Q.   Do you find him to be a danger to the community?

15   A.   Absolutely not.

16            MR. PASSARELLO:  I have nothing further.

17            MS. HAINES:  No questions, Your Honor.

18            THE COURT:  You can step down, sir.

19            MR. PASSARELLO:  Your Honor, that would be all

20   the witnesses the defense has.

21            THE COURT:  Do you have rebuttal witnesses?

22            MS. HAINES:  I do not, Your Honor.

23            THE COURT:  Then before we hear argument we will

24   take a 15-minute recess to give the court reporter a

25   little bit of a rest, since she's been going for quite a

1    while now.  We will try to come back into session in

2    approximately 15 minutes.

3           (Recess taken.)

4           THE COURT:  Attorney Haines, if you would proceed

5    first with the oral argument.

6           MS. HAINES:  Thank you, Your Honor.

7           As I stated at the conclusion of our testimony

8    from our two witnesses, the United States is invoking

9    the presumption of detention in this case.  And as the

10   Court is aware, based on the charge in the indictment,

11   it is a presumption of detention case.  And the defense

12   has failed to rebut that presumption here today.  While

13   they have put forth local supporters who have testified

14   that they have seen nothing wrong or illegal by the

15   actions of the defendant around children, as was amply

16   pointed out, of course those things would not happen in

17   those people's presence.

18          Also when they put forward financial information,

19   as was the crux of the government's case from the

20   beginning, it's not where the money ultimately went to

21   that's at issue.  It's that unknown source of thousands

22   of dollars worth of cash that have existed for years

23   right up to the present, as the IRS agent testified to,

24   is at issue when we're talking about financial

25   situations.

1           So we do not believe the presumption of detention

2      has been rebutted.  And, as we stated, we concur with

3      the pretrial services recommendation of detention, both

4      as they said on risk of flight and on danger.

5           So let's talk first about risk of flight and what

6      you heard today and why, in the eyes of the United

7      States, the defendant is a clear flight risk.  First, as

8      you heard and as detailed in the pretrial services

9      report, that the defendant extensively travels outside

10     of the country.  I believe in the pretrial services

11     report it talks about since January of 2013 he has made

12     seven or eight trips outside of this country, right up

13     until this past summer, right before the charges and the

14     search warrant occurred at his residence.

15          Obviously, with that being said, he has acquired

16     and made many contacts, potentially many friends.  We

17     know that he was sending $10,100 down to a priest down

18     in a foreign country.  Looking at that, as was

19     recognized by the pretrial services officer, we're

20     looking at a defendant with extensive travel history and

21     extensive contacts outside of the country.

22          You also heard today about new charges, or the

23     potential for new charges, not only in Honduras but also

24     here in the United States.  Special Agent Adams told you

25     they just returned from Honduras this week, and we now

1    have Minor Victim Number 2 and Minor Victim Number 3.

2           Defendant is also already aware of the fact that

3    there is an arrest warrant pending for him in Honduras,

4    based on our indictment that is currently in place based

5    on Minor Victim Number 1.  With the knowledge of a

6    current standing arrest warrant in Honduras and the

7    possibility of more charges coming here, as well as in

8    Honduras, it's the contention of the United States it

9    heightens his risk to flee if he's released.

10           I think it's also very important, as we talk

11    about what is the crux of our financial risk of flight

12    argument, as to how this information even came to us

13    that we came to learn that a priest who makes between

14    20- and $25,000 a year has at his disposal in excess of

15    $900,000, and prior to him turning the $127,000-plus

16    over to defense counsel, assets in excess of $1 million.

17           It's also interesting to note, when you look at

18    the pretrial services report, when the defendant is

19    asked to reveal his financial situation you see how he

20    lists a minimal personal checking account, his HIM

21    account which requires two signatures, some vehicle

22    information, and some information to land.  And then at

23    the bottom it says he does have investments or monthly

24    investment income, but "he declines to discuss this."

25           Now, he declines to discuss a couple extra

1    thousand dollars he has hidden under his mattress?  No,

2    Your Honor.  He declined to discuss, like I said, in

3    excess of a million dollars of accessible money that we,

4    as the government, looked into and found after the

5    defense was basically told at one of the hearings "let's

6    sit down and you guys tell us what all you have."

