IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | CRIMINAL NO. 3:14-23 |
| v. | ) | |
| | ) | JUDGE KIM R. GIBSON |
| JOSEPH D. MAURIZIO, JR., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

### I. Introduction

This case arises from charges that Defendant engaged in or attempted to engage in illicit sexual conduct in a foreign place; possessed visual depictions involving the use of a minor engaging in sexually explicit conduct; and transported, transmitted, or transferred funds or monetary instruments out of the United States with the intent to promote illicit sexual conduct in a foreign place. Trial in this matter was held from September 8, 2015, until September 22, 2015. (*See* ECF Nos. 59, 94, 158.) Presently before the Court is Defendant's Motion for a New Trial. (ECF No. 166.) For the reasons explained below, the Court will deny Defendant's motion.

### II. Background

On September 25, 2014, a criminal complaint was filed against Defendant, charging him with engaging in illicit sexual conduct in a foreign place, in violation of 18 U.S.C. § 2423(c), and with possession of visual depictions involving the use of a minor engaging in sexually explicit conduct, in violation of 18 U.S.C. § 2252(a)(4). (ECF No. 1.) On October 7, 2014, the grand jury issued a two-count Indictment, charging Defendant at

Count One with engaging in illicit sexual conduct with a minor in foreign places, in violation of 18 U.S.C. § 2423(c), and at Count Two with possession of material depicting the sexual exploitation of a minor, in violation of 18 U.S.C. § 2252(a)(4)(B). (ECF No. 16.)

On April 7, 2015, the grand jury issued an eight-count Superseding Indictment, charging Defendant at Count One with engaging in illicit sexual conduct with a minor in foreign places, in violation of 18 U.S.C. § 2423(c), at Count Two with possession of material depicting the sexual exploitation of a minor, in violation of 18 U.S.C. § 2252(a)(4)(B), at Counts Three through Five with engaging in and attempting to engage in illicit sexual conduct in foreign places, in violation of 18 U.S.C. § 2423(c), and at Counts Six through Eight with the transporting, transmitting, or transferring of funds or monetary instruments into or out of the United States with the intent to promote the carrying on of a specified unlawful activity, in violation of 18 U.S.C. § 1956(a)(2)(A). (ECF No. 69.)

On September 22, 2015, the jury found Defendant guilty of Counts One, Two, Three, Four, and Eight. (ECF No. 163.) The jury found Defendant not guilty of Counts Five, Six, and Seven. (*Id.*) Defendant moved for a judgment of acquittal at the close of the Government's case-in-chief and after the jury delivered its verdict. The Court granted Defendant's motions for judgment of acquittal as to Count Four and denied Defendant's motions as to Counts One, Two, Three, and Eight. (*See* ECF No. 203.)

## III.  Applicable Law

Pursuant to Rule 33 of the Federal Rules of Criminal Procedure, "the court may vacate any judgment and grant a new trial if the interest of justice so requires."  FED. R. CRIM. P. 33(a).  Granting or denying a motion for a new trial "lies within the discretion of the district court."  *United States v. Cimera*, 459 F.3d 452, 458 (3d Cir. 2006).  A court evaluating a Rule 33 motion "does not view the evidence favorably to the Government, but instead exercises its own judgment in assessing the Government's case."  *United States v. Johnson*, 302 F.3d 139, 150 (3d Cir. 2002).  When reviewing a motion for a new trial based on a "weight of the evidence" argument, a district court may order a new trial only if the court "believes that there is a serious danger that a miscarriage of justice has occurred— that is, that an innocent person has been convicted."  *United States v. Brennan*, 326 F.3d 176, 189 (3d Cir. 2003) (internal quotations omitted).  Rule 33 motions "are not favored and should be 'granted sparingly and only in exceptional cases.'"  *United States v. Silveus*, 542 F.3d 993, 1005 (3d Cir. 2008) (quoting *Gov't of V.I. v. Derricks*, 810 F.2d 50, 55 (3d Cir. 1987)).  Exceptional cases include those in which trial errors "so infected the jury's deliberations that they had a substantial influence on the outcome of the trial."  *United States v. Thornton*, 1 F.3d 149, 156 (3d Cir. 1993) (internal quotations omitted).

## III.  Discussion

In support of his motion, Defendant argues that a new trial must be granted because:  (1) the weight of the evidence was insufficient to sustain the convictions; (2) the Government engaged in prosecutorial misconduct; (3) the Court improperly instructed

the jury as to the attempt to engage in illicit sexual conduct in a foreign place; and (4) the verdict was inconsistent. The Court will separately address Defendant's arguments.

### A. Weight of the Evidence

#### i. Counts One, Three, and Four

Defendant argues that the weight of the evidence was insufficient to sustain the convictions against him as to Counts One, Three, and Four. Count One charged that between on or about February 26, 2009, and March 13, 2009, Defendant engaged in illicit sexual conduct with Minor #1, who was under the age of eighteen at the time and who is known as Otoniel.[1] Count Three charged that between on or about February 26, 2009, and March 13, 2009, Defendant engaged in or attempted to engage in illicit sexual conduct with Minor #2, who was under the age of eighteen at the time and who is known as Erick. Count Four charged that between on or about March 5, 2004, and March 11, 2007, Defendant engaged in or attempted to engage in illicit sexual conduct with Minor #3, who was under the age of eighteen at the time and who is known as Ludin.

To prove Count One, the Government was required to establish that (1) Defendant traveled in foreign commerce or resided, either temporarily or permanently, in Honduras, and (2) Defendant engaged in any illicit sexual conduct with Otoniel. 18 U.S.C. § 2423(c). To prove Counts Three and/or Four, the Government was required to establish that (1) Defendant traveled in foreign commerce or resided, either temporarily or permanently, in

---

[1] On September 15, 2015, the Court granted the Government's motion (ECF No. 144), requesting that the Court enter a protective order, pursuant to 18 U.S.C. § 3509(d)(3), to permit the testifying victims to use only their first names. (ECF No. 148.) Accordingly, the Court will refer to the victims only by their first names in this opinion.

Honduras, and (2) Defendant engaged in or attempted to engage in any illicit sexual conduct with Erick and/or Ludin.  *Id.*

As to Count One, Defendant asserts that Erik's and Luis's respective testimony was inconsistent.  Specifically, Defendant states that Luis testified that he observed Defendant engaging in illicit sexual conduct with Otoniel, while Erik testified that he was with Luis, and they did not witness any illicit sexual conduct between Defendant and Otoniel.  (ECF No. 166 at 2-3.)  Defendant further argues that "Otoniel testified that illicit sex acts only occurred involving himself and [Defendant] in '2001 and 2004[,]' which is [five] and [eight] years earlier than the dates and times alleged by the Government in its indictment."  (*Id.* at 3 (emphasis omitted).)

In response, the Government states that "Otoniel testified without contradiction that Defendant sexually abused him" and that "Erick and Luis testified that they witnessed [Defendant] abusing Otoniel at least once."  (ECF No. 190 at 8.)  The Government concedes that "there were some inconsistencies among the accounts offered by Erick, Otoniel, and Luis" but asserts that the inconsistencies "were minor."  (*Id.* at 9.)  In reply, Defendant contends that "[t]he inconsistencies in this case were major and dramatic."[2]  (ECF No. 195 at 13 (emphasis omitted).)  He concedes that "Luis testified that he saw Otoniel in the chapel in 2009 and that is when the abuse occurred to Otoniel" but asserts that "Otoniel himself clearly testified that the only alleged abused that supposedly occurred with him happened . . . in the years 2001 and 2004."  (*Id.* at 14 (emphasis

---

[2] Although the Court's chambers' rules provide that replies are limited to ten pages, Defendant's reply brief is forty-six pages.  Nonetheless, the Court has considered Defendant's reply brief in its entirety.

omitted).)  Defendant claims that Luis's "version of the events is so absolutely incredible and unbelievable that it cannot form the basis of a conviction."  (*Id.* at 20.)

As noted above, a court can order a new trial on the ground of a "weight of the evidence" argument only if the court "believes that there is a serious danger that a miscarriage of justice has occurred—that is, that an innocent person has been convicted." *Brennan*, 326 F.3d at 189 (internal quotations omitted).  When determining whether a new trial should be granted on the basis that the verdict was against the weight of the evidence, a court exercises its independent judgment.  *Johnson*, 302 F.3d at 150 (3d Cir. 2002); *United States v. David*, 222 Fed. Appx. 210, 215 (3d Cir. 2007).  "If there is substantial evidence to support the jury's determination, [a court] will 'not disturb the verdict although on that evidence [the court] might not have made the same decision.'"  *United States v. McKee*, 506 F.3d 225, 232-33 (3d Cir. 2007) (quoting *United States v. Cooper*, 121 F.3d 130, 133 (3d Cir. 1997)).  Thus, the "inquiry is limited to determining whether the jury's verdict is permissible."  *Id.* at 233.

After examining the evidence that was presented at trial, the Court finds that the jury's verdict as to Count One of the Superseding Indictment was permissible.  First, the Court notes that the Government and Defendant stipulated that Defendant traveled in foreign commerce from the United States to Honduras between February 26, 2009, and March 13, 2009.  (Government Ex. 236.)  The Government and Defendant also stipulated that Otoniel, who was born on June 1, 1994, was fourteen years old during the timeframe of February 26, 2009, and March 13, 2009.  (Government Ex. 237.)  Accordingly, the elements of the offense that Defendant traveled in foreign commerce or resided, either

temporarily or permanently, in a foreign country, and that the victim was under the age of eighteen during the relevant timeframe were established.  18 U.S.C. § 2423(c).

Next, regarding the illicit sexual conduct, Otoniel testified that in 2001, Defendant asked him to touch him while they were inside a church.  (Test. of Otoniel, ECF No. 182 at 690-91, 696-97.)  When Otoniel refused, Defendant touched Otoniel over his pants.  (*Id.* at 690-92, 696-97.)  Otoniel also testified that Defendant put his penis inside him while they were inside a church in 2004, when Otoniel was ten years old.  (*Id.* at 692, 697.)  Otoniel stated that after Defendant placed his penis inside of him while they were inside the church, Otoniel cleaned himself up with paper that he retrieved from a box that was inside the church.  (*Id.* at 692-93, 697.)  He stated that Defendant tried to give him $500 inside the church.  (*Id.* at 693, 697.)

