1

```
1              UNITED STATES DISTRICT COURT
             WESTERN DISTRICT OF PENNSYLVANIA
2                  JOHNSTOWN DIVISION


3
   UNITED STATES OF AMERICA,   )
4                              )
                Plaintiff,     )   CASE NO:  3:14-cr-00023
5                              )
        vs.                    )
6                              )
   JOSEPH D. MAURIZIO, JR.,    )
7                              )
                Defendant.     )
8  _____)

9

          TRANSCRIPT OF ORAL ARGUMENT PROCEEDINGS
10          BEFORE THE HONORABLE KIM R. GIBSON
                   FEBRUARY 2, 2016
11
   FOR THE GOVERNMENT:
12   Stephanie L. Haines, AUSA
     Amy Larson, AUSA
13   United States Attorney's Office
     Penn Traffic Building, Ste. 200
14   319 Washington Street
     Johnstown, PA 15901
15
   FOR THE DEFENDANT:
16   Steven P. Passarello, Esq.
     Daniel Kiss, Esq.
17   Law Office of Steven P. Passarello
     616 Hileman Street
18   Altoona, PA 16601

19

20

21
          Proceedings recorded by mechanical stenography,
22  transcript produced with computer.
23  _____
          Kimberly K. Spangler, RPR, RMR
24           United States District Court
           Penn Traffic Building, Ste. 204
25              319 Washington Street
               Johnstown, PA 15901
```

```
 1                        I N D E X

 2                     FEBRUARY 2, 2016

 3

 4    Defense Argument
        By Mr. Passarello                        6, 25
 5
      Government Argument
 6      By Ms. Larson                              14

 7

 8    Certificate of reporter          43

 9
                            *   *   *
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          P R O C E E D I N G S

2    (The proceedings convened on February 2, 2016, commencing

3 at 10:00 a.m.)

4          THE COURT:  Good morning.  This is the time and

5 place set for defendant Joseph D. Maurizio's motion for a new

6 trial based upon newly discovered evidence and an alleged

7 violation of *Brady v. Maryland*, a Supreme Court case.  This is

8 Criminal Number 14-23.

9          The newly discovered evidence submitted by

10 defendant is a statement by Erick in a victim impact statement

11 dated September 20, 2015.  The Third Circuit Court of Appeals

12 has consistently held that a defendant must meet five

13 requirements before he may be granted a new trial on the basis

14 of newly discovered evidence.

15          First, the evidence must be, in fact, newly

16 discovered.  In other words, discovered since the trial.

17          Second, the facts must be alleged from which the

18 Court may infer diligence on the part of the movant.

19          Third, the evidence relied upon must not be merely

20 cumulative or impeaching.

21          Fourth, the evidence relied on must be material to

22 the issues involved.

23          And, fifth, the evidence relied on must be such,

24 and of such nature, as that on a new trial the newly

25 discovered evidence would probably produce an acquittal.

1    These requirements are set forth in the *United*

2  *States v. Iannelli* 528 F.2d 1290, a 1976 Third Circuit Court

3  of Appeals case, and are routinely referred to as the *Iannelli*

4  requirements.

5    Although the decision to grant or deny a motion for

6  a new trial lies within the discretion of the District Court,

7  the movant has a heavy burden of proving each of these

8  requirements.  If just one of these requirements is not

9  satisfied, a defendant's Rule 33 motion must fail.  Courts

10  should exercise great caution in setting aside a verdict

11  reached after a fully-conducted proceeding, and particularly

12  so where the action has been tried before a jury.

13    In your presentations, I urge each party to

14  concentrate on the third and the fifth *Iannelli* requirements.

15  The third requirement is that the evidence relied on must not

16  be merely cumulative or impeaching.  The fifth requirement is

17  that the evidence relied on must be such, and of such nature,

18  as that on a new trial the newly discovered evidence would

19  probably produce an acquittal.

20    With regard to the motion for new trial based upon

21  an alleged Brady violation, pursuant to *Brady v. Maryland*, a

22  United States Supreme Court case, the government must provide

23  a defendant with exculpatory material, including impeachment

24  material that it either possesses or could obtain through due

25  diligence.

1          To establish a *Brady* violation sufficient to

2     warrant a new trial, a defendant must show, first, that the

3     evidence was suppressed.  Second, that the suppressed evidence

4     was favorable to the defendant and, third, that the suppressed

5     evidence was material either to guilt or to punishment.

6          Evidence is material when there is a reasonable

7     probability that had the evidence been disclosed to the

8     defense, the result of the proceeding would have been

9     different.  Reasonable probability is a probability sufficient

10    to undermine confidence in the outcome.

11         A showing of materiality does not require

