1

1    **UNITED STATES DISTRICT COURT**
     **WESTERN DISTRICT OF PENNSYLVANIA**
2              **JOHNSTOWN DIVISION**

3

**UNITED STATES OF AMERICA,   )**
4                             **)**
              **Plaintiff,     )    CASE NO:  3:14-cr-00023**
5                             **)**
       **vs.                    )**
6                             **)**
**JOSEPH D. MAURIZIO, JR.,     )**
7                             **)**
              **Defendant.      )**
8    **_____)**

9

          **TRANSCRIPT OF SENTENCING PROCEEDINGS**
10        **BEFORE THE HONORABLE KIM R. GIBSON**
                   **MARCH 2, 2016**
11

**FOR THE GOVERNMENT:**
12    Stephanie L. Haines, AUSA
     Amy Larson, AUSA
13    United States Attorney's Office
     Penn Traffic Building, Ste. 200
14    319 Washington Street
     Johnstown, PA 15901
15
**FOR THE DEFENDANT:**
16    Steven P. Passarello, Esq.
     Daniel Kiss, Esq.
17    Law Office of Steven P. Passarello
     616 Hileman Street
18    Altoona, PA 16601

19

20

21

          Proceedings recorded by mechanical stenography,
22    transcript produced with computer.
23    _____
          Kimberly K. Spangler, RPR, RMR
24         United States District Court
          Penn Traffic Building, Ste. 204
25            319 Washington Street
             Johnstown, PA 15901

```
 1                    I N D E X

 2                 MARCH 2, 2016

 3
      Defendant's
 4    Witnesses:              Direct    Cross    Redirect

 5    Christine Shaulis        25        29        31
      Joshua Shaulis          32
 6    Johanna Vena            35
      Vincent Vena            37
 7    Cynthia Howard          38
      Dan Thomas              41
 8    Loretta Jean Tay        44
      Kevin Koclick           46
 9    Karen Sroka             49
      Rosemary DiLoreto       53
10    Angela Maurizio         59

11

12

13    Certificate of reporter   91

14

15                    *  *  *

16

17

18

19

20

21

22

23

24

25
```

```
1                    P R O C E E D I N G S
2        (The proceedings convened on March 2, 2016, commencing at
3    10:07 a.m.)
4              THE COURT:  This is the time and place set for
5    sentencing in the case of United States v. Joseph D. Maurizio,
6    Jr., Criminal Number 14-23.
7              Would counsel enter their appearance, please.
8              MS. HAINES:  Stephanie Haines and Amy Larson for
9    the United States, with Special Agent Molly Rock from the
10   Department of Homeland Security at counsel table.
11             MR. PASSARELLO:  Steve Passarello and Attorney Dan
12   Kiss for the defendant, Joseph Maurizio.
13             THE COURT:  Attorney Passarello, if you and the
14   defendant would go to the lectern, please.
15             Ms. Gorgone, if you would administer the oath to
16   the defendant.
17             (The defendant was placed under oath by Courtroom
18   Deputy Gorgone.)
19             THE COURT:  Mr. Maurizio, you are present today
20   with Mr. Passarello who has represented you throughout this
21   matter.
22             Is that correct?
23             THE DEFENDANT:  Yes.
24             THE COURT:  And is he a retained attorney?
25             THE DEFENDANT:  Yes.
```

```
1              THE COURT:  Have you used any illegal drugs or
2    consumed any alcoholic beverage in the past 24 hours?
3              THE DEFENDANT:  No.
4              THE COURT:  Are you currently on any medications?
5              THE DEFENDANT:  Yes.
6              THE COURT:  Can you tell me what they are, if you
7    know.
8              THE DEFENDANT:  High blood pressure medicine,
9    Zantac, Claritin, some vitamins, a few other medications,
10   nothing significant.
11             THE COURT:  Did you take those today?
12             THE DEFENDANT:  No.
13             THE COURT:  Did you take them last evening?
14             THE DEFENDANT:  No.  Just the Zantac.
15             THE COURT:  When you take those medications in the
16   proper dosage, do they in any way affect your ability to
17   understand what is going on around you?
18             THE DEFENDANT:  No.
19             THE COURT:  And, Mr. Passarello, you have spoken
20   with the defendant today, I'm sure.  Does he appear to be
21   oriented and understanding?
22             MR. PASSARELLO:  He does, Your Honor.
23             THE COURT:  The Court also finds the defendant to
24   be oriented and understanding.
25             Let the record reflect that the defendant has been
```

1    convicted by a jury of Counts 1, 2, 3, 4, and 8 of the

2    superseding indictment at Criminal Number 14-23.

3          Subsequent to the trial, the Court granted

4    Mr. Maurizio's motion for judgment of acquittal as to Count 4

5    on November 30, 2015.

6          Count 1 is engaging in illicit sexual conduct in

7    foreign places between on or about February 26, 2009, to on or

8    about March 13, 2009, with Minor Number 2, known as Otoniel,

9    in violation of 18 United States Code, Section 2423(c).

10          Count 2, knowing possession of one or more visual

11    depictions, the production of which involved the use of minors

12    engaging in sexually explicit conduct on or about

13    September 12, 2014, in violation of 18 United States Code,

14    Section 2252(a)(4)(B).

15          Count 3, engaging in illicit sexual conduct in

16    foreign places between on or about February 26, 2009, to on or

17    about March 13, 2009, with the minor known as Erick, in

18    violation of 18 United States Code, Section 2423(c).

19          Count 8, knowing transportation, transmission, or

20    transfer of a monetary instrument or funds, namely Check 221,

21    issued to ProNiño USA for $3,000 from a place in the United

22    States to a place outside of the United States with the intent

23    to promote the carrying on of an unlawful activity, that is,

24    engaging in illicit sexual conduct in foreign places between

25    on or about December 18, 2008, and March 13, 2009, in

 1    violation of 18 United States Code, Section 2423(c).

 2              I do want to make a correction.  I believe when I

 3    said in Count 1 Otoniel was Minor Number 2, that is not

 4    correct, is it?

 5              MS. HAINES:  That's correct, Your Honor.  It's

 6    Minor Victim Number 1 is Otoniel.

 7              THE COURT:  That should be Minor Victim Number 1

 8    then.  All right.

 9              Following the jury's verdict, the United States

10    Probation Office conducted a presentence investigation and

11    prepared a presentence investigation report.  On or about

12    December 14, 2015, the United States Probation Office filed a

13    draft presentence investigation report.  On December 28, 2015,

14    a final presentence investigation was filed.

15              On December 30, 2015, the defendant filed his

16    position with respect to sentencing factors.

17              On January 5, 2016, the United States filed its

18    position with respect to sentencing factors.

19              On January 8, 2016, the United States Probation

20    Office filed an addendum to the presentence investigation

21    report.

22              On January 26, 2016, the defendant filed letters in

23    support.

24              On January 26, 2016, the United States filed its

25    sentencing memorandum.

1          This Court filed its tentative findings and rulings

2    on February 29, 2016.

3          Attorney Passarello and Mr. Maurizio, have you both

4    had the opportunity to read the presentence report, the

5    addendum to that report, and this Court's tentative findings

6    and rulings?

7          MR. PASSARELLO:  We have, Your Honor.  And I have

8    gone through all of those with the defendant.

9          THE COURT:  Is that correct, sir?

10          THE DEFENDANT:  Yes, sir.

11          THE COURT:  Do you understand, Mr. Maurizio, the

12    purpose of the presentence report and its contents?

13          THE DEFENDANT:  Yes, I do, Judge.

14          THE COURT:  Now, before hearing from the parties

15    with regard to any motions for departure from the sentencing

16    guidelines, I will first review the sentencing guideline

17    calculation as set forth in the presentence report.

18          I will first note that the sentencing guidelines

19    are advisory and not mandatory in their application upon this

20    Court.  The 2015 edition of the guidelines manual, including

21    amendments effective as of November 1, 2015, will be used in

22    this case.

23          I will again summarize the counts before moving to

24    the calculation of the base offense level:  Count 1 of the

25    superseding indictment, engaging in illicit sexual conduct in

foreign places.  Count 2 of the superseding indictment,

knowing possession of visual depictions, the production of

which involved the use of minors engaging in sexually explicit

conduct.  Count 3 of the superseding indictment, engaging in

illicit sexual conduct in foreign places, and Count 8 of the

superseding indictment, knowing transportation, transmission,

or transfer of a monetary instrument or funds from a place in

the United States to a place outside of the United States with

the intent to promote the carrying on of an unlawful activity.

I will first deal with Count 1, which is also Group

1.  The guideline for offenses at 18 United States Code,

Section 2423(c) is found at Guidelines Section 2G1.3.  The

base offense level is 24, pursuant to Guidelines Section

2G1.3(a)(4).

With regard to specific offense characteristics,

because the defendant unduly influenced the minor victim to

engage in prohibited sexual conduct, there is a two-level

increase, pursuant to Guidelines Section 2G1.3(b)(2)(B).

Application Note 3(B) advises that in a case in

which the participant is at least 10 years older than the

minor, there shall be a rebuttable presumption that (b)(2)(B)

applies.  In such a case, some degree of undue influence can

be presumed because of the substantial difference in the age

between the defendant and minor victim.

It is also noted that the defendant provided candy,

1  money, and small gifts to his victims, who were poor, to gain

2  their compliance.

3          Specific offense characteristics:  As Subsection

4  (a)(4) applies in this matter, and the offense involved

5  commercial sex acts, the offense level is increased by two

6  levels, pursuant to Guidelines Section 2G1.3(b)(4)(B).

7          Application Note 1 provides that commercial sex act

8  has the meaning given to the term at 18 United States Code,

9  Section 1591(e)(3).  According to 18 United States Code,

10  Section 1591(3)(3), the term "commercial sex act" means any

11  sex act on account of which anything of value is given to or

12  received by any person.

13          The evidence supports this enhancement in that the

14  defendant, among other things, gave the victim money in

15  exchange for sexual conduct.

16          Victim-related adjustments:  The defendant knew

17  that the victim of the offense was a vulnerable victim.

18  Therefore, two levels are added, pursuant to Guidelines

19  Section 3A1.1(b)(1).

20          In addition to being extremely poor, the victims

21  were exceptionally vulnerable to the defendant's actions.  The

22  victims were living in a home for orphaned, abandoned, and

23  drug-addicted children.  The victims' access to parental

24  guidance, educational resources, health care, and family

25  support was minimal.  As such, small gifts of candy, clothing

 1   and shoes, in addition to cash, were especially attractive to

 2   the victims.

 3          The defendant also gave various privileges,

 4   opportunities, and gifts to the victims in a way to entice and

 5   encourage them to spend time with him alone, which provided

 6   the defendant the opportunity to engage in illicit sexual

 7   conduct with the victims.

 8          Adjustment for role in the offense:  The defendant

 9   abused a position of public or private trust, specifically his

10   position as a Roman Catholic priest, in a manner that

11   significantly facilitated the commission or concealment of the

12   offense.  Therefore, a two-level increase is appropriate,

13   pursuant to Guidelines Section 3B1.3.

14          There is no adjustment for obstruction of justice.

15   Therefore, the adjusted offense level as to Count 1 is 32.

16          I will now cover Count 2, which is also Group 2.

17   This is knowing possession of visual depictions, the

18   production of which involved the use of minors engaging in

19   sexually explicit conduct.

20          With regard to base offense level, the guideline

21   for 18 United States Code, Section 2252(a)(4)(B) offenses is

22   found at Guidelines 2G2.2(a)(1).  The base offense level is

23   18.

24          With regard to specific offense characteristics,

25   the government asserts that as the minor depicted in the

1   photographs possessed by the defendant was a prepubescent

2   minor who had not attained the age of 12, there would be a

3   two-level increase, pursuant to Guidelines Section

4   2G2.2(b)(2).  According to the testimony of the case agent,

5   the victim was between the age of 10 and 11 years.

6          The defendant objects to this two-level adjustment

7   under Guidelines Section 2G2.2(b)(2).

8          The Court finds that the United States did not meet

9   its burden of proof in regard to this enhancement, as the only

10  testimony regarding this factor comes from the special agent,

11  and that special agent's testimony regarding this matter is

12  speculative in nature and is not sufficient to support this

13  enhancement.  Accordingly, the Court denies this enhancement.

14         With regard to specific offense characteristics, as

15  the defendant engaged in a pattern of activity involving the

16  sexual exploitation of a minor, there is a five-level

17  increase, pursuant to Guidelines Section 2G2.2(b)(5).

18         Application Note 1 advises that a pattern of

19  activity involving the sexual abuse or exploitation of a minor

20  means any combination of two or more separate instances of

21  sexual abuse or sexual exploitation of a minor by the

22  defendant, whether or not the abuse or exploitation occurred

23  during the course of the offense, or involved the same minor,

24  or resulted in a conviction for said conduct.

25         With regard to victim-related adjustments, there

1   are no victim-related adjustments.  There is no adjustment for

2   role in the offense.  There is no adjustment for obstruction

3   of justice.  Therefore, the offense level as to Count 2, which

4   is also Group 2, is 23.

5           Count 3, Group 3, engaging in illicit sexual

6   conduct in foreign places:  With regard to base offense level,

7   the guideline for 18 United States Code, Section 2423(c)

8   offenses is found in Guidelines Section 2G1.3.  The base

9   offense level is 24, pursuant to 2G1.3(a)(4).

