**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF PENNSYLVANIA**
**JOHNSTOWN DIVISION**

**UNITED STATES OF AMERICA,**    )
                                 )
              **Plaintiff,**      )    **CASE NO:  14-cr-00023**
                                 )
       **vs.**                    )
                                 )
**JOSEPH D. MAURIZIO, JR.,**      )
                                 )
              **Defendant.**      )
_____ )

**TRANSCRIPT OF DAUBERT HEARING PROCEEDINGS**
**BEFORE THE HONORABLE KIM R. GIBSON**
**SEPTEMBER 3, 2015**

**FOR THE GOVERNMENT:**
  Stephanie L. Haines, AUSA
  Amy E. Larson, AUSA
  United States Attorney's Office
  Penn Traffic Building, Ste. 200
  319 Washington Street
  Johnstown, PA  15901

**FOR THE DEFENDANT:**
  Steven P. Passarello, Esq.
  Daniel Kiss, Esq.
  Law Office of Steven P. Passarello, Esq.
  616 Hileman Street
  Altoona, PA 16601

          Proceedings recorded by mechanical stenography,
transcript produced with computer.
_____

                Kimberly K. Spangler, RPR, RMR
                 United States District Court
                Penn Traffic Building, Ste. 204
                   319 Washington Street
                   Johnstown, PA  15901

1

I N D E X

2

SEPTEMBER 3, 2015

3

4  Government's
   Witness:                Direct     Cross    Redirect    Recross

5

   Veronique Valliere        6         27        34          35

6

7

   Certificate of reporter                                  62

8

9

10                           *  *  *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S
 2      (The proceedings convened on September 3, 2015, commencing
 3   at 1:23 p.m.)
 4              THE COURT:  Before we proceed any further, if
 5   counsel would enter their appearance, please.
 6              MS. LARSON:  Good afternoon, Judge, Amy Larson for
 7   the government.
 8              MS. HAINES:  Stephanie Haines for the United States
 9   as well.
10              MR. PASSARELLO:  Steven Passarello for the
11   defendant.
12              MR. KISS:  Daniel Kiss for the defendant.
13              THE COURT:  Thank you.  I will also note that the
14   defendant is present.
15              This proceeding was scheduled due to the filing by
16   defendant of a motion to exclude expert testimony.  The
17   government filed a response to that motion, and then the
18   defendant filed a reply to the response.
19              After reviewing those documents I determined that a
20   Daubert hearing was called for and would be helpful to the
21   Court, and the issue is whether the government's expert will
22   be permitted to offer opinion testimony in the areas that are
23   set forth in the filings.
24              I will note that subsequent to scheduling this
25   proceeding, that the United States has raised the issue of
```

 1   excluding testimony with regard to defendant's proposed

 2   expert.

 3          I also noted that the defendant filed an amended

 4   witness list, which included an expert witness, Dr. Frank M.

 5   Dattillo.  At some point, before we adjourn for the day, I

 6   would like to address that issue to see if we need to schedule

 7   a comparable hearing on that issue.  And if we do, when we can

 8   schedule that based on the availability of defendant's expert

 9   witness.  My thought was that perhaps we could do that

10   following jury selection on Tuesday, if the person's

11   available.

12          The reason I am suggesting that is that when we

13   finally seat the jury on Tuesday, it was my intention to

14   adjourn and begin jury instructions and opening statements on

15   Wednesday morning.  So that may leave us some time on Tuesday

16   to have a Daubert hearing, if we need one on that issue.

17          There are also some other motions still pending

18   that I am aware I need to rule on before counsel present their

19   case beginning next week, and we are working on those and we

20   intend to get them filed as soon as possible.  I realize that

21   you need to know these things before you can proceed with your

22   presentation of the case, so we will work to get those

23   completed.

24          All right.  That's the introductions.  I do have

25   some questions for the parties, but I will await the

1 presentation today and they may get answered during the

2 presentation.

3          Attorney Larson, are you presenting this on behalf

4 of the government?

5          MS. LARSON:  Yes, Judge.

6          THE COURT:  Then you may proceed.

7          MS. LARSON:  Judge, at this time the government

8 would call Dr. Vary a /TPHAEU /WAOEU air.  She is out in the

9 witness waiting room, so we will go grab her.

10          THE COURT:  While we are waiting for that witness

11 to come in, I just want to advise counsel, you can see that we

12 have actually added some seats in the courtroom and moved some

13 things around.  The reason is I am intending to call 70 jurors

14 for jury selection on Tuesday, which is more than we normally

15 call.  So we've added some seats, and we are hopeful that we

16 can fit all of the called jurors into the seats that we have.

17          Knowing that the media will be interested in this

18 case, I have planned for and reserved some seats in the back

19 or up here in the front, whichever works out, for the members

20 of the media that show up on Tuesday.  After that we won't

21 have all the prospective jurors to try to find seats for, so

22 it should be easier after that.

23          Okay.  Attorney Larson, go ahead.

24     VERONIQUE VALLIERE, GOVERNMENT'S WITNESS, SWORN

25          MS. LARSON:  May I inquire, Your Honor?

1          THE COURT:  You may.  Before you do that though,

2     the microphone is only so long, and I realize that sometimes

3     if you face counsel you may be speaking away from it.  We may

4     have it turned more toward counsel for the trial.  What we

5     were doing here was to try to set it up so that we could have

6     the interpreters seated with the microphone, so we were moving

7     the witness box around a little bit.  So if it is not working

8     for you to have it the way it is, we can easily move that.  It

9     is on wheels so we can turn it a little bit.

10          Would you prefer that or not?

11          THE WITNESS:  I plan to face Your Honor, since I

12     believe the questions are for your benefit.

13          THE COURT:  All right.  Go ahead.

14          MS. LARSON:  Thank you, Judge.

15                    DIRECT EXAMINATION

16     BY MS. LARSON:

17     Q.   Good afternoon.

18     A.   Good afternoon.

19     Q.   Would you please state your name and spell your last name

20     for the record.

21     A.   Certainly.  My name is Dr. Veronique Valliere.

22     V-A-L-L-I-E-R-E.  Would you like my first name as well?

23     V-E-R-O-N-I-Q-U-E.

24     Q.   And what is your occupation?

25     A.   I'm a licensed psychologist in the state of Pennsylvania,

1  as well as a diplomate in forensic psychology.

2  Q.   Do you specialize in any areas of psychology?

3  A.   I do.  My specialty is interpersonal violence, including

4  sexual assault, sexual abuse of children, physical abuse,

5  domestic violence, and treatment and assessment of

6  perpetrators and victims.

7  Q.   Can you describe your educational background for the

8  Court.

9  A.   Certainly.  I have a bachelor's in psychology that I

10  received from St. Mary's College in Maryland in May 1987, and

11  a doctorate in clinical psychology from Rutgers University

12  that I received in January 1993, as well as my diplomate in

13  forensic psychology that I received in 2012.

14  Q.   Now, you just used a word I'm unfamiliar with,

15  "diplomate."  Can you explain for the Court what that is.

16  A.   It's basically similar to a board certification.  I have

17  to pass a test, and my materials are peer reviewed, and I have

18  to pass a variety of things to get awarded this certification

19  or status.

20  Q.   And so after completing your education have you received

21  any additional training in the field of psychology?

22  A.   Yes.  I had to receive postdoctoral training to become a

23  licensed psychologist.  And since that time have received

24  countless hours of self study, continuing education credits,

25  and necessary training to remain on the Pennsylvania Sexual

1    Offender Assessment Board.

2    Q.    Are you employed?

3    A.    I am.

4    Q.    And how are you employed?

5    A.    I am owner of two outpatient practices.  One where I

6    treat children and adults, victims of abuse, and have

7    clinicians under me.  And another outpatient violent offender

8    program where we treat all types of violent offender programs,

9    the majority being sexually offenders.

10         Additionally, I'm on, as I mentioned, Pennsylvania's

11   Sexual Offender Assessment Board, and have been since 1997,

12   and have been reappointed five times by the governor.

13   Q.    Now, so in that capacity do you see individual patients?

14   A.    I do.

15   Q.    And do you continue in a course of diagnosis and

16   treatment with those individual patients?

17   A.    Yes.

18   Q.    What percentage of patients come to you in order to seek

19   treatment for sexual abuse?

20   A.    I would say the majority come for -- any type of abuse,

21   but the majority of the victims of abuse are sexual abuse

22   victims, both adults and children.

23   Q.    And do these adults include individuals who were

24   victimized as children?

25   A.    Yes.

1    Q.   Now, approximately how many individuals have you seen in

2    your professional capacity who have been the victims of child

3    sex abuse?

4    A.   I have no idea.  Hundreds.

5    Q.   I believe you mentioned your work with individuals who

6    have committed sexual offenses and your participation in

7    various boards here in the state of Pennsylvania.

8         Can you tell the Court approximately how many individuals

9    who've had the occasion to work with who have committed sexual

10   offenses.

11   A.   Well over a thousand, probably in the thousands.

12   Q.   And does this include individuals who have committed

13   sexual offenses against children?

14   A.   Yes.

15   Q.   Now, I believe you've already described for the Court,

16   but your work with the State of Pennsylvania, how did that

17   come about, and specifically with respect to sex offenders?

18   A.   Well, the process is a vetting process where I was the

19   director of an outpatient sexual offender treatment program

20   that came to the attention of the state board when it was

21   first formed in the late '90s, and then had to go through a

22   governor appointment-ship and have to be reappointed every

23   four years.

24   Q.   You testified earlier that you received postdoctorate

25   training in the field of psychology.  Does any of that

1   additional training relate to the sexual abuse of children?

2   A.   Yes.  I have to go through quarterly trainings to remain

3   on the Sex Offender Assessment Board, achieving a certain

4   amount of continuing education credits to maintain my

5   licensure.  And I'm a member of the Association for Treatment

6   of Sexual Abusers, which requires at least 30 hours of

7   relevant training biannually.

8   Q.   You indicated previously that you were licensed.  How

9   long have you held a license?

10  A.   Since, I believe it's May 1995.

11  Q.   And what is that license specially allow you to do?

12  A.   Practice psychology in the state of Pennsylvania.

13  Q.   Now, I believe you mentioned it, but I want to circle

14  back, do you hold any specialized credentials?

15  A.   The diplomate in forensic psychology.

16  Q.   Now, have you ever taught in any of these fields?

17  A.   Yes.

18  Q.   And where did you teach?

19  A.   I've done a variety of trainings, both nationally and

20  internationally, as well as for the Department of Justice,

21  FBI, Bureau of Indian Affairs, U.S. Military in victim

22  behavior, victim dynamics, dynamics of sexual offenders,

23  investigating sexual offenders, interviewing victims.  So a

24  broad range within the field of child sexual abuse.

25  Q.   Did you ever teach at a university?