7    That's how we came to know about all this.  It wasn't

8    disclosed initially, and we would argue that that also

9    shows risk of flight.

10         Going to the danger.  Now, the defense probably

11   will want to say, well, the count, Count Number 1 in the

12   indictment is from 2009, and these potential new charges

13   as to Victims 2 and 3 are also from several years ago.

14   But, as the pretrial services officer points out, we

15   concur with the nature of the charges and the sexual

16   abuse perpetrated against children is a risk of danger

17   to the community.  And there's no statute of

18   limitations.  The Adam Walsh Act I believe does away

19   with that.  So whether it happened yesterday, five

20   months ago, five years ago, or 15 years ago that is

21   still a valid, chargeable, prosecutable, and convictable

22   offense.

23         So let's talk about what's more recent.  What do

24   we know more recently that we look at for danger to the

25   community?  As you've heard about the different

1    investigative steps that the agency, Homeland Security,

2    has taken in the very recent past, within the last

3    couple months they did inbound inspections when the

4    defendant was coming back from out of country.  What did

5    they tell you they found on these recent inbound

6    inspections, I believe it was from his trip to Coast

7    Rica -- which just happened in July and August of this

8    year, two or three months ago -- what do we find on his

9    camera?  We find sets of two different pictures.  The

10   first one, as the agent testified to, a child around 10

11   years old, sitting on the beach, full body shots of the

12   child in picture number one.  Picture number two of the

13   child's crotch.

14        The second set of pictures the agent testified to

15   that they found that were on the camera from his recent

16   trips to Coast Rica and the Dominican Republic was of a

17   child, I believe he testified about 15 years of age,

18   same type sequence of pictures; a full body shot of the

19   child, honing in on the child's groin area.

20        What else did they find during that inbound

21   inspection from his trip to Costa Rica?  They found a

22   dialogue on his cell phone between the defendant and a

23   16 year old -- 15 or 16-year-old boy -- which as the

24   agent testified to, was made clear in the dialogue

25   between the defendant and this minor child.

1          And what kind of discussion is the defendant

2     having with this minor child from a different country?

3     He's talking about, "do you want me to stay the night

4     with you, are you having sex with your girlfriend?"

5     This just happened a few months ago.  The defendant's

6     preying upon additional minor children.

7          When we looked at and did our search warrants and

8     we went and we seized various technological devices from

9     hard drives to cameras to phones, everything at the

10    rectory and the farm we could find that may contain

11    evidence, and what do we start seeing as we're looking

12    at his website search history, his download history --

13    and this is recent?  We see the defendant accessing a

14    website not once but I believe the agent said multiple

15    times, www.justusboys.com with a drop down menu with

16    "younger" as one of the places you could look.

17         We also see that he downloaded an article about

18    sex tourism in Costa Rica.  Where did the defendant just

19    come back from?  Costa Rica.  The agent also talked

20    about a recent download or downloads that he had on the

21    computer that was basically a "Mr. Philippines

22    16-year-old swimsuit competition," which, as the agent

23    testified to, were young minor boys frolicking around in

24    front of the camera in Speedo-type bathing suits, with

25    the focus being on their groin area.

1          We also heard from the agent about a YouTube

2    video that was found on the defendant's computer when we

3    seized it dealing with "little white boy gets raped by

4    black man."  Now, while it turned out when you access

5    the video it appeared to be two adults, the United

6    States would look upon look at what the nature of the

7    search would have been to find that type of video on

8    this defendant's computer when we seized it on

9    September 12th of this year.

10         You also heard about off the tip line.  We

11   obtained information of the possibility of abuse at the

12   hands of the defendant of two relatives under the age of

13   ten.  We would ask you to consider the fact that when

14   approached we were denied the ability to interview these

15   children and we were denied, not only by their mother

16   but the woman who sits as the power of attorney with

17   access currently to over $900,000 of his personal money.

18         And finally we'd ask you to consider when we're

19   talking about danger to the community, the information

20   that was just obtained yesterday when the agents were in

21   Central City doing potential further interviews, when

22   law enforcement there talked to them about in the past

23   two years they had received three separate and distinct

24   allegations that the defendant has solicited three

25   separate boys to commit or take part in sex acts with

1    him.  And as you heard, these people that reported it

2    wanted law enforcement to do something about it but

3    didn't want their names or their children involved with

4    it.