Witness Luis testified that in 2009, while he was unloading a truck outside of the church, Defendant was inside the church organizing his items when he called for Otoniel to come inside the church.  (Test. of Luis, ECF No. 180 at 246-47, 257-58.)  Because the church doors were closed, Luis was unable to place the items that he was unloading inside the church.  (*Id.* at 258-59.)  Luis testified that he and two boys named Martin and Gerson looked through a window to peer inside the church.  (*Id.* at 258.)  When Luis looked through the window, he saw that Defendant had pulled Otoniel's pants down to his knees and was taking photographs of Otoniel's penis.  (*Id.* at 260.)  Luis then observed Defendant pull his pants down to his knees and stand in front of Otoniel, at which time Otoniel began to penetrate Defendant.  (*Id.* at 261.)  Defendant was leaning forward, and his hands were on Otoniel's buttocks.  (*Id.* at 262.)  Otoniel's hands were on Defendant's

waist. (*Id.*)  Luis testified that he watched Otoniel penetrate Defendant's rear end for five minutes. (*Id.*)  When they finished, Defendant used toilet paper from a bag of donations that was inside the church to clean himself, and Otoniel also cleaned himself with toilet paper. (*Id.* at 262-63.)  Luis stated that he then saw Defendant give Otoniel chocolates and money, which Otoniel was carrying when he exited the church. (*Id.* at 263.)

Witness and victim Erick testified, without providing dates or years, that he was unloading items from a truck outside of the church when he saw Defendant and Otoniel enter the church. (Test. of Erik, ECF No. 180 at 307-08.)  After the church doors were closed, Erick and Luis looked through a slatted window. (*Id.* at 308-09.)  Erick testified that he saw Otoniel inside the church with his shorts down. (*Id.* at 310.)  Erick did not observe Defendant inside the church, but he testified that he left the window because he believed that Defendant was inside the church and did not want Defendant to see him at the window. (*Id.*)

The Government presented the testimony of expert Dr. Veronique Valliere, who testified, in part, that victims are often unable to recall the dates on which the abuse occurred. (Test. of Dr. Veronique Valliere, ECF No. 183 at 806-07, 815-18.)  Defendant's expert, Dr. Frank Dattilio, also testified that victims "may have contaminated memory." (Test. of Dr. Frank Dattilio, ECF No. 185 at 1014-15, 1052-53.)  Thus, although Defendant was charged in Count One with abusing Otoniel in 2009, and Otoniel testified that Defendant abused him in 2001 and in 2004, the jury may have concluded, based upon Dr. Valliere's and Dr. Dattilio's respective testimony, that Otoniel was unable to recall the specific years of the abuse.  Furthermore, Luis testified that he observed Defendant

engage in illicit sexual conduct with Otoniel in 2009, making the jury's verdict permissible. *McKee*, 506 F.3d at 233. It is well settled that "in general, conflicting testimony or a question as to the credibility of a witness are not sufficient grounds for granting a new trial." *David*, 222 Fed. App'x at 216 n.6 (internal quotations omitted). The discrepancy between Erik's and Luis's respective testimony "[was] not so overwhelming as to indicate a risk that the conviction was unjust and merit[s] the [C]ourt's intrusion on the jury's function of determining credibility." *Id.* at 216. Accordingly, the Court cannot conclude that the verdict as to Count One was against the weight of the evidence and finds that the evidence supports the jury's verdict of guilty beyond a reasonable doubt.

As to Count Three, Defendant contends that Erik testified that "Luis was not present for any encounter between Defendant and himself" and that "Erik never testified that [Defendant] touched him beneath his clothing." (ECF No. 166 at 3 (emphasis omitted).) In response, the Government states that "there were some inconsistencies among the accounts offered by Erick, Otoniel, and Luis" but asserts that the inconsistencies "were minor." (ECF No. 190 at 9.) In reply, Defendant claims that Erick's testimony was "totally contrary" to Luis's testimony. (ECF No. 195 at 12.)

After examining the evidence that was presented at trial, the Court finds that the jury's verdict as to Count Three of the Superseding Indictment was permissible. First, the Court notes that the Government and Defendant stipulated that Defendant traveled in foreign commerce from the United States to Honduras between February 26, 2009, and March 13, 2009. (Government Ex. 236.) The Government and Defendant also stipulated that Erick, who was born on May 23, 1993, was fifteen years old during the timeframe of

February 26, 2009, and March 13, 2009. (Government Ex. 237.) Accordingly, the elements of the offense that Defendant traveled in foreign commerce or resided, either temporarily or permanently, in a foreign country, and that the victim was under the age of eighteen during the relevant timeframe were established. 18 U.S.C. § 2423(c).

Next, regarding the illicit sexual conduct, Erick testified, without providing dates or years, that Defendant asked him, Luis, and another boy named Martin to move some items that were in Defendant's Ford Ranger truck. (Test. of Erik, ECF No. 180 at 299-300.) Erick stated that during the drive from La Esperanza to Latchi Lara, he sat in the front passenger seat, Defendant sat in the driver's seat, and Luis and Martin sat in the back and the middle of the truck. (Id. at 301.) When Defendant, Erick, Luis, and Martin arrived at Latchi Lara, they began to unload Defendant's truck and placed items that belonged to Defendant inside a container. (Id. at 301-02.) Erick testified that, at one point, he was inside the container alone and was unloading items when Defendant touched him. (Id. at 301-03.) Specifically, Erick stated that Defendant touched his penis with his hand for ten to fifteen seconds while they were inside the container. (Id. at 303.) Defendant then gave Erick 200 lempiras.[3] (Id.) Defendant and Erick then left the container and finished unloading Defendant's belongings from the truck, which took approximately a half hour. (Id. at 304.)

Erick testified that after unloading Defendant's belongings, Defendant drove him back to La Montana in his Ford Ranger truck, while Luis and Martin returned to La Montana in a truck that belonged to Latchi Lara. (Id. at 304-06.) Erick stated that

---

[3] The lempira is the official currency of Honduras.

Defendant touched his penis with his hand for approximately ten seconds while they were inside the truck. (*Id.* at 306-07.) Erick also stated that Defendant asked him to masturbate himself and asked him how much Erick would charge. (*Id.* at 307.) Erick did not give Defendant a price, and he did not agree to masturbate in front of Defendant. (*Id.*) Erick testified that Defendant gave him 300 lempiras while they were inside the truck. (*Id.*)

Witness Luis testified that in 2009, he, Defendant, Erick, and Martin went to Latchi Lara to unload items. (Test. of Luis, ECF No. 180 at 246-47.) Defendant drove his Ford Ranger, and Erick sat in the front passenger seat. (*Id.* at 248.) Luis stated that he was sitting in the middle of the backseat, and Martin was in the back cab, or bed, which was outside of the truck. (*Id.* at 248-49, 272.) Luis testified that Defendant asked Erick if Luis could be trusted, by using some words and hand signals, while they were driving to Latchi Lara. (*Id.* at 249-50.) After Erick indicated that Luis could be trusted, Defendant, who was drinking coffee, took Erick's hand and put it on the steering wheel. (*Id.* at 250.) Luis testified that Defendant then unbuttoned Erick's pants, put his hand inside Erick's pants, and touched Erick's penis. (*Id.*) Luis stated that Defendant asked Erick how much Erick would charge him to touch his penis, and Erick said that he charged 100 lempiras. (*Id.*) Luis observed Defendant give Erick 100 lempiras. (*Id.* at 251.) Luis testified that, during this trip to Latchi Lara, Defendant touched Erick again on top of Erick's pants. (*Id.*) Luis stated that Defendant did not ask for permission to touch Erick the second time because he had already asked Erick how much he charged. (*Id.* at 251-52.) Luis testified that on both occasions when he observed Defendant touch Erick, he saw Defendant give Erick money. (*Id.* at 252.) Luis stated that after they unloaded Defendant's belongings

into the container, Defendant and Erick returned to La Montana in Defendant's Ford Ranger truck, while he, Martin, and a truck driver returned to La Montana in another truck. (*Id.* at 253, 270, 274.)

As previously discussed, Dr. Valliere testified, in part, that victims are often unable to recall the dates on which the abuse occurred and often are unable to recall the sequencing of events surrounding the abuse. (Test. of Dr. Veronique Valliere, ECF No. 183 at 806-07, 815-18.) Defendant's expert, Dr. Frank Dattilio, also testified that victims "may have contaminated memory." (Test. of Dr. Frank Dattilio, ECF No. 185 at 1014-15, 1052-53.) Thus, although Erick's and Luis's testimony conflicted as to when the abuse in Defendant's truck occurred, the jury may have concluded, based upon Dr. Valliere's and Dr. Dattilio's respective testimony, that Erick was unable to recall certain specific details of the abuse. As noted above, "conflicting testimony or a question as to the credibility of a witness are not sufficient grounds for granting a new trial." *David*, 222 Fed. App'x at 216 n.6 (internal quotations omitted). Moreover, the discrepancy between Erik's, Luis's, and Otoniel's respective testimony "[was] not so overwhelming as to indicate a risk that the conviction was unjust and merit[s] the [C]ourt's intrusion on the jury's function of determining credibility." *Id.* at 216. Accordingly, the Court cannot conclude that the verdict as to Count Three was against the weight of the evidence and finds that the evidence supports the jury's verdict of guilty beyond a reasonable doubt.