12    demonstration by a preponderance that disclosure would have

13    resulted ultimately in the defendant's acquittal.  Rather, the

14    defendant must show that the favorable evidence could

15    reasonably be taken to put the whole case in such a different

16    light as to undermine confidence in the verdict.

17         In determining whether the defendant has

18    established materiality, a court must evaluate the cumulative

19    effect of the undisclosed evidence.

20         In your presentations, I urge each party to

21    concentrate on whether the evidence was material either to

22    guilt or to punishment.

23         Originally, this day was scheduled for sentencing

24    in this case.  However, before the Court may move to

25    sentencing, the issues before the Court with regard to motion

1    for new trial must be resolved.  Since the parties were set to

2    be here today in any event, I scheduled the evidentiary

3    hearing in this case for today rather than pushing it back to

4    a later date.

5              Are the parties ready to proceed?

6              MS. LARSON:  Yes, Judge.

7              MR. PASSARELLO:  Yes, Your Honor.

8              THE COURT:  Mr. Passarello, this is your motion and

9    I will permit you to make presentation first.

10             MR. PASSARELLO:  Thank you, Your Honor.

11             May it please the Court, Counsel.  First off, Your

12   Honor, I apologize for my voice if it breaks up.  I've been

13   sick for about four days, so I'm trying to get over it.

14             THE COURT:  As long as we can hear you that will be

15   fine.

16             MR. PASSARELLO:  Okay.

17             This Court has laid out clearly what the issues

18   are, and I will address those the Court has requested.  The

19   first motion before the Court is newly discovered evidence

20   under Rule 33.  The Court has asked me to focus on whether

21   it's not merely cumulative or impeaching, and whether this

22   evidence is such a nature that it would probably produce a

23   different result at trial.

24             If the Court reads Rule 33 -- well, first let's

25   look at the statement.  The statement is a statement from one

1  of the linchpins of the United States' case, that being victim

2  Erick.  The whole entire case was a credibility case; would

3  the jury believe the victims, the boys, or would they not.  It

4  clearly came down to credibility, and that is even addressed

5  in Attorney Haines' closing argument.

6          The statement says this in answer to a question:

7  The question is, "Do you relate to people differently since

8  the crime.  Please explain."  Answer by Erick in his

9  handwriting in Spanish, and then translated correctly:  "Yes.

10 Sometimes they think badly about me.  Perhaps they think he

11 really abused me, but that was not the case."

12         That statement taken on its face is a contradiction

13 to his testimony at trial, and clearly goes to his

14 credibility.

15         Now let's talk about whether it's merely

16 impeachment.  If you look at the rule, Rule 33 indicates the

17 fact that newly discovered evidence goes to impeachment does

18 not mean that it cannot serve as the basis for a new trial.

19 The real question to be asked is, is there a strong

20 exculpatory connection between the newly discovered evidence

21 and the evidence presented at trial.  Or does the newly

22 discovered evidence, though not in itself exculpatory -- which

23 I would argue that this is -- throws severe doubt on the

24 truthfulness of the critical inculpatory evidence that had

25 been introduced at trial.

1          That's what this statement is.  It is more than

2    being impeachment, it's exculpatory.  But even if the Court

3    thinks it's simply -- it clearly causes severe doubt on

4    critical and inculpatory evidence at trial.

5          And how do we know that?  How do we know that?

6    Attorney Haines in her closing argument, in her rebuttal

7    closing argument, said what?  "Well, Mr. Passarello, he

8    cross-examined Otoniel, he cross-examined Fredis, he

9    cross-examined this guy and that guy.  But he didn't

10   cross-examine Erick, and that's on them."  That's what she

11   said.  And she said, "You want to know why?"  A quote from

12   rebuttal:  "Because Erick told you what happened, he told you

13   the truth."

14         This evidence clearly goes to that inculpatory

15   evidence that she tried to present.  And it clearly

16   contradicts that.  Erick was their linchpin because we didn't

17   have anything to cross-examine him on.  He was their big

18   witness.  He corroborated allegedly Otoniel, much more than

19   Luis did.

20         And to come in and then after trial in the

21   testimony and under oath say, "Perhaps they think he abused me

22   but he did not," I think clearly is newly discovered evidence

23   that would command a new trial.

24         What they did here, Judge, what they did, is they

25   usurped your role.  They took a bullet from my defendant's gun