10          Specific offense characteristics:  Because the

11  victim was in the custody, care, or supervisory control of the

12  defendant, there is a two-level increase, pursuant to

13  Guidelines Section 2G1.3(b)(1).

14          Application Note 2(A) advises that this applies

15  whether the victim was entrusted to the defendant temporarily

16  or permanently.

17          The defendant in this case had custodial care over

18  the victim Erick, transporting him in his truck from one

19  location to another.

20          Specific offense characteristic:  Because the

21  defendant unduly influenced the minor victim to engage in

22  prohibited sexual conduct, there is a two-level increase,

23  pursuant to Guidelines Section 2G1.3(b)(2)(B).

24          Application Note 3(B) advises that in a case in

25  which the participant is at least 10 years older than the

1  minor, there shall be a rebuttable presumption that (b)(2)(B)

2  applies.  In such a case some degree of undue influence can be

3  presumed because of the substantial difference in the age

4  between the defendant and minor victim.

5            It is also noted that the defendant provided candy,

6  money, and small gifts to his victims, who were poor, to gain

7  their compliance.

8            Specific offense characteristic:  As Subsection

9  (a)(4) applies in this matter and the offense involved

10  commercial sex acts, the offense level is increased by two

11  levels, pursuant to Guidelines Section 2G1.3(b)(4)(B).

12            Application Note 1 provides that commercial sex act

13  has the meaning given to that term at 18 United States Code,

14  Section 1591(e)(3).  In Section 1591(e)(3) the term

15  "commercial sex act" means any sex act on account of which

16  anything of value is given or received by any person.

17            The evidence supports this enhancement in that the

18  defendant, among other things, gave the victim money in

19  exchange for sexual conduct.

20            Victim-related adjustment:  The defendant knew that

21  the victim of the offense was a vulnerable victim.  Therefore,

22  two levels are added, pursuant to Guidelines

23  Section 3A1.1(b)(1).

24            In addition to being extremely poor, the victims

25  were exceptionally vulnerable to the defendant's actions.  The

1    victims were living in a home for orphaned, abandoned, and

2    drug-addicted children.  The victims' access to parental

3    guidance, educational resources, health care, and family

4    support was minimal.  As such, small gifts of candy, clothing

5    and shoes, in addition to cash, were especially attractive to

6    the victims.

7         The defendant also gave various privileges,

8    opportunities, and gifts to the victims as a way to entice and

9    encourage them to spend time with him alone, which provided

10   the defendant the opportunity to engage in illicit sexual

11   conduct with the victims.

12        Adjustment for role in the offense:  There would be

13   a two-level increase, pursuant to Guidelines Section 3B1.3;

14   however, Guidelines Section 2G1.3 Application Note 2(B)

15   provides that if Guidelines Section 2G1.3(b)(1) applies, and

16   the Court has applied that, then the adjustment under 3B1.3 is

17   not to be applied.

18        Since the Court has determined that

19   Section 2G1.3(b)(1) of the guidelines applies, the adjustment

20   for abuse of a position of trust is not applicable, and the

21   two-level increase will not be applied.

22        There is no adjustment for obstruction of justice.

23   Therefore, the offense level as to Count 3 is 32.

24        Count 8, which is also Group 4, knowing

25   transportation, transmission, or transfer of a monetary

instrument or funds from a place in the United States to a

place outside of the United States, with the intent to promote

the carrying on of an unlawful activity is the offense.

The base offense level for violations of 18 United

States Code, Section 1956(a)(2)(A) is found at Guidelines

Section 2S1.1(a)(2) of the guidelines, which calls for a base

offense level of 8.

Specific offense characteristic:  Because the base

offense level is found in Section 2S1.1(a)(2), and because the

defendant knew or believed that any of the laundered funds

were the proceeds of, or were intended to promote an offense

involving the sexual exploitation of a minor, there is a

six-level increase, pursuant to Guidelines Section

2S1.1(b)(1).

Specific offense characteristic:  Because the

defendant was convicted under 18 United States Code,

Section 1956, there is a two-level increase, pursuant to

Guidelines Section 2S1.1(b)(2)(B).

There are no victim-related adjustments.  There is

no adjustment for role in the offense.  There is no adjustment

for obstruction of justice.  Therefore, the adjusted offense

level as to Count 8 is 16.

Now, pursuant to Guidelines Section 3D1.4, the

Court will make multiple count adjustments.  For Count 1,

Group 1, the adjusted offense level is 32 and, therefore,

1    1.0 units is assigned.

2              With regard to Count 2, Group 2, the adjusted

3    offense level is 23, which results in no units being applied.

4              With regard to Count 3, Group 3, 32 is the adjusted

5    offense level, therefore, 1.0 units are applied.

6              With regard to Group 4, Count 8, the adjusted

7    offense level is 16 and, therefore, no units are applied.

8              This results in a total number of units of 2.0.

9    And I will note that is different than what is reflected in

10   the presentence investigation report, based upon my denial of

11   one of the enhancements.

12             The greater of the adjusted offense levels of the

13   four counts is 32, therefore, the increase in offense level is

14   two.  This results in a combined adjusted offense level of 34.

15             There is a Chapter 4 enhancement.  An enhancement

16   under Guidelines Section 4B1.5 for repeat and dangerous sex

17   offender against minors is applicable in this case.

18             Pursuant to Guidelines Section 4B1.5(b), as the

19   instant offense of conviction is a covered sex crime, namely

20   Counts 1 and 3, and the defendant engaged in a pattern of

21   activity involving prohibited sexual conduct, the offense

22   level shall be five, plus the offense level determined under

23   Chapters 2 and 3.

24             According to Application Note 4(B)(i), for purposes

25   of (b), the defendant engaged in a pattern of activity

1  involving prohibited sexual conduct if, on at least two

2  separate occasions the defendant engaged in prohibited sexual

3  conduct with a minor.  And (ii), an occasion of prohibited

4  sexual conduct may be considered for purposes of (b) without

5  regard to whether the occasion occurred during the course of

6  the instant offense, or resulted in a conviction for the

7  conduct that occurred on that occasion.

8           There is no adjustment for acceptance of

9  responsibility.  The defendant has maintained his innocence,

10  and this case went to trial.

11          Therefore, all of those calculations result in a

12  total offense level of 39.

13          Now, understanding that there was a disagreement

14  over one of the enhancements, and understanding that counsel

15  may not agree with the Court's findings on that determination,

16  do counsel agree with the calculation?

17          MR. PASSARELLO:  The defense does, Your Honor.

18          MS. HAINES:  Yes, Your Honor.

19          THE COURT:  With regard to criminal history

20  computation, the defendant has no known adult criminal

21  convictions.  Therefore, he is a Category 1 criminal

22  computation.

23          With regard to sentencing options available to this

24  Court, at each of Counts 1 and 3 the maximum term of

25  imprisonment is 30 years, pursuant to Guidelines

1    Section 2423(c).

2              At Count 2 the maximum term of imprisonment is 10

3    years, pursuant to 18 United States Code, Section 2252(b)(2).

4              At Count 8 the maximum term of imprisonment is

5    20 years, pursuant to 18 United States Code,

6    Section 1956(a)(2)(A).

7              Under the guidelines, based upon a total offense

8    level of 39 and a criminal history category of 1, the

9    guideline imprisonment range is from 262 months to 327 months.

10             There is no plea agreement in this case.

11             With regard to supervised release, at Counts 1, 2,

12   and 3 the Court shall impose a term of supervised release of

13   at least five years and up to life, pursuant to 18 United

14   States Code, Section 3583(k).

15             At Count 8 the Court may impose a term of

16   supervised release of not more than three years, pursuant to

17   18 United States Code, Section 3583(b)(2).  Multiple terms of

18   supervised release shall run concurrently, pursuant to 18

19   United States Code, Section 3624(e).

20             Under the guidelines, at Counts 1, 2, and 3 a term

21   of supervised release of at least five years is required by

22   statute.  Therefore, the guideline range for a term of

23   supervised release is five years to life, pursuant to

24   Guidelines Section 5D1.2(b)(2).

25             At Count 8, as the offense is a Class C felony, the

1    guideline range for a term of supervised release is from one

2    year to three years, pursuant to Guidelines

3    Section 5D1.2(a)(2).

4         With regard to probation, by statute the defendant

5    is ineligible for probation at Counts 1 and 3 because it is

6    expressly precluded by 18 United States Code,

7    Section 3561(a)(2).

8         At Counts 2 and 8, pursuant to 18 United States

9    Code, Section 3561(a)(3), the defendant is not eligible for

10   probation because the defendant will be sentenced at the same

11   time to a term of imprisonment for the same or a different

12   offense.

13        Under the guidelines, the defendant is not eligible

14   for probation at Counts 1 and 3 because it is expressly

15   precluded by statute, pursuant to Guidelines

16   Section 5B1.1(b)(2).

17        At Counts 2 and 8, the defendant is not eligible

18   for probation because the defendant will be sentenced at the

19   same time to a term of imprisonment for the same or a

20   different offense.

21        With regard to a fine, at Counts 1, 2, and 3 the

22   maximum fine for each count is $250,000, pursuant to 18 United

23   States Code, Section 3571(b).  The maximum fine at Count 8 is

24   $500,000, pursuant to 18 United States Code, Section 1956.

25        A special assessment of $100 for each count is

1    mandatory, and results in a total special assessment of $400.

2          Under the guidelines, the fine range for this

3    offense is $25,000 to $500,000.  If the defendant is convicted

4    under a statute authorizing a maximum fine greater than

5    $250,000, the Court may impose a fine up to the maximum

6    authorized by the statute, pursuant to Guidelines Sections

7    5E1.2(c)(4) and 5E1.2(h)(1).

8          With regard to restitution, pursuant to 18 United

9    States Code, Section 3663(a), restitution shall be ordered in

10   this case.  Restitution is due and owing to the following

11   victims:  Otoniel and Erick, and restitution shall be

12   determined later in this proceeding.  Under the guidelines,

13   restitution shall be ordered pursuant to Guidelines

14   Section 5E1.1.

15         The denial of federal benefits does not apply to

16   this case.

17         With regard to forfeiture, the property used to

18   commit or promote the commission of Counts 1 and 2 of the

19   indictment is subject to forfeiture, pursuant to 18 United

20   States Code, Sections 2253(a)(3), and 2428(a)(1), and includes

21   but is not limited to the items set forth in the forfeiture

22   allegations filed with the indictment.

23         Attorney Passarello, did you review with

24   Mr. Maurizio the statutory ranges and the sentencing guideline

25   ranges that I just recited, as well as the sentencing factors

```
 1    found at 18 United States Code, Section 3553(a)?

 2              MR. PASSARELLO:  I did, Your Honor.

 3              THE COURT:  Mr. Maurizio, is that correct?

 4              THE DEFENDANT:  Yes, Your Honor.

 5              THE COURT:  Since Mr. Passarello reviewed with you

 6    the sentencing factors contained at 18 United States Code,

 7    Section 3553(a), do you wish the Court to read those to you at

 8    this time or do you waive that reading?

 9              THE DEFENDANT:  I waive that reading, Your Honor.

10              THE COURT:  Now, counsel, the Court has reviewed

11    all written materials that were docketed in this case, and I

12    want to inquire at this time as to whether or not either party

13    has any additional written materials that should be reviewed

14    that are not docketed?

15              MR. PASSARELLO:  From the defense, Your Honor, no,

16    we do not -- oh.  With the exception of some people that are

17    going to speak today that may read from a letter.

18              THE COURT:  Well, if they're reading it into the

19    record that is fine.  I just wondered if there were any

20    documents that I should look at that have not been docketed.

21              MR. PASSARELLO:  No, Your Honor.

22              MS. HAINES:  Nothing from the United States.

23              THE COURT:  Thank you.

24              Attorney Passarello, other than any objections you

25    have already raised, do you have any objections to the factual
```

```
 1    content or the sentencing calculations in the presentence
 2    report as revised by the addendum dated January 8, 2016?
 3              MR. PASSARELLO:  I do not.
 4              THE COURT:  Do you have any objections to the
 5    Court's tentative findings and rulings?
 6              MR. PASSARELLO:  I do not, Your Honor.
 7              THE COURT:  Attorney Haines, does the government
 8    have any objections to the factual content or sentencing
 9    calculations in the presentence report as revised by the
10    addendum?
11              MS. HAINES:  No, Your Honor.
12              THE COURT:  Do you have any objections to the
13    Court's tentative findings and rulings?
14              MS. HAINES:  No, Your Honor.
15              THE COURT:  Mr. Passarello, we will now move to
16    Gunter stage 2, and I will inquire as to whether you have any
17    motions for departure from the sentencing guidelines before we
18    move to the issue with regard to variance.  And if you do have
19    any motions for departure, please reference them with a
20    specific section of the sentencing guidelines.
21              MR. PASSARELLO:  Your Honor, as stated in my
22    position of sentencing factors, my argument is solely based on
23    the motion for variance, so I do not have any motions for
24    departure at this time.
25              THE COURT:  Thank you.
```

1          Attorney Haines, does the government have any

2     motions for departure from the guidelines?

3          MS. HAINES:  We do not, Your Honor.

4          THE COURT:  Then, Mr. Passarello, at this time we

5     will move to stage three of *Gunter*, which will allow you to

6     present any sentencing arguments that you wish to present.

7     You can present testimony from third parties, any documents,

8     and you also may have Mr. Maurizio address the Court himself,

9     and what order you do that in I will leave entirely up to you.