```
1    A.    I did as an early graduate -- or a late graduate student.

2    Q.    And was that the university of Princeton?

3    A.    Yes.

4    Q.    Can you indicate for the Court what you taught at at

5    Princeton.

6    A.    Abnormal psychology.

7    Q.    Are you a member of any professional organizations?

8    A.    I am.

9    Q.    Can you describe to the Court which ones.

10   A.    American Psychological Association, the Association for

11   Treatment of Sexual Abusers, the American Society for the

12   Prevention of Abuse of Children, I believe the Pennsylvania

13   Polygraph Association.

14   Q.    Do you subscribe to any professional journals?

15   A.    Yes.

16   Q.    And which ones?

17   A.    The American Psychologist, the Journal of Clinical and

18   Consulting Psychology, Trauma and Violence and Public -- I

19   believe it's called Psychology, Public Policy and the Law, as

20   well as journals for abuse of children.

21   Q.    And do you read articles in these journals?

22   A.    I do.

23   Q.    And do these articles and research keep you up to date on

24   the current trends in your field of expertise?

25   A.    Yes.
```

1   Q.   Do you also practice in the fields of both forensic

2   psychology as well as clinical psychology?

3   A.   Yes.

4   Q.   Can you explain the difference between clinical and

5   forensic psychology.

6   A.   Certainly.  Clinical psychology would be all my work in

7   treating people for mental disorders or trauma or things that

8   present who are not legally involved.  So in that role I

9   perform evaluations, diagnostic assessments, treatment needs

10   assessments, as well as provide individual and group therapy,

11   couples counseling, and supervise my clinicians who provide

12   that care.

13       In my forensic role I basically help my clinical work

14   interface with the legal needs.  So I may answer questions for

15   the court such as whether or not somebody meets criteria for

16   classification as a sexually violent predator.  I do forensic

17   interviews of children in investigations for family court,

18   civil court.  I may answer questions for custody court or do

19   expert testimony, explaining to the Court psychological

20   concepts or constructs, as well as I often evaluate offenders

21   to make recommendations to the court on rehabilitation

22   potential or risk assessment.

23   Q.   You mentioned you have experience conducting forensic

24   interviews for family court.  Do these forensic interviews

25   involve individuals who have been sexually abused?

1   A.   Yes, primarily sexually abused.  Sometimes child physical

2   abuse.

3   Q.   Now, have you received any specialized training or

4   education on conducting forensic interviews?

5   A.   Yes, I have.

6   Q.   Does that include trainings and education on the manner

7   and types of questions which should be asked during forensic

8   interviews?

9   A.   Right.  How to question children and how to understand

10  language and developmental issues that impact interviewing, as

11  well as how victims disclose and what to expect during an

12  interview.

13  Q.   Have you ever written on this topic?

14  A.   I've participated in a joint writing effort for the

15  Department of Justice on a manual on interviewing child

16  victims that was supposed to have come out already, but the

17  government.

18  Q.   Approximately how many forensic interviews have you

19  conducted of individuals who have been sexually abused?

20  A.   Probably a few hundred over the course of 20 years.

21  Q.   Now, can you estimate the number of child victims you

22  have interviewed in your profession?

23  A.   Like I said, in the hundreds.

24  Q.   Have you testified and been qualified as an expert

25  witness before?

1   A.   Yes, I have.

2   Q.   In what fields have you been qualified as an expert?

3   A.   In clinical psychology, forensic psychology, in sexual

4   assault, interpersonal violence, domestic violence, sexual and

5   physical abuse of children, sexual offender perpetrators, as

6   well as domestic violence perpetrators, and victim and

7   offender dynamics.

8   Q.   Now, in which courts have you testified and been

9   qualified as an expert on this vast array of topics?

10  A.   Numerous counties in Pennsylvania, as well as U.S.

11  military court well over 50 times.  I've testified in Germany

12  and Italy, and across various states in the United States.

13  Q.   Have you ever been denied qualification as an expert

14  witness in the fields of child sexual abuse, victim offender

15  dynamics, or offender characteristics?

16  A.   No, I haven't.

17  Q.   Doctor, are you familiar with the term counterintuitive

18  behavior?

19  A.   I am.

20  Q.   What is that?

21  A.   Counterintuitive behavior is a term -- it's not a

22  clinical term -- but it's a lay or legal term that describes

23  behaviors of victims that seem to run counter to our

24  expectations of victims who were, quote/unquote, real victims

25  of sexual assault.

1       The reason we don't use this term clinically is victim

2   behavior is very varied, so there is no counterintuitive

3   behavior.  We tend to talk about victim dynamics or victim

4   behaviors in response to assault or trauma.

5   Q.    So if there is a wide array of reactions or responses to

6   trauma, does this include a wide array of responses to trauma

7   by, for example, child sex abuse?

8   A.    Absolutely.

9   Q.    And are these responses or wide array of reactions

10  influenced by any set of factors?

11  A.    Yes.  Everybody has an individualized response to trauma

12  or traumatic events or sexual abuse.  And those responses are

13  influenced by internal factors:  Who the victim is, what they

14  bring to the table in terms of their own understanding, shame,

15  guilt, feelings of self blame, and cultural and religious

16  upbringing.

17      There are external factors, including what resources they

18  have in their environment, how supportive or educative the

19  environment is of abuse, access to resources, family and

20  social support, the influence of the perpetrator on the

21  community of the abused.

22      And then there are offender factors and how the offender

23  themselves influences the victim's behavior.  Offender, the

24  relationship of the offender, the power that the offender has

25  over the victim, the dependency of the victim on the

1   perpetrator, and other interpersonal things that go on between

2   perpetrators and victims, including threats, love, trust,

3   affection, need.  Those kind of things all factor into how a

4   victim responds and in what manner.

5   Q.   Do various factors such as age or gender or socioeconomic

6   status also affect responses to trauma?

7   A.   Absolutely.

8   Q.   Does the cognitive development or ability of an

9   individual also influence the response to trauma?

10   A.   Yes.

11   Q.   Now, based upon your training, education, and personal

12   experience as a clinical psychologist, is it uncommon for

13   people to delay disclosure of sexual abuse?

14   A.   No, not at all.

15   Q.   Is there also literature and/or research that has been

16   published with regard to delayed disclosure?

17   A.   Yes.  In fact, some people never tell.  And when we talk

18   about disclosure we tend to talk about telling to an

19   authority, not just randomly talking to a peer.  But even

20   telling anybody is not uncommon, so telling law enforcement or

21   an official capacity is often either never done or delayed

22   quite extensively.

23   Q.   Is the literature and/or research on this area of

24   disclosure consistent with your years of experience as a

25   clinical psychologist?

A.    Completely consistent.

Q.    Now, can you describe for the Court what delayed

disclosure is.  Is that what we're talking about here?

A.    In terms of you asking me, I guess delayed disclosure,

the expectation or the evaluation of what a delay is,

depending on the listener, can be anywhere from days to years

or decades.

       So victims often fail to tell and do not pursue legal or

official response to their sexual assault.  Most victims

don't.  We know it's a highly underreported crime.  But the

idea that somebody -- delayed disclosure is a term that

implies that the victim didn't tell as soon as they're

expected to tell or provide immediate outcry after the assault

or abuse stops.

Q.    In your experience is such a, quote/unquote, delayed

disclosure common in these types of scenarios?

A.    In which type of scenario, just general child sex abuse?

Q.    Child sex abuse, yes.

A.    Yes.  Generally children, it's not uncommon for them not

to tell at all or to wait months, days, or years, depending on

the circumstance and if there's a triggering event that

reveals disclosure.

Q.    So we'll get to triggering events, but I want to ask you

about are there any certain factors that may influence how or

when an individual discloses sexual abuse?

1   A.   Absolutely.  Individuals have to struggle with, first

2   off, identifying the fact that there are -- they have been

3   abused, the nature of the abuse, and who to tell.  So if there

4   are not resources or they're not educated about what to do

5   with that disclosure that may prevent disclosure.  They may

6   not disclose because they're ashamed, humiliated, or fear they

7   won't be believed, or can't tolerate the process of disclosure

8   because of the trauma related to it, so they don't tell.  They

9   just feel like they want to get over it.

10       The perpetrator may still be in their lives or engaged

11  with them, so telling may risk serious consequences.  They may

12  not have anybody to tell or may live in an environment where

13  they're not valued or sexual abuse is accommodated or there's

14  no use to tell, they've seen other people try to tell.

15       If they rely on the perpetrator for things like basic

16  needs, supporting the family, food, kindness, they may not

17  tell so that they don't have to go through the loss of the

18  good things that the offender provides.

19       They may fear they won't be believed.  They may fear

20  retaliation from the perpetrator or the community for telling.

21  Or they may just not want to get involved in the process that

22  can be instigated by telling at all.

23  Q.   Does the gender of a particular victim affect the way or

24  the timeliness of the disclosure?

25  A.   It depends.  I think there are general -- I know there

1    are general trends that male victims, especially of male

2    perpetrators, tend not to disclose as much, and that can be

3    exacerbated if they're raised in an environment, family

4    environment, cultural environment, or religious environment

5    that has prohibitions against homosexuality, which victims

6    often mistake abuse for homosexuality.

7         Boys tend to be under more expectation, pressure to

8    fight, to resist and not be victims at all, so are not

9    necessarily socialized the same way as girls to tell or

10   identify as a victim.

11   Q.   Can the manner or types of questioning that a victim

12   experiences, can that impact the way or the timeliness of a

13   disclosure?

14   A.   The way -- I'm not sure what you're asking.

15   Q.   Can the types of questions that a victim is asked, can

16   that impact the way or the timeliness of the disclosure?

17   A.   I assume if a victim's being questioned there's some hint

18   of a disclosure already.  But victims, the way they disclose

19   can be profoundly impacted by interviewer questioning, what

20   questions are asked, how the questions are asked.  Which is

21   why we have to go through training to make a solid -- help

22   facilitate a solid disclosure.

23        If the victim isn't even being interviewed but is

24   beginning to disclose and is faced with the listener's

25   disgust, disbelief, or accusations or victim blaming, they may

1   stop disclosing, they may change the disclosure, they may

2   recant, they may disclose to somebody else instead, or just

3   give pieces of disclosure.  So the interviewer, in fact, is

4   tremendously important.

5   Q.   So let's take that piece by piece.  You mentioned

6   piecemeal disclosure.  Can you explain to the Court what

7   piecemeal disclosure is.

8   A.   Piecemeal disclosure is a phrase used to describe the