5          So when we're talking about danger to the

6    community, we're not just talking about what happened

7    back in 2009, which by itself shows a danger as

8    recognized by the United States and the pretrial

9    services officer by what the nature of those charges

10   alone are, but we ask you, too, to look at the sequence

11   coming forward right up until the day we seize computers

12   and hardware from him as to what he's looking at, what

13   he's doing, who he's talking to on his phone when he's

14   in Costa Rica, and the pictures and the nature of the

15   pictures he's taking when he was just out of the

16   country.

17         When you couple that with our risk of flight

18   argument on the new charges that could be coming, he's

19   aware that there's an arrest warrant already in

20   Honduras, and most importantly these unknown sources of

21   thousands and thousands of dollars worth of cash that

22   our IRS agent cannot figure out where they're coming

23   from, we ask that you detain the defendant pending

24   trial.

25         THE COURT:  Attorney Passarello.

1              MR. PASSARELLO:  Thank you, Your Honor.

2              May it please the Court, obviously, Your Honor,

3     the act is, in essence, mandatory in this sense; that

4     the defendant shall be released unless the Court finds

5     by a preponderance of the evidence that the defendant

6     represents a serious flight risk, or by clear and

7     convincing evidence he presents a danger to the

8     community.

9              It is true that there is a presumption here and

10    that the United States has invoked that presumption, but

11    the case law is also clear that the defendant need only

12    to present some credible evidence showing that he is not

13    a flight risk or a danger to the community, and our

14    burden is not one of proof but one of production only.

15             I respectfully submit to this Court that the

16    defense has presented credible evidence showing that

17    this defendant is not a flight risk, a serious flight

18    risk, or any flight risk, or a danger to the community.

19    I respectfully submit that as follows:  The United

20    States did not present one member of the immediate

21    community here today to testify that he was a danger.

22    Not one.  They didn't present one member of the

23    continental United States that indicates he's a danger

24    to the community or they feel that he is.

25             We presented well -respected members of this

```
 1        community, relatives and otherwise, who testified they
 2        have no fear of Father Maurizio, have never saw anything
 3        untoward done by Father Maurizio, and would have no fear
 4        in having their children around Father Maurizio.
 5             Now, they presented to the Court another thing
 6        they drop on me the morning of the hearing -- which has
 7        become a pattern -- but that they just yesterday found
 8        out from the Central City police or something like that
 9        that there were three other people that came in
10        approximately two years ago.  But again, as with most of
11        their allegations here today, they're general and there
12        are no charges that were filed.
13             They come in indicating there are two other
14        victims in Honduras but, again, Honduras has not filed
15        nor has the United States.  What is before this Court
16        today are the charges that are filed, and the focus of
17        whether he's a flight risk or a danger to the community
18        based on those.
19             They also talk about the searches, Judge, and the
20        websites and again -- and the phone call.  Again, no
21        charges were filed.  And I think -- I will tell the
22        Court this:  That the YouTube video that they talk
23        about, and it's fair for you to presume that you would
24        have to put in "black male rapes white boy" in order to
25        get that, is not true.  And I'll just tell you from
```

1    personal experience, my wife wanted a lady's white swing

2    coat one year for Christmas.  I put in "lady's white

3    swing coat," and you don't want to know what websites

4    came up.  So I don't think that you can presume that

5    search was made, and they had no evidence of what search

6    was made.

7         They talked about the website in regards to the

8    boys, "just us boys" and said, well, there's a drop down

9    screen that says "younger" boys, but presented no

10   evidence that he ever searched that part of that

11   website.

12        I would indicate also to the Court that the

13   defendant has no prior record, is 69 years of age, has

14   never had any type of allegation like this at all.  He's

15   been a priest for 27 years; 17 years of that priesthood

16   has been devoted to missionary work, helping

17   underprivileged children, not hurting them.

18        Father Joe was aware of these allegations back in

19   2009 when they were initially made and investigated by

20   the FBI, and didn't flee.  There's no reason to believe

21   that simply because they've made more allegations with

22   these charges that he's an extra flight risk of the

23   same.

24        He has no history of flight, obviously has no

25   criminal history.  He has served his country honorably.

1   He was in the United States Navy, served in Vietnam, and

2   was honorably discharged.

3          I don't believe, Judge, that they have met their

4   burden that he is a danger to the community, and I

5   believe we met our burden of production only with

6   credible evidence that he is not.