As to Count Four, Defendant argues that "Ludin specifically denied that any illicit sexual activity occurred between himself and Defendant" and that "the Government . . . did not charge [Defendant] with any illicit sex act involving [Ludin] in 2009." (

166 at 3 (emphasis omitted).)  Defendant notes that there is a "strong doubt" as to

Defendant's guilt, which "is further buttressed by the not[-]guilty verdict involving

[Ludin] at Count [F]ive." (*Id.*)  In response, the Government states that "Ludin detailed

the abuse he had suffered at the hands of Defendant during an interview with the

Forensic Interview Specialist and said, among other things, that he had engaged in anal

sex with [Defendant] on at least two separate occasions when he was [fifteen] and

[sixteen]."  (ECF No. 190 at 9.)  The Government notes that Ludin recanted the sexual

abuse during the trial but argues that the jury "concluded that [Ludin's] initial reports of

child sexual abuse were truthful, as it was entitled to do." (*Id.*)  The Government asserts

that Ludin's testimony was "so incredible . . . that his entire recantation was [also]

incredible." (*Id.* at 10 (emphasis omitted).)  Finally, the Government argues that "Otoniel

and Luis testified that they had actually seen Ludin and Defendant engag[ing] in anal

sex," which "tended to corroborate Ludin's initial claims of abuse." (*Id.*)  In reply,

Defendant asserts that the United States is attempting "to backdoor the forensic

interviews into the Court record as 'facts.'" (ECF No. 195 at 7.)

 As noted above, the Court has granted Defendant's motion for judgment of

acquittal as to Count Four. (*See* ECF No. 203.)  However, the Court reiterates here that the

jury's verdict as to Count Four was impermissible.  First, the Court notes that the

Government and Defendant stipulated that Defendant traveled in foreign commerce from

the United States to Honduras between March 5, 2004, and March 11, 2007.  (Government

Ex. 236.)  The Government and Defendant also stipulated that Ludin, who was born on

March 12, 1991, was between the ages of twelve years old and fifteen years old during the

timeframe of March 5, 2004, and March 11, 2007.  (Government Ex. 237.)  Accordingly, the elements of the offense that Defendant traveled in foreign commerce or resided, either temporarily or permanently, in a foreign country, and that the victim was under the age of eighteen during the relevant timeframe were established.  18 U.S.C. § 2423(c).

Next, regarding the illicit sexual conduct, Ludin denied that Defendant engaged in any illicit sexual conduct with him.  He also recanted all allegations he previously made against Defendant.  (*See* Test. of Ludin, ECF No. 182.)  Regarding Ludin's previous statements he made during an interview in 2014, in which Ludin alleged that Defendant engaged in illicit sexual conduct with him, the Court held that the statements were admissible as impeachment evidence but were not admissible as substantive evidence. (ECF No. 147 at 10-16.)[4]  During the trial, the Court instructed the jury that Ludin's prior inconsistent statements could not be used as proof of the truth of what he said in these earlier statements; rather, Ludin's prior inconsistent statements could only be used to evaluate his trial testimony and credibility.  (*Id.* at 641-42.)  Thus, contrary to the Government's argument, the jury was not "entitled" to conclude that "[Ludin's] initial reports of child sexual abuse were truthful," (ECF No. 190 at 9), and treat those prior statements as substantive evidence upon which the jury could rely to find Defendant guilty of Count Four.  The Government therefore presented no evidence through Ludin that Defendant engaged in illicit sexual conduct with Ludin during the timeframe of March 5, 2004, and March 11, 2007.

---

[4] The Government appeared to understand the Court's ruling as to Ludin's inconsistent statements by stating at a sidebar during trial, "I'm not using these interviews as substantive evidence. . . . . I'm allowed to impeach my own witness."  (ECF No. 182 at 617.)

The Government presented no evidence through its other witnesses that Defendant engaged in illicit sexual conduct with Ludin during the timeframe of March 5, 2004, and March 11, 2007. Specifically, Otoniel testified that he witnessed Defendant and Ludin doing "things that were not good," or "mischief." (Test. of Otoniel, ECF No. 182 at 693-94.) When asked to elaborate, Otoniel stated that "Ludin would screw him, and he would screw Ludin." (Id. at 694.) Otoniel did not provide any timeframe as to when he witnessed these events. (See id.) Similarly, Erick testified that he saw Defendant and Ludin together several times and described Ludin as Defendant's "favorite." (Test. of Erick, ECF No. 180 at 310-11.) Erick stated that he witnessed Defendant taking photographs of Ludin but provided no other details. (Id. at 311.) Erick did not testify that he observed Defendant engage in any illicit sexual conduct with Ludin. (See id. at 310-11.)

Witness Luis testified that on the same day in 2009 on which he observed Defendant touch Erick inside the truck and witnessed Otoniel penetrating Defendant with his penis inside the church, he also saw Ludin penetrating Defendant. (Test. of Luis, ECF No. 180 at 263-66, 270-71, 277-78.) Specifically, Luis stated that after he observed Otoniel and Defendant inside the church, he continued to unload the truck. (Id. at 264.) After the truck was unloaded, Luis and three others —Juan, Luis, and Pedro Pena — took donation items from the church to an administrative building. (Id. at 264-65.) When they were traveling between the church and the administrative building, Luis was sitting in the bed of the truck and saw Defendant and Ludin behind the classrooms at La Montana. (Id. at 265-67.) Luis testified that Defendant was in front of Ludin, and Ludin was penetrating Defendant. (Id. at 267-68.) Ludin's pants and Defendant's pants were down to their

knees, and Defendant's hands were placed on a wall. (*Id.* at 267.) Ludin's hands were

placed on Defendant's face. (*Id.*) Luis testified that Ludin penetrated Defendant for

approximately five minutes. (*Id.* at 268.) Luis did not testify that he observed Defendant

engage in any illicit sexual conduct with Ludin between the timeframe of March 5, 2004,

and March 11, 2007. (*See* Test. of Luis, ECF No. 180.)

The Government did not present any evidence that Defendant engaged in illicit

sexual conduct with Ludin between the timeframe of March 5, 2004, and March 11, 2007.

Although Luis testified that he observed Defendant engage in illicit sexual conduct with

Ludin, the time period was in 2009. The Government charged Defendant with engaging

and attempting to engage in illicit sexual conduct with Ludin between on or about March

3, 2008, and March 14, 2008, in Count Five of the Superseding Indictment (ECF No. 69),

and the jury found Defendant not guilty of Count Five, (ECF No. 163). Thus, even if the

Court had not granted Defendant's motion for judgment of acquittal as to Count Four, (*see*

ECF No. 203), it would still conclude that the weight of the evidence was against the jury's

decision that Defendant is guilty beyond a reasonable doubt as to Count Four because the

Government failed to present any evidence that Defendant engaged in illicit sexual

conduct with Ludin between the timeframe of March 5, 2004, and March 11, 2007,

rendering the jury's decision as to Count Four impermissible. *McKee*, 506 F.3d at 232-33.

ii.     **Count Two**

Defendant argues that the weight of the evidence was insufficient to sustain the

conviction against him as to Count Two, which charged that on or about September 12,

2014, Defendant did knowingly possess one or more visual depictions, the production of

which involved the use of minors engaging in sexually explicit conduct, and which depicted minors engaging in sexually explicit conduct, all of which had been shipped and transported using any means of interstate and foreign commerce, and all of which had been produced using materials which had been mailed and shipped and transported, by any means including by computer, in interstate and foreign commerce.

Defendant makes several arguments in support of his contention that the conviction was against the weight of the evidence. First, Defendant contends that the Government "did not present any evidence that [he] was aware of any visual depiction of a minor engaging in sexually explicit conduct." (ECF No. 166 at 3.) Second, Defendant asserts that "[n]o evidence was produced that [he] accessed the account where the depiction was located or accessed the depiction itself. Further, no evidence was entered that [he] actually produced the visual depiction at issue." (Id.) Defendant argues that the Government's evidence only established that "it is likely [he] did take the visual depiction and it was possible for [him] to access the depiction where it was located because he had the 'potential' to do so, due to his status as an administrator of the computer." (Id. (emphasis omitted).) Defendant emphasizes that there were eight administrators who could access the computer, including Defendant, and that two other administrators had the same password as the "Marie" account, on which the photographs were found, and the password was "Dental." (Id. at 3-4.) Defendant asserts that his account was not accessible with this password and states that the two other administrators who had the same password as the "Marie" account were "Kathy" and "Brian." (Id. at 4.) Defendant notes that the last password changes occurred in January 2007, six months before the

photographs were placed on the "Marie" account and argues that "[t]his clearly contradicts the Government's argument that [he] might have changed the password on the "Marie" account to upload the picture[s], as [they were] uploaded to the loose hard drive on June 4, 2007[,] and [were] immediately deleted and placed into the recycling bin on June 5, 2007." (*Id.* (emphasis omitted).) Third, Defendant argues that the Government was unable to overcome Defendant's affirmative defense because he was charged with the possession of only two depictions and because the Government's witness, Homeland Security Investigations special agent Robert Connelly, testified that the two photographs were uploaded on June 4, 2007, and were deleted on June 5, 2007. (*Id.* at 4-5.)

In response, the Government argues that the jury was entitled to believe that Defendant possessed two visual depictions of a minor engaging in sexually explicit conduct, "particularly given the evidence that the images were produced with Defendant's camera and stored in a folder captioned '2007-May Honduras,' a place Defendant had visited during that time." (ECF No. 190 at 10-11 (internal citations omitted).) The Government further argues that Defendant cannot rely on an affirmative defense because "Defendant did not 'destroy' the files by simply moving them to the 'recycle bin' of his computer, especially given the fact that he instructed others to never delete any of his photos and that the images were easily retrievable without the use of any specialized forensic tools." (*Id.* at 11 (emphasis omitted).) The Government also notes that Defendant's affirmative defense fails because "there was no evidence that Defendant was the one who placed [the files] in [the] recycle bin." (*Id.* (emphasis omitted).) In reply,

Defendant argues that the evidence the Government presented at trial "was nothing more than mere speculation and/or guessing." (ECF No. 195 at 21.)