```
 1   to constitutionally confront his witness and, more
 2   importantly, took away the jury's role on a critical piece of
 3   evidence to determine credibility.  And I submit to the Court
 4   that by them doing that -- if the jury had heard that evidence
 5   -- now, I can't tell you, Judge, 110 percent if the jury had
 6   heard that evidence they would have changed their mind.  But I
 7   can tell you this:  The whole defense was "you believe him or
 8   you don't."  That piece of evidence would cause doubt as to
 9   Erick's credibility.
10            Now, they can explain away all they want, well, you
11   know what, Judge, that's not what he meant by abuse.  You know
12   what, Judge, we took another statement in November that
13   changes that statement.  That's irrelevant to this inquiry.
14   They could have presented all that to the jury and the jury
15   could have bought it.  But the jury also could have bought
16   that Erick was not telling the truth.  And I submit, based
17   upon newly discovered evidence, that it commands a new trial.
18            Second argument is the Brady argument which, in all
19   fairness to this Court, I think is the strongest argument.  It
20   is clear that the United States government had this statement
21   on September 20th, 2015, and did not advise the Court of it
22   nor did they advise the defense counsel.
23            It is also crystal clear from their supplemental
24   response, that they were so kind to have filed at 4:37
25   yesterday afternoon, that they were concerned about it.
```

1   Because if you read the affidavit, they got the statement,

2   they read it, the prosecution team called Agent Gamarra to

3   come and say, hey, what the heck is this statement.  Agent

4   Gamarra basically thinks it's a translation issue, we'll fix

5   it, realizes it's not.  And Agent Gamarra is there sometime

6   between September 20th and the 22nd, before the verdict comes

7   in.  They're so concerned they send Agent Gamarra to the hotel

8   to talk to Erick.  To say, Erick, what the heck do you mean?

9   What's going on here?

10          And all the while, we're getting ready to close,

11  they say nothing.  We close before the charge, they say

12  nothing.  You charge, you ask the defense counsel and the

13  United States, anything for the record, they stand mute.  They

14  sit there and let the jury deliberate for two days, say

15  nothing.  They sit there and listen to the verdict, say

16  nothing.

17          And why do they tell this Court they say nothing?

18  Because they determined that it wasn't Brady material.  Well,

19  you know what?  That ain't their call.  That's not their call.

20  This evidence is clearly, clearly Brady material.

21          And how else do we know that they were so concerned

22  about this statement?  For some reason in the affidavit they

23  filed, they sent Agent Gamarra in Honduras from Tegucigalpa to

24  San Pedro Sula -- five hours -- on November 4th I believe,

25  2015, to take a new victim impact statement from Erick -- a

1 statement that I have yet to even see -- to get a,

2 quote/unquote, more accurate answer to that question.  And the

3 more accurate answer now is, How does it make you feel?  Well,

4 yes, perhaps people think he abused me, but that's because I

5 put him in jail.

6        Really?  Are you kidding me?

7        Evidence.  First of all, I want to address the

8 issue that they claim it's not Brady material, okay.  That's

9 absurd, okay.  They mock me in their response by saying, well,

10 I have no authority to cite this and I don't cite that.

11        Well, you know, *Brady* and *Giglio* are pretty well

12 known to everybody, but if they need a refresher course here's

13 some authority.  Evidence is -- it's Brady material -- *Brady*

14 requires the government to provide evidence favorable to the

15 accused.  For *Brady* purposes, "evidence is favorable to the

16 accused if it is either exculpatory or impeachable.  See

17 *Strickler*."  Which this evidence is both.

18        "If the information would be advantageous to the

19 defense it is favorable to the accused.  See *Banks v. Dretke*,

20 540 U.S. 668.  Or if the evidence would tend to call the

21 government's case into doubt it is favorable."

22        "Evidence is favorable that is a question of

23 substance and not degree.  And evidence that has any

24 affirmative evidentiary support for the defendant's case or

25 any impeachment value is by definition favorable and Brady

1    material.  See *Strickler.*"

2          This evidence was not only impeaching but also was

3    clearly favorable to the accused, and it clearly constitutes

4    Brady material.

5          That doesn't end the inquiry.  Was it suppressed?

6    I think clearly it was.  It wasn't given.  And they had

7    knowledge of it and chose not to provide it.

8          So now we get to the crux.  Was it material?  "The

9    suppression of evidence is prejudicial if the evidence was

10   material for *Brady* purposes.  Evidence is material if it could

11   reasonably be taken to put the whole case in such a different

12   light as to undermine the confidence in the verdict.  See

13   *Kyles v. Whitley* 514 U.S. 419."

14          "To establish materiality, a defendant need not

15   demonstrate that the disclosure of the suppressed evidence

16   would have resulted ultimately in his acquittal.  A reasonable

17   probability exists if the government's evidence undermines

18   confidence in the outcome of the trial.  See *Bagley.*"

19          "In evaluating materiality, we must focus on

20   whether the withholding of the evidence undermines our trust

21   in the fairness of the trial and the resulting verdict."

22          The Supreme Court case law also instructs that

23   likely damage from suppression of evidence is best understood

24   by reference to a prosecutor's closing argument.

25          This evidence is clearly material for *Brady*

1    purposes.  It is a statement from a victim who testified in

2    this trial, in his own handwriting and signed under

3    declaration of perjury, that indicates the defendant did not

4    abuse him.  Done after he had already testified at trial that

5    he committed those acts.

6           We know it was material because it was of such a

7    concern to the government that they had Agent Gamarra go to

8    the hotel and figure out what was going on.  They had him then

9    take another statement in Honduras on November 4th to change

10   it to make it more accurate.

11          We also know that under the case law -- I ask the

12   Court to look at the case law -- but when the case rises or

13   falls on the credibility of witnesses, and when this witness

14   is the linchpin of their case, it clearly makes that type of

15   evidence material.

16          Again, the Supreme Court says look at the closings

17   to know if it's material.  Attorney Haines specifically said,

18   "They cross-examined everybody, but they didn't cross-examine

19   him, and that's on them.  And why?  Because he told you the

20   truth."  I can guaran-damn-tee you if I had that statement I

21   would have crossed him, and the jury would have been allowed

22   to hear it.

23          They usurped your authority.  They took a bullet

24   from my gun.  And they took the jury's determination of

25   credibility by not providing this statement.