10          MR. PASSARELLO:  Thank you, Your Honor.  The order

11    I would like to do is, for the Court's information, would be

12    to have third parties speak on behalf of Mr. Maurizio.  And

13    then I would ask for the opportunity to make my arguments for

14    variances after that.

15          THE COURT:  All right.  Mr. Maurizio, if you would

16    take a seat at counsel table.  That will make room for the

17    people who are going to address the Court.

18          And the order that you call them in is entirely up

19    to you.

20          MR. PASSARELLO:  Thank you, Your Honor.  Just so

21    the Court's aware, we have informed the United States of the

22    list of people we have chosen to call, and also I believe have

23    provided them the letters that were attached to -- the people

24    who are not speaking, their letters which were forwarded to

25    the Court.

1          We would call first Christine Shaulis.

2          THE COURT:  I don't intend to have these witnesses

3    sworn because I presume what they are presenting is more in

4    the nature of character evidence and support for the

5    defendant.

6          MR. PASSARELLO:  That is the nature of their

7    testimony.  But it is my understanding, I believe that the

8    United States is requesting they be sworn.

9          MS. HAINES:  We are, Your Honor.  We'd ask that

10   they be sworn, based upon what they say there may be potential

11   cross-examination of them.

12         THE COURT:  All right.  Then with the request for

13   the oath to be given, will you please administer the oath to

14   each witness, and the first one will be Mrs. Shaulis.

15         (The witness was placed under oath by Courtroom

16   Deputy Gorgone.)

17         THE COURT:  Mr. Passarello, you can do this by

18   question and answer or you can just have the person address

19   the Court.

20         MR. PASSARELLO:  Judge, I'll just ask her name and

21   what her address is, and then I will have her address the

22   Court, if that's all right.

23         THE COURT:  That's fine.

24         (The witness was placed under oath by Courtroom

25   Deputy Gorgone.)

1          CHRISTINE SHAULIS, DEFENDANT'S WITNESS, SWORN

2                        DIRECT EXAMINATION

3     BY MR. PASSARELLO:

4     Q.    Would you state your name for the record, please.

5     A.    Christine Shaulis.

6     Q.    Would you spell your name.

7     A.    C-H-R-I-S-T-I-N-E, S-H-A-U-L-I-S.

8     Q.    And where do you currently reside?

9     A.    2907 Jackson Avenue, Winder, PA.

10    Q.    And I understand you would like to speak on behalf of

11    Father Maurizio, and now's your time.

12    A.    Thank you, Judge Gibson, for allowing me to speak.  Good

13    morning.

14         I wanted to say a few things about my uncle, my

15    godfather, Father Joe Maurizio.  It is hard to think of

16    everything to say about my uncle because has done so much good

17    for my family and for people all over the world.

18         As far back as I can remember, my Uncle Joe has always

19    been my favorite uncle.  He has always been there for support

20    and done things for me and all of his nieces and nephews.

21         When I was just a little girl he traveled all around the

22    world.  Every time he would come home from the different

23    countries he visited he would bring home a doll.  Not just for

24    me, but for all of his nieces also.  I still have all of them

25    to this day.

When I was young my parents didn't have much, and we didn't really vacation except to visit my family.  Uncle Joe took us on our first beach trip.  I remember him carrying me into the ocean.  I was scared but he protected me, even though I got a mouthful of water.  He always spent a lot of time with my mom, his sister Rosemary; therefore, he was with my sister Cynthia and I a lot.

He took us to different places.  When he would come home we were always together as a family and had many family dinners.  I was alone with him as well as my cousins.  There was never anything strange or uncomfortable about him.  He was very loving, and a giving uncle.

At Easter time we would always color eggs together, and he would make sure that my dad got the one that was not hardboiled so when he cracked it it would go all over him.  He was a huge jokester and an instigator.  He always made us laugh.

I remember the day when he told us he was going to be a priest.  I thought he was joking, but he wasn't.  He said he got the calling.  It then became real.  I remember as a young girl going with my family and my cousins to visit him at the monastery and other places where he trained in his ministry.  It was always a little unbelievable to me because he was my uncle and not what I thought a priest was.  The priests I had growing up were mean and strict.  Not my uncle.  He was

1   caring, funny, and an instigator.  As I got older I realized

2   he was one of a kind.  Special.  He put everyone's needs

3   before his.

4        When he first told us he was going to go to these other

5   countries to help poor children on the streets, we were very

6   concerned for him and his safety.  My dad didn't want him to

7   go because of the third-world countries; they were not like

8   ours.  But my uncle's faith in God was so strong and he told

9   us this was his calling, so we knew there was no changing his

10  mind.  We just had to pray for him to come back home safely.

11       When he first came back from these missions and he told

12  us what goes on over there, we couldn't even imagine.  Then

13  when he showed us pictures then we understood why he needed to

14  go and help the poor children.

15       So over many years his HIM Ministry grew because people

16  loved my uncle and also trusted him and wanted to help the

17  children.  That is exactly what my uncle did:  He helped the

18  children.  He didn't harm them.

19       I know what he has been accused of but, in my opinion,

20  that is because people become jealous, and especially when it

21  involves a lot of money.  Money can be the root of all evil.

22  I know my uncle, and no one could ever make me believe that

23  these allegations are true.

24       My two sons are devastated that their Uncle Joe is in

25  prison.  They have been around him since they have been born.

1    My heart breaks for them that he has been taken away from them

2    so early on in their life.

3        On the other hand, I'm so glad they have had the precious

4    time with him that they have had, and everything that they

5    have learned from him spiritually and personally.  They miss

6    him so much and want to visit him and can't.  I hope when he

7    gets transferred it will be permitted to visit.  I also have

8    had a talk with them about my uncle, and they said they have

9    never felt strange or uncomfortable around him, that they love

10   him with all of their hearts.

11       They are now eight and ten years old.  On a daily basis

12   they talk about him and how they don't want me to be sad or

13   wonder when he will come home.  We pray all the time, hoping

14   it will be sooner than later.

15       These past 17 months have been the longest, hardest

16   period of my family's life.  We all live a pretty simple life.

17   This has put all of our faith to the test, and has only made

18   me stronger, for I do believe God has a plan.

19       Being that I'm a power of attorney has been a learning

20   experience for me because I thought that was something you

21   deal with at the end of a person's life, never thinking my

22   poor uncle would ever have to go through something like this.

23   It has definitely made me more knowledgeable and stronger.

24       Judge Gibson, I'm asking you today to please have

25   leniency on my uncle's sentence, and please keep him as close

```
 1    as possible so I can get my mother, aunt, and my father, who
 2    are all older, to visit him as much as possible, as well as
 3    his friends.
 4         Once again, thank you for listening to me today for what
 5    I had to say about my uncle, Father Joe Maurizio, for he is
 6    truly my hero.
 7         I love you.
 8              THE COURT:  Thank you.
 9              MS. SHAULIS:  Thank you.
10              MS. HAINES:  We do have cross-examination and
11    questions, Your Honor.
12                         CROSS-EXAMINATION
13    BY MS. HAINES:
14    Q.   Morning, Ms. Shaulis.
15    A.   Morning.
16    Q.   I believe you stated that you are and have been the power
17    of attorney for your uncle, correct?
18    A.   Yes.
19    Q.   And you would agree with me you've been the power of
20    attorney throughout this case, correct?
21    A.   Yes.
22    Q.   And you would agree with me that at the outset of this
23    case when you were the power of attorney, there were assets
24    belonging to your uncle in excess of $1 million, correct?
25    A.   Yes.
```

1   Q.   You would agree with me, as the power of attorney, it's

2   your duty and responsibility to oversee how that money is

3   moved or where it goes, correct?

4   A.   Correct.

5   Q.   You would agree with me that your uncle was convicted of

6   the crimes to which he's now being sentenced in September of

7   2015, correct?

8   A.   Correct.

9   Q.   You would agree with me that on November 4th of 2015,

10  which was post indictment, that all of his remaining assets

11  were retitled in the name of The Joseph D. Maurizio Revokable

12  Trust Agreement, and that you and your sons are listed as the

13  beneficiaries of those assets at this time, correct?

14  A.   Correct.

15  Q.   You would also agree with me, on November 4th of 2015,

16  post indictment, that there was a transfer of a house and

17  property located in this district that had a fair market value

18  of 128,800 -- post conviction, excuse me -- post conviction

19  not post indictment.

20       But on November 4th of 2015, post conviction, that the

21  house and property located at 164 Sugar Maple Drive that had a

22  fair market value of $128,825 was transferred to you by your

23  uncle for the price of $1, correct?

24  A.   It's not 164.  It's 809 Sugar Maple Drive.  And yes,

25  correct.

1   Q.   So you bought it for a dollar after his conviction?

2   A.   Correct.

3   Q.   You would also agree with me, during the pendency of your

4   time as a power of attorney that there were a number of

5   securities accounts that were in the name of your uncle that

6   you became the power of attorney over, correct?

7   A.   Correct.

8   Q.   You would agree with me that there were at least five

9   separate accounts that at one time had a balance of

10  approximately $364,381, correct?

11  A.   I don't know the exact numbers.

12  Q.   It wouldn't surprise you though that there were

13  substantial amounts of money in these securities accounts?

14  A.   Yes, there was.

15  Q.   Would you agree with me that at this time, as you are the

16  power of attorney, that there's not a dollar left in those

17  accounts; is that correct?

18  A.   No, there's not.

19          MS. HAINES:  If I may have a moment, Your Honor.

20          No further questions.

21          THE COURT:  Mr. Passarello, any follow up?

22                      REDIRECT EXAMINATION

23  BY MR. PASSARELLO:

24  Q.   Christine, there are balances left of Father Joe's money,

25  correct?

1   A.   Yes.

2   Q.   How much?

3   A.   He has a few accounts.  There's probably about a total of

4   maybe 400,000.

5   Q.   So there's still $400,000 left in the accounts?

6   A.   Yes.

7   Q.   Okay.

8   A.   Sorry, I...

9   Q.   And Father Joe retained private counsel for his trial,

10  correct?

11  A.   Yes.

12  Q.   And Father Joe also retained appellate counsel for his

13  appeal, correct?

14  A.   Yes.

15  Q.   Okay.  And some of the monies that were spent as power of

16  attorney were for attorney's fees, correct?

17  A.   Yes.

18          MR. PASSARELLO:  I have nothing further.

19          THE COURT:  Attorney Haines, any recross?

20          MS. HAINES:  No, Your Honor.

21          MR. PASSARELLO:  Thank you, Judge.

22          THE COURT:  You can step down, Mrs. Shaulis.

23          MR. PASSARELLO:  We'll call Joshua Shaulis.

24          (The witness was placed under oath by Courtroom

25  Deputy Gorgone.)

```
1                JOSHUA SHAULIS, DEFENDANT'S WITNESS, SWORN

2                          DIRECT EXAMINATION

3    BY MR. PASSARELLO:

4    Q.   Would you state and spell your name for the record,

5    please.

6    A.   Joshua Shaulis.

7    Q.   And where do you --

8    A.   J-O-S-H-U-A, S-H-A-U-L-I-S.

9    Q.   Where do you currently reside?

10        (Court reporter request for clarification.)

11   A.   2907 Jackson Avenue, Windber, Pennsylvania.

12   Q.   You asked for the opportunity to speak on behalf of the

13   defendant.  This is your opportunity.

14   A.   Thank you, Judge Gibson.

15        I've been provided the opportunity to know Father Joe for

16   many years.  I met him prior to meeting my wife, his niece.

17        Many years ago I witnessed Father consoling and offering

18   spiritual guidance to a couple who would be about my age now.

19   They were grieving the loss of their son.  For the many

20   obstacles for this couple to make a very difficult decision,

21   he kept their faith steadfast with his guiding words, as if

22   God himself was offering comforting words through him.  I

23   respected him from that day on.

24        Twenty years later Father Joe is Uncle Joe to me.  He's

25   treated me and continues to treat me as a blood relative.
```

 1   He's a huge part of my family, my wife, and my sons.  There

 2   hasn't been many dinners at my home where he has not provided

 3   grace and strength over our meals.  Paul said in Philippians,

 4   I can do all things through Christ who strengthens me.  How

 5   true this is.  Father Joe has taught his whole family to be

 6   strong in their faith and to look upon Christ as we need him

 7   the most.

 8         As I look at Uncle Joe and all his good works over the

 9   years, I am also able to thank him for providing the

10   opportunity to help teach my wife and my sons, myself, the

11   same virtues and values.  It's very disheartening to know

12   that -- to hear our sons ask him about and where he is at, or

13   if he'll be back for the summer picnics.  But through his

14   guidance we're able to talk with them so they have an

15   understanding of where he is.

16         In the book of Joshua it says that I have not abandoned

17   you, be strong and of good courage, do not be afraid, do not

18   be dismayed.  The Lord your God is with you wherever you go.

19         Judge Gibson, I ask you to grant leniency with respect to

20   as well as placing him close to my aging family, his two

21   sisters and brother-in-law, as well as my family.