9   process of disclosure.  In general, victims do not tell

10  everything all at once.  They tend to -- and this is true for

11  victims of physical violence as well.  They tend to give a

12  piece of the disclosure, see how that's managed, how they are

13  able internally to tolerate it, if they can stand talking

14  about it add other details as they go along.

15       And that's both a conscious process and a traumatic

16  process in terms of accessing memory and pieces of memory, but

17  also being able to cope with the information they're

18  disclosing.

19       Often as victims learn more about how the environment

20  will take their disclosure or what questions are asked or what

21  they even identify as abuse, more and more details or more and

22  more things will come out over time.

23  Q.   Now, is there research on this piecemeal or incremental

24  disclosure?

25  A.   Yes.

1  Q.   And do you also see incremental or piecemeal disclosure

2  in your practice?

3  A.   Oh, absolutely.

4  Q.   Have you observed individuals disclosing sexual abuse

5  over time?

6  A.   Yes.  In fact, that's more my expectation than knowing

7  the first or second time they meet me they're going to tell me

8  everything.  We tell what we can tolerate.

9  Q.   Is that clinical experience consistent with the research

10  and literature on this subject?

11  A.   Yes.

12  Q.   Now, you also mentioned in your testimony trigger events

13  or triggering events, can you give us some examples of events

14  that would trigger a disclosure.

15  A.   There's often in a victim's life something that happens

16  that helps them decide to disclose.  Sometimes they become

17  cognitively able to understand and express the abuse or

18  internally or psychologically able to disclose.

19       Sometimes they get education and support which helps them

20  be more free from the shame or self blame that inhibited their

21  disclosure.  They may receive information on resources,

22  understanding that what happened to them was wrong, there are

23  ways to get help.

24       They may -- for instance, if it's a child in a family or

25  somebody who's leaving the care of a caretaker, they may now

 1   have the freedom to tell because they're out of the

 2   caretakers's hold.  They may learn of other victims and

 3   realize that they're not the only one with the problem.  They

 4   may disclose to protect other victims, motivated by a sense

 5   that the offender may be targeting somebody else.

 6        They also -- many victims tell because they just decide

 7   they can't take it anymore or they thought they could just get

 8   over it, but their symptoms continue to increase or they get

 9   old enough to become aware of the impact of their abuse, for

10   instance, if they become sexually active or decide to have a

11   family.

12        So there are events in somebody's life which makes them

13   decide that this is a time to tell and they're often very

14   personal.

15   Q.   Could the introduction of a supportive person, like a

16   spouse or a teacher or an additional caretaker, could that

17   trigger disclosure?

18   A.   Actually, positive social support is one of the biggest

19   influences in disclosing and seeking help for sexual assault.

20   Q.   Now, based upon your training and experience, are

21   recantations of abuse allegations uncommon?

22   A.   They're not uncommon, no.

23   Q.   Can you explain for the Court what a recantation is.

24   A.   A recantation is withdrawing a true allegation of abuse.

25   So somebody will disclose the actual abuse and then take it

1    back.  So it's different than a fabrication or a lie, which is

2    just saying a lie or a false or fabricated allegation.

3    Q.   Now, is this common even in the face of medical evidence

4    or, perhaps, documentary evidence if a child or an individual

5    is being, perhaps, assaulted on videotape or there is a

6    picture capturing their abuse?

7    A.   I don't know if I would say that it's common, that it

8    happens all the time, but up to a third of victims can recant,

9    even in the face of actual documented evidence.

10   Q.   Now, what factors can influence or lead to a recantation?

11   A.   Social support or actually lack thereof, feeling

12   disbelieved, feeling unsupported, feeling penalized for the

13   abuse.

14       In my practice most children have recanted after being

15   placed into foster care or understanding that their loved one

16   would have to go to jail.  They feel like the family has

17   disintegrated and it's their fault, so if they just take it

18   back everything can go back together.

19       So there's often very serious consequences for victims to

20   disclose that they don't anticipate and aren't ready for,

21   including coming to court and having to be repeatedly

22   interviewed or moved or disrupted in their life.

23       They also may recant because they find that reliving or

24   telling about their trauma in front of strangers is far too

25   painful and distressing for them and they can't do it anymore.

1    Q.   Could pressure or coercion or bribery lead to

2    recantation?

3    A.   Absolutely.  Especially if the victim is feeling

4    intimidated, threatened, or is convinced they won't be

5    believed.

6    Q.   Now, can an interviewer facilitate a recantation?

7    A.   Yes.

8    Q.   Can you explain to the Court how that could happen.

9    A.   If the interviewer reacts in an accusing or blaming or

10   shaming way, if they're too aggressive and confrontative.  If

11   they question the victim on things that they might be

12   struggling with like, well, if it was so bad why did you go

13   back, why didn't you fight, why didn't you say no.  And the

14   victim can get intimidated or coerced into feeling that they

15   are to blame for the assault and guilty about getting somebody

16   else in trouble, again getting confused about whether or not

17   this is abuse or not.

18   Q.   Doctor, did you interview any of the victims that the

19   government alleges were sexually abused as children in the

20   case of United States v. Joseph D. Maurizio Jr.?

21   A.   No.

22   Q.   Have we discussed any details of this case?

23   A.   Other than they were abused as children and they're from

24   another country, no.

25   Q.   Is that why you haven't tailored your testimony today to

1    the specific facts of this case?

2    A.    Right.

3    Q.    And, instead, your testimony has remained more

4    generalized?

5    A.    Yes.

6    Q.    Has your testimony today been consistent with your

7    specialized knowledge, training, and experience?

8    A.    Entirely consistent.

9    Q.    Has it been based on your background and your experience

10   in forensic and clinical psychology, including your work with

11   hundreds of individuals who have been the victims of sexual

12   abuse?

13   A.    Yes.

14   Q.    Now, based upon your training and experience in these

15   fields, including seeing and treating patients, training,

16   giving lectures on these topics that we've discussed today, is

17   the average person familiar with the topics we've just

18   discussed?

19   A.    In my experience, no.  Even from working with other

20   professionals, including Children and Youth caseworkers,

21   investigators, law enforcement, it's my experience that we

22   still maintain some faulty expectations for victim response,

23   and that these faulty expectations often cloud our

24   understanding of how victims, quote/unquote, really act and

25   what are the varied and array-type of responses a victim can

1   have.

2   Q.   Can you elaborate for the Court when you say "faulty

3   expectations for victim behavior" what some of those faulty

4   expectations are, or commonly are.

5   A.   Well, I think from the outside we view child sexual

6   assault as so heinous that we think that victims should

7   immediately identify that they were abused, immediately hate

8   the perpetrator, feel supported in making an allegation, make

9   a clear and strong and complete allegation, not feel blamed or

10  shamed by the abuse, and not feel any attachment or

11  willingness to be with the offender.  And that just is not

12  true.

13          MS. LARSON:  If you could give me one second,

14  Judge.

15          THE COURT:  Go ahead.

16          MS. LARSON:  Judge, I have nothing further.

17          THE COURT:  All right, thank you.

18          Counsel, which of you will be questioning?

19          MR. KISS:  I will be, Your Honor.  Thank you.

20          THE COURT:  All right.  Go ahead.

21          MR. KISS:  Thank you, Judge.  If I may proceed,

22  Your Honor?

23          THE COURT:  You may.

24          MR. KISS:  Thank you.

25                      CROSS-EXAMINATION

BY MR. KISS:

Q.    Good afternoon, Doctor.  My name's Dan Kiss.  I'm one of

Mr. Maurizio's attorneys.  How are you?

A.    Good afternoon.

Q.    Now, Doctor, as I understand it, correctly, your degree

is a clinical psychology doctorate; is that correct?

A.    That's right.

Q.    And it's not a Ph.D., correct?

A.    No, it's a doctorate in psychology --

Q.    Okay.

A.    -- or --

Q.    Very good.  I understand.  Thank you.

      And looking at your curriculum vitae, you would agree

with me that your last publication, at least according to

that, was in 2007?

A.    Right.  I'm primarily a clinician --

Q.    Sure.

A.    -- and trainer, not a researcher.

Q.    Okay.  So you don't actually go out and do the research

yourself?  If I understood your testimony to the government,

you rely on reading through journals, as well as your own

practical experience?

A.    Primarily, yes.  I have done research, but I have not --

Q.    You haven't done it --

A.    -- in a long time.  Right.

1   Q.   I understand.  I understand.

2        And most of your research is actually from the '90s?

3   A.   Right.

4   Q.   Would that be accurate?

5   A.   That's accurate.

6   Q.   Thank you.

7        Now, Doctor, we talked about a couple things here, and

8   I'd like to touch base back on some of them.  First and

9   foremost, you talked about forensic interview.  I'm

10  actually -- I'm also certified, so I understand the pleasure

11  of going through all of those trainings to be a certified

12  forensic interviewer.

13       You would agree, forensic interviewing is best practice?

14  A.   Yes.

15       I'm not a certified forensic interviewer; I've just been

16  trained in forensic interview --

17  Q.   Oh, okay.  I understand.  And I think that's what I am,

18  as well.  It's not the whole way, but you've gone through the

19  training and stuff?

20  A.   Right.

21  Q.   I understand.

22       But, again, you would agree that it is best practice, as

23  early as possible, for a child victim or alleged child victim

24  to be given a forensic interview?

25  A.   As early as possible?

1    Q.    Once an initial disclosure is made.

2    A.    If you can.  There are limited resources all over the

3    world, so --

4    Q.    Sure.

5    A.    -- you can't apply best standards of practice to even so

6    much as rural Pennsylvania.

7    Q.    Absolutely.  And are you aware in this case whether any

8    forensic interviews were ever conducted by anyone?

9    A.    I don't know anything specifically about this case except

10   there were multiple victims and they're from another country.

11   Q.    Sure.  Now, talking about forensic interviewing and some

12   of the problems of normal interviewing, some of the problems

13   would be leading questions, for example?

14   A.    There may be.

15   Q.    And some of the problems that I think you stated were

16   interviewers who don't know the subject matter very well, and

17   maybe put their own personal opinions or impressions through

18   their questioning?

19   A.    You're equating two different things.  So just a poor

20   interview; is that what you're talking about?

21   Q.    Yes.  Yes.

22   A.    Yeah, there are a lot of ways to give a poor interview.

23   Q.    Okay.  And, in fact, there could be the opposite of some

24   of the interviews you were talking about, and there could be

25   interviews where you're kind of pressuring a child to say

1  something the child may not want to say?

2  A.    Sure.

3  Q.    Okay.  And, again, you don't know if any of that has

4  occurred in any of these situations?

5  A.    I have no idea.