7          Let's talk about risk of flight.  Again I would

8   indicate he knew about these charges back in 2009 and

9   didn't flee.

10          We were ordered by the lower court to provide all

11   of the accounts.  We did.  Both parties are aware of all

12   the accounts that are available.  They present the IRS

13   agent who indicates that through his investigation there

14   are unknown sources of cash from which he doesn't know

15   where it comes from.  Yet he was unaware of the housing

16   allowance the father gets.  He didn't calculate any

17   gifts from parishioners that he gets.

18          They made a big deal about $9700 that was

19   transferred on the search warrant pursuant to his

20   investigation, and the United States Attorney's

21   investigation they didn't know where it was.  All they

22   had to do was call Sean Lewis.  He knew where it went.

23   They could have followed that.

24          I don't think you can base -- and I think the law

25   is fairly clear that even with the presumption, it

1    cannot be based on general allegations or future

2    dangerousness or flight.

3         We have taken every step and provided a

4    comprehensive plan to allay any fears that this Court

5    may have in regards to risk of flight.  We have offered,

6    and were ordered until the appeal was taken, to freeze

7    all of his accounts.  We would revoke the power of

8    attorney.  We have agreed to home detention -- obviously

9    that's part of it -- but with any conditions this Court

10   would put on it.  We have done everything -- the United

11   States has his passport.  We have done everything that

12   we can do to assure and try to allay this Court's fears

13   that he is not a flight risk.

14        I believe that the law is that you must find that

15   there is no condition or combination of conditions that

16   will reasonably assure that the appearance of this

17   defendant and the safety of any other person in the

18   community.  I don't believe based on what this Court has

19   heard today that you can make that finding, and I would

20   respectfully submit that.

21        I would ask the Court to release the defendant

22   pending disposition of his case, with all the conditions

23   that we have set forth in our plan -- oh, Your Honor,

24   also to indicate we have -- I got all the documents

25   prepared to place his property up as collateral as well,

1      we've done the appraisal and the title search.

2              The United States talks about the nature of the

3      offense.  And the nature of the offense is repulsive,

4      but I think it's mindful to note that to be falsely

5      accused of such things is just as repulsive.

6              Thank you.

7              THE COURT:  Anything additional from the United

8      States?

9              MS. HAINES:  No, Your Honor.

10             THE COURT:  I note that the pretrial services

11     officer who prepared the pretrial services report is

12     present.

13             Mr. Bossart, I also note that your report is

14     dated September 26th, 2014, so it was approximately a

15     month and a half ago.  Based on what you have heard in

16     court and any other information you have received or

17     gathered, is your recommendation the same as you made on

18     September 26th, 2014, or do you have a different

19     recommendation today?

20             MR. BOSSART:  Our recommendation remains

21     unchanged, Your Honor.

22             THE COURT:  All right.  Counsel, this is a case

23     that we've been in court today for a significant amount

24     of time, plus you had multiple proceedings prior to this

25     in front of the magistrate judge.  There are also

1    exhibits that are fairly extensive in terms of

2    information.  So what I am going to do is I am going to

3    take this under advisement, and I intend to issue a

4    written decision today, sometime this afternoon, which

5    will be docketed and available to counsel for both

6    parties.  And, obviously, this is priority in terms of

7    what I and my staff will be doing today.  As I said, we

8    intend to get this filed this afternoon.

9         I thank both counsel for their presentations and

10   arguments today, all of which will assist the Court in

11   its decision.

12        Having said that, we will be in recess until call

13   of Court.

14        (Proceedings concluded at 11:54 a.m.)

15                            * * *

16             CERTIFICATE OF OFFICIAL REPORTER

17        I, Kimberly K. Spangler, Federal Official Court
     Reporter, in and for the United States District Court
18   for the Western District of Pennsylvania, do hereby
     certify that pursuant to Section 753, Title 28, United
19   States Code, that the foregoing is a true and correct
     transcript of the stenographically reported proceedings
20   held in the above-entitled matter, and that the
     transcript page format is in conformance with the
21   regulations of the Judicial Conference of the United
     States.

22                   Dated this ____ day of _____ 2014

23

24        _____
          KIMBERLY K. SPANGLER, RPR
25        FEDERAL OFFICIAL COURT REPORTER