To prove Count Two, the Government was required to establish that (1) Defendant knowingly possessed one or more matters which contained a visual depiction of a minor engaging in sexually explicit conduct; (2) the visual depiction had been shipped or transported using any means of interstate or foreign commerce, or had been produced using materials which had been mailed, or shipped or transported by any means including by computer in interstate or foreign commerce; (3) the production of such visual depiction involved the use of a minor engaging in sexually explicit conduct; (4) such visual depiction was of a minor engaging in a sexually explicit conduct; and (5) Defendant knew that such visual depiction was of sexually explicit conduct and that at least one of the persons engaged in sexually explicit conduct in such visual depiction was a minor. 18 U.S.C. § 2252(a)(4)(B).

Within the statute, the phrase "minor" means "any person under the age of eighteen years." *Id.* § 2256(1). The term "visual depiction" includes "undeveloped film and videotape, data stored on computer disk or by electronic means which is capable of conversion into a visual image." *Id.* § 2256(5). The Court instructed the jury that the phrase "shipped or transported in interstate or foreign commerce" means that "the materials used to produce the visual depiction, that is[,] the computer hard drive, had previously moved from one state to another or between another country and the United States." (ECF No. 186 at 1235.)

The term "sexually explicit conduct" means the "lascivious exhibition of the genitals or pubic area of any person." 18 U.S.C. § 2256(2)(B)(iii). Regarding this factor, the Court instructed the jury to consider the "overall content of the material" and further instructed the jury that it could, but was not required to, consider the following factors: (1) "[w]hether the focal point of the visual depiction is on the minor's genitals or pubic area;" (2) "whether the setting of the visual depiction is sexually suggestive, that is[,] a place generally associated with sexual activity;" (3) "whether the minor is depicted in an unnatural pose, or inappropriate attire, considering the age of the child;" (4) "whether the minor is fully or partially clothed[,] or nude;" (5) "whether the visual depiction suggests sexual coyness or a willingness to engage in sexual activity;" and (6) "whether the visual depiction is intended or designed to elicit a sexual response in the viewer." (ECF No. 186 at 1234-35.)

Regarding the photographs, the Government presented Exhibits 113 and 114 as evidence. (Government Exs. 113, 114.) Exhibit 113 depicted a boy who was completely nude with his genitals or pubic area exposed. He was lying down on a mattress but was propped up on one elbow. One knee was propped up in the air, and the boy was smiling in the direction of the person who was taking the photograph. (Government Ex. 113.) Exhibit 114 depicted the same photograph, but it was an extreme close-up of the boy with his genitals and pubic area exposed. (Government Ex. 114.)

After examining the evidence that was presented at trial, the Court concludes that the jury's verdict as to Count Two of the Superseding Indictment was permissible. First, the Court finds that there was sufficient evidence for the jury to conclude that one or both

of the photographs depicted sexually explicit conduct, or the lascivious exhibition of the genitals or pubic area of any person. Specifically, the jury could have concluded that the focal point of one or both of the photographs was on the boy's genitals and that the setting of one or both of the photographs was sexually suggestive because the boy was on a mattress, which is a place generally associated with sexual activity. The boy was nude, and the jury may have found that the minor was depicted in an unnatural pose, or inappropriate attire, in one or both of the photographs. Additionally, the jury may have determined that the visual depiction in one or both of the photographs, based upon the boy's positioning and facial expression, suggested sexual coyness or a willingness to engage in sexual activity and that the visual depiction in one or both of the photographs was intended or designed to elicit a sexual response in the viewer. Given that the jury, in considering the above factors, could have concluded that one or both of the photographs depicted sexually explicit conduct, it also could have reasonably determined that Defendant knew that the visual depiction in one or both of the photographs was of sexually explicit conduct.

The Court also finds that there was sufficient evidence for the jury to conclude that the boy depicted in Exhibits 113 and 114 was a minor. The Government can prove the age of an individual in a photograph in the following ways:

> First, the individual himself, or someone who has knowledge of his age, can testify as to the individual's age at the time the photograph was taken. Second, an expert, such as a pediatrician, can analyze the photograph and give an expert opinion as to the age of the individual. . . . Third, the jury can examine the photographs in question and determine for itself whether the individual is under eighteen years of age.

*United States v. Villard*, 700 F. Supp. 803, 814 (D.N.J. 1988) (explaining that "[i]n this case, a lay witness who had seen the photographs gave his opinion of the individual's approximate age"). Here, the Government presented the testimony of Homeland Security Investigations special agent Molly Rock, who stated that the boy appeared to be prepubescent and was possibly around the age of ten or eleven. (Test. of Molly Rock, ECF No. 180 at 165-66.) Moreover, the Court finds that the jury, which examined Exhibits 113 and 114, could have reasonably determined that the boy depicted in the photographs was under the age of eighteen. The jury also could have reasonably concluded that Defendant knew that the boy engaged in sexually explicit conduct in one or both of the photographs was a minor.

Next, the Court concludes that there was sufficient evidence for the jury to determine that Defendant knowingly possessed the matters that contained a visual depiction of a minor engaging in sexually explicit conduct. Specifically, the Government presented the testimony of Homeland Security Investigations special agent Robert Connelly, who specializes in computer forensics and examined Defendant's desktop computer. (Test. of Robert Connelly, ECF No. 181 at 369, 373-74.) Agent Connelly testified that the EXIF data of Exhibits 113 and 114, which were found in the recycling bin on the Western digital hard drive, (Government Ex. 34), revealed that the photographs were taken on an Olympus digital camera, model number X-3C-60Z, (Government Ex. 192). (Test. of Connelly, ECF No. 181 at 374-75, 380-81, 385-86, 402-03.) Agent Connelly stated that he located a photograph that depicted Defendant taking a photograph of his reflection in a mirror. (*Id.* at 389; Government Ex. 193a.) The EXIF data for this

photograph revealed that it was taken on an Olympus digital camera, model number X-3C-60Z. (Test. of Connelly, ECF No. 181 at 389-90; Government Ex. 193b.) Agent Connelly also testified that he located a photograph of an individual holding a pole, (Government Ex. 194a), followed by three photographs of Defendant, (Government Exs. 194b-194d). (Test. of Connelly, ECF No. 181 at 390-91.) The EXIF data for all four photographs indicated that they were taken on an Olympus digital camera, model number X-3C-60Z. (*Id.* at 391-92; Government Ex. 194e.) Accordingly, there was sufficient evidence for the jury to conclude that Defendant took the photographs depicted in Exhibits 113 and 114.

Moreover, Agent Connelly testified that the images depicted on Exhibits 113 and 114, which were taken on an Olympus digital camera, model number X-3C-60Z, were later uploaded to a computer to which Defendant had access. (Test. of Connelly, ECF No. 181 at 382-83, 385-86, 412-13.) Agent Connelly stated that eight individuals, including Defendant, had administrator accounts on the computer located in the rectory. (*Id.* at 382-83, 400; Government Ex. 190.) An administrator could add user accounts, delete user accounts, change passwords, move passwords, and install programs on to the computer. (Test. of Connelly, ECF No. 181 at 383.) Agent Connelly testified that Exhibits 113 and 114 were deleted on June 5, 2007, and were found in the recycling bin connected to Marie Pollack's account. (*Id.* at 380-82, 402-03, 407-08; *see also* Government Ex. 187.) Agent Connelly testified that Ms. Pollack's password was last changed on January 23, 2007, at 9:30 p.m. (Test. of Connelly, ECF No. 181 at 384-85; Government Ex. 191.) That same day,

the password to the account of an administrator named Brian was changed at 9:40 p.m. (Test. of Connelly, ECF No. 181 at 385; Government Ex. 191.)

The Government presented the testimony of Marie Pollack, who volunteered at the parish from 2006 until 2013. (Test. of Marie Pollack, ECF No. 182 at 585.) Ms. Pollack stated that she occasionally transferred photographs from Defendant's camera on to the computer. (Id. at 585-87.) She also testified that Defendant instructed her to never delete photographs. (Id. at 587.) Ms. Pollack testified that she never saw photographs of naked children and that she did not remember if she had a user profile on the computer. (Id. at 587-88.) Ms. Pollack stated that she volunteered at the parish two to three times per week, but she could not recall ever working as late as 9:30 p.m. in the evenings. (Id. at 585, 588.)

Although there were several administrators who had access to the computer, the Government "was not required to prove that defendant had exclusive or sole access to the computers that contained the child pornography images." *United States v. Pavulak*, No. 09-CR-043, 2011 U.S. Dist. LEXIS 103699, at *17 (D. Del. Sept. 13, 2011). Moreover, given the evidence described above, there was sufficient evidence for the jury to conclude that Defendant took one or both of the images depicted in Exhibits 113 and 114 on an Olympus digital camera, model number X-3C-60Z and/or possessed one or both of the images depicted in Exhibits 113 and 114 on the computer to which he had access.

There was also sufficient evidence for the jury to conclude that one or both of the photographs had been shipped or transported using any means of interstate or foreign commerce, or had been produced using materials which had been mailed, or shipped or transported by any means including by computer in interstate or foreign commerce.

Exhibit 34 was a Western digital hard drive that was stamped as a "product of Thailand." (Government Ex. 34; *see also* Test. of Connelly, ECF No. 181 at 374-75.) As the Court instructed the jury, the phrase "shipped or transported in interstate or foreign commerce" means that "the materials used to produce the visual depiction, that is[,] the computer hard drive, had previously moved from one state to another or between another country and the United States." (ECF No. 186 at 1235.) The jury therefore could have determined that the hard drive was moved between Thailand and the United States.

Finally, regarding Defendant's affirmative defense, 18 U.S.C. § 2252(c) provides:

> (c) Affirmative defense. It shall be an affirmative defense to a charge of violating [18 U.S.C. § 2252(a)(4)] that the defendant—
>> (1) possessed less than three matters containing any visual depiction proscribed by that paragraph; and
>> (2) promptly and in good faith, and without retaining or allowing any person, other than a law enforcement agency, to access any visual depiction or copy thereof—
>>> (A) took reasonable steps to destroy each such visual depiction; or
>>> (B) reported the matter to a law enforcement agency and afforded that agency access to each such visual depiction.