1           I submit respectfully, Your Honor, that based upon

2    -- look, sometimes things are just what they are.  It is what

3    it is, okay.  And what this is is, you know, sometimes what's

4    right is right and what's wrong is wrong.  No matter how you

5    slice it, this is wrong.

6           They should have given it to us.  They should have

7    at least made you aware of it.  What was the harm?  They could

8    have called their agents to say, now, that's what Erick meant.

9    They could have explained to the jury he doesn't understand

10   what abuse means, or he changed his statement.  But they took

11   away from me the right to challenge his credibility and argue

12   to that jury that he was not telling the truth.  And that was

13   my whole defense.

14          I don't care how you slice it.  And I understand

15   that -- obviously, I think I've laid out the arguments for

16   this Court -- but what's right is right and what's wrong is

17   wrong.  And this is just plain wrong.

18          Thank you.

19          THE COURT:  For the United States.

20          MS. LARSON:  Good morning, Judge.  As the Court

21   noted as we started here today, this is the defendant's burden

22   on both of the issues that he now advances before the Court.

23   Both whether or not there was, in fact, a Brady violation and

24   the much more onerous standard of, if so, whether or not he's

25   entitled to a new trial based on this or based upon what he

1   asserts is newly discovered evidence.

2          Now, he's failed to meet his burden here on either

3   of the arguments he raises today because he's failed to offer

4   any support for what he is offering to the Court.  For his

5   interpretation of what a single statement taken completely out

6   of context of a five-page document, which he conveniently

7   ignores the substance of that statement, what that means.

8   Again, without any evidence that he's placed in the record

9   that supports any of his arguments that he makes before the

10  Court today.

11         It should also be noted that it was not the

12  defendant who asked for an evidentiary hearing today, but

13  rather the Court who suggested it and, in fact, set it for a

14  hearing today.

15         So when we boil this down what do we have, Judge?

16  We have a single statement which Mr. Passarello read into the

17  record, taken completely out of context in which it was given.

18  In his pleadings there's absolutely no factual support for his

19  assertion that this is, in fact, a recantation by one of the

20  government's victims, or that he has changed his testimony in

21  any sort of material way.

22         There's absolutely no basis for any of his

23  assertions or for any of him standing up here and

24  pontificating and, quite frankly, repeatedly pointing at the

25  prosecution table in a manner that's inappropriate and

1    unprofessional.

2            But what did Mr. Passarello have in the discovery

3    materials prior to the start of the trial, which were turned

4    over on September 4th in a production of Jencks material, as

5    well as any and all outstanding discovery materials?  He had

6    materials which directly contradict the argument he's asking

7    this Court to swallow without any support, and which

8    corroborate the sworn affidavits which have been submitted by

9    the two government witnesses; that being Jackie Goldstein and

10   Special Agent Carlos Gamarra.  He had in his position an ROI,

11   Number 79, which was produced to him on September 4th -- which

12   was days before the trial started, days before any of the

13   witnesses testified -- regarding an interview conducted with

14   the victim witness, who in that ROI is referred to as Number

15   Four, but he's clearly victim minor Number Three, who is

16   Ludin.

17           And the allegations that were the basis of the

18   charges related to Minor Victim Number Three are Counts 4 and

19   5 of the indictment.  And that was based on allegations made

20   by Ludin that on at least two occasions -- once when he was 15

21   and once when he was 16 -- he was anally penetrated by the

22   defendant, as well as on witness statements, such as Luis and

23   others, that they had observed Ludin anally penetrating the

24   father.

25           Now, as this Court is well aware, by the time Ludin

 1    came to court to testify, the defendant's investigator had

 2    already prompted what the government argued was a false

 3    recantation through their videotaped interview of him,

 4    repeated interviews, where they only produced a portion of

 5    that to the government.

 6            So when he was questioned by the government on

 7    September 1st, 2015, Ludin made a statement that, "I never

 8    abused Maurizio the priest, and he never abused me."  In that

 9    context "abuse" is anal penetration.  "I never abused him, he

10    never abused me."  Those were the allegations with respect to

11    that victim.  Which is very different than the allegations

12    that were ever in play with respect to Minor Victim Number

13    Two, Erick.

14            So he had this information which, once again,

15    retrial completely undercuts the whole argument he asks the

16    Court to swallow, and corroborates all of the statements that

17    are in the government's original response with Jackie

18    Goldstein's affidavit, sworn affidavit, as well as in our

19    supplemental response in the affidavit of Carlos Gamarra.

20            So turning first, Judge, there was absolutely no

21    factual support for the defendant's argument that there was a

22    *Brady* violation here.  Again, nothing in the record before

23    this Court that meets either of the requirements necessary for

24    a Brady violation.

25            Again, the disclosure of a single statement in a

1    five-page victim impact statement, which was based on a

2    misunderstanding regarding a nonlegal, ambiguous, broad term

3    such as "abuse" is simply not -- when coupled with all of the

4    remaining statements in the victim impact statement -- again

5    four pages worth -- in which Erick methodically details the

6    impact of the crimes which the defendant perpetrated against

7    him.  Which is the sole purpose of a victim impact statement,

8    not evidence of the defendant's guilt, to discuss the impact

9    of the crime on the victim, which he did.

10            He outlines how the crime has, in fact, affected

11   him and his family, how people are thinking.  Or he's worried

12   people think he's gay, which is again corroborated by all of

13   the other testimony, including the experts on both sides of

14   this case.  But that's a very real fear when young boys are

15   assaulted by adult male perpetrators.

16            And again he discusses the fear, the grief, the

17   depression, the repeated memories of the crime, as well as the

18   ongoing emotional consequences he's suffered by the

19   defendant's criminal conduct perpetrated against him.

20            So when you take that entire five-page statement

21   it's clearly not favorable evidence to the defense.  But even

22   if the Court were to find that the evidence were favorable to

23   the defense, there's no Brady violation because under the

24   standard it is simply not material.  Evidence is material only