22         Thank you.

23               THE COURT:  Thank you.

24               Attorney Haines, any questions?

25               MS. HAINES:  No, Your Honor.

```
 1                THE COURT:  You can have a seat, sir.
 2                MR. PASSARELLO:  Call Dr. Joey Vena.
 3                (The witness was placed under oath by Courtroom
 4    Deputy Gorgone.)
 5                JOHANNA VENA, DEFENDANT'S WITNESS, SWORN
 6                          DIRECT EXAMINATION
 7    BY MR. PASSARELLO:
 8    Q.   Would you state your full name and spell it for the
 9    record, please.
10    A.   Johanna Vena.  J-O-H-A-N-N-A, V-E-N-A.
11    Q.   Where do you currently reside?
12    A.   528 Waterfall Drive, Johnstown, Pennsylvania.
13    Q.   You've asked for the opportunity to speak on behalf of
14    the defendant.  This is your opportunity to do so.
15    A.   Thank you.
16         Your Honor, I'm here today to plead for leniency in the
17    sentencing of my good friend Father Joseph Maurizio.  I've
18    known Father Joe for nearly two decades now, and I've known
19    the vast amount of good he has done in his lifetime.  I
20    suspect Father Joe has brought about more good in this world
21    than most any of us sitting here in this room today.
22         Father Joe proudly served his country in the Armed
23    Forces.  He has served as a spiritual leader for thousands,
24    and still does, maintaining and sharing hope and faith, even
25    from the bleak confines of a prison cell.
```

1        Most of all, I have witnessed firsthand the desperately

2   needed humanitarian aid that Father Joe has provided for

3   thousands of destitute children.  Father Joe witnessed a

4   hopeless situation in a part of the world where there were no

5   safety nets.  If a child is starving, he'll likely just

6   starve.  If a child is homeless, he'll likely just sleep in

7   the streets.  And if a child causes trouble for law

8   enforcement in his attempt to survive, he will quite possibly

9   be shot.

10       Father Joe saw these things and he did something about

11  it.  Through his tireless work he provided food, safety, a

12  home, and an education and hope to many hopeless children in

13  Central America.

14       Incarceration has been extremely difficult for Father

15  Joe, and anything but the shortest of sentences will be a life

16  sentence for him.  A man who has done so much to make the

17  world a better place does not deserve to end his days in jail.

18  Regardless if Father Joe's ever free again, he has provided to

19  numerous innocent children something that can never be taken

20  away; faith, hope, and love.  And he has provided to me and

21  many like me an undying model of a faithful servant to God.

22             MR. PASSARELLO:  Thank you.

23             MS. HAINES:  No cross, Your Honor.

24             THE COURT:  You may be seated.

25             MR. PASSARELLO:  Call Vincent Vena.

```
 1              (The witness was placed under oath by Courtroom
 2   Deputy Gorgone.)
 3              VINCENT VENA, DEFENDANT'S WITNESS, SWORN
 4                        DIRECT EXAMINATION
 5   BY MR. PASSARELLO:
 6   Q.   State and spell your full name for the Court, please.
 7   A.   Vincent Vena.
 8   Q.   Where do you -- I'm sorry, spell --
 9   A.   V-E-N-A.  First is V-I-N-C-E-N-T.
10   Q.   Where do you currently reside?
11   A.   528 Waterfall Drive, Johnstown, PA.
12   Q.   This is your opportunity to speak on behalf of your
13   friend.
14   A.   Judge Gibson, thanks for allowing me to speak.
15        I had the opportunity to come here today and support
16   Father Joe, and I do ask for leniency in his sentencing.
17        I've been an orthopedic surgeon in town since 1998, and
18   I've been exposed to Father Joe since that time.  As a
19   professional in the community, I risk persecution for being
20   here speaking for him but, admittedly, consider it a
21   privilege.  Mainly because I believe strongly enough in his
22   character and his innocence that I feel compelled to speak.
23        At the hospital I've had the opportunity, as a physician,
24   to see him work with patients that many times I can't as a
25   physician console, where he offers them peace and comfort,
```

1    that as a physician I can't give them.

2        I've had the opportunity to financially assist him

3    through all of his work since I've been in town, and I've also

4    done physical work to help him with that.  My wife and I and

5    our children have traveled with him to Costa Rica, assisted

6    him with his mission.  My children continue to revere him as a

7    humble, reverent man who's caused no harm.

8        Neither I nor anyone around him has ever seen a man other

9    than a man that's committed to God, society, and the orphans

10   of our world.

11       He has worked to improve the lives of orphans in some of

12   the most desperate areas of our world.  They're horrific.

13   This work has provided a sense of hope and peace for those

14   individuals who are otherwise stuck in desperation and death.

15       I will share with you not only is his actions a testament

16   to his character before this whole issue, but as a physician

17   locally I -- for reasons I don't fully understand -- I have a

18   following of prison guards.  When some of them discover my

19   association with Father Joe, unprompted they'll share

20   heartwarming stories of his peaceful and prayerful nature in

21   prison.

22       One of them explained -- and I'll quote -- "There's no

23   way he's guilty of what he's been convicted.  I have not

24   prayed in years, and I find myself praying again because of

25   him."

1          I, as well as many others, have witnessed the tremendous

2     amount of good that this individual has done, both abroad and

3     locally.  He served his country faithfully in the military.

4     He's committed no prior crimes.  And at his age anything short

5     of a lengthy sentence is a life sentence for him.  And for

6     this, Your Honor, I ask for leniency in his sentence.

7          Thank you.

8               THE COURT:  Thank you, sir.

9               Any cross?

10              MS. HAINES:  No, Your Honor.

11              MR. PASSARELLO:  We'd call Cynthia Howard.

12              CYNTHIA HOWARD, DEFENDANT'S WITNESS, SWORN

13                      DIRECT EXAMINATION

14    BY MR. PASSARELLO:

15    Q.   Would you state and spell your full name for the record.

16    A.   Cynthia Howard, C-Y-N-T-H-I-A, H-O-W-A-R-D.

17    Q.   Where do you currently reside?

18    A.   407 Village Street in Windber.

19    Q.   This is your opportunity to speak to the Court.

20    A.   Thank you.

21         Good morning, Judge Gibson.  I'm here today to speak on

22    the behalf of my uncle, Joseph D. Maurizio, Jr.  I want to

23    tell you of my life with him.

24         Growing up our family was always very close.  We

25    celebrated every holiday, every birthday, every special event

1  together.  My Uncle Joe was the best uncle there was.  He was

2  fun, loving, and we always knew he would be there for us.

3      He was one of our main babysitters when I was little.

4  There was a time when we were running all over the house and

5  we jumped on my mother's favorite couch, tipped it over, and

6  broke the leg.  Of course, I started crying because she was

7  going to be so mad, but Uncle Joe said, "no worries."  He went

8  outside, got a brick, and put it underneath.  Years went by

9  before my mother ever noticed, and by that time it was so

10  funny she never became upset.

11      Growing up, he had a travel business which allowed him to

12  go anywhere in the world he wanted, and he did just that.  I

13  still have my wonderful doll collection.  He would bring a

14  doll home from every country he would travel to.  I have used

15  it in show and tell many times growing up.  It is very special

16  to me.

17      After all of our years of pranks and fun, he came to my

18  father and said he had a calling from God to become a priest.

19  Our family was so proud.  He worked hard for many years to

20  achieve his goal.  That only added to the wonderful things

21  that he did for us.

22      I always told him I could never call him Father Maurizio;

23  he would always be my Uncle Joe to me.  And I never did.  I

24  was and still am very proud to tell people that he is my

25  uncle.

1    He baptized both of my boys, his nephews, into the

2    Catholic faith.  He assisted in both of their First Holy

3    Communion events, as well as their Confirmation.  He was so

4    proud of the fact that we chose to send them to a Catholic

5    school.

6    Both Connor and Jared love their uncle dearly.  Connor

7    was even planning to go on a mission trip with my uncle, the

8    Vena family and their daughter Aubrey, who was a good friend

9    of Connor's, to Honduras.  Unfortunately, he did not apply for

10   his passport in enough time.

11   Both of the boys enjoyed hearing of his travels to these

12   countries to help the poor families and children have hopes

13   for a better life.

14   Uncle Joe had a number of parishes he worked while living

15   in the Johnstown area.  I have spoken with so many people who

16   love and support him for everything he has done.

17   Both of my boys volunteered numerous times at his last

18   parish for the turkey dinners, Knights of Columbus dinners,

19   and many sponsored events.  Uncle Joe even sponsored a high

20   school dance because a nearby school would not allow any

21   religious songs or decorations of any kind, and the teenagers

22   were all very upset.  My son Connor attended this dance.

23   Uncle Joe was always helping anyone who was in need.  He

24   took care of my grandma, his mother Viola, until her passing.

25   The boys and I would visit weekly to the rectory.  He was a

1   wonderful son.  She was very blessed to have him, and we are

2   all blessed to have him.

3        Holidays have not been the same since he has been gone.

4   This has been very devastating to our family.  I ask today

5   when sentencing my uncle, please take into consideration his

6   age and failing health.  Please put him in a facility that is

7   close so that we can take our mother and father and aunt to

8   visit him.  They are older, and it would be a hardship on them

9   to travel a long distance.  It is difficult enough that he

10  isn't home with us now to be able to possibly assist in other

11  family marriages, baptisms, and confirmations.

12       Through all of this my uncle's faith has not wavered.  He

13  is stronger than all of us combined.  He believes in God, the

14  truth, and our family.

15       Thank you very much.

16            THE COURT:  Thank you.

17            Attorney Haines.

18            MS. HAINES:  Nothing, Your Honor.

19            THE COURT:  You may be seated, please.

20            MR. PASSARELLO:  We would call Dan Thomas, Your

21  Honor.

22            (The witness was placed under oath by Courtroom

23  Deputy Gorgone.)

24            DAN THOMAS, DEFENDANT'S WITNESS, SWORN

25                      DIRECT EXAMINATION

1   BY MR. PASSARELLO:

2   Q.   Mr. Thomas, would you state and spell your full name,

3   please, for the record.

4   A.   Daniel Thomas.  D-A-N-I-E-L, T-H-O-M-A-S.

5   Q.   And where do you currently reside?

6   A.   My address is 1921 Saylor School Road in Thomas Mills,

7   Pennsylvania.

8   Q.   This is your opportunity to speak.

9   A.   Thank you.

10       Good morning, Your Honor.  My name is, as I said, my name

11  is Daniel Thomas.  My wife, Faith, and I operate the Thomas

12  Mills Agway.  We have known Father Maurizio for about

13  30 years.  We've never been parishioners of Father Joe.  Our

14  relationship is that of a deep and respectful friendship.

15       It's been with a heavy heart that I've watched events

16  over the past year and a half and their effects on him and

17  those who care about him.  And because of our relationship, I

18  feel compelled to write and to make this request for

19  sentencing leniency.

20       Over the past 30 years Father Joe's been a guest at my

21  farm many, many times.  And as with Dr. Vena, my three

22  children have grown up with him, and their affection for him

23  is similar to that of Dr. Vena's children.

24       It's unfathomable to me personally that he has been

25  convicted of sexual crimes against children.  I know several

1   men who are actually child molesters, and Joe does not fit the

2   profile, in my opinion.  And I believe he is innocent.  But

3   since a jury has convicted him, those of us who care about him

4   must ask you for leniency in his sentencing.

5        The money that Father Joe has invested in the early 1980s

6   as a successful businessman before he became a priest has

7   grown dramatically, as anyone who has had that experience.

8   That money will surely be gone by the time this is over, and

9   Joe never used any of that money to live lavishly.  And having

10  to spend it all on his defense is, in my view, a victory for

11  the state, and no small punishment for Father Joe.

12       I believe that no matter how hard they try -- and this is

13  a personal belief -- but I believe that no matter how hard

14  they try, in this day and age a jury is unlikely to be able to

15  be completely impartial when a Catholic priest is charged with

16  sex crimes.  I can't help believe that this has been a factor

17  in Father Joe's conviction.

18       I ask that you take into account his age and his physical

19  condition.  A long sentence will be a death sentence for him.

20  I'm shocked when I visit him in prison and see how this once

21  vibrant, hale, and irrepressible man has now become.  It's

22  hard for me to see God's plan in this, Your Honor.  I hope and

23  pray that you perceive leniency as a part of His plan.

24       Thank you.

25            THE COURT:  Thank you.

```
 1              Attorney Haines.
 2              MS. HAINES:  No questions, Your Honor.
 3              MR. PASSARELLO:  We would call Loretta Jean Tay.
 4              (The witness was placed under oath by Courtroom
 5    Deputy Gorgone.)
 6              LORETTA JEAN TAY, DEFENDANT'S WITNESS, SWORN
 7                        DIRECT EXAMINATION
 8    BY MR. PASSARELLO:
 9    Q.   Would you state and spell your full name for the record,
10    please.
11    A.   My name is Loretta Jean Tay.  Loretta, L-O-R-E-T-T-A,
12    Jean, J-E-A-N, Tay, T-A-Y.
13         And I am here on behalf -- it is my duty to be here on
14    behalf of an accused -- falsely accused -- priest, and Father
15    Joe Maurizio.
16         I am a retired junior and senior high school teacher.
17    Having taught 30 years in the United School District in
18    Armagh, Indiana County, Pennsylvania, my first personal
19    meeting with Father Joseph Maurizio was in 2003, when he was
20    acting supervisor of volunteers in a pastoral care, now
21    spiritual care department of Conemaugh Valley Memorial
22    Hospital in Johnstown.
23         We, as pastoral care, spiritual care visitors took
24    patients, were attentively instructed in our mission of
25    offering comfort, consolation, hope, and yes, even joy to the
```

1    ailing and dying patients.