6  Q.    Okay.  Now, your practice up in the Allentown area, do

7  you often deal with children from Honduras?

8  A.    Not often, no.

9  Q.    Okay.  And your research, you would agree with me that

10 the vast body of research in clinical psychology and cognitive

11 psychology and forensic psychology deals with what I call

12 "first world," Western Europe, the United States, Canada?

13 A.    Well, in some of the social sciences that's true, because

14 third world countries don't have phones or phone interviews,

15 and they don't have universities for freshman classes, so

16 there is a lot of research that we rely on set bodies of

17 people, per se, right.

18 Q.    Okay.  Now, you've made a lot of mention in this case

19 about a recantation, and I think that was the major point of

20 your earlier testimony.

21       Now, sometimes recantation is because it actually

22 occurred, right?

23 A.    Recantation is because the abuse actually occurred?

24 Q.    It did not -- because it did not occur.  I'm sorry.

25 A.    I guess I don't consider that recantation.  I consider

1    that taking back a lie.

2    Q.   Okay.  Okay.  So there is a difference -- and I guess it

3    was poor terminology on my part between taking back a lie and

4    recantation.

5    A.   Right.

6    Q.   And both do exist out there in the world of child abuse,

7    correct?

8    A.   Sure.

9    Q.   And you said that the numbers are up to a third of

10   children may recant at some point?

11   A.   Right.

12   Q.   And, but you said up to a third.  It could be as low as 8

13   percent according to some studies, correct?

14   A.   Right.

15   Q.   Okay.  So there's a, boy, about a 20 percent range of

16   what science currently tells us whether a child can or can't

17   recant?

18   A.   That's right.

19   Q.   Okay.  And typically children who are younger in age are

20   more vulnerable to the recantation process?

21   A.   That's typical, but we also know that there are gender

22   and cultural biases to that as well.

23   Q.   Sure.  Sure.  And, again, you have no knowledge of how

24   any of the disclosures were made in this case?

25   A.   Or actually if anyone actually recanted.  I just know I'm

1   actually asked to talk about that.

2   Q.   Oh, okay.  I understand.

3        Now, you said that oftentimes recantation involves

4   pressure from a family member or external forces or offender

5   forces, something like that, correct?

6   A.   It can.  Or it can result in the victim feeling so

7   pressured of not being able to go through the process that

8   we're asking them to go through.

9   Q.   But that pressure's somehow put on them from something

10  else?

11  A.   Or it could be internal pressure --

12  Q.   I understand.

13  A.   -- shame and things.

14  Q.   And most of the studies have shown that the external

15  pressures come from a family member, the classic scenario;

16  stepfather abuses child and mother doesn't want stepfather to

17  leave.

18       That's the classic scenario, correct?

19  A.   That's the classic scenario described in the research.

20  Q.   Uh-huh.  And that's a lot of what the research talks

21  about, is kind of that type of scenario?

22  A.   Yes.  That's what we have access to.  I personally have

23  clinical experience with people who have recanted for other

24  reasons as well.

25  Q.   Okay.  Now, Doctor, are you familiar with the very recent

1    psychology article that came out talking about the

2    reputability of psychology experiments?

3    A.    You have to give me more than that.

4    Q.    Sure.  Well, basically, it came out on the 28th of August

5    saying that basically 75 percent of social psychology research

6    and 50 percent of cognitive psychology research -- they were

7    using 2008 in the major journals that you mentioned

8    actually -- were not able to be replicated in independent

9    tests.

10        Are you aware of that?

11   A.    I'd have to research -- the term "research" is so

12   broad --

13   Q.    Sure.

14   A.    -- I'd have to review the article and see what you're

15   asking me about.  It may or may not be applicable to things

16   that have been replicated and known over and over in terms of

17   like the late disclosure and things.

18   Q.    Okay.  I understand.  And again, Doctor, so the Court is

19   well aware, you have not interviewed these children

20   whatsoever?

21   A.    Not at all.

22   Q.    Okay.  And you have no personal experience in Honduran

23   culture, being in the Honduras or anything like that?

24   A.    No.  No.

25             MR. KISS:  If I may have one moment, Your Honor?

1          THE COURT:  You may.

2          MR. KISS:  Nothing else, Your Honor.  Thank you.

3          MS. LARSON:  May I have a brief redirect, Your

4   Honor?

5          THE COURT:  Yes.  Go ahead.

6                    REDIRECT EXAMINATION

7   BY MS. LARSON:

8   Q.   You mentioned on cross-examination that gender and

9   cultural biases could affect recantation.  Can you elaborate

10  what you meant by that.

11  A.    Well, if somebody discloses and, for instance, there's --

12  I already mentioned the influence of stigma regarding

13  male/male perpetration, that affects male victims of sexual

14  assault who are offended by males.

15       If there's a very strong religious component or a

16  shame-based component to it, that may affect recantation, as

17  well as suspicion of systems.  Often, for instance, I consult

18  in the tribal nations, and children will disclose.  And then

19  once the government gets involved, because of the distrust of

20  the system or Children and Youth are involved and things like

21  that.

22       So there are other things that influence a child taking

23  it back to get out of the process, as well as a more typical

24  scenario mentioned by defense.

25  Q.   Are you aware of anything either in the literature,

1    research, or anything in your numerous years of clinical

2    experience which indicates that the subject matters we

3    discussed here today stop or end at the borders of the

4    continental United States?

5    A.    Absolutely not.  I've worked with many offenders who are

6    able to describe their influence over victim response, who

7    have traveled across countries, adopted kids from other

8    countries.

9          Plus, there's a whole body of literature on refugees and

10   immigrants from sexual abuse that we are trained in how to

11   provide sensitive treatment to cultures of other countries.

12              MS. LARSON:  Thank you.  I have nothing further.

13              MR. KISS:  One question, if I may, Your Honor?

14              THE COURT:  Go ahead.

15              MR. KISS:  Thank you, Judge.

16                        RECROSS-EXAMINATION

17   BY MR. KISS:

18   Q.    Doctor, I just have one question, and that question would

19   be:  Can you point to the Court any single study about

20   Honduran culture or children in the Honduras in dealing with

21   the things you've described here today?

22   A.    There's a lot of information on refugees from Honduras,

23   in particular, and the factors and issues that make Honduran

24   children excessively vulnerable to sexual exploitation, sexual

25   trafficking in terms of their response.  There are stats about

1   reporting rates, what percentage of children, what ages,

2   things like that.

3   Q.   As a followup to that, that's not -- I'm sorry, I

4   apologize, that's not what I asked you.

5   A.   Okay.

6   Q.   I'm talking about what you presented here about

7   recantation, about the late disclosure, things like that.  Do

8   you have a single study that was done in Honduras that was

9   peer reviewed about Honduran children and what you have

10  described here today?  Not whether they're being trafficked or

11  whether they are refugees or anything like that, but

12  specifically about Honduras about Honduran children.

13  A.   There are studies out there.  I don't have a single

14  reference in my hand.

15  Q.   So you can't present to the Court what these studies are?

16  A.   Not at this time.

17              MR. KISS:  Thank you.

18              MS. LARSON:  Nothing further, Judge.

19              Judge, may this -- I apologize, if the Court would

20  like to question the witness.

21              THE COURT:  I was curious with regard to the issue

22  of recantation, whether that usually occurs when the child is

23  still under 18, or do the recantations occur very often after

24  a person is an adult?

25              THE WITNESS:  It depends.  The recantation would

1  depend, first of all, the age of disclosure.  But second of

2  all, where and why might somebody recant.  So if somebody

3  tells and is in foster care, and they go on and then they get

4  18 and the DA gets a hold of it, and now they're in a big mess

5  and they don't want to go through with it, they may recant

6  then.

7       So it has more to do with at what point in the

8  process is the allegation important.  So if I have a child

9  who's behaviorally disturbed in foster care, and she's 16 or

10  17, and then she discloses and then, you know -- but she's

11  been abused at age 10.  So there's no set, like, age

12  demarcation of when recantation happens.  It tends to be more

13  reliant on what's going on in the child's life that may be

14  adding pressure, stress, or contribute to their decision to

15  not want to pursue this.

16       THE COURT:  I have no further questions.  Do you

17  have additional questions?

18       MS. LARSON:  I do not, Your Honor.

19       MR. KISS:  No, Your Honor.  Thank you.

20       THE COURT:  Thank you.  You can step down.

21       THE WITNESS:  May I be excused, Your Honor?

22       MS. LARSON:  That's fine with the government --

23       MR. KISS:  No objection, Your Honor.  Thank you.

24       THE COURT:  Yes, you may be excused.

25       THE WITNESS:  Thank you, sir.

1          THE COURT:  The witness has left the courtroom.

2    Attorney Larson, do you wish to make argument?

3          MS. LARSON:  Sure.  Do you mind if I use the

4    podium, Judge, just so I can spread my things out a little

5    more?

6          THE COURT:  Yes.  I would prefer that you do

7    because I can hear you better.

8          MS. LARSON:  Judge, the government will rely

9    heavily on the argument that we made in our filing before the

10   Court of August 20th of 2015, that's Document 100.  But I

11   think that the starting point is that the Federal Rules of

12   Evidence 702 is what is governing here, the testimony by an

13   expert witness, which is very clearly laid out that a witness

14   who is qualified as an expert by knowledge, skill, experience,

15   training or education may testify in the form of an opinion or

16   otherwise.  And then those requirements are laid out.

17         The case law that develops from there, including

18   Daubert and the progeny that follows, clearly indicates that

19   Daubert does not require the exclusion of expert testimony

20   that does not involve scientific theory.  There's obviously a

21   litany of case law out of the Ninth Circuit on that as well as

22   others.

23         If you're looking for Third Circuit precedent on

24   that, 657 F.3d 160, the *Walker* case, that's a Third Circuit

25   case out of 2011.  As well as the more recent opinion, I

1   believe it's the *Bonner* opinion 469 Fed. at 119, a Third

2   Circuit case out of 2012.  That may, in fact, be an

3   unpublished decision, Judge.  But, nevertheless, when we're

4   talking about cases that do not involve scientific --

5   quote/unquote, scientific testimony what we're relying on here

6   is the personal knowledge and experience of the witness.

7   That's what's going to turn on whether or not the evidence or

8   the proffered evidence is, in fact, reliable.

9           That's what we have here, Judge.  We have a very

10  qualified witness.  She's qualified by her training, her

11  impeccable educational background, her pedigree, as well as

12  her years in professional practice.  You heard that she has

13  the unique ability that she not only works with victims of

14  sexual abuse, including victims of child sexual abuse who are

15  now adults, as well as children who are victims of sexual

16  abuse, she also treats sex offenders and has the unique

17  experience of interviewing thousands of them, and has been