18 U.S.C. § 2252(c)(1)-(2). Here, fewer than three matters containing a visual depiction of a minor engaging in sexually explicit conduct were at issue. *Id.* § 2252(c)(1). However, although the photographs were found in the computer's recycling bin, there was no evidence that Defendant placed them there. *Id.* § 2252(c)(2)(A). Moreover, the jury could have concluded that placing the photographs in the recycling bin was not equivalent to "[taking] reasonable steps to destroy each such visual depiction." *Id.*; *see also United States v. Hill*, 750 F.3d 982, 987-88 (8th Cir. 2014) (concluding that the defendant possessed four images found in his computer's recycling bin because "[p]lacement in the bin does not

automatically delete files" and explaining that because the defendant "never emptied the four files from his recycle bin . . . [t]he images remained in his recycle bin, accessible to [him] and subject to his dominion and control without any special tools") (internal quotations omitted); *United States v. Romm*, 455 F.3d 990, 993 n.2 (9th Cir. 2006) (declining to consider two images of child pornography that had been placed in the recycling bin but were then manually deleted from the bin). Finally, there was no evidence that Defendant reported the matter to a law enforcement agency and afforded the agency access to each visual depiction. 18 U.S.C. § 2252(c)(2)(B). The jury therefore could have permissibly rejected Defendant's affirmative defense. Accordingly, the Court cannot conclude that the verdict as to Count Two was against the weight of the evidence and finds that the evidence supports the jury's verdict of guilty beyond a reasonable doubt.

### iii. Count Eight

Defendant argues that the weight of the evidence was insufficient to sustain the conviction against him as to Count Eight, which charged that between on or about December 18, 2008, and March 13, 2009, Defendant did knowingly transport, transmit, or transfer, or cause to be transported, transmitted, or transferred, Check #221 issued to ProNiño USA for $3,000.00, from the Western District of Pennsylvania to Honduras, with the intent to promote the carrying on of engaging in illicit sexual conduct in foreign places.

In support of his argument, Defendant states that "[t]he Government was not able to produce a shred of evidence that [he] ever received the money sent to Pro Nino USA" because "[Timothy] Covington made it abundantly clear that the monies sent to Pro Nino

26

USA by [Defendant] was deposited [into] the accounts of Pro Nino Honduras[,] where [the funds were] at the disposal of George Mealer." (ECF No. 166 at 5.) Defendant contends that "Covington, Richard Boxler, and Special Agent Kevin Petrulak were unable to testify if George Mealer ever withdrew those monies from Pro Nino Honduras and transmitted that amount to [Defendant]." (Id.) Defendant claims that "[t]he best the Government was able to produce in evidence was an email indicating [Defendant's] desire to have those monies available to him, but no evidence this actually occurred" because Special Agent Petrulak "indicated that he did not get [the] bank records and could not show the chain of custody of the money once it was sent to Pro Nino Honduras, but that it can be 'assumed' that it went to [Defendant] because he had sent emails previously requesting its availability." (Id. at 5-6.)

In response, the Government argues that the evidence established that Defendant's "e-mails confirmed that he had instructed those at ProNiño to make all of [the $3,000 transmitted in Check #221] available to him in Honduran lempiras in three increments of [$1,000] apiece during his March 2009 visit." (ECF No. 190 at 12 (emphasis omitted).) Relying upon the testimony of Luis, Erick, Otoniel, and Fredis — who stated that Defendant had offered them money and items of value — the Government further argues that "the jury easily could infer that some or all of the money Defendant was using to promote the carrying on of his engagement in illicit sexual conduct with these boys had come from Check #221." (Id.) In reply, Defendant asserts that "[t]here was absolutely no evidence that [he] received any of this money [from Check #221] in Honduras" because

Luis's and Erick's testimony had "major credibility issues and inconsistencies and contradictions." (ECF No. 195 at 24.)

To prove Count Eight, the Government was required to establish that (1) Defendant knowingly transported, transmitted, or transferred, or caused to be transported, transmitted or transferred, a monetary instrument or funds from a place in the United States to or through a place outside of the United States; and (2) Defendant acted with the intent to promote the carrying on of a specified unlawful activity, that is engaging in illicit sexual conduct in foreign places. 18 U.S.C. § 1956(a)(2)(A).

The Government provided evidence of Check #221, which was dated December 18, 2008, and was to be paid to the order of ProNiño USA in the amount of $3,000. (Government Exs. 167, 167A.) The memo line of the check stated that it was for the March 2009 mission trip. (*Id.*) The Government also presented evidence of an e-mail, dated February 20, 2009, in which Defendant stated that "two months ago I sent Tim[] $3,000 for the start of our expenses." (Government Ex. 183.) Defendant also stated, "I will need $1,000 in [lempiras] when I arrive, $1,000 early next week and the final $ at the end of that week." (*Id.*) The Government presented evidence of another e-mail, dated May 8, 2009, that detailed Defendant's personal expenses during the March 2009 mission trip. (Government Ex. 184.) The Government also presented the testimony of Kevin Petrulak, a special agent with the Internal Revenue Service Criminal Investigation, who provided his interpretation of the Government's exhibits. (Test. of Petrulak, ECF No. 181 at 479, 528-32.) He confirmed that Defendant's personal expenses for the March 2009 mission trip totaled $3,000. (*Id.* at 530-32.)

28

As discussed above, Luis testified that after he observed Otoniel penetrating Defendant inside the church in 2009, he saw Defendant give Otoniel chocolates and money, which Otoniel was carrying when he exited the church. Erick testified that Defendant gave him 200 lempiras after Defendant touched his penis while they were unloading items inside the container in 2009. Erick also testified that Defendant gave him 300 lempiras after Defendant touched his penis while they were inside the truck in 2009. Luis testified that he observed Defendant give Erick 100 lempiras after Defendant touched Erick's penis while they were inside the truck in 2009. *See supra* Part III.A.i. As the Government has noted, Fredis testified that in 2008 or 2009, Defendant asked him to undress and to masturbate. (Test. of Fredis, ECF No. 182 at 707-08.) After Defendant asked Fredis how much he would charge, he entered the number 200 on his calculator and handed it to Fredis. (*Id.* at 708-09.) Fredis declined Defendant's offer and handed the calculator back to him. (*Id.* at 709.) The jury could have determined that Defendant used some or all of the money from Check #221 to purchase items and to make these payments in 2009. Accordingly, Court cannot conclude that the verdict as to Count Eight was against the weight of the evidence and finds that the evidence supports the jury's verdict of guilty beyond a reasonable doubt.

## B.     Prosecutorial Misconduct

### 1.     Statements Made During Closing Argument

Defendant argues that he is entitled to a new trial because the Government engaged in prosecutorial misconduct during its closing argument. (ECF No. 166 at 6.) First, Defendant asserts that, while discussing Erik's testimony, the Government stated

that "Defendant had the opportunity to cross[-]examine [him] and to question his testimony and his credibility[,] and [Defendant] chose not to do so." (*Id.*) Defendant contends that, while pointing at the defense table, the Government stated, "That's on them." (*Id.*) Defendant argues that the Government's statement "shifted the burden of proof from the Government to [Defendant] by insinuating to the jury that [Defendant was] required to question a witness or prove his innocence through questioning the credibility of any witness." (*Id.*) Defendant also argues that the Government "[was] essentially vouching for the credibility of the witness by arguing that it was on [Defendant] to prove the witness was not credible." (*Id.* at 7.)

Second, Defendant asserts that, while discussing whether the photographic evidence in Exhibits 113 and 114 constituted illicit sexual conduct, the Government stated its personal opinion on the matter by indicating that the jury "may not see the depiction for the purpose of sexual gratification, but [Defendant] would see the depiction for purposes of sexual gratification." (*Id.*) Defendant contends that the definition of obscenity applies to "'the average person, applying contemporary adult community standards.'" (*Id.* (quoting *Miller v. California*, 413 U.S. 15, 24-25 (1973)).) He argues that "[t]his misstatement by the Government wrongly shifted the burden to [Defendant] to show that it did not elicit a sexual response in him, rather than community standards." (*Id.* at 8.)

In response, the Government first notes that Defendant did not object to both statements during closing argument and asserts that Defendant's failure to object results in forfeiture. (ECF No. 190 at 13.) Next, the Government argues that its comment that

Defendant failed to cross-examine Erick was permissible because the Government may "point out 'what evidence was, and was not, in the record.'" (*Id.* at 14 (quoting *Brennan*, 326 F.3d at 182).) Regarding its remark that the photographic evidence in Exhibits 113 and 114 elicited a sexual response to Defendant, but not to other viewers, the Government argues that it did not misstate the law because "[t]he question whether the charged images were intended or designed to elicit a sexual response . . . is answered by asking whether the photographer or 'an audience that consists of himself or like minded pedophiles' would view it that way." (*Id.* at 15 (quoting *United States v. Larkin*, 629 F.3d 177, 184 (3d Cir. 2010)).)

In reply, Defendant claims that he did not waive his claims because "[e]ven without objection, statements may be found to constitute reversal if plain error is present." (ECF No. 195 at 25.) He further argues that the Government's statement that Defendant did not cross-examine Erick "unquestionably was improper shifting of the burden of proof and undeniably prosecutorial misconduct" because "[t]here is no more egregious error that a prosecutor can make than telling a jury it was incumbent upon the defendant to take some action during a trial without then following that statement up with reaffirming the presumption of innocence." (*Id.* at 27.) Regarding Exhibits 113 and 114, Defendant contends that *Larkin* is inapplicable and that "the [Government] did not state the law appropriately[,] and that misstatement amounts to an egregious error." (*Id.* at 28.)

A claim of prosecutorial misconduct during closing argument requires the reviewing court to determine if the prosecutor's challenged remarks "so infected the trial

with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974). "'For due process to have been offended, the prosecutorial misconduct must be of sufficient significance to result in the denial of the defendant's right to a fair trial.'" *United States v. Mangiardi*, 173 F. Supp. 2d 292, 303 (M.D. Pa. 2001) (quoting *Werts v. Vaughn*, 228 F.3d 178, 197-98 (3d Cir. 2000)).