25   if there's a reasonable probability, as the Court has noted,

1   that had it been disclosed the result of the proceeding would

2   have been different.

3            Again, it's the defendant's burden of showing this

4   reasonable probability of a different outcome, one that is

5   sufficient to undermine the confidence in this verdict.  And

6   there's absolutely no factual support for his assertions that

7   had this victim impact statement been produced and the one

8   statement at issue had been disclosed that the trial would

9   have ended in an acquittal.

10           In order to make that finding of fact, in order to

11   make the conclusions of law that would require this Court to

12   ignore or overlook or otherwise disregard far, far too many

13   things, you would have to read that one statement, Judge, in a

14   vacuum and ignore the rest of Erick's victim witness statement

15   that are contained within the four corners of that document.

16   You would have to find the sworn statements in the affidavits

17   of Jacqueline Goldstein and Carlos Gamarra not credible and

18   not part of the record.  You would have to find that this

19   ambiguity and what abuse means, and the fact that it is open

20   to interpretation was not immediately rectified by the

21   prosecution, that we were determined to make that decision,

22   and that there was, in fact, no Brady material.  It was not

23   exculpatory, nor was it *Giglio*, nor was it anything different

24   than what Erick has consistently alleged since 2009, when

25   these allegations first arose.

1    The Court would have to ignore the entirety of

2  Erick's sworn unchallenged, uncontroverted testimony at trial,

3  as well as all of the corroborated evidence of all of the

4  other government witnesses.

5    Remember, Judge, they can call him a linchpin.

6  They can call him whatever they would like.  He's a victim.

7  He's a victim of illicit sexual conduct perpetrated against

8  him by the defendant when he was only 15 years old.

9    But he was not the only witness to that conduct.

10  Luis testified he viewed the defendant fondling Erick's

11  genitals.  Erick's always maintained that that's exactly what

12  happened, and both affidavits before the Court indicate that

13  he has never once recanted those allegations nor has he

14  changed his allegations of the acts perpetrated against him by

15  the defendant at all.  Not at all during the pendency of this

16  investigation or prosecution.

17    The Court would also have to overlook the forensic

18  evidence in this case, including the images found on his

19  computer, which a jury determined were child pornography.  As

20  well as all the EXIF data showing that the defendant

21  repeatedly photographed these children in various states of

22  undress, including holding their shirts up because he directed

23  them to do so -- Erick testified to that -- to expose their

24  chest, to expose their abdomen.

25    The Court would have to overlook all of the

1    photographic evidence that led up and exactly corroborated

2    Erick and Luis's testimony of the events of the day that lead

3    to the defendant's criminal conduct perpetrated against not

4    one but two minor victims.

5            The Court would have to ignore the testimony of

6    both expert witnesses, which corroborated the victim's

7    testimony in various aspects about the way in which they

8    reacted to the sexual abuse that they suffered, as well as all

9    the documentary evidence, the defendant's travel records, his

10   passports, all physical evidence recovered from his home, as

11   well as various stipulations that are in evidence, and the

12   defendant's own statements made in e-mails that he was not

13   worried about sexual abuse allegations, not because they

14   hadn't occurred but because he was convinced he'd get away

15   with it because the victims, by that point, would be over the

16   age of 18.  We've cited that trial exhibit for the Court's

17   consideration.

18           Given that the defendant has failed to meet his

19   burden showing that this is in no way material evidence

20   because there's no way that the disclosure of one single

21   statement would have drastically altered or given a reasonable

22   probability for acquittal here, he has not made his burden and

23   so that motion at least with respect to the Brady allegation

24   should be denied.

25           As the Court has cited, because he can't meet the

1    materiality under *Brady*, he also cannot prevail under the

2    requirements for a new trial for newly discovered evidence.

3    As the Court has noted, this is an even more stringent

4    standard, a heavy burden for the movant, which he has simply

5    failed to meet.

6              He must prove all of the five requirements.  And

7    again, he asserts absolutely no factual support, nothing in

8    the record to show that this newly discovered evidence, which

9    again, is one statement, one in a multi-page document, that

10   includes tons of inculpatory answers and information provided

11   by the victim, how that in any way would change the outcome of

12   this trial and that there would be a probability of an

13   acquittal.

14             As the Court's noted, he fails to establish at

15   least three of the requirements necessary for a new trial.

16   We've addressed materiality.  But first the fact that Erick

17   responded the way he did to that single question, based on an

18   erroneous belief to an ambiguous nonlegal term such as

19   "abuse," that that did not, in fact, include touching where

20   Erick believed that that only included anal penetration,

21   that's impeachment evidence at best.  At best it's impeachment

22   evidence.  So under the progeny of case law that is not

23   sufficient to warrant the defendant a new trial.

24             And he's not provided, again, a shred of factual

25   support for that final requirement that that newly discovered

1  evidence, which again boils down to one single sentence, is of

2  such nature that it would have produced an acquittal at trial.

3          Again, Judge, when you take this sentence in the

4  context in which it was given, when it was given, all of the

5  other answers given by Erick, it is completely clear that

6  Erick was victimized by this defendant.

7          You have the affidavit of Jackie Goldstein saying

8  at no point did she consider this to be a recantation because

9  it was consistent with Erick's distinction between anal

10  penetration and the abuse the defendant perpetrated against

11  the other boys, and what he had experienced, which to Erick,

12  what he disclosed, what he testified to at court, was simply

13  fondling of the genitals.  Erick drew that distinction.

14          That was then verified on the day after the

15  statement was produced by Carlos Gamarra, who again went to

16  clear up any possible ambiguity of the term "abuse."  That was

17  the sole purpose of that.  And he did so.  Again, Erick stated

18  to Carlos Gamarra -- which you have a sworn affidavit -- that

19  he did not understand that the term "abuse" could include

20  touching, that he defined it as solely penetration.  Which as

21  we've now established, Ludin did as well.

22          Again, the testimony of Erick -- while