2        Also at that time, Father was overseeing the operation of

3    the Humanitarian Interfaith Ministry, which he established in

4    the Honduras, having been motivated only by compassion.  His

5    mission of compassion, which ultimately expanded to some ten

6    different Latin American countries, provided for the physical,

7    as well as the intellectual and spiritual needs of children

8    who are abandoned, neglected, and forgotten by the global

9    community.

10       Through the ministry's periodic newsletters, I became

11   further acquainted and impressed with Father's work of hope

12   and justice.  I continue to support this aid to the poorest of

13   the poor, because I agree with Father that all human beings

14   have God-given inalienable rights.

15       Thank you for letting me speak, Your Honor.

16               THE COURT:  Thank you.

17               Attorney Haines.

18               MS. HAINES:  Nothing, Your Honor.

19               MR. PASSARELLO:  We'd call Kevin Koclick.

20               (The witness was placed under oath by Courtroom

21   Deputy Gorgone.)

22               KEVIN KOCLICK, DEFENDANT'S WITNESS, SWORN

23                        DIRECT EXAMINATION

24   BY MR. PASSARELLO:

25   Q.   Would you state and spell your full name, please.

1  A.    Kevin Koclick.  K-E-V-I-N, K-O-C-L-I-C-K.

2  Q.    Where do you currently reside?

3  A.    106 Shaw Road, Stoystown, Pennsylvania.

4      I first met Father Joe when he became pastor of Our Lady

5  Queen of Angels parish about 13 years ago.  I was only

6  15 years old at the time.  I got to know Father very well

7  through being an altar server at the parish and serving at the

8  majority of the funerals during that period.

9      My first teachable moment with Father, there was no

10  lecturer at a funeral mass, and Father taught me very quickly

11  how to read while maintaining eye contact with a crowd, while

12  holding your place in a passage.  I'm reminded of that every

13  time I read out loud, especially today.

14      When I was a senior in high school and was looking for an

15  idea for a graduation project, Father suggested that I travel

16  with him to Honduras with his mission team.  I did, and it was

17  the most humbling experience of my life.

18      Father taught me what it really meant to be generous and

19  to care for the poor through his actions.  It was very clear

20  to me that his prerogative was to help those who cannot help

21  himself.  I traveled with Father on multiple occasions to

22  Honduras, but I'll never forget the first time that I arrived

23  at the mountain orphanage.  Every child was down at the gate

24  when we arrived.  The children mobbed Father with hugs.

25      In the three times that I traveled with Father to the

1  missions in Honduras, in 2006, 2007, and 2009, I saw a man who

2  made his life's work caring for helpless children and making a

3  positive difference.

4      Following those trips, I personally uploaded photos taken

5  from Father's camera on his computers in the church rectory.

6  Father wanted to look through the pictures and liked what he

7  had wanted on the website, but he didn't know how to view them

8  on the computer.  So I had to print out every photo for him on

9  paper, about 20 per page, and he would go through and circle

10  in pencil the ones that he liked.

11      I also helped doing the website for Father's mission.

12  This was the long process that we would argue about.  I could

13  never win an argument with Father because he'd always just

14  say, Kevin, I am old enough to be your grandfather.  And I

15  know he wouldn't like me to say it out loud, because that

16  would make him sound old, but I did and I still do think of

17  Father Joe as a grandfather figure.  He always gave me good

18  advice.  He knew whenever I was upset about something.  He

19  could always cheer me up with a joke.  We would poke fun of

20  each other and laugh about it.

21      I spent a lot of hours working around the church, mostly

22  in the summers when I was in college when Father was the

23  pastor, and it always felt like a second home to me.  Father

24  made it that way.  Everybody who worked around the rectory

25  felt welcome there.

1    There were things that Father would do that would get on

2    my nerves, like when he would explain that the grass was too

3    high and it needs cut right this second.  But then he wouldn't

4    let me start until I ate a three-course meal that he prepared.

5    Everybody there had to eat with Father; you didn't have a

6    choice.  He wanted to share a meal with those in his life as

7    often as he could, and that is something that I really miss.

8    I have to laugh about all food that Father pushed on me

9    throughout the years.  Father once overheard my younger

10   brother say that he liked pumpkin pie, and he wound up giving

11   us a pumpkin pie to take home every week for about six months.

12   We also learned not to let Father know that when you were

13   sick with a cold or the flu, or else he would give us about

14   five gallons of homemade chicken soup to take home.  It was

15   good soup, but you'd be eating it for breakfast, lunch, and

16   dinner for a few weeks.

17   That's the Father Joe I know.  The guy who is generous to

18   a fault.  A guy who was insufferable at times because of his

19   grandiose ideas, but his heart was always in the right place.

20   And the guy that would always brighten your day with his quick

21   wit.  Father may not be perfect, but I can only wish to be

22   half the man that he is.  He always, always, always put

23   others' needs in front of his own.

24   Some people may not like Father.  Some people may even

25   hate Father.  But anyone who has ever met Father would never

1   say that he is anything other than an honest, generous human

2   being or they'd be lying.  It's very difficult for me to sum

3   up in a couple of sentences the amount of gratitude I have and

4   admiration that I have for Father.  I'm saying that I'm lucky

5   and blessed to have him in my life.

6        Thank you, Your Honor.

7             THE COURT:  Thank you.

8             Attorney Haines.

9             MS. HAINES:  No questions, Your Honor.

10            MR. PASSARELLO:  We'd call Karen Sroka.

11            (The witness was placed under oath by Courtroom

12   Deputy Gorgone.)

13            KAREN SROKA, DEFENDANT'S WITNESS, SWORN

14                   DIRECT EXAMINATION

15   BY MR. PASSARELLO:

16   Q.   Would you state and spell your name for the record,

17   please.

18   A.    Karen Sroka, K-A-R-E-N, S-R-O-K-A.  And I live at 275

19   Rambler Road in Windber.

20        Good morning, Your Honor.  I've known Father Joe since

21   the 1980s when he became a good friend to my parents, Deacon

22   John Sroka and Marian Sroka.  My mom is here with me today to

23   show her support for Father Joe because he's like family to

24   her.  And at 88, she is still a believer in Father and prays

25   daily for his health and well-being.

1       My father had resurrected the St. Vincent DePaul Society

2   in Johnstown, along with my mom's help.  And Father Joe became

3   the spiritual advisor for St. Vincent dePaul, and the personal

4   spiritual advisor for both my parents.  He frequently visited

5   their home.  I lived next-door, and was included in the

6   dinners and visits.

7       My two young sons were also there throughout that time,

8   until they left for college in the early 2000s.  I never once

9   felt that there was any threat to my children.  Father Joe was

10  always respectful and congenial.  He would greet the boys, ask

11  a few questions about school or sports, but primarily his

12  conversations were with my parents about the church, St.

13  Vincent dePaul, and later about his missions to Central

14  America.

15      Initially, he started mission work with his Banana

16  Project through St. Vincent dePaul.  Clothes were collected to

17  fill banana boxes for shipping to Honduras.  Eventually this

18  project expanded, and I recall mission trips with doctors and

19  other medical persons to treat the people who lived in the

20  area where he traveled.

21      It was very common for high school students or college

22  students from around Johnstown to join this mission trip in

23  the summer.  My son, who was hoping for a dental career at

24  that time, considered going along.  There were never any

25  questions about the teens' welfare, and the people were always

1   eager to help.

2        This was the beginning of the HIM Ministry, which my

3   father did his best to help Father set up.  Both my parents

4   and I contributed to his efforts.  Father Joe confided in my

5   dad and mom about the business side of the ministry, keeping

6   records of donations, activities, and the problems in dealing

7   with the corrupt Honduran government.

8        There were also a few local boys who helped Father Joe

9   pick up donations at people's homes around Johnstown.  They

10  would arrive in a used van together to load up the items.

11  Again, I never heard of any concerns or complaints about the

12  relationship between Father and the boys.  I saw them interact

13  together on several occasions.  It all seemed fine.  There was

14  no tension evident.

15       When my father had his first cardiac arrest and was in

16  the emergency room, my mom asked me to call Father Joe.  As

17  soon as he arrived my dad, who was barley able to speak and

18  saw Father with a look of relief to have him by his side.

19  Father Joe later spoke at my dad's funeral, fulfilling a

20  request which my dad had made since his death.

21       I have known Father Joe to be a good and faithful servant

22  of God, his church, his community, the people of Honduras, and

23  my family.  I never once doubted his drive to help the people

24  of Honduras.

25       Although I manage a real estate company, I was trained as

a registered nurse.  I've taken classes on sexual predators,
and the care that must be taken by medical and psychiatric
counselors in dealing with the victims, because it is easy to
plant ideas about what happened or ask leading questions that
result in false testimony.

In today's world when someone mentions Catholic priests
and pedophile in the same sentence, the general public
automatically rushes to the conclusion that it is true.
Priests have been branded, regardless how farfetched the
accusations.  This is similar to ex-wives who claim their
former husbands are sexually molesting the kids just so they
can have full custody and the husbands are kept out.  Right
from the start, men have an uphill battle fighting these
allegations.

Father Joe is now in his 70s.  I will never believe that
this good and decent man spent most of his adult life waiting
to become a pedophile in his late 60s.  He became a priest,
took a vow of celibacy, and built an orphanage in another
country decades later, just to molest two young men?  That's
absurd.  It defies all rational thought.  It is not the Father
Joe I love and respect.

I'm hopeful, Your Honor, that you will consider this
thoughtfully when considering Father Joe's sentence.  In
today's world, Father Joe is needed in the community and not
in a cell.

```
 1        Thank you for listening.

 2               THE COURT:  Attorney Haines.

 3               MS. HAINES:  Nothing, Your Honor.

 4               MR. PASSARELLO:  Your Honor, we only have two more

 5    witnesses.

 6               We would call Rosemary DiLoreto.

 7               (The witness was placed under oath by Courtroom

 8    Deputy Gorgone.)

 9               ROSEMARY DILORETO, DEFENDANT'S WITNESS, SWORN

10                        DIRECT EXAMINATION

11    BY MR. PASSARELLO:

12    Q.   Would you state and spell your full name for the record,

13    please.

14    A.   Rosemary DiLoreto.  R-O-S-E-M-A-R-Y, DiLoreto,

15    D-I-L-O-R-E-T-O.

16    Q.   Where do you currently reside?

17    A.   409 Village Street, Windber.

18        Good morning, Judge Gibson.  I am here today to speak on

19    my brother's behalf.  I will start with his graduation from

20    high school.  After high school he immediately joined the

21    Navy.  Soon, he was off to Vietnam, as so many of our

22    Americans were.  It was war.  In Vietnam he did dangerous

23    classified work for our government.

24        After an honorable discharge from the Navy he came home

25    to us, unlike many others.  He moved to Philadelphia, where
```

1  many of our relatives lived, and held jobs there and then

2  bought a business.

3      As time went by he began to make retreats with the church

4  involving taking care of the most severely disabled and

5  handicapped people.  In time, he leaned towards the church

6  more and more.

7      I will never forget the day that he came home and said,

8  "I have made the most important decision of my life.  I've had

9  a calling from God to be a priest."  I wasn't surprised.  I

10  saw it coming.  So my brother, who was over 25, started

11  college, which he paid for himself, and graduated and went on

12  to theology.

13      He finally became a priest in our diocese.  All churches

14  he served in were very rewarding experiences, as he helped

15  many people and made a lifetime of friends.  He served seven

16  or eight churches in our diocese as a parochial vicar.  But

17  when he received his orders to go to Our Lady Queen of Angels

18  Church in Central City, where he was pastor and in missionary

19  work for over a decade.  This was also a most rewarding

20  church, where he worked with wonderful parishioners and with

21  the children of the parish.

22      With adult supervision, he had hot dog parties, hay

23  rides, bowling parties, trips to Sea World, and trips to

24  amusement parks.  He also worked with the Boy Scouts and many

25  other children-oriented activities.  Everything was free for

 1   the children with one stipulation; you had to attend

 2   Catechism.  On these trips you could bring a friend or a

 3   parent.  There were adults on all trips to help with the

 4   children.

 5        Another rewarding ministry was when he was director of

 6   the campus ministry at UPJ.  There he started with a handful

 7   of students in a school hallway.  Soon, the Wally charitable

 8   trust was built for all religions.  My brother moved mass

 9   there, and in no time at all the chapel was full.  Then they

10   had to put chairs around the back of the chapel, and they even

11   overflowed into the vestibule.  There -- there was so many

12   people that came.  And what a surprise to see so many students

13   at mass.

14        Father held all-nighters for the students with coffee,

15   pizza, soda, and food when they were having their finals.  He

16   was always there for them.

17        Another, and perhaps more important, was head of pastoral

18   care at the Conemaugh Hospital.

19        He began talking about helping the poor children of Latin

20   American countries.  And with friends, the HIM Missions were

21   formed.  There were many good doctors, nurses, and caring

22   people from all around that Father knew that went with him on

23   missions.

24        Somehow he met Congressman John Murtha.  John Murtha was

25   head of our appropriations in Washington, DC, and a lifetime

1  friendship was made with the congressman.

2      Congressman Murtha took soldiers to the first country my

3  brother helped, Honduras.  An orphanage was built for the

4  street children and orphans.  The orphans soon filled -- soon

5  filled the orphanage.

6      My brother raised hundreds of thousands of dollars, with

7  other people helping, which kept growing with the years with

8  supporters from all around the United States.