18  appointed by the governor of Pennsylvania several times.  So

19  there's no doubt that she's qualified, Judge, to give this

20  testimony.

21          As well as this being reliable evidence, this is

22  backed up by literature and research, as well as, again, her

23  personal experience treating numerous people who have been the

24  victims of sexual abuse.  She talked about various

25  characteristics of child sex abuse victims.  She talked about

1   issues involving disclosure, how and why disclosures happen,

2   why there may be a delay, why there may be piecemeal or

3   incremental disclosure, as well as recantation.

4           She also touched on the importance of forensic

5   interviews and some of the nature of how a forensic interview

6   should be done.  She's had trainings in the questions that

7   should be asked and the manner in which they should be

8   conducted.

9           For all of those reasons this testimony should be

10  admissible.  It's clearly relevant, probative testimony that

11  is helpful to the jury to understand the issues that will be

12  going on here, and to assist them in reaching their ultimate

13  decision.

14          She testified that, in fact, these concepts we're

15  taking about, disclosure of sexual abuse, child sex abuse

16  victims, piecemeal disclosure, the delay in which children

17  disclose, recantation, all of that is so well outside the

18  purview of the average juror or the lay experience that,

19  unfortunately, there are still these myths based on faulty

20  information and misperceptions about how a victim,

21  quote/unquote, should behave.

22          This is not being offered to improperly bolster the

23  credibility of any of the witnesses.  This clinician has very

24  plainly stated on direct and cross she has not interviewed

25  these victims, she is not diagnosing them, she is not

1    rendering an opinion as to whether or not they've been abused,

2    or suggesting that to the Court or in any way improperly

3    usurping the jury.

4           The litany of federal cases is clear that the exact

5    evidence that we're talking about is admissible in federal

6    court, and that's on page 3 of 7 of the filing I referred to

7    earlier, Your Honor, in Document 100.

8           So we renew those arguments made therein and

9    support to the Court that this has been uniformly used in

10   federal court and in cases exactly as this, and the government

11   should be permitted to elicit this testimony at trial.

12          Thank you.

13          THE COURT:  Counsel.

14          MR. KISS:  Thank you, Judge.

15          Your Honor, very briefly, if we were talking about

16   American children or we were talking about individuals raised

17   in American culture, we wouldn't be here because there'd be no

18   objection to that testimony.

19          But what we heard here, Your Honor, was an

20   individual who clearly has significant qualifications in the

21   area dealing with, as she said, with children here in the

22   United States and people who are, in fact, children and

23   offenders.

24          What we didn't hear, Judge, and the whole point of

25   our motion in this matter was that she has no experience with

1   children from the Honduran culture.  She has no experience in

2   dealing with particularly that culture, but even she didn't --

3   she had no experience with other cultures in regard to that,

4   Your Honor.

5          That is a critical, critical point in our

6   determination -- in the Court's determination here is inasmuch

7   as it's reliable, does it fit this case.  Does the evidence

8   that the government wishes to present through this expert fit

9   this case.  And when you look at it, it just simply doesn't.

10          She could not articulate a single study that shows

11   the evidence she spoke about was applicable to Honduras in

12   particular, or particularly outside of the United States,

13   Canada, Western Europe.  I asked her directly, Where's the

14   body of research.  And she said, Canada, United States,

15   Western Europe, and she said because we can't get to those

16   other places.  She can't say it extends past that.  So if it

17   doesn't fit this particular case, we're truly talking about

18   apples and oranges.

19          And when we start doing that, we're confusing the

20   jury.  We're bringing evidence into the jury that doesn't make

21   sense because it doesn't fit the particular charge in the

22   particular case.

23          And the Court raised some very interesting

24   questions about the age of this disclosure or recantation in

25   particular.  And I think through our cross-examination it was

1   very clear, this occurs when children are typically very,

2   very, very young or younger, and it lessens over time, and

3   studies have shown that, as stated by her.

4            So our position is very clear, Your Honor, is while

5   this all may be good evidence if we were sitting in a

6   courtroom with American children or children raised in the

7   American culture or Western European culture or Canadian

8   culture, that would all be absolutely relevant and we wouldn't

9   be standing here.

10           But because we're talking about a very specific

11   culture, and it's the government's burden to show that that

12   evidence fits and would fit to the particular facts of this

13   case, they haven't done that.  They have not shown any

14   evidence.  And they cannot present any studies showing that

15   that is applicable and applies over to this particular culture

16   and these individuals who are above 18 at this point, Your

17   Honor.

18           Thank you.

19           THE COURT:  Thank you.

20           Any additional argument?

21           MS. LARSON:  No, Judge.  I would just point out

22   very briefly -- I apologize.  I should have said, Yes, very

23   briefly.

24           That misstates the testimony.  On redirect she was

25   specifically asked, Do you have any reason, based on your

1    clinical experience and/or the body of research and literature

2    to believe that the topics you discussed here today -- and we

3    went through them, disclosure, the way in which it happens,

4    delays, piecemeal, recantations -- stops at the border of the

5    continental United States, and she said no.

6            She went on to specifically talk about her

7    experience with offenders who travel to other countries across

8    borders and engage in this type of abuse of children and the

9    methodologies that they use in her clinical experience there.

10           She talked about the body of research and

11   literature talking about refugees and immigrants who

12   experience the same thing.  So that misstates the testimony.

13           And again, the progeny of cases in the Third

14   Circuit and otherwise makes clear that it's not about

15   scientific studies.  We are talking about the reliability

16   based on specialized knowledge of the witness, which she

17   clearly has based on her training, her experience in the case

18   of clinical and forensic psychology for 20 years, and in

19   interviewing thousands of victims and offenders.  So that's

20   why this testimony is admissible, regardless of where these

21   children were abused.

22           Thank you.

23           THE COURT:  Before you are seated I wanted to ask a

24   couple questions.  I have the correspondence from the

25   Department of Justice to Attorney Passarello regarding this

1   issue.  Before that letter was sent to Attorney Passarello,

2   was any prior notice given to him that this witness would be

3   presented and what areas would be presented?

4           MS. LARSON:  No, Judge.  Notice was provided on

5   August 7th.

6           THE COURT:  And was this prompted by a decision you

7   made or was there some inquiry that you were responding to?

8           MS. LARSON:  This was a decision that we made to

9   provide unsolicited notice of our expert witness to allow the

10   defense the right to prepare for trial.

11          THE COURT:  So prior to August 7th, the defendant

12   and counsel for the defendant would not have been aware that

13   the government intended to offer the testimony of this expert?

14          MS. LARSON:  That's correct, Judge.

15          THE COURT:  And the defendant filed notice today of

16   intent to present an expert witness, and it appears to the

17   Court that the reason this witness was added was in response

18   to your intent to present expert testimony.  And that was

19   filed less than 30 days after the notice to defendant was

20   provided.

21          Are you opposing the defendant's request to have an

22   expert witness testify in response to your expert witness?

23          MS. LARSON:  At the time that that motion to compel

24   was filed, absolutely.  Because, as our motion indicated, we

25   had repeatedly asked for expert notice and had not been given

1    any.  When we were, in fact, given the notice, the notice was

2    woefully insufficient, which was the purpose of that.

3            We're in a slightly different posture now.  We have

4    been given a CV and we've been given a brief outline which,

5    you know, assuming that we agree that that complies with the

6    notice requirements -- which I'm not here to argue today --

7    that was the alternative argument in our motion, was to have

8    this expert witness here today -- because we start trial next

9    week -- so that the government would have the opportunity to

10   cross-examination their proposed expert, to test his

11   qualifications, and hold a Daubert hearing on whether or not

12   his proposed testimony -- which is rather vague and I do not

13   believe is within his area of expertise -- but again, we have

14   the ability to question that on cross-examination to be here

15   today to afford us that opportunity.

16           So given the fact that we did just receive this

17   notice, I believe yesterday.  It might have been the day

18   before yesterday so I don't want to misspeak, but definitely

19   within the last 36 hours we received this notice.  At this

20   point we would like the opportunity to cross examine their

21   expert on whatever proffer or proposed testimony they believe,

22   to undergo the same analysis that this Court is doing with the

23   government's expert.

24           THE COURT:  All right.  Thank you.

25           I will direct this to either or both defense

1    counsel.  It would appear to the Court that if the defendant

2    is to be permitted to present expert testimony from Dr. --

3               MR. PASSARELLO:  Dattillo.

4               THE COURT:  -- Dattillo, that the government's

5    request that a similar proceeding to what we are doing today

6    would be a reasonable request.

7               Is he available to come and participate in a

8    Daubert proceeding relatively soon?

9               MR. PASSARELLO:  Well, Judge, just so you get a

10   little bit of a background -- and I apologize.  The government

11   has made requests regarding expert testimony under Rule 16 for

12   a while now.  There was no reason to have an expert called

13   because we had no notification that they were going to provide

14   an expert.

15              When they did provide an expert, and we had filed a

16   motion to preclude her, in order to save -- attempt to save --

17   my client some funds, and I told them this in person when they

18   were at a meting in my office a week ago, that I was hoping to

19   hold off until you ruled on that motion before I retained an

20   expert.

21              Our expert's called solely to rebut the expert that

22   the United States intends on calling.  We just secured his

23   dates for trial.  I did not ask him, Your Honor, in all

24   frankness, what availability he would have had before

25   September 8th, so I cannot answer you that.  I cannot answer

1    that question at this time.

2          THE COURT:  Well, how about the day of

3    September 8th, do you think he's available that date, or are

4    you saying you have no idea?

5          MR. PASSARELLO:  What I am saying is he told me his

6    best available dates were September 25th.

7          THE COURT:  For testimony?

8          MR. PASSARELLO:  Yes.  But I do not -- I might be

9    -- you know, to be here in person I don't know the answer.  I

10   would have to contact him, and I could probably call him today