A prosecutorial misconduct claim is examined to determine whether the remarks "had a substantial and injurious effect or influence" on the jury's verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 638 (U.S. 1993) (internal quotations omitted). Because the prosecutor, in delivering a closing argument, "is entitled to considerable latitude in summation to argue the evidence and any reasonable inferences that can be drawn from that evidence," *United States v. Werme*, 939 F.2d 108, 117 (3d Cir. 1991), "it is not enough that the prosecutor['s] remarks were undesirable or even universally condemned," *Darden v. Wainwright*, 477 U.S. 168, 181 (U.S. 1986) (internal quotations omitted). Rather, "the reviewing court must examine the prosecutor's offensive actions in context and in light of the entire trial, assessing the severity of the conduct, the effect of the curative instructions, and the quantum of evidence against the defendant." *Moore v. Morton*, 255 F.3d 95, 107 (3d Cir. 2001).

As the Government has noted, Defendant did not object to the Government's comments during closing argument. (*See* ECF No. 186 at 1152-53, 1198-99.) The Third Circuit has held that, under these circumstances, a district court's decision is reviewed under the plain-error standard. *See United States v. Douglas*, 522 Fed. Appx. 125, 129 (3d Cir. 2013) ("Because [the defendant] did not raise a contemporaneous objection to the

alleged prosecutorial misconduct in the closing argument, we review the District Court's decision not to order a new trial for plain error."); *United States v. Bethancourt*, 65 F.3d 1074, 1079 (3d Cir. 1995). Under the plain-error standard, the prosecutor's comments "must not only be obvious," but they "must also have affected the outcome of the District Court proceeding" and were "so serious as to undermine the fundamental fairness of the trial and contribute to a miscarriage of justice." *Bethancourt*, 65 F.3d at 1079-80 (internal quotations omitted).

During his closing argument, Defendant stated that he "[did not] ask Erick one question." (ECF No. 186 at 1175.) In its rebuttal, the Government stated:

> They never cross-examined Erick. They had the right and the opportunity to, they didn't. That's on them. Any why? Because Erick, he told you what happened. You saw that sensitive boy sit up there and tell you what happened.

(*Id.* at 1198.) The Court concludes that the Government's comment did not constitute impermissible vouching for Erick's credibility, and it did not shift the burden of proof to Defendant.

First, regarding Defendant's argument that the Government vouched for Erick's credibility, it is well settled that "[a] prosecutor may not vouch for the credibility of a witness based on the prosecutor's knowledge, experience, or opinions." *United States v. Lee*, 612 F.3d 170, 195 (3d Cir. 2010). "Vouching occurs when two criteria are met: (1) the prosecutor must assure the jury that testimony of a Government witness is credible; and (2) this assurance is based on either the prosecutor's personal knowledge, or other information not contained in the record." *Id.* (internal quotations omitted).

While the Government's comments were not favorable to Defendant and may have suggested that Erick's testimony was credible, they were not based on the prosecutor's personal knowledge or other information not contained in the record. Moreover, the Government has "'considerable latitude' in laying out the evidence and suggesting to a jury that [it] may draw permissible inferences from the evidence." *United States v. Solomon*, No. 2:05-CR-0385, 2013 U.S. Dist. LEXIS 31211, at *27-28 (W.D. Pa. Mar. 7, 2013). The Government's remarks therefore did not rise to a level of misconduct that undermined the fundamental fairness of the trial or contributed to a miscarriage of justice. *See id.* at *28 (holding that the prosecutor's comments during closing argument did not deprive the defendant of a fair trial). *See also United States v. Thai*, 29 F.3d 785, 807 (2d Cir. 1994) (concluding that the prosecutor's comment that the defendants had not cross-examined a witness was not inappropriate because "[a]n observation in summation that evidence adduced by the Government was not confronted on cross-examination is entirely proper") (internal quotations omitted); *Hall v. United States*, 46 F.3d 855, 858 (8th Cir. 1995) (holding that "[t]he prosecutor may focus on the absence of impeachment during cross-examination so long as his comments are sufficiently circumscribed and [do] not necessarily implicate appellant's assertion of his [F]ifth [A]mendment right not to take the stand in his own defense") (internal quotations omitted).

Second, regarding Defendant's argument that the Government impermissibly shifted the burden of proof to him by suggesting that he was required to question Erick, it is well settled that "[p]rosecutorial misconduct during closing argument[,] including an improper burden-shifting argument . . . [necessitates] a new trial only where the remarks

were improper and prejudiced the defendant's substantial rights." *Ferguson v. United States*, No. 2:03-CR-72, 2012 U.S. Dist. LEXIS 157341, at *33-34 (W.D. Pa. Nov. 2, 2012) (internal quotations omitted). "Statements by a prosecutor on the defense counsel's failure, rather than the defendant's failure, to counter or explain evidence does not violate a defendant's Fifth Amendment right not to testify." *Id.* at *34.

The Government's comments "were isolated and not a pattern or extensive argument" and did not improperly shift the burden of proof to Defendant. *United States v. Johnson*, No. 08-CR-146, 2010 U.S. Dist. LEXIS 51733, at *15 (D. Del. May 25, 2010). Moreover, the Court thoroughly discussed the burden of proof after Defendant delivered his closing argument and in its jury instructions, which were read to the jury after closing arguments. (ECF No. 186 at 1185-86, 1217-20, 1225, 1227, 1232-33, 1236-37, 1239-40, 1242-43, 1246-47, 1249.)[5] Accordingly, the Court concludes that Defendant is not entitled to a new trial based upon the comments the Government made regarding Defendant's failure to cross-examine Erick. *See United States v. Lore*, 430 F.3d 190, 213 (3d Cir. 2005) ("[T]here is nothing improper about a prosecutor attempting to focus the jury's attention on holes in the defense's theory.") (internal quotations omitted); *Cabezudo v. Fischer*, No. 05-CV-3168, 2009 U.S. Dist. LEXIS 112842, at *24-25 (E.D.N.Y. Dec. 1, 2009) ("[T]he prosecution is permitted to discuss a defendant's failure to refute its evidence, and defendant's cross-examining technique."); *United States v. Duronio*, No. 02-CR-0933, 2006 U.S. Dist. LEXIS

---

[5] While reading the final jury instructions, the Court mistakenly stated that Defendant was required to prove the elements of the offenses beyond a reasonable doubt on two occasions. (*See id.* at 1232, 1236.) After Defendant and the Government informed the Court, the Court immediately issued a curative instruction and reiterated that "the [G]overnment has the burden to prove the elements of each offense beyond a reasonable doubt." (*Id.* at 1250-51.)

89303, at *13 (D.N.J. Dec. 8, 2006) (finding that the Government's statement that "[the defendant's counsel] stood up when [the] direct examination was completed . . . and said, I have no questions" did not shift the burden of proof to the defendant).

During its closing argument, the Government also stated:

> And what was this picture [depicted in Government Exhibits 113 and 114] for? For you and I, a picture like this doesn't elicit a sexual response to the viewer. But that's us. But it certainly elicits a sexual response from a man like [Defendant], who clearly has a sexual attraction to children. How do we know that he has a sexual attraction to children? Because of all the evidence you heard in this case. That tells you his sexual attraction.

(ECF No. 186 at 1153.)

The Court concludes that the Government's statement was not improper. Defendant's reliance upon *Miller* is inapposite because the *Miller* standard relates to "[t]he basic guidelines for the trier of fact" to apply when "[determining] what constitutes obscene, pornographic material." *Miller*, 413 U.S. at 22-24. Because the Supreme Court in *Miller* did not address the visual depiction of a minor engaging in sexually explicit conduct pursuant to 18 U.S.C. § 2252, Defendant's argument is inapplicable. *See id.*; *see also United States v. Villard*, 885 F.2d 117, 120-21 (3d Cir. 1989) (explaining that "the test for child pornography is separate from the obscenity standard enunciated in *Miller*" and applying the statutory language of 18 U.S.C. § 2252) (internal quotations omitted). In cases involving charges under 18 U.S.C. § 2252, the Third Circuit has held that "lasciviousness is not a characteristic of the child photographed but of the exhibition which the photographer sets up for an audience that consists of himself or like minded pedophiles." *Larkin*, 629 F.3d at 184 (holding that the photograph met the definition of

"lascivious" because "[the defendant] engineered [it] for the purpose of eliciting a sexual response"). Accordingly, the Court must reject Defendant's argument that prosecutorial misconduct occurred because the Government's comment was not a misstatement of the law, and it did not "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly*, 416 U.S. at 643.

## 2.     Outrageous Governmental Conduct

Defendant argues that the Government engaged in outrageous conduct while interacting with Ludin throughout this case. (ECF No. 166 at 8-10.) First, Defendant asserts that the Government questioned Ludin at length at the United States Embassy in Honduras, chased him when he departed the Embassy, and denied him an entry visa into the United States. (*Id.* at 8-9.) Second, Defendant states that "Ludin was then brought to the United States but [was] kept separately from the other alleged victims and was not permitted the same freedoms and activities enjoyed by those other individuals from Honduras." (*Id.* at 9.) Third, Defendant contends that the Government "ridiculed and mocked" Ludin while he was testifying at the trial by calling him a "liar," "implying that he was lying because he did not want anyone to think he was a homosexual," stating that he "just sold food on buses," and "mockingly and sarcastically" replying to Ludin with, "Okaayy[,] Ludin." (*Id.* at 9-10.)

Defendant argues that the Government's conduct "constitutes egregious and outrageous interrogation of a victim, defiled [Ludin's] dignity and integrity, and constitutes a violation of the Victim Rights Act." (*Id.* at 9 (emphasis omitted).) He asserts that "[c]learly, the jury bought into this egregious conduct[,] as a guilty verdict was

returned against [Defendant] at Count Four" and that "[i]t is impossible to quantify the chilling effect this outrageous and egregious behavior had on the jury in deliberating the other counts." (*Id.* at 10.)