23  Mr. Passarello wants to call him a linchpin -- of course he

24  was an important piece of the puzzle.  He testified about the

25  acts of sexual contact that he suffered at the hands of the

 1   defendant, the various illicit sexual conduct that he endured,

 2   which the defendant offered him and, in fact, gave him money

 3   to perpetrate against this young boy.  His testimony again is

 4   buttressed by all the other evidence in this case.  This does

 5   not stand alone.  There was a witness to this abuse.  There

 6   was photographic evidence.  There was forensic evidence on the

 7   computer.  All of those things which buttress Erick's

 8   testimony.

 9            So it seems clear that the defendant's motion for a

10   new trial based on this newly discovered evidence must be

11   denied as well, Judge.  So for all of these reasons we would

12   ask that you deny both of the defendant's motions, as he has

13   clearly failed to meet his burden.

14            Additionally, Judge, I would note for the record

15   that Mr. Passarello indicated he had not received the victim

16   impact statement on November 5th.  That is in direct

17   contradiction to an e-mail he sent to a legal assistant at the

18   United States Attorney's Office that he had received our

19   filings, which included two affidavits, yesterday.

20            Additionally, when Erick was provided by Agent

21   Gamarra on November 5th, 2015, as noted in Agent Gamarra's

22   affidavit, "The point of this meeting was to review the victim

23   impact statement in its entirety to ensure that all of the

24   answers were accurate."  As stated in Agent Gamarra's sworn

25   affidavit, which is uncontroverted, "At that point Erick

1    indicated that all of the answers on his victim impact

2    statement were accurate, except one:  The one in which he

3    indicated that he had "not really been abused."  And so he was

4    able to answer that question in a way he felt was accurate.

5    And he says, "that sometimes people think badly of me, perhaps

6    because he is in jail because of me," because of the testimony

7    that Erick gave at trial under oath which the defense chose

8    not to cross-examine him.  That was their strategic error, and

9    they now don't get a second bite of the apple by not meeting

10   their burden on the two issues that they brought before the

11   Court today.

12           Thank you.

13           THE COURT:  Mr. Passarello, do you have rebuttal?

14           MR. PASSARELLO:  Just briefly, Your Honor.

15           First of all, I want to address what I said to this

16   Court was that I did not receive what I believe to be a new

17   victim impact statement taken by Agent Gamarra on

18   November 4th, 2015.  Attorney Larson, as she always likes to

19   do, cleared that up.  I guess there's not a new victim impact

20   statement.  But it's -- they had it, they hid it, and they got

21   caught.  And now they're backpedaling.  That's what this

22   argument is.  They cheated and they got caught.

23           How anybody can look this Court in the eye and say

24   a victim who says, "perhaps people think he abused me but he

25   did not" is not material to a case where they say he abused

1    them is unbelievable.  That clearly is material.  And yes,

2    Your Honor, I did -- what I have is the statement.  That's my

3    evidence.  That's the statement.  And it's your job and it's

4    your sole discretion to determine whether or not that

5    statement is and of itself material.

6            That's my evidence.  They had it.  I can show they

7    had it.  I can show they didn't disclose it.  I can show all

8    of that.  But this case is about credibility.  If I have a

9    statement from somebody who says something different than what

10   they said on the stand, how in Sam Hill is that not material?

11   How can that be?  How can that be?

12           This clearly is material evidence.  This clearly

13   should have -- what should have happened is on September 20th,

14   they should have come into this court on the 21st in the

15   morning and said, Judge, we got an issue with this statement.

16   Here it is.  I'm here to answer any questions you may have.

17   Do what you will with it.  They didn't.  They didn't.  And

18   they didn't because they decided, "Nah, I'm not giving it to

19   them.  It's not material."  It's not their call.  I can't

20   believe they come in here and say it's not material.

21           But anyway, Judge, I believe we've met our burden.

22   It is a statement that contradicts -- and it's odd, isn't it,

23   that Mr. Gamarra went on November 4th, 2015, and Erick assured

24   him that every single answer in that victim witness impact

25   statement was correct, except for the one statement I'm

1  alleging.

2          I have nothing further.

3          THE COURT:  Counsel, anything further?

4          MS. LARSON:  No, Judge.

5          THE COURT:  All right.  Just one moment.

6          (Off-the-record discussion between the Court and

7  Law Clerk Savino.)

8          THE COURT:  Attorney Larson, just so I'm certain as

9  to what occurred back on September 20th, 2015, the victim

10  impact statement was completed that day and signed by Erick.

11          Now, was it reviewed by you?

12          MS. LARSON:  It was not, Judge.

13          THE COURT:  Who reviewed it?

14          MS. LARSON:  Judge, it was in Spanish.  One of the

15  things we pointed out with our memo was that Mr. Passarello

16  erroneously asserts that the victim assistant specialist wrote

17  it down in English.  And at that point that was not the case.

18  It was documented in Spanish.  Erick did not write the

19  statement.  Erick did not read the statement.  The questions

20  were read to him.

21          The Court is very aware of the background of these

22  young men.  So the decision was made that the statements would

23  be read to them, and their answers would be provided verbally

24  and documented by Jacqueline Goldstein, and that's what

25  happened.

1          They then had to be sent to the U.S. Attorney's

2     Office for official translation.  When they were translated

3     into English I reviewed the victim impact statements.  At that

4     point was when that was determined there was an ambiguity with

5     what he meant by "abuse."  It's unclear.  At that point Agent

6     Gamarra, being fluent in Spanish as his affidavit attests to,

7     went on that very day to talk to Erick, and this explanation

8     was given --

9          THE COURT:  Well, just wait for a moment.  We

10    started on September 20th.

11         MS. LARSON:  That's correct, Judge.

12         THE COURT:  Erick was interviewed and orally gave

13    these answers; is that correct?

14         MS. LARSON:  That's correct, Judge.

15         THE COURT:  Then it was transcribed in Spanish on

16    the victim impact statement?

17         MS. LARSON:  That's correct, Judge.

18         THE COURT:  And then he signed it?

19         MS. LARSON:  That's correct.

20         THE COURT:  And when did that process end?

21         MS. LARSON:  That was in the evening hours of

22    September 20th, Judge.

23         THE COURT:  When did you first see the statement?

24         MS. LARSON:  Judge, I believe that I saw it on

25    September 22nd.  However, while I want to be 100 percent clear