9      He always loved children.  All his nieces and nephews

10 love and adore him.  He never forgot where his humble

11 beginnings started, with immigrant parents from Italy who

12 became U.S. citizens, which they were so proud to be.

13     He went to many Latin American countries as a missionary,

14 some violent.  My mother and I always worried.  But he told us

15 he had to do this, because small children from the ages of

16 three and older were being sold as sex slaves and they were

17 starving.  Once I said, "You can do mission work here, Joe."

18 He told me, "Rosemary, unless you see these countries, you

19 just cannot believe what real poor is.  I have a calling to do

20 this."  So it was off to Honduras first.

21     Once he gave all his clothes away because a man didn't

22 have any.  Another time he gave his tent away, which he

23 bought.  That tent had a zippered floor, fabric floor, because

24 there were poisonous snakes in Honduras, and my brother never

25 liked snakes.  But he gave that tent to a man who didn't have

1   a home.

2       Honduras was the first country my brother went to.  He

3   helped them the most, and they received much.  And now they

4   have come after him in the worst way possible, with false

5   accusations.

6       When the hearings began an older couple sat behind us.

7   The gentleman tapped me on the shoulder and asked who I was.

8   I told him I was Father Maurizio's sister.  He said, "When

9   Father was in our parish he helped us in our time of need, and

10  we are here today to support him."

11      Another woman from the parish called me and told me

12  Father helped her son in high school when he was having

13  problems.  She has never forgotten him.  Even though she has

14  left the area, she calls a lot and she tells me her son, her

15  husband, and she offers him a rosary every day after dinner.

16      A young man who attended his 25th anniversary party stood

17  up and said, "I was on the wrong path as a young boy and

18  Father helped me.  I would not be where I am today if not for

19  him."

20      Last week I was getting dinner ready and my littlest

21  grandson, Cole, who's eight, follows me all around.  He was at

22  the kitchen table and he was writing, and I said to him -- I

23  call him Coley; his name is Cole -- "Coley, what are you

24  doing?"  He says, "Mawmaw, I'm writing a letter."  And I said,

25  "Who are you writing to?"  He says, "I'm writing to Uncle

1  Joe."  He says, "I love him, I miss him, and I want him to

2  come home."

3      This is what my brother, Father Joseph Maurizio, is all

4  about, Judge Gibson.  Please be lenient to him, for he's

5  70 years old.

6      And this is the last thing that I have to say:  I pledge

7  allegiance to the flag of the United States of America, and to

8  the republic for which it stands, one nation under God,

9  indivisible, with liberty and justice for all.

10      Thank you, Your Honor.

11          THE COURT:  Thank you.

12          Attorney Haines.

13          MS. HAINES:  Nothing, Your Honor.

14          MR. PASSARELLO:  The last witness I would call at

15  this time would be Angie Maurizio.

16          (The witness was placed under oath by Courtroom

17  Deputy Gorgone.)

18          ANGELA MAURIZIO, DEFENDANT'S WITNESS, SWORN

19                      DIRECT EXAMINATION

20  BY MR. PASSARELLO:

21  Q.   Would you state and spell your full name for the record,

22  please.

23  A.   Angela Maurizio.  A-N-G-E-L-A, M-A-U-R-I-Z-I-O.

24  Q.   And where do you currently reside?

25  A.   809 Sugar Maple Drive, Winder, PA.

```
 1        Good morning, Your Honor.  Thank you for letting me speak

 2   on behalf of my brother, Father Joseph Maurizio.  I have

 3   always admired and have been proud of my brother in many ways

 4   and on many occasions.  I am not ashamed of who my brother is

 5   or that I am his sister.

 6        How courageous he was when he was in the Navy.  And when

 7   he was sent to Vietnam, he carried confidential high security

 8   papers while bombs were going off around him.  He took many

 9   slides while he was there, and had them all identified so he

10   could remember to tell our family which village he was in and

11   when.  He wrote my mother often, and we weren't sure if we

12   would ever see him again.  The hotel was attacked shortly

13   after he left to come back to the states, and hostages were

14   taken.  God brought him back home to us because he had other

15   plans for him.

16        He worked very hard to be a top salesman for many years

17   while he lived with my parents and his godfather in

18   Philadelphia, and he continued to save his money.  But my

19   brother always liked to travel and take many pictures to show

20   our family.

21        When he went to work for a travel agency, he got to

22   travel to places all over the world that he knew our family

23   would never be able to afford to go to.  And we would sit for

24   hours while we would look through the pictures and listen to

25   his stories.
```

1    Then he bought the travel agency and continued to travel

2    and take many more pictures to share with our family.  Many

3    times I wished I could see for myself the beauty of our world

4    firsthand.  I only got to see it through my brother's

5    pictures.  There were also many times that I couldn't -- I

6    wish I couldn't see through his eyes all the death,

7    starvation, and the way some countries live and treated their

8    people.

9    After a while he got a different calling from God so he

10   sold his travel agency to go to seminary school.  I remember

11   him calling me and asking me what I thought.  I told him I

12   would be supportive of any profession he chose, and if that

13   was his calling and that is what he wanted to do, I was behind

14   him 100 percent.

15   I knew this had to be hard for him because he didn't like

16   school.  He was 42 years old when he became a priest, and our

17   family was proud of him, and still is to this day.  I was told

18   that the secretary from our church told my mother when my

19   brother was a small boy that someday he would become a priest.

20   He attended Villa Nova University and received a bachelor

21   of arts degree in peace and justice to start his long journey.

22   He attended the University of Peruvia in Italy, and was a

23   graduate of the Washington Theological Union with a master's

24   in divinity.

25   He served many churches in the area and was director of

1    the Catholic campus ministry at the University of Pittsburgh

2    at Johnstown.  He was on the peace and justice commission for

3    the diocese, where he served on the legislative awareness

4    subcommittee task force on ministry for persons with

5    disabilities, where he was also founder and spiritual advisor

6    for the handicapped encounter Christ retreat program for the

7    diocese.  He was founder and spiritual advisor to the Catholic

8    young adult ministry, sponsored through the family life

9    office, a spiritual advisor to the Saint Vincent dePaul

10   society, also acted as a certified instructor to the Stevens

11   ministry, a lay ministry pastoral care for giving, training

12   programs, a member of the board of directors of mom's house

13   incorporated, Catholic core veterans of America.  He was very

14   active in the Knights of Columbus, where he was chaplain of

15   Our Lady of the Alleghenies counsel and Pennsylvania state

16   chaplain of the Knights of Columbus.  In 2008 he was awarded

17   the legion of honor award presented by the chapel of the four

18   chaplains.

19        My sister Rosemary and I had the honor of representing

20   our brother at the VA 50th anniversary recognition ceremony

21   luncheon at the Cambria County War Memorial on November 21st,

22   2015.  He received a certificate of appreciation, a Vietnam

23   veteran lapel pin that I was honored to accept on my brother's

24   behalf.

25        The lapel pin was five distinctive symbols on the front.

The eagle represents courage, honor, and dedicated service to
our nation.  As one of the most recognizable and notable
American symbols, it is emblazoned with distinction on
numerous military insignia.  The blue circle matches the
canton of the American flag and signifies diligence,
perseverance, and justice.  The laurel wreath is a
time-honored symbol representing victory and integrity.  The
stripes behind the eagle represent the American flag.  And the
six stars represent the six allies who served, sacrificed, and
fought alongside one another:  Australia, New Zealand, the
Philippines, Republic of Korea and Thailand, and the United
States.

The message embossed on the back reads:  A grateful
nation thanks and honors you.  Where it's closest to the heart
of the wearer there is also a proclamation from the president
of the United States.

I have watched my brother evolve into becoming a
wonderful man and a priest.  My brother has been around my son
and nieces and nephews all their lives.  I have observed him
very closely at his masses, how he makes people laugh, and how
he blesses each child that comes up with their parents at
communion.

I have seen him around many adults, as well as children,
on many different occasions, and the compassion and faith he
has, and I have never heard or saw him do anything

1   inappropriate.

2        The poor children are the biggest part of the reason why

3   he got into being a priest.  All he wanted to do was to help

4   them, to get them food, to educate them, to get them off the

5   streets, and off of drugs.  My brother has a good heart.  Just

6   like my mother, always giving.

7        Our mother had dementia for many years, and he would

8   always take our mother to dinners and events and special

9   places he was invited to.  He was devoted to her.

10       He was constantly working between 50 and 60 hours a week.

11   Not only does he have a good heart, he is very frugal, like

12   both our parents.  When you're raised on a farm and you don't

13   have much, you learn to do without a lot of things.

14       When he had his 25th anniversary he gave the money to the

15   orphanage to take care of the children.  He didn't have to do

16   that, but he did.  I have seen my brother hand off his camera

17   many times to other people, even me, to take pictures of the

18   event, because he didn't have time and he wanted to record the

19   event with pictures.

20       He took both my parents back to Italy to see relatives we

21   still have there, and to show our parents the houses they live

22   in.  On one visit my father and mother were invited in to see

23   the inside of a house where my mother lived as a little girl.

24   Their houses were still standing.  My parents were so excited

25   to tell us about the trip.  And, of course, there were many

1   more pictures.

2       My godson took a trip with my brother to New York.  And I

3   remember him telling me that he didn't realize there were so

4   many churches.  And again, many more pictures.

5       I have seen my brother do much good over the years for so

6   many poor and hungry people and children of this world that

7   had lost hope, that were starving, had no roof over their

8   head.  I remember he gave his tent to a man who had no place

9   to live on one of his trips.  My sister bought him a new one

10  and told him not to give that one away.  It was just in his

11  nature to help people.

12      My brother got special permission from the bishop to let

13  our mother stay with him at the rectory where she was -- when

14  she was no longer able to stay at the farm herself.

15      I remember one of my mother's caregivers -- she had known

16  my mother since she was 17 -- telling me that one night she

17  stayed over at the church in my mother's room, where there was

18  a small living space on the other side of the closet, where

19  she had slept on the loveseat that night.  She got up in the

20  middle of the night to go to the bathroom, and when she turned

21  the corner she stopped dead in her tracks.  My brother had set

22  up a cot next to our dying mother's bed and was holding her

23  hand.  She couldn't get around them, and she wasn't going to

24  disturb them.

25      When our mother died in 2009 our caregiver was later

1    diagnosed with cancer.  She had no family, and it wasn't my

2    brother's responsibility to take care of her, but he did.  The

3    house she lived in was a shambles, so he found her a place to

4    live and provided for her.  He would bring her to dinner and

5    our family gatherings all the time, and we loved her.  When

6    she died my brother took care of all the funeral arrangements

7    and the headstone.

8         My brother is not the monster the government insists that

9    he is.  I believe my brother, in his innocence, and he is true

10   to his vows and always has been, even to this day.  Just

11   because he is a Catholic priest doesn't make him guilty, as a

12   lot of people in our society have categorized all priests to

13   be.  I now believe my brother is a political prisoner, someone

14   to be made an example of.

15        My brother, close family, friends and family that have

16   known him for a very long time have grown stronger in faith

17   with my brother.  I have talked to many people that don't even

18   know my brother, and they believe in his innocence.  We will

19   never give up hope that the truth will come out, and that we

20   can bring my brother home safely to us.

21        My sister Rosemary and I -- she's 74, I'm 63 -- we ask

22   that the Court take mercy on my brother and not give him the

23   maximum sentencing.  We would like our brother to be home with

24   us, may God have another plan for him.  We ask that my brother

25   possibly can be kept close by so we can maybe see each other

1  until the end of our time together.

2  Be not afraid.  I go before you always.  Come follow me,

3  and I will give you rest.

4  I am the proud sister of Father Joseph Maurizio.

5  I love you, Brother.

6  Thank you for your time and patience, Your Honor.

7  THE COURT:  Thank you.

8  MS. HAINES:  No questions, Your Honor.

9  MR. PASSARELLO:  Your Honor, that would be all the

10  witnesses we would have.

11  THE COURT:  The defendant may return to the

12  lectern, please.

13  Attorney Passarello, you may continue.

14  MR. PASSARELLO:  Thank you, Your Honor.

15  In light of what's all been said and already been

16  filed in my position for sentencing factors, I'll be as brief

17  as I can.

18  As I was watching the TV recently I noticed that a

19  specific movie won the academy award.  And I watched the

20  impeccable and predictable timing of the attorney general's

21  statements yesterday.  It reminded me of something that a

22  judge told me a long time ago at a sentencing, "had a lot of

23  water to push uphill."

24  I believe firmly that the guideline range in this

25  case is inappropriate.  I believe that there are factors that

1    the Court should consider in varying from those guidelines

2    drastically.

3           If the Court takes a look at what we're here on

4    today, my client stands before this Court for a small moment

5    in time.  If you believe the indictment, it's February to

6    March of 2009.  If you believe the witnesses, it was one day

7    or even less than one day in 2009.  Granted, it's one heck of

8    a day, but I believe that the Court has to balance, and I

9    believe the Court has to weigh factors and balance.

10          I think you need to balance a lifetime -- a

11   lifetime -- of good works of this man.  Military service for

12   our country; received an award from the United States

13   Government, the four chaplains award, which is one of the

14   greatest honors bestowed upon any individual in this country.

15   He received that from Congressman Murtha.

16          He spent his entire life after his military service

17   and his education as a priest with not one iota or whisper of

18   a problem.  No prior criminal history, fully educated, does

19   everything that his family says he did, helped children, spent

20   thousands -- millions -- on helping these kids.