11   outside of this courtroom to see if I could get an answer

12   about his availability on the 8th.

13         THE COURT:  Well, it appears to the Court that if

14   the Court permits testimony by Dr. Valliere, that I will also

15   permit testimony by your expert, provided he is qualified and

16   his testimony would be reliable and would fit the case.  But

17   the only way for me to determine that would be to have another

18   proceeding like we had today.

19         MR. PASSARELLO:  I understand.  And, Your Honor,

20   like I said, I will attempt to get you an answer as quickly as

21   possible as soon as we leave this courtroom.

22         THE COURT:  I will issue a decision tomorrow in

23   writing on the proceeding that we just had today.  But to give

24   counsel, my inclination at this point is to permit the

25   testimony of the government's expert.  And in fairness to the

1    defendant, as I said earlier, I would also approve testimony

2    by your expert for rebuttal.

3           However, since the government has raised the

4    objection, I don't know how I can determine whether this

5    person is qualified and his testimony is reliable and will fit

6    this case unless we have a proceeding like we did today.

7           MR. PASSARELLO:  Understood.

8           THE COURT:  So the sooner we can do that the

9    better.  And what I would propose to do would be to do this

10   after court during the trial.  I don't want to take time away

11   from the jury, and I don't want to take time away from

12   presentation of evidence in the trial.  So as I've done in

13   other cases, I can hold the Daubert proceeding after the jury

14   is sent home for the day.

15          So if you can give me, and of course with notice to

16   the government, what days Dr. Dattillo would be available for

17   a proceeding like this, then I can schedule that.

18          MR. PASSARELLO:  I will do so, Your Honor.

19          THE COURT:  And, as I said, it would probably be in

20   the evening.  We usually end testimony in the trial around

21   5 o'clock p.m., so sometime thereafter on a scheduled date.

22          I don't want it to go too late into the trial,

23   either.  I realize that you're proposing that he could testify

24   toward the end of the trial.  However, I would like to make

25   that decision on whether he will be permitted to offer opinion

1    testimony a lot sooner than that.

2          MR. PASSARELLO:  Understood.  And I will get dates

3    to the United States and I will get dates to the Court.

4          THE COURT:  And this is directed to the government:

5    I understand your objection with regard to the timing of this.

6    However, given the timing of your notice to defendant and

7    given the importance of this case, both to the government and

8    to the defendant, I do not intend to permit you to offer

9    expert testimony and preclude the defendant from offering the

10   same type of testimony.  So it is all or none.  And my

11   inclination at this point would be to permit your expert to

12   offer testimony.  But I am going to reserve, actually, the

13   specific ruling on that until tomorrow, because I want to go

14   through the factors carefully and issue a written decision.

15         Also, obviously you are going to oppose the

16   government's motion to preclude, but you will need to file

17   that.

18         MR. PASSARELLO:  Yes.  Your Honor, if I may, there

19   was another motion just filed today by the United States that

20   was handed to me at the table.  I believe it was filed under

21   seal, if I'm not mistaken.

22         I intend on getting our response to the 404(b)

23   motion, the motion to exclude our expert, and the new answer

24   to the motion, I will be getting it all filed this evening.

25         THE COURT:  Okay.

1        MR. PASSARELLO:  And so I would just ask the

2   Court's indulgence in allowing me to get that filed this

3   evening.

4        THE COURT:  I was going to ask you to do that, but

5   since you are volunteering to do it, that's better.

6        MR. PASSARELLO:  Oh, yeah, sorry, Judge.  We're

7   going to have to answer the one that's under seal, so we're

8   going to have to hand deliver that answer, so I'll try to get

9   it tomorrow.  I'll file the other two this evening, and we'll

10   have to hand deliver the answer to the motion under seal

11   tomorrow morning.

12        THE COURT:  Well, is your issue that it would need

13   to be filed under seal, your answer?

14        MR. PASSARELLO:  Yes.

15        THE COURT:  Well, I can give you permission to do

16   that without getting permission by filing another motion, if

17   that is what you wish.

18        MR. PASSARELLO:  If you give me permission to do

19   it, then I will do so.

20        THE COURT:  Usually you have to ask permission --

21        MR. PASSARELLO:  Yes.

22        THE COURT:  -- to file it under seal --

23        MR. PASSARELLO:  Correct.

24        THE COURT:  -- and I understand that.  But in the

25   interests of the trial being next week, I will grant you

1    authority to file that response under seal without asking

2    again to do so.

3                MR. PASSARELLO:  Thank you, Your Honor.

4                THE COURT:  So you can do that all tonight then.

5                MR. PASSARELLO:  I'll get it all done.

6                THE COURT:  I do have a question.  As part of your

7    requested voir dire --

8                MR. PASSARELLO:  To the defense, Your Honor?

9                THE COURT:  Your requested voir dire.

10               MR. PASSARELLO:  Yes.

11               THE COURT:  If you would look at Proposed Question

12   6 and explain to me the need for that, because that one was

13   one I didn't understand exactly why you were asking.

14               MR. PASSARELLO:  I understand why most people

15   wouldn't understand why I'm asking that.

16               MS. LARSON:  We might need to -- and I understand

17   -- I think I understand where this is going.  Can we talk

18   about it at sidebar because of people being in the audience?

19               THE COURT:  Would you prefer that also?

20               MR. PASSARELLO:  I think it would be safer.

21               THE COURT:  Is it a topic that would be appropriate

22   for sidebar?

23               MR. PASSARELLO:  I would think more appropriate

24   than from the podium, Your Honor.

25               MS. LARSON:  Yes.

1          THE COURT:  Because, really, when I got that
2    proposed question I wasn't certain why you were asking that.
3          MR. PASSARELLO:  I figured you wouldn't.
4          THE COURT:  All right.  You can come forward then.
5          (The following proceedings were held at sidebar:)
6          THE COURT:  And I wasn't certain why it had
7    anything to do with the Comfort Inn, but I'm just guessing
8    that perhaps that is where some of the witnesses are staying.
9          MR. PASSARELLO:  It's my understanding that's where
10   they're staying.  Although I guess one is to sleep in -- I'm
11   not sure.  But here's the issue -- and the only reason why I
12   raised that, when we were looking for hotels to house our
13   witnesses from the Honduras in, we went to the Comfort Inn.
14   And when approached about it, the lady at the front desk said,
15   I had heard all about the case from one of the agents from
16   Homeland Security or something, and that they had already
17   booked rooms there.  So that would be the reason why.  And so,
18   obviously, we're not staying at the Comfort Inn.
19          But that would be the reason why we ask that
20   question, just if anybody was related to or working at the
21   Comfort Inn, because not only does she know about the case,
22   but gave a lengthy dissertation to our investigator of how sad
23   it was for these children, and how priests are X, Y, and Z.
24   And that's the reason I have for that question being asked.
25          MS. HAINES:  Well, Your Honor, of course, we know

1   nothing about what Mr. Passarello is talking about.  And,

2   frankly, we found it quite interesting that he knew or had

3   reason to believe where our witnesses were being housed,

4   because it's my understanding he had booked his rooms even

5   prior to us inquiring about where to book rooms.

6           But based upon that, like I said, we have no idea

7   what was said or wasn't said to his investigators, we just

8   found it interesting that there would be that question asked

9   of potential jurors, without any understanding as to why that

10  would at all be relevant, and we still oppose such a question.

11          THE COURT:  Well, when I first looked at it I

12  didn't really understand why that question would be asked, but

13  the more I thought about it I assumed that it had something to

14  do with witnesses staying at that facility, and that there was

15  some concern about the employees there interacting with the

16  witnesses or the agents, and it was just to make sure that

17  that person who works there doesn't get on the jury.

18          MS. LARSON:  And I apologize, Judge, as you know, I

19  haven't done a trial with you before.  So is where they're

20  employed one of your standard questions?  If not, can we ask

21  that, you know, are you employed in the Johnstown area, if so

22  where are you employed?  I mean, is that sufficient?  I just

23  don't want to out the location of victims and witnesses.

24          MR. PASSARELLO:  I don't have a problem with saying

25  that.  My concern -- I think the Court can understand my

1    concern.  And all I'm asking for, I just want to know if

2    anybody works at the Comfort Inn.  We can ask where they're

3    employed.  The problem though I have is asking if family

4    members, because it is fact specific.  Say the people at the

5    front desk are the daughter or the niece or the son-in-law of

6    one of the members of the jury.  My concern is they talked to

7    that person.  And I can bring my investigator in if Attorney

8    Haines doesn't believe what I'm saying as to what that person

9    at the front desk told my investigator.  She knew all about

10   the case.

11            I mean, so that's why I'm asking.  And I don't know

12   if asking generally where they're employed covers the extent

13   of why I asked that question.

14            THE COURT:  So you're concerned that the employee

15   may be someone in the immediate family, but not the juror who

16   was here?

17            MR. PASSARELLO:  That's correct.

18            MS. LARSON:  Doesn't it come out in the questions

19   about have you talked to anybody about the case, do you know

20   anything about the facts?  I mean, we're going to have

21   problems because I've been shocked by the fact that this is in

22   the paper -- the local paper -- every day, and that there's

23   reporters here for a pretrial.  I mean, that's not my

24   experience.  So doesn't that get addressed with the other voir

25   dire questions about what have you heard about this case, have

1    you seen media, have you spoken to any person?

2         THE COURT:  Well, I do ask them whether they have

3    any knowledge about the case or of any of the people involved

4    in the case, that is true.  I am trying to think of a scenario

5    that you should be concerned with what wouldn't be covered by

6    whether they have any knowledge about the case.  I guess the

7    only thing there would be that they might get someone talking

8    to them after the trial starts.  But I always tell them they

9    are not to discuss the trial with anyone, and I have to assume

10   that they follow that instruction.

11        MR. PASSARELLO:  Okay.  Well, my concern is just

12   that, Judge.  Assuming that you're asking members of the jury

13   if they have any knowledge about the case, that's great.  They

14   go home, and daughter says to dad, did you get picked for the

15   jury --

16        THE COURT:  Well, they are supposed to not do that,

17   and I can't follow them home every --

18        MR. PASSARELLO:  I know.

19        THE COURT:  -- night.

20        MR. PASSARELLO:  I know that.

21        THE COURT:  I assume they follow my instructions.

22        MR. PASSARELLO:  I understand.  I would hope that

23   they would.  Okay.  That was the reason.

24        THE COURT:  I was curious about that question.

25        MR. PASSARELLO:  Thank you.