In response, the Government argues that Defendant waived his claims of the Government's outrageous pretrial conduct because he failed to raise them before trial. (ECF No. 190 at 17-18.) The Government explains that Ludin testified that "he did not know whether anyone chased him [when he departed the Embassy]" and asserts that "[n]o evidence whatsoever supports Defendant's suggestion that Ludin was mistreated by U.S. Government officials." (*Id.* at 18-19 (emphasis omitted).) The Government contends that "Ludin was not permitted to roam freely while awaiting his chance to testify at trial because he was not in the United States on a visa" and because "his overtly hostile, confrontational attitude toward [the other victims] suggested that he might retaliate against them for reporting that they had witnessed Defendant engaging in illicit sexual conduct with Ludin." (*Id.* at 19-20.)

The Government argues that Defendant's claims of the Government's outrageous trial conduct are "completely fabricated." (*Id.* at 20.) Noting that Defendant failed to object to its "sarcasm or eye-rolling" at trial, the Government contends that it "neutrally" asked Ludin questions and did not mock or ridicule him. (*Id.*) The Government states that it asked questions regarding Ludin's employment "to lay a foundation for the argument that he lacked . . . job stability" and "to rebut his insinuation that the denial of his via application was somehow related to his recantation. (*Id.*) The Government asserts that it raised questions regarding Ludin's sexuality because "Ludin himself had

introduced this issue" by stating that "he actually had been called gay by 'people on the street' in Honduras (where such allegations could be deadly) and that this had made him upset with U.S. Government officials." (*Id.* at 20-21 (emphasis omitted).)

In reply, Defendant argues that his claims are not waived because he "did not have access to Ludin until the eve of trial" and that "[i]t would be simply impossible for Defense Counsel to be aware of the exact nature of the allegations until an opportunity was presented to speak with Ludin." (ECF No. 195 at 30.) Defendant asserts that "[t]here is un-contradicted testimony that Ludin was harassed by agents of the United States while at the American Embassy," which Juan Ramon Anariba corroborated. (*Id.* at 30, 33.) Defendant also argues that after Ludin arrived in the United States, the Government "did not believe him and [was] upset and angry at him over his testimony" and then "was kept separate from the others." (*Id.* at 36.) Finally, Defendant claims that the Government mistreated Ludin during the trial by "attacking [its] own witness" through impeachment. (*Id.* at 36-37.)

Claims that the Government engaged in outrageous conduct allege defects in the institution of the prosecution. *See United States v. Pitt*, 193 F.3d 751, 760 (3d Cir. 1999) ("[T]he defense of outrageous government conduct is based on an alleged defect in the institution of the prosecution itself."). The defense "examines whether a defendant's due process rights have been violated because the government created the crime for the sole purpose of obtaining a conviction." *Id.* at 759-60. Thus, "[t]he pertinent question is whether the government's conduct was so outrageous or shocking that it amounted to a due process violation." *United States v. Christie*, 624 F.3d 558, 573 (3d Cir. 2010). "[T]he

challenged conduct must be shocking, outrageous, and clearly intolerable," and "[i]t must violate our sense of fundamental fairness or shock the universal sense of justice." *Pitt*, 193 F.3d at 761-62. The Third Circuit "repeatedly ha[s] noted that [it is] 'extremely hesitant to find law enforcement conduct so offensive that it violates the Due Process Clause.'" *United States v. Hoffecker*, 530 F.3d 137, 154 (3d Cir. 2008) (quoting *United States v. Voigt*, 89 F.3d 1050, 1065 (3d Cir. 1996)). Indeed, "the Third Circuit has not sustained a due process challenge based upon outrageous government misconduct since 1978." *United States v. Trombetta*, No. 13-CR-227, 2015 U.S. Dist. LEXIS 93945, at \*42 (W.D. Pa. July 20, 2015)

As the Government has noted, "claims of outrageous government conduct . . . must be made in a pretrial motion, unless the evidence supporting these claims [was] not known to the defendant prior to trial." *United States v. Salahuddin*, 765 F.3d 329, 350 (3d Cir. 2014). Although Defendant claims that he was unaware of the Government's conduct until the eve of trial, he also concedes that his witness, Juan Ramon Anariba, was aware of the conduct when he was at the Embassy with Ludin. (*See* ECF No. 195 at 30, 33.) Defendant also admits that he met with Ludin before trial, (*id.* at 30), but did not raise his arguments until October 1, 2015, nine days after the verdict was delivered, (ECF No. 166). Because Defendant was aware of the Government's alleged outrageous conduct at the Embassy and in the United States before the trial commenced, he has waived these claims. *See, e.g., United States v. Potter*, 596 Fed. Appx. 125, 128 (3d Cir. 2014) ("Because [the defendant] was aware of the evidence forming the basis of his claim and has provided no explanation for his failure to raise this defense before trial, the claim is waived."); *Pitt*, 193 F.3d at 760 (finding claims waived for failure to raise them in a pretrial motion).

Even if Defendant had not waived his claims of the Government's outrageous pretrial conduct, they are without merit. At trial, Ludin initially testified that when he left the United States Embassy in Honduras, "[some Americans and gringos] came behind us, and of course they were chasing us." (Test. of Ludin, ECF No. 182 at 652-53.) During redirect, Ludin stated that "[a gringo and American guy] were looking at us seeing which way we went, for sure to chase us." (Id. at 671.) When asked whether the individuals actually chased him, Ludin responded, "I don't -- don't -- don't know, but they had the intention of chasing us." (Id.) Given that Ludin did not know whether anyone chased him, the Court cannot conclude that the Government engaged in conduct so offensive that it violated the Due Process Clause.

Defendant asserts that Ludin "was questioned at length" at the Embassy but provides no other details. (ECF No. 166 at 8.) At trial, Ludin testified that the agents at the Embassy "had [him] there for about an hour" and told him "that [he] was lying, and they asked [him] if [he] wanted to be the richest person in Honduras." (Test. of Ludin, ECF No. 182 at 650-52, 670.) Ludin testified that he "wasn't scared" during the questioning. (Id. at 652.) The Court cannot conclude that the Government engaged in conduct that was shocking, outrageous, and clearly intolerable. Defendant also contends that the Government engaged in outrageous conduct by denying Ludin's visa into the United States. At trial, Ludin testified that the five individuals he was with at the Embassy were approved for visas, but he was not approved. (Id. at 650.) The requirements for applying for a United States visa are extensive, see 8 U.S.C. § 1202, and Defendant has not offered any evidence to establish that the Government engaged in

outrageous conduct by denying Ludin's visa. The Court therefore cannot conclude that Defendant's Due Process rights were violated.

Defendant argues that after Ludin arrived in the United States, the Government engaged in outrageous conduct by questioning him "intensely and harshly," by calling him a "liar" during questioning, by separating him from the other alleged victims, and by not permitting him to participate in activities. (ECF No. 166 at 9.) At trial, Ludin testified that Attorney Larson, Attorney Haines, and Agent Rock did not call him anything during his interview and stated that the agents only said that they did not believe him. (Test. of Ludin, ECF No. 182 at 661.) Ludin did not provide any other details about the interview. (See id. at 660-61.) The Court therefore cannot conclude that the Government engaged in outrageous conduct during its interview of Ludin that would have resulted in a violation of Defendant's Due Process rights.

Regarding Ludin's treatment by the Government while awaiting trial, Ludin testified during cross-examination that he was kept inside a room that was guarded by agents and that he "only left [the room] twice." (Id. at 653.) He also stated that he did not go bowling, but he went "out to lunch and dinner" and "[t]o the malls." (Id. at 656.) On redirect, Ludin conceded that he "went out several times" and that the agents made sure he ate three meals per day. (Id. at 671-72.) He also admitted that the agents took him to a Mexican restaurant, Walmart, Johnstown's inclined plane, and the Flight 93 Memorial. (Id. at 672-73.) Although Ludin did not go sightseeing with the other alleged victims, Ludin stated several times that he would like to have "those people [who had alleged that Defendant engaged in illicit sexual conduct] out in front of me." (Id. at 623, 662; see also id.

42

at 667, 677.) Given that Otoniel testified that Ludin "would threaten [him], and he would hit [Otoniel]," the Government did not engage in outrageous conduct by separating Ludin from the other alleged victims. (*Id.* at 694.) Additionally, because Ludin was denied a visa, (*id.* at 650), the Government did not act outrageously by supervising him during his stay in the United States.

Defendant's claims that the Government engaged in outrageous conduct during trial are also meritless. During the trial, Defendant did not object to the Government's tone of questioning, to the Government's question regarding Ludin's employment, or to the Government's inquiries regarding homosexuality. Moreover, during her direct and redirect examination of Ludin, the prosecutor stated, "Okay, Ludin," seven times, without rolling her eyes. (*See id.* at 599, 618, 621, 623, 629, 663-64.) The prosecutor prefaced her other questions with, "Okay," on 105 occasions. (*See id.* at 593-94, 596-97, 599-613, 615-16, 618-19, 621-28, 630-34, 663-65, 667, 669-72, 674, 676.) The Court therefore must reject Defendant's argument that the Government "sarcastically responded[,] 'Okaayy[,] Ludin.'" (ECF No. 166 at 9.)

Similarly, the Court must reject Defendant's argument that Ludin was "ridiculed and mocked" because "he 'just sold food on buses.'" (*Id.*) As previously noted, Ludin stated that the five individuals he was with at the United States Embassy were approved for visas, but he was not approved. (Test. of Ludin, ECF No. 182 at 650.) During redirect, Ludin stated that two of the individuals were security guards, and another individual was a teacher. (*Id.* at 668.) The Government then asked, "And they asked you questions about your job at the [E]mbassy, didn't they?" (*Id.* at 669.) After Ludin responded affirmatively,

the Government asked, "And your job is to sell food on buses?" (*Id.*) The Government asked these questions, without mocking or ridiculing Ludin, to support its assertion that Ludin's visa may have been denied because he lacked job stability. Because the Government did not ask Ludin whether he "just sold" food on buses and because the Government did not ridicule or mock Ludin, the Court cannot conclude that the Government engaged in outrageous conduct.