```
 1   in everything that we've communicated to the Court, which is

 2   why in Carlos Gamarra's affidavit, we're saying it was the

 3   21st or the 22nd.  The earliest it could have been would have

 4   been the afternoon of the 21st, after the jury was charged,

 5   because we were in court all morning and, in fact, returned to

 6   court for the charge after lunch.  So there's no way that

 7   these statements would have been translated or reviewed prior

 8   to the afternoon or evening hours of the 21st.  And I believe

 9   that they were first reviewed on the 22nd, which is when Agent

10   Gamarra had the conversation with Erick clearing up this

11   ambiguity.

12           THE COURT:  Well, then the Homeland Security people

13   were the ones who first became aware of the contents of this

14   victim impact statement?

15           MS. LARSON:  That's correct.

16           THE COURT:  And did they report to you or to

17   Attorney Haines -- and I'll let her speak for herself -- but

18   if you know, that's fine.  Did they report to you that it had

19   this statement in there that Mr. Passarello is referring to?

20           MS. LARSON:  Absolutely not, Judge.  And as

21   contained, again, in the sworn affidavit of Jackie Goldstein,

22   based on the hundreds of hours she had spent with him -- with

23   Erick -- as well as her hours and training and experience as a

24   victim assistant specialist, she did not note anything unusual

25   about Erick's response.  She did not view it as a recantation.
```

1  She viewed it as being in conformity with what he had already

2  said.

3          THE COURT:  Well, regardless of how she viewed it,

4  when did she become aware of it?

5          MS. LARSON:  Well, Erick made the statements in her

6  presence on the 20th, Judge.  But I believe that your question

7  was did she then communicate to the members of the prosecution

8  team, and the answer is no.

9          THE COURT:  When did you first learn about it?

10          MS. LARSON:  When the English versions were

11  provided.  And, again, the earliest that could have been was

12  the evening hours of -- afternoon, evening hours of the 21st.

13  I believe it was the morning of the 22nd, but I can't say for

14  100 percent certain, which is why the dates in the affidavit

15  are as they are.

16          THE COURT:  So it was presented to you in English?

17          MS. LARSON:  That's correct, Judge.

18          THE COURT:  Did you read it?

19          MS. LARSON:  In English, Judge.  My Spanish is not

20  good enough to read the victim impact statements in Spanish.

21          THE COURT:  And when you read that, did you not

22  note that it at least could be Brady material?

23          MS. LARSON:  Judge, I didn't know what Erick meant

24  by that statement.

25          THE COURT:  Well, regardless of what he meant --

```
 1    often we don't know what people mean -- but it was written out

 2    clearly, as Mr. Passarello has read it today.  Regardless what

 3    Erick meant, the fact that that had been stated and put on the

 4    paper, would that not be Brady material because it would be

 5    helpful to the defense at that point?

 6            MS. LARSON:  Well, while, again, the Court may find

 7    that it's favorable, I don't see that as Brady.  I do not find

 8    that as exculpatory material.  And I don't see it certainly as

 9    rising to the materiality aspects that would render it a Brady

10    violation.

11            THE COURT:  Well, let's not mix the fact of whether

12    it's Brady with whether it's material; those are two separate

13    issues.

14            I am asking you, Would you not agree that it

15    certainly would appear to be favorable to the defense,

16    regardless of what Erick believed it meant?  I mean to me, it

17    is pretty clear that this is favorable to the defense.  I

18    don't think there is -- I don't see how you can say it isn't

19    favorable to the defense.  It is.

20            Now, whether it is material is a separate issue,

21    and that is why I told you to concentrate on that particular

22    aspect of the Brady.  But, quite frankly, I don't see how it

23    could be read as anything other than favorable to the

24    defendant, so I want to know when you knew about it.