21          I specifically refer the Court to the defendant's

22   age, his health, his vulnerability or victimization of abuse

23   in prison because of his position as a Catholic priest.

24          I refer this Court to his otherwise outstanding

25   character.  There's been nothing beyond what this

 1   February/March 2009 talks about.  His lack of criminal

 2   history, his good deeds, his past integrity, his exceptional

 3   community service, his past military service.  All factors,

 4   Judge, that I believe this Court can consider in a variance of

 5   the guidelines.

 6              I understand the enhancements.  And yes, they are

 7   permissible, which is a term that's been used a lot in this

 8   case.  But those enhancements, the base -- the base level is a

 9   24.  The base level for these crimes command a guideline

10   sentence of 51 months to 63.  When you pile on everything

11   else, it brings us to 27 years.  That cannot be right.

12              Before I end, I just want to say that when I told

13   the jury that it was my honor and privilege to represent this

14   man, I truly meant that.  I've known Father Joseph Maurizio

15   for about seven years now, since I undertook this task, and I

16   found him to be what everybody in his family said he was.  I

17   apologize to him for not being able to do more.

18              Abraham Lincoln said that he found that mercy bore

19   more fruit than strict justice.  All I can ask this Court to

20   do is to fashion a sentence that tempers justice with mercy.

21              Thank you.

22              THE COURT:  Does the defendant wish to address the

23   Court?

24              MR. PASSARELLO:  Your Honor, on advice of his lead

25   appellate counsel, he does not.

1          THE COURT:  All right.  Thank you.  You may be

2    seated then.

3          The government may present its arguments with

4    regard to sentencing.

5          MS. LARSON:  Good afternoon, Judge.

6          First I'd like to address Mr. Passarello's argument

7    to this Court for a variance.  It's the government's position

8    that the defendant's actions in this case are not one small

9    day or one small snapshot in time.

10          It's true that while the sex acts of this defendant

11   perpetrated against innocent, defenseless minors may have

12   occurred on one of his many trips to Honduras, perhaps only

13   occurring on one day, it took years for the defendant to lay

14   the groundwork.  It took years and several trips of money

15   poured into this organization to gain the trust and unfettered

16   access that he had.  The rules simply didn't apply to him

17   because of all the money that he had donated to this

18   organization.  That took years to build that level of trust

19   and access.

20          And it certainly also was perpetrated against these

21   children over the course of many years.  This Court saw the

22   evidence that was introduced, the physical, the documentary

23   evidence, including dozens upon dozens of pictures which show

24   this defendant's longstanding sexual interest in children.

25   Pictures dating back as early as 2002 of children, some very

1    young, in various states of undress or fully nude.

2          You saw numerous pictures that this defendant had

3    directed children to lift up their shirts to show off their

4    abdomens, or had instructed them to pose flexing their

5    muscles.  Pictures that he took alone inside the dorm rooms of

6    these children.

7          All of that, all of these years of visits, all of

8    the time, the attention, the money, the candy, the gifts, all

9    of that is grooming behavior, classic grooming behavior, that

10   put this defendant in a position where he was able to take

11   advantage of these boys that could not defend themselves.  And

12   he was able to perpetrate the horrific acts that he now stands

13   convicted of.

14         The defendant has already gotten a benefit from his

15   lack of criminal history, that was of course factored into the

16   guidelines calculation.  He stands with a criminal history

17   number one.  He shouldn't get double credit for that now.  It

18   is not the appropriate basis for a variance.

19         In the government's sentencing memorandum we

20   addressed all of the reasons why age should also not warrant a

21   variance in this case.  Citing, of course, the high risk of

22   recidivism for child offenders, including those that are

23   convicted of both hands-on offenses, as well as child

24   pornography offenses, those pose a severe and greater risk of

25   recidivism, as well as the fact that this defendant committed

1   these crimes while he was already in his mid 60s.

2          So his age did not prohibit or prevent him from

3   committing the crime, he shouldn't stand to gain a benefit

4   from it now.  Nor should he benefit from the fact that it took

5   as long as it did, over five years, to actually bring justice

6   to these victims.

7          Now, Judge, you've read the government's sentencing

8   memo with all of our arguments at this point in time why a

9   sentence of 365 months is reasonable, necessary, and

10  appropriate in this case.  In light of the Court's amended

11  guidelines calculation, we are now asking for a sentence of

12  327 months.

13         But beyond just the arguments in our papers, Judge,

14  you presided over this trial.  You heard the overwhelming

15  evidence of this offender's guilt, the physical evidence, the

16  documentary evidence, the photographs.  You had the

17  opportunity to observe the testimony of all the witnesses and

18  assess the credibility, as the jury did, which included the

19  testimony of two victims, Otoniel and Erick.

20         To say that the crimes this defendant stands

21  convicted of are serious is an understatement.  The sexual

22  abuse of any child is a horrific and heinous crime which cries

23  out for stringent punishment, but the circumstances here are

24  so truly horrific that they've set this case apart, and what

25  makes this defendant's actions all the more appalling.

1       This defendant is a predator.  He shamelessly
2  preyed upon the good will and generosity of members of this
3  community.  He took their money and their donations under the
4  guise that he was performing humanitarian missionary work in a
5  country that was in complete crises.
6       And any financial contributions that he provided to
7  ProNiño, all of those are tainted, Judge, by the defendant's
8  true motives in doing so.  He used those donations, as the
9  government has argued, to build the trust and the dependance
10  of the staff and the owners of ProNiño at that time, the
11  Meullers, who were overseeing this organization.  And he used
12  his position as "the money man" to gain unfettered access to
13  and to sexually abuse the most vulnerable victims imaginable.
14       And that's who Otoniel and Erick were.  They were
15  completely vulnerable children who had been abandoned,
16  orphaned, they'd been forced to live on the street, they've
17  been subjected to abuse.  And yet somehow, some way they found
18  their way to ProNiño, a place where they were supposed to be
19  safe from danger.  But they weren't safe.
20       And as you learned over the course of the eight-day
21  trial we had here, the defendant ruthlessly exploited the
22  terribly sad situation these children found themselves in, and
23  he did so for his own sexual gratification.
24       It is quite simply despicable that this offender
25  took advantage of these children's extreme poverty in the way

1   that he did.  He knew that these boys were desperate for

2   money, for candy, and toys.  We take those items for granted,

3   but those were luxury items to those boys.  And the fact that

4   this offender threw very small amounts of money at children in

5   order to engage in sex acts with them is too horrendous to put

6   into words.

7         We are not here today because anyone is jealous of

8   the defendant.  We're not here because of any amount of money

9   that he may have had, and has subsequently transferred away.

10   That's preposterous.  We're not here because the Honduran

11   government or Honduran children came after this defendant.

12   That's ludicrous.  And the defendant was not convicted because

13   he's a priest.  And make no mistake about it, he is certainly

14   not a political prisoner.  He is not here today standing in

15   front of you because he criticized or protested against the

16   government.  We are here today because this offender sexually

17   abused two boys.

18         Now, we're not here because he was convicted simply

19   because he's a priest, but certainly the fact that he was a

20   priest is relevant to the sentence the Court fashions today.

21   As a priest, he held a position of power and utmost trust.  He

22   betrayed the trust of the members of the community who donated

23   to his charity, his parishioners, the staff and the board of

24   ProNiño.  And, most importantly, he betrayed the trust of the

25   children.  The magnitude of this defendant's abuse of his

1    position of trust and power is too great to even comprehend.

2          Perhaps what's even most upsetting about all of

3    this is that the defendant stands before this Court without

4    having taken any responsibility for the criminal conduct that

5    he perpetrated against these boys.  He has shown zero remorse

6    for his actions.  Absolutely no empathy for the devastating

7    impact that his crimes have had on the victims in this case.

8    He has caused them immeasurable psychological trauma and

9    scars, will never be able to fully compensate these boys for

10   the damage that the defendant has caused.

11         In fact, it's quite remarkable that given

12   everything that these victims went through, from the time that

13   they were on the streets to the abuse that they suffered at

14   the hands of the defendant, that they were able to do what

15   they did during this trial.  They came here, and through

16   embarrassment, shame, and fear they told their stories.  And

17   not one of the victims or witnesses that testified described

18   this man as an honest, trustworthy, or decent man.  In fact,

19   it was quite the opposite.

20         The sentence that the Court imposes today must be

21   sufficiently stringent to promote respect for the law, to

22   deter the defendant's future conduct, as well as to send a

23   message to others who seek to exploit the most vulnerable

24   members of our society.

25         It also must be just punishment.  And justice for

1    these victims is not reflected in a sentence that varies

2    drastically, as defense counsel asks for, from the guidelines.

3    Such a sentence would fail to satisfy or comply with any of

4    the factors enumerated in Section 3553(a).

5            Instead, after using the defendant's guidelines as

6    a starting point, and after considering all the factors

7    enumerated in 3553(a), a sentence of 327 months is clearly

8    warranted, reasonable, and appropriate, given all the facts

9    and circumstances of this case.

10           THE COURT:  Anything further, Attorney Larson?

11           MS. LARSON:  No, Judge.

12           THE COURT:  Attorney Haines?

13           MS. HAINES:  No, Your Honor.

14           THE COURT:  Mr. Passarello?

15           MR. PASSARELLO:  No, Your Honor.

16           THE COURT:  If you would return to the lectern,

17   please.

18           Mr. Passarello, is there any reason why sentence

19   should not now be imposed?

20           MR. PASSARELLO:  No reason from the defense, Your

21   Honor.

22           THE COURT:  First I will deal with the motion for

23   variance.  I am going to grant the motion for variance, and it

24   will be reflected in the sentence that is imposed.

25           Pursuant to the Sentencing Reform Act of 1984, it

1  is the judgment of the Court that the defendant, Joseph D.

2  Maurizio, Jr., is hereby committed to the custody of the

3  Bureau of Prisons to be imprisoned for a term of 200 months.

4          The Court recommends that the designation by the

5  Bureau of Prisons be to a facility geographically close to the

6  Johnstown, Pennsylvania, area.

7          The sentence of 200 months of imprisonment consists

8  of 200 months at Counts 1 and 3, 120 months at Count 2, and

9  200 months at Count 8, all to run concurrently.

10          Upon release from imprisonment, the defendant shall

11  be placed on a term of supervised release for a term of life.

12          Within 72 hours of release from the custody of the

13  Bureau of Prisons the defendant shall report in person to the

14  probation office in the district to which the defendant is

15  released.

16          While on supervised release the defendant shall not

17  commit another federal, state, or local crime; shall comply

18  with the standard conditions of supervision recommended by the

19  United States Sentencing Commission and adopted by this Court;

20  and shall comply with the following additional conditions:

21          The defendant shall not illegally possess a

22  controlled substance.

23          The defendant shall not possess a firearm,

24  ammunition, destructive device or any other dangerous weapon.

25          The defendant shall report any change of address

1   within 30 days to the United States Attorney's Office while

2   any portion of restitution remains outstanding.

3           The periodic drug testing mandated by the Violent

4   Crime Control and Law Enforcement Act of 1994 is hereby

5   waived.  The Court finds that this offense is not drug

6   related, and the defendant has no current or past history of

7   substance abuse.

8           The defendant is prohibited from incurring new

9   credit charges or opening additional lines of credit without

10  prior written approval of the probation officer.

11          The defendant shall pay restitution that is imposed

12  by this judgment that remains unpaid at the commencement of

13  the term of supervised release at a rate of not less than 10

14  percent of his gross monthly earnings.  The first payment

15  shall be due within 30 days from the defendant's release from

16  the custody of the Bureau of Prisons.

17          The defendant shall submit his person, property,

18  house, residence, vehicle, papers, business, or place of

19  employment to a search conducted by a United States probation

20  or pretrial services officer at a reasonable time and in a

21  reasonable manner, based upon reasonable suspicion of

22  contraband or evidence of a violation of a condition of

23  supervision.  Failure to submit to a search may be grounds for

24  revocation.

25          The defendant shall inform any other residents that

1   the premises may be subject to searches pursuant to this

2   condition.

3        The defendant shall provide the probation officer

4   with access to any requested financial information.

5        The defendant shall cooperate in the collection of

6   DNA as directed by the probation officer.

7        The defendant is permitted to possess or use a

8   computer and is permitted access to the internet.  However,

9   the defendant is not permitted to use a computer or electronic

10  communication or data storage device, including a cell phone,

11  to access child pornography or to communicate with any

12  individual or group for the purpose of promoting sexual

13  relations with children.

14       The defendant shall consent to the installation of

15  any hardware or software to monitor any computer or other

16  electronic communication or data storage devices used by the

17  defendant to confirm compliance with this condition.

18       The defendant shall pay the monitoring costs as

19  directed by the probation or pretrial services officer.

20       Furthermore, the defendant shall consent to

21  periodic unannounced examinations by the probation or pretrial

22  services officer of any computers, cell phones, or other

23  electronic communication or data storage devices that the

24  defendant has access to to confirm compliance with this

25  condition.

1          Additionally, the defendant shall consent to the

2    seizure and removal of hardware and data storage media for

3    further analysis by the probation or pretrial services

4    officer, based upon reasonable suspicion of a violation of the

5    conditions imposed in this case or based upon reasonable

6    suspicion of unlawful conduct by the defendant.

7          Failure to submit to the monitoring or search of

8    computers or other electronic communication or data storage

9    devices used by the defendant may be grounds for revocation.