```
1              THE COURT:  Any other issues on the voir dire that
2    either party wants to raise?
3              MS. HAINES:  The United States --
4              MR. PASSARELLO:  They filed a...
5              THE COURT:  I have seen the government's requested
6    questions and I have seen your questions.  What I usually do
7    is I go through them and I put them into a supplemental
8    questionnaire, and the jurors would fill that out.  I don't
9    necessarily use all the questions that you have asked me to
10   use.  But they would fill that out that morning, and then you
11   would get a copy of it and you could ask follow-up questions.
12             MS. HAINES:  And, Judge, actually as we were coming
13   down into court today the United States actually filed a
14   specific response.
15             THE COURT:  I saw that.
16             MS. HAINES:  Okay.  And Number 6 was one of the
17   ones.  And we also opposed 8, 10, 11, and 12 in our responses,
18   our specific reasons why we are opposed to asking those
19   questions as well.
20             THE COURT:  I saw that.  The ones, other than
21   Number 6, I can respond to without any additional argument.
22   But when I saw that question that was a new one on me, so I
23   wanted to ask Mr. Passarello why we were asking that.
24             MR. PASSARELLO:  Just trying to cover all my bases.
25             THE COURT:  My plan for next week is that we will
```

1    pick a jury and then we will send the jury home, and then if

2    we need to address anything else we will have part of that

3    afternoon.  Hopefully we will get the jury picked.  We are

4    calling in an extra 15 jurors, because I am anticipating that

5    a lot of people will have a very difficult time being a juror

6    in a three-week trial because of employment.

7              MR. PASSARELLO:  I know you talked about this

8    before.  Are you selecting four alternates or two?

9              THE COURT:  I have actually decided on three.

10             MR. PASSARELLO:  Okay.

11             THE COURT:  And mainly the reason for that is that

12   the seating is such that I did not want to have the alternates

13   sitting out in front of the jury box.  So there is 14 seats in

14   the jury box, and I can put one chair down at this end.  That

15   gives us 15, and we hopefully won't lose more than three.

16             MR. PASSARELLO:  Okay.

17             THE COURT:  My experience here is that the jurors

18   in this area are pretty hardy people, and they rarely have to

19   be excused from the jury for things.  So occasionally we might

20   lose one or two because of a family emergency or something

21   like that.

22             Three weeks, it's anybody's guess.  I am hoping we

23   don't lose more than three.  But that means you will each get

24   two additional preemptories for the alternates, but those will

25   be from only alternates.

 1              MR. PASSARELLO:  Correct.  Understood.

 2              MS. LARSON:  Okay.

 3              MR. PASSARELLO:  Thank you.

 4              THE COURT:  We will run through that that day.  I

 5    am anticipating we will get a lot of requests for hardship.

 6              MR. PASSARELLO:  I anticipate that as well.

 7              THE COURT:  And normally what I do with those is if

 8    it is really, really severe I probably would grant it,

 9    regardless.  But if it is borderline, I would have them in the

10    pool until the end, and then we would look and see if we have

11    enough.  Then I would ask counsel whether or not you wish to

12    allow these people to be excused.  If we don't have enough,

13    then just proceed.

14              MR. PASSARELLO:  And, as I understand it, you ask

15    all the questions.

16              THE COURT:  I ask them all the questions.  However,

17    the questions on the questionnaires, based on what the

18    response is, I will call them up here and you can follow up on

19    those.

20              MR. PASSARELLO:  I understand.

21              THE COURT:  I anticipate it being fairly lengthy,

22    because of the length of the trial.  I am calling 70, so if we

23    get 65 that should be enough to get us through.  If we have

24    65, then we can have well over 20 cause challenges and still

25    be fine.