Finally, the Government did not engage in outrageous conduct by asking Ludin questions related to homosexuality. As the Government has noted, Ludin raised the topic during his pretrial interview by stating that Defendant threatened to "tell the other boys at ProNiño that [Ludin was] gay" and by stating that he was afraid to disclose what happened "because [he was] afraid that the other boys would think that [he was] gay." (*Id.* at 623, 626.) During the interview, Ludin also stated that he was upset that people thought he was gay and that "[s]ometimes there were people on the street [who] would tell [him that he] was gay." (*Id.* at 632.) The Government's expert witness, Dr. Valliere, testified, "[I]f it's a male-on-male sexual assault . . . the victim is socialized to be ashamed of homosexual behavior or fear that [he is] going to be labeled queer or gay." (Test. of Dr. Veronique Valliere, ECF No. 183 at 810.) Based upon this evidence, the Government did not engage in outrageous conduct. Rather, the Government was impeaching Ludin's recantation at trial based upon his previous inconsistent statements, which the Court ruled was permissible. (*See* ECF No. 147 at 10-16.) The Court concludes that the Government's actions in attempting to impeach Ludin did not constitute outrageous

conduct; therefore, the Court finds that the Government did not engage in outrageous conduct while interacting with Ludin before and during the trial.

### C. Jury Instructions as to Attempt

Defendant argues that the Court erred by instructing the jury regarding the attempt to engage in illicit sexual conduct in foreign places in Counts Three through Five. (ECF No. 166 at 10-11.) Defendant contends that he was charged in Counts Three through Five under 18 U.S.C. § 2423(c), which does not include language for attempt. (*Id.* at 10.) Rather, the language regarding attempt is contained in 18 U.S.C. § 2423(e), which was not included in the Superseding Indictment. (*Id.*) Defendant asserts that the Court's jury instructions were "improper and unduly prejudicial" because the Superseding Indictment included the language "engaging and attempting to engage," while the instructions included the language "engaging or attempting to engage." (*Id.* at 10-11.)

In response, the Government contends that Defendant has waived his argument because it "is nothing more than a thinly-veiled challenge to the language of the Indictment itself," which, pursuant to Federal Rule of Criminal Procedure 12(b)(3)(B), must have been made before trial. (ECF No. 190 at 22.) The Government further argues that the Superseding Indictment was sufficient despite its failure to cite 18 U.S.C. § 2423(e). (*Id.* at 23.) The Government asserts that the Court's jury instructions were not prejudicial because they "tracked the language of the Indictment" and because an indictment may be phrased in the conjunctive, while the statutory language and jury instructions are phrased in the disjunctive. (*Id.* at 24.) In reply, Defendant concedes that he raised his claim after the deadline for pretrial motions had expired but argues that he

45

did not waive his claim because "this issue has been contested multiple times in this trial and preserved for appellate review." (ECF No. 195 at 38-39.) He further admits that the Superseding Indictment "tracked" the language of 18 U.S.C. §§ 2423(c) and 2423(e) but asserts that "[t]he inclusion of a completed act with an attempted act together as a single offense immediately set forth uncertainty or ambiguity as to what exactly was charged." (*Id.* at 41.)

On September 10, 2015, the Court granted the Government's motion to include instructions to the jury regarding 18 U.S.C. § 2423(e). (*See* ECF No. 139.) Specifically, the Court explained that "an indictment is adequate 'where it informs the defendant of the statute he is charged with violating, lists the elements of a violation under the statute, and specifies the time period during which the violations occurred.'" (*Id.* at 11 (quoting *United States v. Huet*, 665 F.3d 588, 595 (3d Cir. 2012) (holding the District Court erred in granting a motion to dismiss because the indictment "set forth the required elements . . . , with 'sufficient factual orientation' to allow [the defendant] to prepare her defense")).) The Court further explained that "'[a] defendant may be found guilty of . . . (1) an offense necessarily included in the offense charged; (2) an attempt to commit the offense charged; or (3) an attempt to commit an offense necessarily included in the offense charged, if the attempt is an offense in its own right.'" (*Id.* (quoting FED. R. CRIM. P. 31(c)).)

As the Government has noted, Defendant's arguments relate to the sufficiency of the Superseding Indictment, and Defendant did not raise any issues regarding the Superseding Indictment in his pretrial motions. Pursuant to Federal Rule of Civil Procedure 12(b), "defenses, objections, and requests must be raised by pretrial motion"

when they relate to "a defect in the indictment." FED. R. CRIM. P. 12(b)(3)(B). The Government filed the Superseding Indictment on April 7, 2015, (ECF No. 69), and Defendant's pretrial motions were required to be filed by June 6, 2015, (ECF No. 76). Because Defendant did not raise his objections to the Superseding Indictment until the day before trial, his arguments are waived. *See United States v. Burnett*, 773 F.3d 122, 131 (3d Cir. 2014) ("[A] party waives any Rule 12(b)(3) defense, objection, or request not raised by the deadline the court sets under Rule 12(c) or by extension the court provides.") (internal quotations omitted).

Even if Defendant had not waived his objections to the Superseding Indictment, his arguments are meritless. Defendant has not provided any authority or argument supporting his position that the Court erroneously applied the law. (*See* ECF No. 166 at 10-11.) The Government's failure to cite 18 U.S.C. § 2423(e) in Count Three of the Superseding Indictment "is not fatal."[6] *United States v. Vroman*, 975 F.2d 669, 671 (9th Cir. 1992) ("Correct citation to the relevant statute, though always desirable, is not fatal if omitted."). Furthermore, the Federal Rules of Criminal Procedure provide that "[u]nless the defendant was misled and thereby prejudiced, neither an error in a citation nor a citation's omission is a ground to dismiss the indictment or information or to reverse a conviction." FED. R. CRIM. P. 7(c)(2). The Court cannot conclude that Defendant was

---

[6] The Government did not include citations to 18 U.S.C. § 2423(e) in Counts Three, Four, and Five of the Superseding Indictment. (*See* ECF No. 69.) Because the jury found Defendant not guilty of Count Five, (*see* ECF No.163), and because the Court granted Defendant's motion for judgment of acquittal as to Count Four, (*see* ECF No. 203), only Count Three is at issue.

misled or prejudiced by the Government's failure to include a citation to 18 U.S.C. § 2423(e) in Count Three of the Superseding Indictment.

Similarly, the Court's use of the language "engaging or attempting to engage in illicit sexual conduct in foreign places" in the jury instructions did not prejudice Defendant. [7] The Third Circuit has held that "while an indictment employs the conjunctive, jury instructions may employ the disjunctive where . . . the statute employs the disjunctive." *United States v. Johnson*, 452 Fed. Appx. 219, 225 (3d Cir. 2011); *see also United States v. Korey*, No. 2:14-CR-108, 2015 U.S. Dist. LEXIS 65373, at *4 n.1 (W.D. Pa. May 19, 2015) ("[A]n indictment may be phrased in the conjunctive, when the statute and jury instructions are phrased in the disjunctive, without creating a constructive amendment of the indictment."). Here, the Court's jury instructions permissively employed disjunctive language because the statute is phrased in the disjunctive. *See* 18 U.S.C. § 2423(c); 18 U.S.C. § 2423(e). The Court therefore concludes that it did not err in instructing the jury regarding attempt and in permitting the Government to present arguments regarding attempt. *See, e.g., United States v. Weingarten*, 713 F.3d 704, 710 n.4 (2d Cir. 2013) ("[A]n attempt traditionally merges with the completed crime, because every successful crime necessarily encompasses an attempt to commit it."); *United States v. Huyck*, No. 8:13-CR-1078, 2015 U.S. Dist. LEXIS 104589, at *20 (D. Neb. Aug. 10, 2015) ("It is a general rule that every completed crime necessarily includes an attempt to commit it,

---

[7] While reading the jury instructions, the Court used the language "engaging and attempting to engage in illicit sexual conduct" five times. (ECF No. 186 at 1219, 1228-29, 1231.) The Court used the language "engaging or attempting to engage in illicit sexual conduct" two times. (*Id.* at 1236.) As to Count Three in the verdict sheet, the Court used the language "engaging or attempting to engage in illicit sexual conduct." (ECF No. 163.)

so that, under a charge of a completed offense, an accused may be convicted of the lesser offense of attempting to commit the crime charged.").

### D. Consistency of the Verdict

Finally, Defendant argues that he is entitled to a new trial because the jury's verdict was inconsistent. (ECF No. 166 at 11-12.) Specifically, Defendant states that the jury found him guilty of Count Four but not guilty of Counts Six and Seven. (*Id.* at 11.) He contends that the inconsistency in the jury's findings on these three counts "shows a confusion of the evidence or the law and thus caused prejudice to [him] in coming to a guilty verdict on Count Four." (*Id.*)

The Court need not address Defendant's argument because it relates only to Counts Four, Six, and Seven of the Superseding Indictment. The jury found Defendant not guilty of Counts Six and Seven, (ECF No. 163), and the Court granted Defendant's motion for judgment of acquittal as to Count Four, (ECF No. 203).

## IV. Conclusion

For the foregoing reasons, the Court concludes that Defendant is not entitled to a new trial, and the Court will therefore deny Defendant's motion for a new trial.

An appropriate order follows.

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| UNITED STATES OF AMERICA | ) | |
| | ) | **CRIMINAL NO. 3:14-23** |
| v. | ) | |
| | ) | **JUDGE KIM R. GIBSON** |
| JOSEPH D. MAURIZIO, JR., | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

**AND NOW**, this 30th day of November, 2015, upon consideration of Defendant's

Motion for a New Trial (ECF No. 166), the Government's response in opposition (ECF No.

190), and Defendant's reply (ECF No. 195), **IT IS HEREBY ORDERED** that Defendant's

motion is **DENIED**.

**BY THE COURT:**

**KIM R. GIBSON
UNITED STATES DISTRICT JUDGE**