25            MS. LARSON:  Again, Judge, the earliest I would
```

 1   have known was when it was translated into English.  I cannot

 2   give the Court an exact time, which is why it's the 21st or

 3   the 22nd, and the conversation was with Erick immediately

 4   thereafter.

 5          THE COURT:  I don't know what Erick meant by that.

 6   You don't know what Erick meant by that.  You now have his

 7   version of what he meant.  But could not Mr. Passarello have

 8   used that in terms of "you said this, did you not?"  Then he

 9   could explain what he meant.

10          But would that not be favorable to the defense?

11          MS. LARSON:  At the point -- again, this was given

12   after Erick's sworn testimony, after the parties had rested.

13   Now, in the situation in which the Court is saying could

14   Mr. Passarello have cross-examined him and said, Did you make

15   what amounts to an inconsistent statement, Erick would have

16   been able to say yes or no and given an explanation.

17          If, in fact, it was an inconsistent statement,

18   we're talking about impeachment.  Which, again, if this

19   evidence is solely for impeachment it does not rise to the

20   level of getting a new trial.

21          THE COURT:  Well, again, you are going to the

22   materiality issue.  I am asking you about the responsibility

23   of the prosecution to provide Brady material, not to view

24   whether it would change the outcome of the trial.  That is not

25   the issue.  The issue is should it not have been provided.

1          MS. LARSON:  Judge, again, we immediately clarified

2     this ambiguity.  And because of that and because the content

3     of the rest of the statement, which clearly indicated it was

4     consistent with the fact that Erick had been victimized by the

5     defendant, no, we did not view this as favorable information.

6     We did not view it as Brady material.

7          We are aware of our obligations, and had we viewed

8     it that way it would have been immediately produced.  Had

9     there been a recantation, had there been any sort of testimony

10    or statements made to any member of the prosecution team which

11    demonstrated an inconsistency in what Erick was saying then

12    versus his sworn testimony, absolutely that would have been

13    documented and turned over.

14          As this Court is aware, and as we just put on the

15    record regarding the ROI, Number 79 of Ludin's recantation,

16    that was documented and immediately turned over, consistent

17    with our obligations.

18          This was not done to take a bullet out of

19    Mr. Passarello's gun nor was it done to hide anything.  There

20    was no nefarious intent, period.

21          THE COURT:  Well, please keep in mind, I am

22    differentiating between whether for purposes of a new trial

23    this is material.  I separate that from whether or not this is

24    Brady material or Giglio material, and I don't quite

25    understand how you could not view this as favorable to the

```
1    defendant.  Having said that, that doesn't answer the issue of

2    whether there should be a new trial or not, which is a

3    separate issue.

4              Attorney Haines, are you basically on the same page

5    with Attorney Larson as to when you learned about this?

6              MS. HAINES:  I am, Your Honor.  I was present with

7    her.  Yes, Your Honor.

8              THE COURT:  And you say that when this Homeland

9    Security person went back and discussed this with Erick, that

10   Erick clarified or changed his answer to that particular

11   inquiry?

12             MS. LARSON:  That's correct, Judge.  As detailed in

13   the affidavit of Carlos Gamarra in Paragraphs 10 and 11, this

14   details when the issue was first brought to Agent Gamarra's

15   attention, that he immediately went to speak with Erick, asked

16   him what did he mean when he said, That perhaps people think

17   he was "really abused," and perhaps that -- and that's not the

18   case.  He was asked what he meant by that.

19             Erick gave the explanation, as he had many times,

20   and consistent with Jacqueline Goldstein's understanding, He

21   did not penetrate me, as he had with the other boys.  Abuse

22   means penetration, consistent with the way the other boys

23   viewed it, so therefore, he didn't abuse me.

24             As Carlos Gamarra detailed in that affidavit in

25   Paragraph 11 when it was explained to him that in the U.S. we
```

1    consider abuse to include touching of the genitals, Erick said

2    he did not know that.  He said he didn't understand, and under

3    that definition yes, he was abused.  At that point, that

4    information was immediately relayed back to the case agent and

5    the other members of the prosecution team.

6              THE COURT:  Mr. Passarello, anything further?

7              MR. PASSARELLO:  No, Your Honor.

8              THE COURT:  Attorney Larson or Attorney Haines,

9    anything further?

10             MS. LARSON:  No, Judge.

11             MS. HAINES:  No, Your Honor.

12             THE COURT:  Then do either of you have any evidence

13   to present as opposed to oral argument?

14             MS. HAINES:  Your Honor, we have attached as

15   government exhibits onto our initial response, as well as our

16   supplemental response, the affidavits that have been referred

17   to here today of Jacqueline Goldstein and Special Agent

18   Gamarra.

19             If the Court would like a copy of those appended to

20   this proceeding as Government Exhibit Number 1 and Government

21   Exhibit Number 2 we would be happy, or if the Court is fine

22   with just using what has been attached to the previous filings

23   of the United States, we're happy to do whatever the Court

24   would request in this proceeding.

25             THE COURT:  Well, documents that have already been

1   docketed as a part of pleadings and responses and motions need

2   not be presented again today.

3          MS. HAINES:  We would ask for them to be

4   incorporated herein then.

5          THE COURT:  All right.  Well, I am not going to

6   rule from the bench on this.  I would like to analyze it

7   thoroughly before coming to a conclusion, and we will do that.

8   Then depending on what the decision is, we will schedule

9   further proceedings in accordance with that finding.

10          We will be in recess until call of Court.

11          (Proceedings concluded at 10:55 a.m.)

12                         * * *

13

14          CERTIFICATE OF OFFICIAL REPORTER

15

16          I, Kimberly K. Spangler, Federal Official Court
    Reporter, in and for the United States District Court for the
17   Western District of Pennsylvania, do hereby certify that
    pursuant to Section 753, Title 28, United States Code, that
    the foregoing is a true and correct transcript of the
18   stenographically reported proceedings held in the
    above-entitled matter, and that the transcript page format is
19   in conformance with the regulations of the Judicial Conference
    of the United States.

20          Dated this ____ day of _____ 2016

21

22

23   _____
    KIMBERLY RUSHLOW SPANGLER, RPR, RMR
24   FEDERAL OFFICIAL COURT REPORTER

25