10          The defendant shall provide the United States

11    Probation Office with accurate information about the

12    defendant's entire computer system, hardware, or software, and

13    other electronic communication or data storage devices or

14    media, to include all passwords used and the name of the

15    internet service provider.

16          The defendant shall also abide by the provisions of

17    the computer restrictions and monitoring program approved by

18    the Court.

19          The defendant shall not possess or access with

20    intent to view any materials, including pictures, photographs,

21    books, writings, drawings, videos, or video games depicting

22    and/or describing child pornography, as defined in 18 United

23    States Code, Section 2256(8), or obscene visual

24    representations of the sexual abuse of children as defined at

25    18 United States Code, Section 1466(a).

1    With the exception of brief unanticipated and

2    incidental contacts, to include the defendant's place of

3    employment and/or volunteer activity, the defendant shall not

4    associate with children under the age of 18 except in the

5    presence of an adult who is aware of the nature of the

6    defendant's history, characteristics, and convictions, and has

7    been approved by the probation officer.

8    The defendant shall participate in a mental health

9    and/or sex offender treatment program approved by the

10   probation officer until such time as the defendant is released

11   from the program by the Court.

12   The defendant shall abide by all program rules,

13   requirements, and conditions of the sex offender treatment

14   program, including submission to polygraph testing.  Said

15   testing shall continue throughout the term of supervision in

16   order to monitor and ensure compliance with the conditions of

17   supervision.

18   Further, the defendant shall be required to

19   contribute to the costs of services for any such treatment in

20   an amount determined by the probation officer, but not to

21   exceed the actual cost.  The probation officer is authorized

22   to release the defendant's presentence report to the treatment

23   provider if so requested.

24   As required by 18 United States Code,

25   Section 3563(a)(8) and 3583(d), and the Sex Offender

1  Registration and Notification Act, known as SORNA, 42 United

2  States Code, Section 16901 et sec, the defendant shall report

3  the address where he will reside and any subsequent change of

4  residence to the probation officer responsible for the

5  defendant's supervision and, further, shall register as a

6  convicted sex offender in any state where he resides, is

7  employed, carries on a vocation, or is a student.

8          The defendant shall not enter into a rental

9  agreement and/or purchase computers, cell phones, or

10 electronic communication or data storage devices without the

11 consent of the probation officer.

12         Furthermore, the defendant shall not make excessive

13 and/or unexplained purchases of items ordinarily related to

14 children under the age of 18 without approval of the probation

15 officer.

16         The defendant shall not frequent and/or loiter

17 within 500 feet of places where children congregate on a

18 regular basis, such as but not limited to schools,

19 playgrounds, children's toy and/or clothing stores, video

20 arcades, day care centers, swimming pools, zoos, amusement

21 parks, or other parks primarily used or that can reasonably be

22 expected to be used by children under the age of 18 without

23 prior permission of the probation officer.

24         The defendant shall not photograph and/or videotape

25 any children under the age of 18 without the written consent

1  of their parent or legal guardian who is aware of the nature

2  of the defendant's history, characteristics, and convictions,

3  and has been approved by the probation officer.

4          It is further ordered that the defendant shall pay

5  a fine in the amount of $50,000 to the Clerk of Court, United

6  States Courthouse, 700 Grant Street, Suite 3110, Pittsburgh,

7  PA 15219.  The fine shall be paid within 10 days of this

8  judgment.

9          It is further ordered that the defendant shall pay

10  to the United States a mandatory special assessment of $100

11  for each of Counts 1, 2, 3, and 8, for a total of $400 which

12  shall be paid to the United States District Court Clerk.

13          It is further ordered that the defendant shall pay

14  restitution to the following individuals:  Otoniel and Erick.

15  Restitution shall be in the amount of $10,000 to Otoniel and

16  $10,000 to Erick.

17          Unless the director of the administrative office

18  directs the defendant otherwise, all payments made pursuant to

19  the Court's restitution order are to be sent to the Clerk of

20  Court, United States Courthouse, 700 Grant Street, Suite 3110,

21  Pittsburgh, PA 15219, and the clerk's office will transmit the

22  restitution payment.

23          This sentence is imposed after consideration of

24  each of the factors set forth in 18 United States Code,

25  Section 3553(a), and those factors support your sentence as

1    follows:

2            As to Factor One:  The offense conduct involved two

3    counts of engaging in illicit sexual conduct in foreign

4    places, one count of knowing possession of visual depictions,

5    the production of which involved the use of minors engaging in

6    sexually explicit conduct, and one count of knowing

7    transportation, transmission, or transfer of a monetary

8    instrument or funds from a place in the United States to a

9    place outside of the United States with the intent to promote

10   the carrying on of an illegal unlawful activity.

11           With regard to personal characteristics, the

12   defendant was born in Johnstown, Pennsylvania, on August 22,

13   1945.  The defendant stated that he and his four sisters were

14   raised on a 42-acre farm outside of Windber.  This farm has

15   been in the family since 1929, when it was purchased by his

16   paternal grandfather.

17           The defendant described his childhood as lower

18   class poor, but stated that the family's needs were always

19   provided for.  He reports no abuse of any nature in his

20   childhood years.

21           The defendant has never been married and reports he

22   has not fathered any children.

23           With regard to medical condition, the defendant has

24   high cholesterol and high blood pressure, but states that

25   otherwise except for some minor ailments he is in good health.

1          The defendant has no history of mental or emotional
2    problems.
3          The defendant reports that he has never had any
4    sexual experiences and describes himself as a non-sexual
5    person, due to his position as a priest.
6          He denies any substance abuse and states that his
7    consumption of alcohol is limited to social occasions and is
8    very limited.
9          The defendant graduated from Winder Area High
10   School in 1964.  He later achieved a bachelor of arts in
11   geography from Villa Nova in 1982, and had a concentration in
12   peace and justice.  The defendant graduated with a master of
13   divinity degree in 1987 from Washington Theological Union,
14   Washington, DC.  The defendant graduated from the Pittsburgh
15   Theological Seminary in 2000 with a doctorate in ministry
16   degree.  The defendant did honorably serve in the United
17   States Navy, and was assigned for one year to the Republic of
18   Vietnam during the Vietnam War.
19          With regard to employment record, the defendant has
20   been a priest and assigned to the diocese of Altoona/Johnstown
21   since 1987.  Prior to that he was gainfully employed for his
22   adult life.  He was at various parishes form 1987 to 2014.
23          According to the defendant, over 18 years ago he
24   developed Humanitarian Interfaith Ministry, also referred to
25   as HIM, and ran mission trips to Honduras and other countries.

1      HIM Ministries turned to assisting children in the

2  Honduras, specifically through ProNiño.  The defendant

3  reported that he was the CEO of HIM, and according to the

4  defendant, HIM has spent more than $1 million in building and

5  maintaining an orphanage in Honduras.

6      The defendant, at the time of the preparation of

7  the presentence report, reported a net worth of $586,831.

8  Therefore, based upon the information given to the Court, the

9  defendant has the means to satisfy a fine and the restitution

10  in this case.

11      Clearly, the defendant has a large support group

12  consisting of friends, family, and parishioners.

13      The Court did grant a variance, resulting in a

14  sentence of 200 months of imprisonment, lifetime supervision,

15  and a fine.

16      Contributing to the decision to grant a variance

17  were the following particular factors, in addition to the

18  overall circumstances of this case:  The defendant's honorable

19  military service, his age, his otherwise praiseworthy

20  activities and achievements, his prior good works, civic and

21  charitable activities, vulnerability to victimization and

22  abuse in prison, lack of any prior criminal history, and the

23  short time frame in which the sexual abuse in Counts 1 and 3

24  actually occurred; namely, approximately two weeks in 2009.

25      Even with a downward variance, defendant's sentence

 1   is 200 months of imprisonment, which takes into account the

 2   serious nature of the offenses of which he has been convicted.

 3          As to Factor Two:  Your offenses are serious, as

 4   they are violations of federal law and caused danger to the

 5   community.  Your sentence is below the guidelines range

 6   because although the guidelines range generally reflects the

 7   seriousness of your offense, the need for your sentence to

 8   reflect punishment and deterrence is satisfied by 200 months

 9   of imprisonment, followed by lifetime supervised release, and

10   a fine of $50,000.

11          This sentence will hopefully see you become and

12   remain a productive citizen in the community following service

13   of your imprisonment sentence.

14          A mandatory special assessment of $400 is

15   mandatory.

16          As to Factor Three, the kinds of sentences

17   available to the Court:  The maximum possible sentence the

18   Court is permitted by statute to impose at Counts 1 and 3 is

19   30 years of imprisonment for each count.  The maximum possible

20   sentence the Court is permitted by statute to impose at Count

21   2 is 10 years of imprisonment.  The maximum possible sentence

22   the Court is permitted by statute to impose at Count 8 is

23   20 years of imprisonment.  The sentencing guidelines, which

24   are advisory and are one factor to be considered, provide for

25   a term of 262 to 327 months.

1    The Court has chosen to impose a sentence of

2    200 months of imprisonment, followed by lifetime supervised

3    release and a fine of $50,000.  The Court believes this

4    adequately reflects the seriousness of your crimes and is

5    severe enough to reflect the danger posed to the community by

6    those crimes.

7        As to Factors Four and Five:  The sentencing

8    guidelines generally provide a fair gauge of the amount of

9    imprisonment and supervised release that are appropriate for

10   your punishment.  However, taking into account your criminal

11   history, which is none, and your personal history, which the

12   Court has previously set forth, I determine that the below

13   guidelines sentence of 200 months of imprisonment is

14   sufficient but not greater than necessary to comply with the

15   statutory purposes of sentencing.  The Court believes that

16   your sentence is an appropriate and just punishment in this

17   case.

18       As to Factor Six:  In applying a sentence of

19   200 months of imprisonment, the sentencing guidelines as

20   applied to your specific circumstances present an instance

21   where the sentence imposed is proper.  Any disparity with

22   others sentenced for similar crimes is justified in light of

23   several factors and specific circumstances surrounding you and

24   your crime, your lack of history of criminal behavior, and

25   your personal history.

1        As to Factor Seven:  Pursuant to 18 United States

2   Code, Section 3663(a), restitution has been ordered in this

3   case.  Restitution is due and owing to the following two

4   victims:  Otoniel and Erick, each in the amount of $10,000.

5        The defendant has been detained without bond since

6   his arrest, and the Court determines that the defendant is not

7   a candidate for voluntary surrender, pursuant to 18 United

8   States Code, Section 3143(a)(2).

9        Mr. Maurizio, you can appeal your conviction if you

10  believe that your conviction was somehow unlawful or if there

11  is some other fundamental defect in the proceedings.  You also

12  have a statutory right to appeal your sentence under certain

13  circumstances, particularly if you think the sentence is

14  contrary to law.

15       If you cannot afford the costs of an appeal, you

16  have the right to request to proceed with your appeal in forma

17  pauperis.  The clerk of court will prepare and file a notice

18  of appeal upon your request.  With very few exceptions, any

19  notice of appeal must be filed within 14 days of the entry of

20  this judgment.

21       Mr. Passarello, you indicated during your

22  presentation that there will be separate appellate counsel

23  representing Mr. Maurizio.  I advise you that under the rules

24  of the Third Circuit Court of Appeals that you must remain

25  counsel in this case until they approve your withdrawal, which

1  I am sure will be after the appellate counsel enters his

2  appearance.

3           MR. PASSARELLO:  Yes, Your Honor.

4           THE COURT:  Are there any other issues to be

5  brought before the Court by either party at this time?

6           MS. HAINES:  Nothing from the United States.

7           MR. PASSARELLO:  Your Honor, just briefly.

8           (Off-record discussion between counsel.)

9           MS. HAINES:  Your Honor, I believe earlier in the

10 proceeding you did order that the forfeitures would be in

11 accordance with the enumerated allegations in the forfeiture

12 allegation?

13          THE COURT:  Well, I will add that to the sentencing

14 order.  I had indicated that previously, but I should really

15 make that a part of the sentencing order.  Thank you for

16 reminding me of that.

17          The Court orders forfeiture of all items that are

18 set forth in the forfeiture allegations, which were filed with

19 the superseding indictment and indictment in this case.

20          MR. PASSARELLO:  Thank you.  With that, there would

21 be nothing further from the defense.

22          THE COURT:  Then, Attorney Larson or Attorney

23 Haines, anything further?

24          MS. HAINES:  No, Your Honor.

25          THE COURT:  Thank you.  That concludes this

1   sentencing proceeding, and we will be in recess until call of

2   Court.

3             (Proceedings concluded at 12:34 p.m.)

4                         * * *

5

6             CERTIFICATE OF OFFICIAL REPORTER

7

8        I, Kimberly K. Spangler, Federal Official Court
   Reporter, in and for the United States District Court for the
   Western District of Pennsylvania, do hereby certify that
9   pursuant to Section 753, Title 28, United States Code, that
   the foregoing is a true and correct transcript of the
10  stenographically reported proceedings held in the
   above-entitled matter, and that the transcript page format is
11  in conformance with the regulations of the Judicial Conference
   of the United States.

12
             Dated this ____ day of _____ 2016
13
             _____
14           KIMBERLY RUSHLOW SPANGLER, RPR, RMR
             FEDERAL OFFICIAL COURT REPORTER
15

16

17

18

19

20

21

22

23

24

25