```
 1              MR. PASSARELLO:  We can do like some judges and
 2   pull them out of Wal-Mart.  Go get the sheriffs and pull them
 3   out of Wal-Mart.
 4              THE COURT:  Well, if we don't finish on Tuesday --
 5   and I hope we do -- we have the option of calling more in on
 6   Wednesday and finishing it.
 7              MR. PASSARELLO:  And then Tuesday morning we're
 8   starting promptly at 9 or 8?
 9              THE COURT:  The jurors report on Tuesday at 8:30.
10              MR. PASSARELLO:  Okay.
11              THE COURT:  We usually start the questioning about
12   10 or 10:15 because it takes that long to get the
13   questionnaires filled out, copied, and then I give you time to
14   read them.
15              MR. PASSARELLO:  Okay.
16              MS. LARSON:  Thank you.
17              MR. PASSARELLO:  Thank you, Judge.
18              THE COURT:  All right.
19              (The following proceedings were held in open
20   court:)
21              THE COURT:  Other than the pending motions which I
22   am aware of, are there any other issues for the Court today
23   that we need to address?
24              MR. PASSARELLO:  Nothing from the defense, Your
25   Honor.
```

 1              MS. LARSON:  No, Judge.

 2              THE COURT:  All right.  Are you all familiar with

 3    the courtroom technology here and how to operate everything,

 4    or would you rather have someone give you a brief tutorial on

 5    how it works?

 6              MR. PASSARELLO:  I know your prior law clerk gave

 7    me a brief tutorial.  I'm an old guy, so Dan's probably

 8    better.  If we can have someone just give him a quick tour.

 9              THE COURT:  We can do that today, if you wish to.

10    I know that Attorney Haines is in here frequently enough that

11    she probably doesn't need it.

12              Whenever the training fellow comes into Johnstown I

13    always sit in again, because I have forgotten something

14    between the last time and the current date.  So Stephanie --

15    not Stephanie Haines but Stephanie Savino, my law clerk -- can

16    come in after we are done and give you a brief run-through on

17    how the system works, and also Kimberly Spangler is pretty

18    familiar with it.

19              Anything other than that?

20              MS. LARSON:  I don't believe so, Judge.

21              THE COURT:  Well, thank you.  We will prepare an

22    opinion on this and file it tomorrow, and I am hoping to get

23    the decision on at least one of the other motions done first

24    thing in the morning.  We will try to get to the other ones,

25    assuming you file your responses tonight, Attorney Passarello,

 1   we will try to work on those tomorrow.

 2              MR. PASSARELLO:  I'll get them done tonight.

 3   Thanks.

 4              THE COURT:  Thank you, all.  Your presentation was

 5   a help in my understanding this, and we will file a decision

 6   tomorrow.

 7              MR. PASSARELLO:  Thank you.

 8              THE COURT:  We will be in recess until call of

 9   Court.

10              (Proceedings concluded at 2:47 p.m.)

11                             *  *  *

12

13              CERTIFICATE OF OFFICIAL REPORTER

14     I, Kimberly K. Spangler, Federal Official Court Reporter,
     in and for the United States District Court for the Western
15   District of Pennsylvania, do hereby certify that pursuant to
     Section 753, Title 28, United States Code, that the foregoing
16   is a true and correct transcript of the stenographically
     reported proceedings held in the above-entitled matter, and
17   that the transcript page format is in conformance with the
     regulations of the Judicial Conference of the United States.

18                   Dated this _____ day of _____ 2015

19

20

21     _____
       KIMBERLY RUSHLOW SPANGLER, RPR, RMR
22     FEDERAL OFFICIAL COURT REPORTER

23

24

25